UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK GALLAGHER,<br><br>      Plaintiff,<br><br>   v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>      Defendants. | Case No. 23-cv-03579-SI<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPL.AINT; SCHEDULING INITIAL CASE MANAGEMENT CONFERENCE FOR MARCH 1, 2024 AT 2:30 P.M.**<br><br>Re: Dkt. No. 29 |

On February 9, 2024, the Court held a hearing on defendants' motion to dismiss the second amended complaint. For the reasons set forth below, the motion is GRANTED as to the state law claims, which are dismissed without prejudice, and DENIED as to the fourth cause of action under 42 U.S.C. § 1983. The Court schedules an initial case management conference for March 1, 2024 at 2:30 p.m. to be held via zoom.

**BACKGROUND**

**I.   Factual Background**

Plaintiff Patrick Gallagher is a "veteran in the construction industry" with over 45 years of experience. Second Amended Compl. ("SAC") ¶ 1. Gallagher brings this case "individually and as trustee for the Madison Trust FBO Patrick Gallagher." *Id.* ¶ 9. In 2018, Gallagher, through his trust, purchased a single family home located at 200 Naples Street in San Francisco with the intention of renovating and selling it. *Id*. ¶¶ 1, 28.

Gallagher alleges that once he began renovations, he became a victim of a "pay to play fraud" perpetrated by San Francisco City building inspectors, planners, and the City, and that "after he refused to participate" in the scheme and spoke to the FBI, the City and its employees retaliated against him by "issuing and refusing to release frivolous code enforcement liens, issuing and refusing to release notices of violation, issuing and refusing to release abatement orders, revoking permits, and revoking a certificate of completion." *Id.* ¶ 4. Gallagher claims that these retaliatory actions have caused the property to fall out of escrow three times and that the City's actions have amounted to an "unjustified taking." *Id.* Gallagher has sued the City and County of San Francisco, ("the City"), four current and former building inspectors with the San Francisco Department of Building Inspection ("SFDBI") (Bernard Curran, Joe Duffy, Kevin Birmingham, and Mauricio Hernandez), two employees of the San Francisco Planning Department (William Hughen and Natalia Kwaitkowska), and a structural engineer who had been a former City employee (Rodrigo Santos).

Gallagher alleges that Building Inspector Bernard Curran told him that he needed to obtain a permit from the City in order to begin renovations, and that he needed to hire structural engineer Rodrigo Santos in order to obtain the permit. *Id.* ¶ 31. Even though Gallagher believed a structural engineer was not required for the renovations, Gallagher hired Santos. *Id.* Gallagher alleges that Santos continually delayed the project, and that after Gallagher had paid Santos $13,000 "for work that was essentially useless," he fired Santos and hired a different structural engineer who completed the work in two weeks and at a fraction of the cost charged by Santos. *Id.* ¶ 32. Gallagher received the permit from the City in June 2019, and he began the main renovation process. *Id.* ¶ 33. In August 2020, the project was complete and Curran issued Gallagher a signed certificate of completion. *Id.* ¶ 34. Around May 2021, Gallagher entered into an agreement to sell the property and it went into escrow. *Id.* ¶ 35.

At about the same time, the FBI contacted Gallagher about an investigation the agency was conducting into Curran and Santos about an illegal "pay to play" scheme. *Id.* ¶¶ 36-37.[1] Curran

---

[1] In 2021, following an investigation by the FBI, Curran and Santos were federally indicted, and in 2023, both men pled guilty. Curran pled guilty to accepting illegal gratuities in violation of

was forced to resign from SFDBI as a result of the investigation. *Id*. ¶ 37. Building Inspectors Duffy, Birmingham, and Hernandez, and City Planners Hughen and Kwaitkowska, were "close associates" of Curran and Santos, and they "became aware and/or were under the belief" that Gallagher had spoken to the FBI about Curran and Santos. *Id.* ¶ 38. Gallagher claims that SFDBI began retaliating against him when, approximately four days before escrow was scheduled to close on the property, SFDBI issued a notice of violation for an expired permit and an illegal downstairs unit. *Id.* ¶ 39. SFDBI "falsely claimed that the certificate of completion that Curran signed never got filed correctly and was now void" and that the entire property would need to be reinspected and approved. *Id.* Escrow did not close and the sale of the property fell through. *Id.*

Building Inspectors Birmingham and Hernandez reinspected the property and issued a notice of violation about windows on the second floor that had been in existence since the house was built and that "had already been approved twice." *Id*. ¶ 41. They also told Gallagher that he needed to submit an application for an additional dwelling unit and revise the plans for the property to reflect more accurately how the stairs were built. *Id.* During this inspection, Hernandez "sneered at Plaintiff, telling him, 'we know who you've been talking to.'" *Id.* Gallagher "had no choice but to comply with SFDBI's demands related to these unfound[ed] violations and submitted his applications and revised plans accordingly." *Id.* ¶ 42. Without cause, Birmingham then rejected the application related to the second floor windows, now demanding that the windows needed to be closed off completely. *Id.* ¶ 43.

Gallagher contacted the San Francisco Board of Supervisors for help, and the Board facilitated a meeting between Gallagher and SFDBI. *Id.* ¶ 44. At that meeting, Gallagher "presented evidence showing that the subject property had already received a certificate of completion and that the recent demands of SFDBI were unreasonable and excessive." *Id.* ¶ 45. "SFDBI dismissed Plaintiff's concerns and ignored the validity of his claims, refusing to approve his plans or his applications." *Id.* During the meeting, Duffy also "expressed that he had no doubt that Plaintiff had

---

18 U.S.C. § 666 and Santos pled guilty to honest services wire fraud in violation of 18 U.S.C. §§ 1343, 1346. Both men have been sentenced and are currently incarcerated. This Court presided over the related criminal cases.

3

1    spoken to the FBI concerning his dealings with Curran and Santos." *Id.*  Gallagher had "no choice
2    but to comply with SFDBI's demands" and he closed off the second floor windows, spending
3    $30,000 for the additional work. *Id.* ¶ 48.

4        In October 2021, approval of Gallagher's application for an additional dwelling unit was
5    transferred to Senior Planner Hughen. *Id.* ¶ 49.  Hughen, and then Principal Planner Kwaitkowska,
6    "egregiously delayed the application for months on end, forcing Plaintiff to jump over more arbitrary
7    hurdles." *Id.*  While Gallagher's application for an additional dwelling unit was pending, Hughen
8    "placed yet another baseless roadblock" in front of Gallagher:  a citation that the driveway on the
9    property was out of code and could not be used for off-street parking. *Id.* ¶ 50.  Gallagher claims
10   that the driveway had been in existence since the property was built and "had already been
11   approved," and that not being able to use the driveway for parking "would place a significant
12   limitation on the property and greatly affect its overall value." *Id.*  Gallagher contacted the City
13   Attorney's Office and provided Hughen with the applicable laws and ordinances showing that the
14   driveway was code compliant. *Id.*  Hughen "dismissed Plaintiff's pleas and demanded that he now
15   apply for a variance." *Id*.  Gallagher had "no choice" but to apply for a variance.  His applications
16   for the variance and the additional dwelling unit were approved in May 2022, and Gallagher
17   received the necessary permits. *Id*. ¶ 51.

18       Around this time, Gallagher entered into another agreement to sell the property and entered
19   into escrow. *Id*. ¶ 52.  Gallagher had not received a new certificate of completion, which negatively
20   affected the sale price, but Gallagher needed to sell the property and was "willing to do so at a
21   discount." *Id*.

22       In July of 2022, while the property was still in escrow, SFDBI informed Gallagher that his
23   permits for the additional dwelling unit and the driveway were being revoked. *Id*. ¶ 53.  SFDBI
24   "falsely claimed that the City's Planning Department had mistakenly provided him these permits
25   and that he needed approval from SFDBI as it was within their purview." *Id*.  Gallagher was told
26   he needed to submit new applications and new revised plans, and that he needed to go through the
27   entire process again. *Id*.  The sale of the property fell through a second time. *Id*.

28       Approximately six months later in January 2023, "after another long, arbitrary, and arduous

1    process," the City issued new permits for the additional dwelling unit and the driveway.  *Id*. ¶ 54.
2    Additional inspections were required in order to obtain a final certificate of completion, and
3    "[a]lthough Plaintiff possesses valid permits, inspections have led to new, unfound, and vindictive
4    violations concerning, among other things, the legality of the windows located on the first floor of
5    the property."  *Id*. ¶ 55.

6          In February 2023, Gallagher entered into another agreement to sell the property, again at a
7    discount because he lacked a certificate of completion.  *Id*. ¶ 56.  "Due to the numerous abatements
8    and notices of violation that remain on the property, the sale fell through in or around August 2023."
9    *Id*.  Gallagher claims that the City has intentionally and vindictively drawn out the renovation
10   process, and that as a result, he has lost a significant amount of money in lost profits, lost income,
11   lost interest, expenditures for unnecessary repairs, and increased taxes, and he has suffered severe
12   emotional distress, and irreparable harm to his reputation.  *Id*. ¶ 57.

13         The second amended complaint alleges seven causes of action against all defendants, except
14   the second cause of action which is alleged only against the City:  (1)  slander of title; (2) inverse
15   condemnation; (3) intentional interference with prospective economic relations; (4) violation of civil
16   rights, 42 U.S.C. § 1983; (5) intentional infliction of emotional distress; (6) negligence; and (7)
17   declaratory relief.  Gallagher seeks various forms of damages, injunctive and declaratory relief, and
18   attorneys' fees.

19

20   **II.**   **Procedural Background**

21         This case was originally filed in San Francisco Superior Court in March 2023.  On July 17,
22   2023, the City removed this case from state court on the basis of federal question jurisdiction,
23   namely the addition of the fourth cause of action in the first amended complaint alleging a cause of
24   action under 42 U.S.C. § 1983 for violation of Gallagher's First and Fourteenth Amendment rights.
25         On July 26, 2023, the City filed a motion to dismiss the first amended complaint.  The Court
26   granted that motion, finding that the *Monell* allegations were insufficient, and granted leave to
27   amend.  On November 9, 2023, Gallagher filed the SAC, adding allegations discussed *infra* about
28   Duffy's role as a final policymaker and his ratification of retaliatory acts, as well information about

1    another retaliation lawsuit brought against the City and Hernandez. The City and the individual
2    defendants who have been served (Duffy, Birmingham, Hernandez, Hughen and Kwaitkowska)
3    have moved to dismiss the SAC.[2]

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

---

[2] As of the filing date of this order, neither Curran nor Santos have been served. At the hearing, Gallagher's counsel stated that they were attempting to serve these defendants through their criminal counsel.

# DISCUSSION

## III. 42 U.S.C. 1983 Retaliation

### A. *Monell* Claim against the City

Local governments are "persons" subject to liability under 42 U.S.C. § 1983 where official policy or custom causes a constitutional tort, *see Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978); however, a city or county may not be held vicariously liable for the unconstitutional acts of its employees under the theory of *respondeat superior. See Board of Cty. Comm'rs. of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997); *Monell*, 436 U.S. at 691; *Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995). To impose municipal liability under § 1983 for a violation of constitutional rights resulting from governmental inaction or omission, a plaintiff must show: "(1) that he possessed a constitutional right of which he or she was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional rights; and (4) that the policy is the moving force behind the constitutional violation." *Oviatt By and Through Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (internal quotation marks omitted). To establish an official policy that would give rise to *Monell* liability, a plaintiff must allege facts to support one of the following to survive dismissal of its claim: (1) an unconstitutional custom or policy behind the violation of rights; (2) a deliberately indifferent omission, such as a failure to train or failure to have a needed policy; or (3) a final policy maker's involvement in, or ratification of, the conduct underlying the violation of rights. *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir. 2010) (synthesizing authorities), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

Gallagher seeks to hold the City liable under a custom and policy theory as well as Duffy's involvement as a final policymaker and ratification. On custom and policy, the SAC alleges,

> The City has a pattern, custom, and/or practice of retaliatory conduct against those who speak out against wrongful and illegal actions. Namely, much like the facts in this case, a City Planning Commissioner, who also owned an investment property in San Francisco, recently filed suit alleging that he was retaliated against by SFDBI employees after making complaints and speaking out against its pay-to-play scheme and corrupt practices. The Commissioner alleged that after he called on the City Attorney to conduct an investigation, SFDBI employees riddled the Commissioner's

7

> property with erroneous complaints, unnecessary inspections, unwarranted notices of violation, and revoked nine (9) permits, all related to completed work that had already been approved, permitted, and inspected by SFDBI. The retaliation caused the value of the Commissioner's property to depreciate and caused other significant damages. The Commissioner named Defendant Mauricio Hernandez ("Hernandez"), a SFDBI Building Inspector, as a defendant in his case, alleging that he was one of the employees who retaliated against him. The Commissioner settled his case against the City for $1.8 Million dollars.

SAC ¶ 5. Gallagher also alleges that Duffy, as SFDBI's Deputy Director, was in charge of and had complete oversight over SFDBI, that he was a final policymaker, and that "[a]ll of the wrongful conduct complained of herein including, without limitation, issuing and refusing to release frivolous code enforcement liens, issuing and refusing to release notices of violation, issuing and refusing to release abatement orders, revoking permits, and revoking a valid certificate of completion, was at the behest and/or endorsement of Duffy." *Id.* ¶ 46; *see also id.* ¶ 47 (listing Duffy's job duties and responsibilities).

The City contends that these allegations are insufficient to state a *Monell* claim. Considering these allegations along with the other allegations of the SAC, the Court finds that Gallagher has alleged enough to state a claim against the City. While it is correct that "isolated" incidents of unconstitutional conduct do not constitute a municipal policy and custom, the additional detail regarding the other recent retaliation lawsuit, combined with the allegations of Gallagher's own experiences with SFDBI, allege a pattern of numerous unnecessary inspections and unwarranted notices of violations, and the revocation of many permits related to completed work that had been previously approved, all related to alleged retaliation after the property owner complained about corruption at SFDBI.

In addition, the Court finds that the new allegations about Duffy's role and his job responsibilities, as well as Duffy's personal involvement in the meeting with Gallagher and the Board of Supervisors, are sufficient to proceed on the theory that Duffy is a final policy maker who was involved in and/or ratified unconstitutional conduct. The City argues that the SAC fails to allege that Duffy had knowledge of the unconstitutional conduct and that he approved it. However, the SAC alleges that after the retaliation began and Hernandez and Birmingham revoked permits and required additional work, Gallagher met with Duffy and "presented evidence showing that the subject property had already received a certificate of completion and that the recent demands of

8

SFDBI were unreasonable and excessive." SAC ¶ 45. Gallagher alleges that SFDBI (presumably Duffy) dismissed his concerns and that Duffy "expressed that he had no doubt that Plaintiff had spoken to the FBI concerning his dealings with Curran and Santos." *Id.* These allegations are sufficient, as a pleading matter, to show that Duffy was involved in and/or ratified unconstitutional conduct.

The City also argues that the allegations about Hughen and Kwiatkowska cannot be considered for the *Monell* claim because they are (or were) Planning Department employees, not Building Inspectors. The SAC suggests that there was some degree of coordination between SFDBI and the Planning Department, with the transfer of Gallagher's application for an additional dwelling unit from SFBI and the Planning Department in October 2021, and the review by both departments of Gallagher's application. SAC ¶¶ 49-51, 53-54. Whether Hughen and Kwiatkowska's allegedly retaliatory acts are in fact part of a pattern or practice of retaliation at the City is a factual matter that will be resolved on a full factual record.

### B. Individual Defendants

To bring a claim for First Amendment retaliation under § 1983, a plaintiff must allege: (1) they engaged in constitutionally protected activity; (2) as a result, they were subjected to adverse action by defendants that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action. *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010).

Defendants contend that the SAC fails to state a claim against any of the individual defendants. Defendants argue that Gallagher has failed to allege causation, and that it is not enough to show retaliatory motive and injury, but that he must show the injury would not have happened without the retaliation. Defendants rely on *Nieves v. Bartlett*, in which the Supreme Court held in the context of a First Amendment retaliation claim involving an arrest, that "[t]he plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." *Nieves v. Bartlett*, 587 U.S. ___, 139 S. Ct. 1715, 1724 (2019). The Court found that "probable cause

speaks to the objective reasonableness of an arrest" and that "its absence will . . . generally provide weighty evidence that the officer's animus caused the arrest, whereas the presence of probable cause will suggest the opposite." *Id*. The Court instructed that "when reviewing an arrest, we ask 'whether the circumstances, viewed objectively, justify [the challenged] action,' and if so, conclude 'that action was reasonable *whatever* the subjective intent motivating the relevant officials.'" *Id*. at 1725 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (emphasis in original)).

The Court also recognized a "narrow" exception to this rule: "Although probable cause should generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id*. at 1727. "[T]he no-probable cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id*. The Court provided the example of jaywalking, which "is endemic but rarely results in arrest." *Id*. "If an individual who has been vocally complaining about police conduct is arrested for jaywalking at such an intersection, it would seem insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest." *Id.*; *see also Henneberry v. City of Newark*, Case No. 13-cv-05238-TSH, 2019 WL 4194275, at *7 (N.D. Cal. Sept. 4, 2019) (holding *Nieves* exception could apply where the plaintiff actively criticized city officials for years and was arrested for trespassing at private function involving the city, where there was no evidence the plaintiff was loud, confrontational or abusive and the plaintiff submitted evidence that police rarely arrest individuals for trespassing).

Here, Gallagher alleges that he received the necessary permits and received a certificate of completion for the renovations, but that after he spoke to the FBI about corruption at SFDBI – a fact of which the individual defendants were aware – the individual defendants began retaliating against him by revoking the certificate of completion, issuing notices of violation and requiring further work. The SAC also alleges that the permit denials and notices of violation and abatement were without cause. The Court finds that these allegations of causation are sufficient as a pleading matter, and whether Gallagher can prove causation is a factual matter to be explored in discovery.

**IV.     State Law Claims**

The SAC alleges the following state law causes of action: (1) slander of title; (2) inverse condemnation; (3) intentional interference with prospective economic relations;[3] (5) intentional infliction of emotional distress; (6) negligence; and (7) declaratory relief. Defendants contend that the state law claims are subject to dismissal on numerous independent grounds.

Defendants argue that because "the permits and notices of violation are still pending with SFDBI and Planning," Gallagher's state law claims are not ripe. Relatedly, defendants argue that Gallagher is required to pursue his administrative remedies to challenge the notices of abatement and violations and permit issues by seeking administrative review of each decision (or conditions placed on them) to the San Francisco Board of Appeals. *See* S.F. Charter § 4.106 (general jurisdiction of the Board of Appeals); S.F. Bus. & Tax Regs. Code Article 1, § 8(e)(2) (appealing decisions of Department of Building Inspection); S.F. Building Code § 105A2 (appealing order of abatement to Abatement Appeals Board). Defendants assert that once Gallagher receives a final administrative order, the proper method for judicial review is by seeking a writ of mandate pursuant to California Code of Civil Procedure § 1094.5(a) ("Review of administrative orders or decisions").

The Court agrees with defendants that to the extent Gallagher seeks relief regarding the City "issuing and refusing to release frivolous code enforcement liens, issuing and refusing to release notices of violation, issuing and refusing to release abatement orders, revoking permits, and revoking a certificate of completion," SAC ¶ 4, he is required to seek administrative review and then a writ of mandate pursuant to California Code of Civil Procedure § 1094.5. Courts have held that San Francisco's municipal codes vest administrative agencies with broad discretion to decide whether and on what conditions an applicant will be granted a permit, and that applicants must pursue administrative remedies prior to seeking judicial review of permit denials and related code enforcement decisions. *See, e.g., Martin v. City & Cnty. of San Francisco*, 135 Cal. App. 4th 392, 400 (2005) ("It would do violence to the language and history of section 26[4] for a court to usurp the

---

[3] The fourth cause of action is the § 1983 retaliation claim.

[4] Section 26 of San Francisco Business and Tax Regulations Code provides, in relevant part,

1  City's discretion by concluding in advance of administrative review that, as a matter of law, a
2  particular permit application will not have an adverse effect on the public health, safety or general
3  welfare. Absent the exercise of section 26 administrative discretion, the issue of the limits of the
4  City's section 26 powers over Martin's project is not ripe for judicial resolution."); *see also*
5  *Guinnane v. San Francisco City Planning Com.*, 209 Cal. App. 3d 732, 735, 736-40 (1989)
6  (discussing authority of City administrative tribunals and affirming denial of administrative
7  mandamus action and noting earlier procedural history in which the court had held the plaintiff's
8  inverse condemnation claim "was premature . . . [and that] the appropriate remedy for the denial of
9  the requested building permit was an administrative mandamus action.").

10  Gallagher argues that his state law claims are premised on "multiple allegations" including
11  "multiple instances of fraud; threats; harassment; retaliation; wrongful conduct; false claims;
12  intentional delays; the discharge of and refusal to release numerous unfound, frivolous, and
13  vindictive notices of violation, abatement orders, and enforcement liens; revocation of valid permits;
14  and, notably, the revocation of a valid certificate of completion." Opp'n at 14. However, Gallagher
15  does not allege in the SAC or state in his opposition any facts about alleged fraud, threats,
16  harassment, retaliation, wrongful conduct, false claims or intentional delays aside from the permit
17  denials, abatement orders, etc., and Gallagher concedes that his state law claims are premised, at

---

(a)  Subject to subsection (b), in the granting or denying of any permit, or the revoking or the refusing to revoke any permit, the granting or revoking power may take into consideration the effect of the proposed business or calling upon surrounding property and upon its residents, and inhabitants thereof; and in granting or denying said permit, or revoking or refusing to revoke a permit, may exercise its sound discretion as to whether said permit should be granted, transferred, denied, or revoked.

(b)  In the granting or denying of any permit, or the revoking or the refusing to revoke any permit with respect to a "dwelling" in which "protected class members" are likely to reside (each as defined in Administrative Code Chapter 87), the granting or revoking power shall comply with the requirements of San Francisco Administrative Code Chapter 87 which requires, among other things, that the granting or revoking power not base any decision regarding the development of "dwellings" in which "protected class" members are likely to reside on information which may be discriminatory to any member of a "protected class" (As all such terms are defined in San Francisco Administrative Code Chapter 87).

S.F. Bus. & Tax Regs. Code Art. 1, § 26(a)-(b).

12

1   least in large part, on the contention that the various permit denials, abatement orders etc. were
2   erroneous.
3         Gallagher also argues that he sought administrative review by requesting assistance from the
4   Board of Supervisors, who then facilitated a meeting between Gallagher and SFDBI, and that the
5   results of that meeting demonstrate that any further administrative review would be futile. Gallagher
6   does not cite any authority for the proposition that seeking assistance from the Board of Supervisors
7   satisfies the administrative review requirement, and to the contrary, the City's municipal code
8   explicitly lays out the process for administrative review to challenge decisions by SFDBI and the
9   Planning Department.
10        Gallagher also has not demonstrated that administrative review would be futile. "The futility
11  exception to the ripeness doctrine relieves a developer from submitting 'multiple applications when
12  the manner in which the first application was rejected makes it clear that no project will be
13  approved.'" *Milagra Ridge Partners, Ltd. v. City of Pacifica*, 62 Cal. App. 4th 108, 120 (1998)
14  (quoting *Southern Pacific v. City of Los Angeles*, 922 F.2d 498, 504 (9th Cir. 1990). "'When the
15  regulatory authority has 'drawn the line, clearly and emphatically,' as to the permissible use of the
16  property, the developer is not required to submit additional development applications." *Id.* (quoting
17  *Hoehne v. County of San Benito*, 870 F.2d 529, 533 (9th Cir. 1989)); *see also Sea & Sage Audubon
18  Soc., Inc. v. Planning Com.*, 34 Cal. 3d 412, 418 (holding exhaustion of administrative remedies is
19  required "unless the petitioner can positively state that the commission has declared what its ruling
20  will be in a particular case"). "The exception is narrowly construed and the burden of establishing
21  it lies with the developer." *Id*. Gallagher does not allege that the relevant administrative bodies
22  have declared what their rulings would be if he were to challenge the various permit denials and
23  notices at issue.
24        At the hearing on this motion, Gallagher's counsel stated that Gallagher had filed some
25  appeals of denials but had not sought administrative review of many of the denials and notices
26  mentioned in the SAC, and he stated that Gallagher had not sought judicial review through a writ of
27  mandate pursuant to California Code of Civil Procedure § 1094.5. Thus, the record before the Court
28  shows that Gallagher has not exhausted his administrative or judicial remedies, and accordingly, the

13

state law claims are DISMISSED WITHOUT PREJUDICE. Further, the Court finds that Gallagher's state law claims raise complex issues of state law, and thus to the extent that any state law claims are not subject to administrative exhaustion, the Court declines supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367(c)(1).

## CONCLUSION

For the reasons set forth above, the Court DENIES defendants' motion to dismiss the fourth cause of action under 42 U.S.C. § 1983 and GRANTS defendants' motion to dismiss the state law claims. Those claims are DISMISSED WITHOUT PREJUDICE. An initial case management conference is scheduled for March 1, 2024 at 2:30 p.m.

**IT IS SO ORDERED**.

Dated: February 9, 2024

SUSAN ILLSTON
United States District Judge