1  DAVID CHIU, State Bar #189542
   City Attorney
2  JENNIFER E. CHOI, State Bar #184058
   Chief Trial Deputy
3  HUNTER W. SIMS III, State Bar #266039
   Deputy City Attorney
4  Fox Plaza
   1390 Market Street, Sixth Floor
5  San Francisco, California 94102-5408
   Telephone:    (415) 554-4259
6  Facsimile:    (415) 554-3837
   E-Mail:       hunter.sims@sfcityatty.org
7
8  Attorneys for Defendants
   CITY AND COUNTY OF SAN FRANCISCO;
9  WILLIAM HUGHEN; KEVIN BIRMINGHAM; NATALIA FOSSI
   (ERRONEOUSLY SUED AS NATALIA KWAITKOWSKA);
10 MAURICIO HERNANDEZ; and JOE DUFFY

11

12                 UNITED STATES DISTRICT COURT

13               NORTHERN DISTRICT OF CALIFORNIA

14 PATRICK GALLAGHER,                    Case No. 23-cv-03579-SI (JCS)

15         Plaintiff,                    **DEFENDANTS CITY AND COUNTY OF SAN FRANCISCO, WILLIAM HUGHEN, KEVIN BIRMINGHAM, NATALIA FOSSI, MAURICIO HERNANDEZ AND JOE DUFFY'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT (Fed. R. Civ. P. 56)**

16         vs.

17 CITY AND COUNTY OF SAN
   FRANCISCO, BERNARD CURRAN,
18 RODRIGO SANTOS, WILLIAM HUGHEN,
   KEVIN BIRMINGHAM, NATALIA
19 KWAITKOWSKA, AND JOE DUFFY,

20         Defendant.

21

Hearing Date:    December 5, 2025
Time:            10:00 a.m.
Place:           Videoconference

Trial Date:      February 17, 2026

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................3

NOTICE OF MOTION AND MOTION ...............................................................................6

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................7

INTRODUCTION ..................................................................................................................7

FACTUAL BACKGROUND ................................................................................................8

    I.      PLAINTIFF PURCHASES THE PROPERTY WITH EXISTING NOVS ...........8

    II.     PLAINTIFF OBTAINS BUILDING PERMITS THEN BEGINS WORK THAT
          EXCEEDS THE SCOPE OF THOSE PERMITS AND RESULTS IN
          COMPLAINTS FROM THE PUBLIC..............................................................8

    III.    PLAINTIFF'S RETALIATION CLAIM ..............................................................9

        A.     Plaintiff's DBI Based Retaliation Theory ................................................11

             1.      Evidence Related to Duffy's Supervisorial Liability....................11

             2.      Evidence Related to the Certificate of Completion ......................11

             3.      Evidence Related to NOV 202175602............................................13

        B.     Plaintiff's Planning Based Retaliation Theory .........................................14

SUMMARY JUDGMENT STANDARD...............................................................................16

ARGUMENT ..........................................................................................................................17

    I.      PLAINTIFF'S *MONELL* CLAIM FAILS ..............................................................17

    II.     THE CITY DEFENDANTS DID NOT VIOLATION PLAINITFF'S FIRST
          AMENDMENT RIGHTS ...................................................................................19

        A.     There is no Admissible Evidence that Duffy Directed Any City
             Defendants or Altered the CFC................................................................20

        B.     Hernandez and Birmingham Had Clear Cause to Conduct Enforcement
             at the Property ............................................................................................21

        C.     Fossi and Hughen Had Clear Cause to Require a Variance for Plaintiff's
             Parking ......................................................................................................22

    III.    THE CITY DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ..22

CONCLUSION.......................................................................................................................25

# TABLE OF AUTHORITIES

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986) ..................................................................................16

*Ashcroft v. al-Kidd*
    563 U.S. 731 (2011) ..................................................................................23

*Autotek, Inc. v. Cty. of Sacramento*
    2020 WL 4059564 (E.D. Cal. July 20, 2020) ..............................................19, 23

*Blair v. Bethel Sch. Dist.*
    608 F.3d 540 (9th Cir. 2010) ......................................................................19

*Brosseau v. Haugen*
    543 U.S. 194 (2004) ..................................................................................23

*Butz v. Economou*
    438 U.S. 478 (1978) ..................................................................................23

*Capp v. Cty. of San Diego*
    940 F.3d 1046 (9th Cir. 2019) ....................................................................19

*Christie v. Iopa*
    176 F.3d 1231 (9th Cir. 1999) ....................................................................17

*Gravelet-Blondin v. Shelton*
    728 F.3d 1086 (9th Cir. 2013) ....................................................................17

*Hartman v. Moore*
    547 U.S. 250 (2006) ..................................................................................19

*Haynie v. Cty. of Los Angeles*
    339 F.3d 1071 (9th Cir. 2003) ....................................................................23

*Hunter v. Bryant*
    502 U.S. 224 (1991) ..................................................................................23

*Jett v. Dallas Independent School District*
    491 U.S. 701 (1989) ..................................................................................17

*Johnson v. Feist*
    2020 WL 6121981(C.D. Cal. Sep. 8, 2020) ..................................................21

*LSO, Ltd. v. Stroh*
    205 F.3d 1146 (9th Cir. 2000) ....................................................................23

*Malley v. Briggs*
    475 U.S. 335 (1986) ..................................................................................23

*McMillian v. Monroe Cnty., Ala.*
    520 U.S. 781 (1997)...................................................................................17

*Merrick v. Farmers Ins. Group*
    892 F.2d 1434 (9th Cir. 1990) ..................................................................21

*Monell v. Dep't of Soc. Servs. of City of New York*
    436 U.S. 658 (1978)..................................................................6, 7, 17, 18

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*
    429 U.S. 274 (1977)...................................................................................19

*Mullenix v. Luna*
    577 U.S. 7 (2015)......................................................................................23

*Nieves v. Bartlett*
    139 S. Ct. 1715 (2019)..............................................................................19

*Nunez v. City of Los Angeles*
    147 F.3d 867 (9th Cir. 1998) ....................................................................21

*Pearson v. Callahan*
    555 U.S. 223 (2009)...................................................................................23

*Pembaur v. City of Cincinnati*
    475 U.S. 469 (1986)...................................................................................17

*Rodriguez v. Cnty. of Los Angeles*
    891 F.3d 776 (9th Cir. 2018) ....................................................................17

*Romero v. Kitsap Cty.*
    931 F.2d 624 (9th Cir. 1991) ....................................................................23

*Sanders v. City and Cnty. of San Francisco*
    226 Fed. Appx. 687 (9th Cir. 2007)..........................................................21

*Saucier v. Katz*
    533 U.S. 194 (2001)............................................................................22, 23

*Schmid v. Cnty. of Sonoma by & through Permit & Res. Mgmt. Dept.*
    2024 WL 743774 (9th Cir. Feb. 23, 2024) ...............................................18

*Scott v. Harris*
    550 U.S. 372 (2007)...................................................................................16

*Weiner v. San Diego Cnty.*
    210 F.3d 1025 (9th Cir. 2000) ..................................................................17

*White v. Pauly*
    137 S. Ct. 548 (2017).................................................................................23

*Zahra v. Town of Southold*
   48 F.3d 674 (2d Cir. 1995) .................................................................................................24

**Federal Statutes**
42 U.S.C. §1983 ...........................................................................................................7, 17

**San Francisco Statutes, Codes & Ordinances**
San Francisco Building Code § 104A.2.1 ..........................................................................24

San Francisco Building Code § 104A.2.11.1.2 ..................................................................18

San Francisco Building Code § 106A.4.5 ..........................................................................24

San Francisco Charter § 4.106 ...........................................................................................18

San Francisco Charter § 4.121 .....................................................................................17, 18

San Francisco Planning Code § 134 .............................................................................15, 22

San Francisco Planning Code § 136 .............................................................................15, 22

San Francisco Planning Code § 176 ..................................................................................24

**Rules**
Federal Rule of Civil Procedure 56 ...................................................................................16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

**TO PLAINTIFF AND THEIR COUNSEL OF RECORD**:

**PLEASE TAKE NOTICE** that on December 5, 2025, at 10:00 a.m., by videoconference, Defendants City and County of San Francisco (the "City"), William Hughen, Kevin Birmingham, Natalia Fossi (formerly Kwaitkowska), Joe Duffy and Mauricio Hernandez ("City Defendants") (collectively "Defendants") will and hereby do move the Court for summary judgment under Federal Rule of Civil Procedure 56 on all claims for relief contained in the Second Amended Complaint ("SAC") in this action. Defendants base this motion on the following grounds:

The sole Cause of Action in Plaintiff's SAC alleging a violation of the First Amendment fails as a matter of law and undisputed fact because the City Defendants had probable cause to conduct enforcement at Plaintiff's property at 200 Naples Street, San Francisco, California that was allegedly done in retaliation. Additionally, there is no evidence that any of the City Defendants acted with retaliatory intent, as the undisputed evidence shows that the alleged retaliatory conduct was done pursuant to the San Francisco Building and Planning Codes. Nor has Plaintiff identified any unconstitutional conduct that would satisfy a *Monell* claim. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Even if Plaintiff did so, Duffy is not a final policymaker for purposes of *Monell*. Finally, the City Defendants are entitled to qualified immunity.

Dated:  November 7, 2025

DAVID CHIU
City Attorney
JENNIFER E. CHOI
Chief Trial Deputy
HUNTER W. SIMS III
Deputy City Attorney

By: ___/s/  Hunter W. Sims III_____
HUNTER W. SIMS III

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO;
WILLIAM HUGHEN; KEVIN BIRMINGHAM;
NATALIA FOSSI (ERRONEOUSLY SUED AS
NATALIA KWAITKOWSKA); MAURICIO
HERNANDEZ; and JOE DUFFY

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Plaintiff Patrick Gallagher sues the City and County of San Francisco ("City"), Joe Duffy, the former Deputy Director of the Department of Building Inspection ("DBI"), Kevin Birmingham, a Chief Building Inspector of DBI, Mauricio Hernandez, a Chief Building Inspector of DBI, Natalia Fossi (formerly Kwaitkowska), a Deputy Zoning Administrator at the City's Department of Planning ("Planning Department"), and Wiliam Hughen, a former Planner II with the Flex Team of the Planning Department ("City Defendants") (collectively "Defendants"), alleging of a vast conspiracy on the part of the City Defendants to unnecessarily obstruct and delay his construction project located at 200 Naples Street (the "Property"). Plaintiff's retaliation claims stem from an alleged interview by a Federal Bureau of Investigations ("FBI") agent of Plaintiff as part of an investigation into criminal conduct by Defendants Rodrigo Santos and Bernard Curran. Plaintiff believes the City Defendants retaliated against him for his participation in the FBI investigation because they were work colleagues with Santos and Curran.

Despite Plaintiff's grandiose allegations, the undisputed facts and clear case law show that Plaintiff's constitutional rights were not violated. City agencies received complaints, conducted investigations, and exercised their express statutory power enforce violations of the San Francisco Building and Planning Codes. Plaintiff's claims fail for two reasons. First, Plaintiff's *Monell* claim fails because Duffy was not a final policymaker. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Even if Duffy was a final policymaker, he did not have the authority over Planning Department employees Fossi and Hughen. Second, Plaintiff's retaliation claim fails because he cannot show that Defendants lacked cause to issue Notices of Violation ("NOV") or deny Plaintiff's parking application that was in clear contradiction to the City's Planning Code. Further, the alleged statement that Hernandez knew who Plaintiff was talking to is a stray remark and not actionable under 42 U.S.C. section 1983. This is especially so since Hernandez was unaware Plaintiff spoke with the FBI until this lawsuit and Plaintiff was the only source of his alleged interview.

///

///

# FACTUAL BACKGROUND

## I.    PLAINTIFF PURCHASES THE PROPERTY WITH EXISTING NOVS

Plaintiff is a retired construction professional who previously worked for various construction companies. Declaration of Hunter W. Sims III ("Sims Decl.") Ex. A, Deposition of Plaintiff Patrick Gallagher ("Plaintiff Dep.") 11:24–15:2.) Plaintiff retired in 2010. Plaintiff Dep. 13:1–4. During his career, he had limited experience in residential remodels. Plaintiff Dep. 17:15–20; 25:6–21. Plaintiff worked on three residential projects during the course of his career. *Id*. Notwithstanding, he started a trust shortly before his retirement to renovate residential properties for sale. Plaintiff Dep. 20:7–23:2.

Plaintiff purchased the Property in May 2018. Plaintiff Dep. 24:17–21. At that time, there were two outstanding NOVs at the property. Declaration of Matthew Greene ("Greene Decl.") Exs. A, B. The first NOV, number 201644272, was issued by DBI inspector James Lawrine on September 11, 2017. Greene Decl. Ex. A. NOV number 201644272 was issued due to a dilapidated roof, a lack of weather proofing around the home, and trash in the front yard and was not abated until October 23, 2024. *Id.* The second NOV, number 201721241, was issued by DBI inspector Carl Weaver on January 5, 2018. Greene Decl. Ex. B. NOV number 201721241 was issued due to the Property being unsafe due to a lack of guardrails and weatherization on the rear deck and was not abated until October 24, 2024. *Id.*

## II.    PLAINTIFF OBTAINS BUILDING PERMITS THEN BEGINS WORK THAT EXCEEDS THE SCOPE OF THOSE PERMITS AND RESULTS IN COMPLAINTS FROM THE PUBLIC

Plaintiff obtained two permits with DBI for the Property on the same day, August 10, 2018. Greene Decl. Exs. C, D. The first permit application ("PA") was identified by DBI as number 201808107075. Greene Decl. Ex. C. According to PA number 201808107075, Plaintiff sought to replace the Property's roof and gutters and to abate NOV number 201644272. Greene Decl. Ex. C. The second PA, number 201808107063, was to replace the "kitchen and bath cabinets, paint, drywall, flooring and to comply with violation notice 201721241." Greene Decl. Ex. D.

In short order, Plaintiff was cited by DBI for performing work that was beyond the scope of PAs 201808107075 and 201808107063. DBI Inspector Philip Saunders issued NOV 201895477 on October 3, 2018. Greene Decl., Ex E. NOV 201895477 noted that the Property was undergoing

significant construction that went beyond what was described in PAs 201808107075 and 201808107063. *Id.* The NOV also noted significant amounts of trash in the backyard and that the work conducted at the Property required approval from the San Francisco Planning Department ("Planning"), which had not been given. *Id.* Plaintiff then obtained PA number 201810183586 from DBI on October 25, 2018 to comply with NOV 201895477. Greene Decl. Ex. G. In addition, PA 201810183586 sought to perform structural strengthening at the Property, removing and replacing the floor framing, remove one dormer and add two dormers on each side, and to perform demolition inside the second floor laundry room. *Id.*

Defendant Bernie Curran drafted a Certificate of Final Completion and Occupancy ("CFC") for PA 201810183586 on August 27, 2020. Plaintiff Dep. Ex 10. However, the CFC was registered into the internal DBI system as a "pre-final" inspection. Greene Decl. ¶ 11. Notably, there is no entry for the Certificate of Completion on August 27, 2020 in DBI's internal complaint tracking system. *Id.* Therefore, DBI never recognized the CFC issued by Defendant Curran as valid. *Id.* Even if it were so recognized, the CFC would only cover work associated with PA 201810183586 and not any of the other NOVs or permits associated with the Property. *Id.*

DBI received a number of complaints from the public regarding the manner of construction being performed at the Property that fell short of the need to issue an NOV. For example, DBI received a complaint on November 5, 2018 stating that work was being done at the Property in a "dangerous manner" and without permits. Green Decl. Ex. H. DBI inspectors investigated the complaint and referred the matter to the City's Department of Public Works. *Id.* DBI received a complaint for the Property on November 27, 2018. Greene Decl. Ex. I. That complaint concerned work being performed at the Property throughout the night and that the construction site was untidy. *Id.* The complaint was closed the next day after a DBI investigator was able to confirm the trash at the work site had been substantially removed. *Id.*

## III.    PLAINTIFF'S RETALIATION CLAIM

Plaintiff's retaliation is based on speculation and conjecture and is devoid of any factual basis. The crux of Plaintiff's retaliation claim is that the City Defendants acted in concert to retaliate against him due to his alleged participation in an FBI investigation of Curran and Santos by the FBI. Plaintiff

Dep. 60:4–11; 62:4–13; 64:1–7; *see generally* Second Amended Complaint ("SAC"), Dkt. No. 28. Plaintiff contends that after he spoke with an FBI agent about Defendants Curran and Santos, the "rumor mill" started and since all the City Defendants "work in the same office" they conspired to retaliate against him. *Id.*; Plaintiff Dep. 52:17–53:3; 70:9–71:25; 74:15–21; 88:20–95:23.

Plaintiff alleges the conspiracy was led by Duffy, who he believes is a high ranking DBI employee. Plaintiff Dep. 64:23–71:2. Plaintiff testified of his belief that Duffy directed Birmingham, Hernandez, Hughen, and Fossi to delay Plaintiff's construction project at the Property. Plaintiff Dep. 66:20–67:21. This is partly based on Plaintiff's assumption that Duffy has the authority to direct Planning employees. *Id.* Plaintiff believes that a reason that Duffy retaliated against him "could be" that Plaintiff was speaking with the FBI or that he had a bad reputation. Plaintiff Dep. 153:1–11. Plaintiff does not know when Duffy learned that Plaintiff was interviewed by the FBI, but presumes it was when Defendant Curran was indicted. Plaintiff Dep. 154:9–14.

The alleged conspiracy began in May or June 2021, after Plaintiff spoke with the FBI. Plaintiff's Dep. 134:19–136:4. Plaintiff does not believe there was any retaliation by the City Defendants before his interview with the FBI. *Id.* The alleged conspiracy manifested itself across two City departments—DBI and Planning. Plaintiff alleges employees from both departments took direction from Duffy. Plaintiff either does not believe or does not know whether the alleged retaliation would have occurred without Duffy's involvement. Plaintiff Dep. 69:10–23.

Plaintiff testified that the motivation of the City Defendants to retaliate was because they were "close associates" with Curran. Meaning, the City Defendants "all work in the same office" and that "once a rumor gets circulated in that building … you're sunk." Plaintiff Dep. 70:9–71:25; 74:15–21; 88:20–91:23; 94:23–95:23.

However, there was little to no relationship between the City Defendants, Curran and Santos. Declaration of Joe Duffy ("Duffy Decl.") ¶ 14; Declaration of Kevin Birmingham ("Birmingham Decl.") ¶ 20; Declaration of Mauricio Hernandez ("Hernandez Decl.") ¶ 16; Declaration of Natalia Fossi ("Fossi Decl.") ¶ 18; Declaration of William Hughen ("Hughen Decl.") ¶ 18). Fossi and Hughen did not know Curran at all and did not work with him on the Property, much less have a personal relationship. Fossi Decl., ¶ 18; Hughen Decl. ¶ 18. Similarly, Duffy, Hernandez and Birmingham did

not have a personal relationship with Curran. Duffy Decl. ¶ 14; Birmingham Decl. ¶ 20; Hernandez ¶ 16. Plaintiff concedes that he does not know whether or not Birmingham or Curran are close associates. Plaintiff Dep. 90:16–91:8.

### A.    Plaintiff's DBI Based Retaliation Theory

There are three main categories of retaliation Plaintiff alleges were carried out by DBI. The first is Plaintiff's general allegation that Duffy directed the other City Defendants to delay his project. (Sims Decl. Ex. O ¶¶ 38, 45, 46–47; Plaintiff Dep. 64:23–66:3; 158:1–21.) The second is an allegation that Duffy altered the CFC he received from Curran so that it was "expired." Plaintiff Dep. 155:9–156:3. The third is that Birmingham and Hernandez unreasonably amended an existing NOV, number 202175602, on June 8, 2021. Sims Decl. Ex. O ¶¶ 41, 43. Each category is discussed below.

### 1.    Evidence Related to Duffy's Supervisorial Liability

Plaintiff alleges that a reason that Duffy retaliated against him "could be" that Plaintiff was speaking with the FBI or that he had a bad reputation. Plaintiff Dep. 153:1–11. Plaintiff does not know when Duffy learned that Plaintiff was interviewed by the FBI, but presumes it was when Defendant Curran was indicted. Plaintiff Dep. 154:9–14. Criminal charges were brought against Defendant Curran on August 20, 2021. RJN Ex. T. However, Duffy did not learn that Plaintiff had any connection to the FBI's investigation into Curran until Plaintiff told Duffy. Duffy Decl. ¶ 12.

Duffy never directed either Fossi, Hughen, Birmingham, or Hernandez to retaliate against Plaintiff in any way. Fossi Decl. ¶ 17; Hughen Decl. ¶ 17; Birmingham Decl. ¶ 19; Hernandez Decl. ¶ 15. Duffy never supervised Fossi or Hughen and they never worked with Duffy in any capacity related to the Property. Fossi Decl. ¶ 17; Hughen Decl. ¶ 17; Duffy Decl. ¶ 11.)

### 2.    Evidence Related to the Certificate of Completion

Plaintiff alleges that Duffy altered a CFC he received from Curran from "completed" to noting that the underlying permit for the CFC was "expired." Plaintiff Dep. 155:9–156:3. The CFC Plaintiff alleges was altered was for permit application number 201810183586 signed by Curran on August 27, 2020. Sims Decl. Ex. K. The CFC described the construction as, "To Comply with NOV 201895477. Structural strengthening to include removing + replacing floor framing. Remove 1(E) dormer. Add 2 New dormers on each side. Demo (E) laundry @ 2nd floor." *Id*. The CFC then states that the

"construction described above has been completed and, effective as of the date the building permit was filed." *Id*. The CFC concludes with instructing Plaintiff that "[b]efore making any changes to the structure in the future, please contact the Department of Building Inspection." *Id*.

By way of background, once DBI receives a permit application or a complaint, it creates a data entry system for every permit application and complaint. Green Decl. ¶ 9. Every time a DBI employee works on either a permit application, permit, or complaint, the employee is required to enter a summary of their work into DBI's database. *Id*. When an employee enters information into the database, the employee's name is reflected next to the entry. *Id*. Data entries may not be edited once they are entered into the database. In addition, if another DBI employee updates or supplements the data entry of another DBI employee, that change is reflected in the database. *Id*.

While Curran provided Plaintiff the CFC, it was registered into DBI's tracking system as a "pre-final" inspection. Green Decl. ¶ 19. In fact, DBI's internal tracking system has no entry for August 27, 2020. For these reasons, the CFC Curran provided Plaintiff was never recognized by DBI as a valid CFC. *Id*. Further, even if the CFC had been entered into DBI's system as a "final" inspection, it would have only covered work done to abate NOV 201895477 and not any of the other NOVs outlined above or below. *Id*. Specifically, the CFC would not have abated any NOV occurring after August 27, 2020. *Id*.

Plaintiff's basis for his "alteration" theory is the alleged alteration must have come from someone in a leadership position at DBI and Duffy held a leadership position. Plaintiff Dep. 156:4–17. Plaintiff concedes that his theory is "circumstantial." Plaintiff Dep. 156:18–22; 158:1–6. Plaintiff does not know when Duffy learned he had spoken with the FBI. Plaintiff Dep. 153:1–21. Nonetheless, Plaintiff believes Duffy's part in the retaliation began "because why would he claim [the CFC] never got filed correctly." Plaintiff Dep. 154:15–25.

However, Duffy never changed anything related to Plaintiff's CFC and only learned of its existence from speaking with Plaintiff. Duffy Decl. ¶ 9; Declaration of Mark Langan ("Langan Decl.") ¶ 11, Ex. A. Had Duffy altered how the CFC was entered into DBI system, DBI's internal tracking system would reflect the change. Green Dec. ¶ 9. There is no evidence from DBI's internal tracking

1  system that the CFC had been entered as a "final" inspection by Curran or any other DBI employee.

2  *Id.*; Langan Decl. ¶ 11, Ex. A.

3       **3.**      **Evidence Related to NOV 202175602**

4       DBI inspector Thomas Keane inspected the Property on May 17, 2021. Inspector Keane issued

5  NOV number 202175602. Greene Decl. ¶ 22, Ex. K. The nature of the violation was because the

6  operative permit, number 201810183586, had expired. *Id*.

7       Hernandez was Inspector Kean's supervisor at the time NOV 202175602 was issued.

8  Hernandez Decl. ¶ 4. Hernandez reviewed NOV 202175602 before it was issued by Inspector Keane.

9  *Id.* Once NOV 202175602 was issued, Plaintiff requested to speak with Inspector Keane's supervisor.

10  Hernandez Decl. ¶ 5. In anticipation of speaking with Plaintiff, Hernandez reviewed a Zillow post

11  advertising the Property for sale. Hernandez Decl. ¶ 5. The post listed the Property as two separate

12  units and included photographs that appeared to show the Property having two kitchens. *Id.* The

13  description of the Zillow post was inconsistent with internal DBI records showing the Property as a

14  single family home. *Id.*

15       Hernandez spoke with Plaintiff at some point between May 17 and June 1, 2021. Hernandez

16  Decl. ¶ 6. Hernandez explained DBI's general enforcement process to Plaintiff on the call. *Id.*

17  Hernandez suggested that they meet at the Property to confirm conditions onsite to understand whether

18  or not the construction at the Property was consistent with the approved plans in the underlying permit

19  application, identified as PA 201810183586. *Id.*

20       Hernandez and Inspector Keane met Plaintiff at the Property on June 3, 2021. Hernandez Decl.

21  ¶ 8. Hernandez amended NOV 202175602 on June 8, 2021 to reflect the issues observed during the

22  meeting. Hernandez Decl. ¶ 9; Green Decl. ¶ 23, Ex. L. The issues outlined in amended NOV

23  202175602 included issues with the placement of stairs, windows, ceiling heights, and other issues that

24  were not constructed pursuant to plans and were in violation of San Francisco Building Code sections

25  103A and 106.4.7. *Id.* The issues outlined in amended NOV 202175602 presented serious life-safety

26  issues pertaining to fire safety, emergency access, and tripping hazards. Hernandez Decl. ¶ 10.

27       The next meeting at the Property occurred on January 21, 2022. Hernandez Decl. ¶ 15;

28  Birmingham Decl. ¶¶ 4–15. Birmingham reviewed all active permits for the Property, including PA

201810183586, NOV 202175602, and NOV 201895477 prior to the meeting. *Id*. The conditions at the Property were virtually identical to what Hernandez observed at the June 8, 2021 meeting. Hernandez ¶ 15. Birmingham issued a "Correction Notice and Report" following this meeting to document conditions that were not identified in amended NOV 202175602. Birmingham Decl. ¶ 15, Ex A. The main issue in the Correction Notice and Report were the windows, which presented a significant fire hazard, emergency egress issues, and were inconsistent with documents signed by Plaintiff connected with the approved plans. Birmingham Decl. ¶¶ 11–17, Exs. A, B.

Plaintiff concedes that the issues outlined in amended NOV 202175602 are accurate. Plaintiff Dep. 137:22–145:1. Plaintiff agrees that the stairs leading to the third floor of the Property differed from the submitted plans in the same way that was stated in amended NOV 202175602. Plaintiff Dep. 137:4–138:8. Plaintiff agreed that there were no stairs leading from the first floor to the second floor as noted in amended NOV 202175602. Plaintiff Dep. 138:5–17. Plaintiff agreed that the addition of a mechanical closet for a furnace was not in the approved plans. Plaintiff Dep. 138:18–139:7. Plaintiff agreed the windows had been replaced. Plaintiff Dep. 139:8–11. Plaintiff mostly agreed that he had converted the first floor to an Accessory Dwelling Unit ("ADU") by adding cabinets, installing a "dummy stove," and disclosing that he will help permit the ADU. Plaintiff Dep. 139:12–140:7. Lastly, while Plaintiff quibbles with the method of measurement, he admits that the ceiling heights did not match the plans submitted in PA 201810183586. Plaintiff Dep. 141:5–143:9. He also agrees the City's Building Code requires a ceiling height of at least 7 feet 6 inches. Plaintiff's Dep. 169:14–24.

### B.    Plaintiff's Planning Based Retaliation Theory

Two of the City Defendants, William Hughen and Natalia Fossi, worked at the Planning department during the relevant times at issue here. Plaintiff Dep. 59:10–15; Declaration of William Hughen ("Hughen Decl.") ¶ 1; Declaration of Natalia Fossi ("Fossi Decl.") ¶ 1. At the time of the facts underlying this lawsuit, both Hughen and Fossi were part of a unit in the Planning department called the "Flex Team." (Hughen Decl. ¶¶ 1, 5; Fossi Decl. ¶ 2. This team was a catch-all team focused on smaller projects, with a focus on unit legalization and ADUs within the City. *Id*. Hughen worked as a Planner II and was supervised by Fossi, who was the unit's Principal Planner. Hughen Decl. ¶¶ 1, 6; Fossi Decl. ¶ 7. The Planning Department, and in particular the Flex Team, receives permit

applications from DBI when the submitted plans warrant review by Planning. Hughen Decl. ¶¶ 1, 4–5; Fossi Decl. ¶5.

Hughen was assigned to work on an application, identified as PA 202108096049, on August 26, 2021 from Plaintiff to comply with NOV 202175602. Hughen Decl. ¶ 6; Fossi Decl. ¶ 7.) PA 202108096049 sought to legalize an ADU and add parking to the in the rear yard with the ADU. Hughen Decl. ¶ 7; Fossi Decl. ¶ 6. The Planning issues covered in PA 202108096049 were routine and did not require any meaningful supervision from Fossi. Fossi Decl. ¶ 8.

When Hughen reviewed the plans, he did not have an issue with legalizing the ADU. Hughen Decl. ¶ 8. However, Plaintiff's election to include a proposed curb cut and request to park in the rear yard with the ADU application was in conflict with the Planning Code. *Id.* Specifically, the Planning Code requires the rear yard to be open space per Planning Code sections 134 and 136(c)(30). *Id.* Therefore, adding a curb cut at that location is not something that could be allowed at the permit approval process. *Id.* In this circumstance, a property owner must apply for a variance from the Planning Code. *Id.* Hughen communicated this concern on September 7, 2021 when he provided Plaintiff eleven comments regarding PA 202108096049. Hughen Decl. ¶¶ 9–10, Ex. A. Hughen gave Plaintiff the option of removing the request for parking from the plans, thereby proceeding only with the legalization of the ADU, or applying for a variance from Planning Code sections 134 and 136(c)(30). Hughen Decl. ¶8.

Plaintiff emailed the Zoning Administrator on October 30, 2021 disputing some of Hughen's comments on PA 202108096049. Fossi Decl. ¶ 9, Ex. A. Plaintiff was particularly interested in the determination that Avalon Street is the front of the Property for purposes of Planning's review of PA 202108096049. *Id.* Fossi responded to Plaintiff's email on behalf of the Zoning Administrator on November 1, 2021. *Id.* Fossi told Plaintiff that he could request a formal written determination from the Zoning Administrator if he wished to pursue the matter further. *Id.*

Plaintiff filed a variance request on November 9, 2021. Hughen Decl. ¶ 11; Fossi Decl. ¶ 10; Sims Decl. Ex. P. Plaintiff's ADU permit was placed on hold pending the variance hearing as it was part of the same permit application seeking the disputed parking. Hughen Decl. ¶ 11; Fossi Decl. ¶ 10. Neither Hughen nor Fossi were involved in the variance request in any way. Hughen Decl. ¶ 12; Fossi

Decl. ¶ 11. Specifically, neither Hughen nor Fossi were involved in scheduling the variance hearing. *Id.* Planning denied the variance request on July 27, 2022. Hughen Decl. ¶ 13; Fossi Decl. ¶ 12; Sims Decl. Ex. Q. Plaintiff then appealed the variance decision. Hughen Decl. ¶ 14; Fossi Decl. ¶ 14; Sims Decl. Ex. R. The Board of Appeals denied Plaintiff's appeal on August 30, 2022. Hughen Decl. ¶ 14; Fossi Decl. ¶14; Sims Decl. Ex. S.

Hughen had no further involvement with the project after the Board of Appeals denied Plaintiff's appeal. Hughen Decl. ¶ 15. Fossi, however, assisted Plaintiff in finalizing his ADU permits. Fossi Decl. ¶ 15. She eventually approved Plaintiff's ADU application on November 7, 2022, the same day Plaintiff submitted plans that were consistent with the Board of Appeal's decision. *Id*.

Planning and DBI are different and distinct departments within the City. Hughen Decl. ¶¶ 4,16; Fossi Decl. ¶¶ 4,16. While there is general overlap between the two departments when construction permits are reviewed for approval, Duffy never supervised Hughen or Fossi. Hughen Decl. ¶¶ 4, 16–17; Fossi Decl. ¶¶ 4,16–17. Neither Hughen nor Duffy worked with Joe Duffy in any meaningful capacity connected to their work at the Property. Hughen Decl. ¶ 17; Fossi Decl. ¶17. The same is true for Defendant Curran. Neither Hughen nor Duffy ever worked with Curran at all, much less related to their work at the Property. *Id.* Neither Hughen nor Fossi have socialized with Curran. *Id.* Lastly, Hughen and Fossi only learned that Plaintiff allegedly spoke with the FBI because Plaintiff told them. *Id.* The fact that Plaintiff told Hughen and Fossi that he spoke with the FBI did not affect their review of Plaintiff's application in any way, nor did it cause them to act differently with respect to Plaintiff's ADU application. *Id.*

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). An ostensible factual "dispute" will not bar summary judgment where the purported fact "is blatantly contradicted by the record," i.e., by "a videotape capturing the events in question," because "no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 378–80 (2007)

1

**ARGUMENT**

2

**I.    PLAINTIFF'S *MONELL* CLAIM FAILS**

3      The Court previously interpreted Plaintiff's *Monell* claim as based on a custom and policy

4  theory based on Duffy's role as a final policymaker and ratification. Order Granting in Part Motion to

5  Defendants' Dismiss SAC at 7–9, Dkt. No. 37. The City may be liable under Section 1983 if "the

6  individual who committed the constitutional tort was an official with final policy-making authority or

7  such an official ratified a subordinate's unconstitutional decision or action and the basis for it."

8  *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 802–03 (9th Cir. 2018) (internal quotation marks and

9  citation omitted) (quoting *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013)).

10      The question of policymaking authority is one of state law. *Jett v. Dallas Independent School*

11  *District*, 491 U.S. 701 (1989). But it is not simply a matter of statutory interpretation. Even if state law

12  "simply label[s]" someone as a final policymaker, courts must determine the "actual function" of the

13  official. *McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 786 (1997); *see also Weiner v. San Diego*

14  *Cnty.*, 210 F.3d 1025, 1029 (9th Cir. 2000) (refusing to "blindly accept [the California Supreme

15  Court's] balancing of the different provisions of state law in determining liability under § 1983").

16      The policymaking official must have *final* authority over the relevant policy; it is not enough

17  for the official to simply exercise discretion over the given subject matter. *Pembaur v. City of*

18  *Cincinnati*, 475 U.S. 469, 481–82 (1986) (plurality opinion) ("The fact that a particular official—even

19  a policymaking official—has discretion in the exercise of particular functions does not, without more,

20  give rise to municipal liability based on an exercise of that discretion."); *see also Christie v. Iopa*, 176

21  F.3d 1231, 1238 (9th Cir. 1999) ("[D]elegating discretion is not equivalent to delegating final

22  policymaking authority.").

23      In this case, Plaintiff seeks to hold the City liable for the actions of Duffy, the former Deputy

24  Director of Inspection Services for DBI. As deputy director, Duffy served under DBI's Director, who

25  served under the Building Inspection Commission ("BIC"). *See* S.F. Charter § 4.121 ("The

26  Commission may reverse, affirm, or modify determinations made by the Department of Building

27  Inspection on all permits required for a final certificate of completion."), § D3.750-2 ("The Director of

28  Building Inspection shall be the department head and appointing officer of the Department of Building

Inspection … ."). The BIC, which also constitutes the Abatement Appeals Board, has final policymaking authority over building permits, except for permits appealable to the Planning Commission or Board of Appeals. *See* S.F. Charter § 4.121; S.F. Building Code § 104A.2.11.1.2 (referring any amendments to the Building Code to the BIC).

Here, Plaintiff has not received a final administrative order for the relevant permits NOVs. Dkt. No. 37 at 11. Duffy's decisions can therefore be appealed to the BIC or the Board of Appeals. *See id.*; S.F. Charter § 4.106(b) ("The Board shall hear and determine appeals with respect to any person who has been denied a permit or license, or whose permit or license has been suspended, revoked or withdrawn … except for … a building or demolition permit for a project that has received a permit or license pursuant to a conditional use authorization.").

Duffy's responsibilities and role in the DBI hierarchy resembles that of *Schmid*, where the Ninth Circuit held that the Director of Sonoma County's Permit and Resource Management Department was not the final policymaker for land use policies or permits, because his decisions were appealable to two higher bodies. *Schmid v. Cnty. of Sonoma by & through Permit & Res. Mgmt. Dept*, No. 23-15314, 2024 WL 743774, at *2 (9th Cir. Feb. 23, 2024) (per curiam). Absent a delegation of authority, then, Duffy does not have the requisite final policymaking authority to establish *Monell* liability.

Duffy must be the *final* decisionmaker for permitting and notices of violation in San Francisco for Plaintiff to hold the City/County accountable for his actions. The City's Charter contradicts Plaintiff's conclusory allegation that Duffy "was in charge of and had complete oversight of SFDBI and all its employees," and that he "had the power to approve, deny, and/or overturn any decisions made by SFDBI employees" for the subject property. SAC ¶ 46. Even if this were true, discretion is not enough to find delegation and there is nothing in the record establishing Duffy has been delegated final authority over building inspection policy by the BIC, the Board of Appeals, or the Director of DBI. Therefore, Plaintiff cannot establish *Monell* liability for Duffy's actions.

///

///

///

II.    **THE CITY DEFENDANTS DID NOT VIOLATION PLAINTIFF'S FIRST AMENDMENT RIGHTS**

Plaintiff alleges that the City Defendants retaliated against him for exercising his right to free expression. Specifically, Plaintiff alleges that when DBI and Planning employees retaliated against him by delaying and obstructing his construction project because of his participation in a criminal investigation of Curran and Santos. Dkt. No. 28 ¶ 4, 36-39. Plaintiff's allegations are not true and unsupported by the evidence.

To bring a claim for First Amendment retaliation under Section 1983, "plaintiffs must show: (1) they engaged in constitutionally protected activity; (2) as a result, they were subjected to adverse action by defendants that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Autotek, Inc. v. Cnty. of Sacramento*, No. 2:16-cv-01093-KJM-CKD, 2020 WL 4059564, at *7 (E.D. Cal. July 20, 2020), *aff'd sub nom. Lull v. Cnty. of Sacramento*, No. 20-16599, 2022 WL 171938 (9th Cir. Jan. 19, 2022) (citing *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010)).

Although plaintiffs need not be actually chilled, the alleged retaliation must "chill a person of ordinary firmness from continuing to engage in the protected activity." *Capp v. Cty. of San Diego*, 940 F.3d 1046, 1054 (9th Cir. 2019) (citation omitted). Here, this would require a showing that the enforcement of the Building and Planning Codes would chill a person of ordinary firmness from continuing to engage in protected speech.

Finally, to make a prima facie case plaintiffs must have evidence of causation. The test for causation in the First Amendment context stems from the Supreme Court's decision in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). Plaintiff must do more than simply show retaliatory motive and injury—they must show the injury would have never occurred without retaliation. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) ("It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury"); *see also*, *Hartman v. Moore*, 547 U.S. 250 (2006) (recognizing that although it "may be dishonorable

to act with an unconstitutional motive," an official's "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway").

### A.    There is no Admissible Evidence that Duffy Directed Any City Defendants or Altered the CFC

Plaintiff's retaliation claims against Duffy focus on allegations that he directed Fossi, Hughen, Hernandez, and Birmingham to obstruct Plaintiff's project and that he altered a CFC provided to Plaintiff by Curran. Plaintiff's claims against Duffy fail under either theory.

First, there is no admissible evidence that Duffy directed anyone to retaliate against Plaintiff. Birmingham and Hernandez, declared that Duffy never instructed them to obstruct, delay or otherwise frustrate the progress of Plaintiff's construction project. Similarly, Fossi and Hughen declared that Duffy is not their supervisor and did not work with Duffy in any meaningful way related to the Property. Further, this claim is based on Plaintiff's speculation that Duffy must have been the orchestrator of the alleged conspiracy because he was a senior DBI official. (Plaintiff Dep. 64:4–65:23; 66:20–67:21; 70:9–71:25.) However, Plaintiff has not evidence this actually occurred outside of his own suspicions. Therefore, this claim must fail.

Second, there is no admissible evidence Duffy changed the CFC or how it was recognized in DBI's internal system. DBI's internal data entry system reflects when an employee enters information into the database the employee's name is reflected next to the entry. (Green Decl. ¶ 9.) Data entries may not be edited once they are entered into the database without approval from DBI's management information system division; if another DBI employee changes, edits or alters the data entry of another DBI employee, that change is reflected in the database. *Id.*. The undisputed evidence shows that, while Curran provided Plaintiff the CFC, it was registered into DBI's tracking system as a "pre-final" inspection in DBI's internal tracking system and was never recognized by DBI as a valid CFC. Further, even if the CFC been entered into DBI's system as a "final" inspection, it would have only covered work done to abate NOV 201895477 and not any of the other NOVs outlined above or below. Specifically, the CFC would not have abated any NOV occurring after August 27, 2020.

///

///

**B.**    **Hernandez and Birmingham Had Clear Cause to Conduct Enforcement at the Property**

The only involvement Hernandez and Birmingham had related to enforcement at the Property is related to the issues articulated in amended NOV 202175602. Plaintiff concedes that Hernandez and Birmingham had probable cause to amend NOV 202175602. Plaintiff Dep. 137:22–145:1. Plaintiff agrees that the stairs, ceiling heights, location of a mechanical closet, windows, cabinets, and stove were not done per the plans submitted. (*See generally* Plaintiff Dep. 137:4–140:7.) This is a violation of the City's Building Code sections 103A and 106.4.7. The issues noted in amended NOV 202175602 were not minor. They all implicated life-safety issues that, if accepted, would frustrate first responders' ability to assist in an emergency. Hernandez Decl. ¶ 10; Birmingham Decl. ¶ 12.

Plaintiff will likely argue that Hernandez's alleged statement that "We know who you have been talking to" is evidence of retaliation. However, courts have labeled statements "stray remarks" when they are "single" or "isolated." *See Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438–39 (9th Cir. 1990) (relating to Title VII employment discrimination context). To support a claim of retaliation, there must be a sufficient nexus between the statement and the retaliation. *See Sanders v. City and Cnty. of San Francisco*, 226 Fed. Appx. 687, 692 (9th Cir. 2007). "Mere threats and harsh words are insufficient" for a First Amendment retaliation claim. *Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998).

In *Johnson v. Feist*, 2020 WL 6121981, at *6 (C.D. Cal. Sep. 8, 2020)[1] the court deemed a comment that "the things you're not getting may be related to the complaining you have been doing during the pas[t] few months in the Butcher/Bakery Shop" was a "stray remark" insufficient to establish that the plaintiff was denied pay raises in retaliation for "unspecified 'complaining.'" *Id.* The court specifically noted that the complaint had nothing "giving context to this statement," indicating that there needs to be more than just "vague and ambiguous" context for a comment to support claims of retaliation. *Id.* The same reasoning applies to this case. The alleged stray remark by Hernandez is

---

[1] While *Johnson* is an employment-related case, Defendants contend that the same rationale applies here.

vague, ambiguous, and the same type of stray remark courts have found insufficient to support a retaliation claim.

### C.    Fossi and Hughen Had Clear Cause to Require a Variance for Plaintiff's Parking

The only portion of Plaintiff's retaliation claim that touches on Fossi and Hughen's purview is the review of the application for an ADU and the proposed curb cut. These claims fail.

First, the undisputed evidence shows that Fossi and Hughen had cause to require Plaintiff to apply for a variance. Plaintiff's application for rear parking in conjunction with the ADU violated San Francisco Planning Codes 134 and 136(c)(30). Planning Code 134 requires that the "basic rear yard be equal to 30% of the total depth of the lot on which the building is situation, but in no case lass than 15 feet." S.F. Planning Code § 134(c). As was found by the Zoning Administrator and the Board of Appeals, Hughen correctly decided that he could not approve Plaintiff's permit in its current state. After this decision was made, it was Plaintiff's election to continue with a variance request and then appeal the denial of the variance. In fact, Hughen provided an alternative of removing the parking request so that the ADU permit could be approved quickly. Plaintiff declined that invitation. For her part, Fossi, had an extraordinarily limited role in the approval process of Plaintiff's permit application. Fossi was initially involved as Hughen's supervisor on the Flex Team and did not oversee his work in any meaningful way. Further, neither Hughen or Fossi was involved with the scheduling or decision-making within the appeals process. Therefore, the undisputed facts demonstrate that Hughen and Fossi had cause to act in the manner in which they did.

## III.    THE CITY DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

Because the Individual Defendants did not retaliate against Plaintiff, this Court need not determine whether the Individual Defendants are entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). But even if this Court determined that there was a factual dispute precluding summary judgment on the alleged constitutional violations, the Individual Defendants are entitled to qualified immunity.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S.

731, 735 (2011). There is "ample room for mistaken judgments" in the qualified immunity standard. *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)). The purpose of qualified immunity is to ensure that governmental officials, before they are held liable for constitutional violations, have "fair notice that [their] conduct was unlawful." *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). Even when a governmental official makes a reasonable mistake about either the state of the law or the facts, a court should grant qualified immunity. *Butz v. Economou*, 438 U.S. 478, 507 (1978); *Haynie v. Cnty. of Los Angeles*, 339 F.3d 1071, 1077–78 (9th Cir. 2003) (citing *Saucier*, 533 U.S. at 206). Although Supreme Court precedent "does not require a case directly on point' for a right to be clearly established, *existing precedent must have placed the statutory or constitutional question beyond debate.*" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (emphasis added, citation modified) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)); *see also Ashcroft*, 563 U.S. at 741 (officials entitled to qualified immunity unless "existing precedent [has] placed the statutory or constitutional question beyond debate"); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (same).

In a Section 1983 action, plaintiffs bear the burden of showing defendants violated their clearly established rights. *Autotek*, 2020 WL 4059564, at *16 (citing *Romero v. Kitsap Cty.*, 931 F.2d 624, 627 (9th Cir. 1991)); *see also LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000) ("Once the defense of qualified immunity is raised by the defendant, the plaintiff bears the burden of showing that the rights allegedly violated were 'clearly established.' … If that burden is satisfied, the defendant must prove that his conduct was 'reasonable.'" *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (internal citations omitted).

Plaintiff will be unable to identify clearly established law that would have given Hernandez and Sweeney fair notice that they could not issue an NOV or revoke the permits under the circumstances. To the extent Plaintiff bases his allegations against Sweeney on his alleged participation in submitting a complaint, the same holds true. In *Autotek*, the County of Sacramento cited a party for zoning code violations and enforced the violations despite the fact that the party being cited had repeatedly and publicly criticized the County and building inspectors. *Autotek*, 2020 WL 4059564, at *16. Although the court found that such criticisms were protected First Amendment

activity, the court dismissed claims against two code enforcement officers because plaintiffs did not identify law showing that those officers were on notice that it would be a constitutional violation to enforce the code under those circumstances. *Id.* The Court should reach the same result here where Plaintiff will be unable to show that Sweeney and Hernandez had notice that issuing a NOV or revoking the permits would be a constitutional violation.

Even if the Court finds that clearly established rights were violated, Defendants are still entitled to qualified immunity because their conduct was reasonable. *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995) (affirming grant of qualified immunity, assuming that revocation of permit implicated a clearly established right, because defendants' conduct was reasonable). In *Zahra*, plaintiff's building permits were revoked and plaintiff sued alleging constitutional violations and selective enforcement. *Id.* The court granted the individual defendants qualified immunity on the basis that it was "objectively reasonable to conclude that [Plaintiff] was not in compliance with the plans approved by the Building Department." *Id.* at 687.

Defendants employed by DBI are granted explicit statutory power to revoke permits when those permits are based on inaccurate information. S.F. Building Code Section 106A.4.5. In addition, DBI and Planning employees are authorized to enforce the provisions of the San Francisco Building and Planning Codes. S.F. Building Code Section 104A.2.1; S.F. Planning Code Section 176(b). Plaintiff admits that the conditions of the Property did not match the approved drawings when Birmingham and Hernandez issued a Corrective Notice and amended NOV 202175602, respectfully. Accordingly, Hernandez and Birmingham were operating within their specific statutory authority when they conducted enforcement at the Property. Hughen and Fossi were similarly acting within their statutory authority when they declined to approve Plaintiff's permit application that clearly violated the Planning Code's rear set back requirement. Given that the undisputed evidence shows that the work done at the Property was not in compliance with the approved plans, Defendants' actions were reasonable and they are entitled to qualified immunity.

///

///

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the foregoing reasons, this Court should grant summary judgment in favor of the City

Defendants.

Dated:  November 7, 2025

DAVID CHIU
City Attorney
JENNIFER E. CHOI
Chief Trial Deputy
HUNTER W. SIMS III
Deputy City Attorney


By: _/s/ Hunter W. Sims III_
HUNTER W. SIMS III

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO;
WILLIAM HUGHEN; KEVIN BIRMINGHAM;
NATALIA FOSSI (ERRONEOUSLY SUED AS
NATALIA KWAITKOWSKA); MAURICIO
HERNANDEZ; and JOE DUFFY

1

**PROOF OF SERVICE**

2

I, KATHLEEN K. HILL, declare as follows:

3

I am a citizen of the United States, over the age of eighteen years and not a party to the above-entitled action.  I am employed at the City Attorney's Office of San Francisco, Fox Plaza Building, 1390 Market Street, Sixth Floor, San Francisco, CA 94102.

4

5

On November 7, 2025, I served the following document(s):

6

**DEFENDANTS CITY AND COUNTY OF SAN FRANCISCO, WILLIAM HUGHEN, KEVIN BIRMINGHAM, NATALIA FOSSI, MAURICIO HERNANDEZ AND JOE DUFFY'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT (Fed. R. Civ. P. 56);**

7

8

**NOTICE – WARNING TO PLAINTIFF PURSUANT TO *WYATT/RAND* (SUMMARY JUDGMENT);**

9

**DECLARATION OF HUNTER W. SIMS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Fed. R. Civ. P. 56);**

10

**DECLARATION OF KEVIN BIRMINGHAM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Fed. R. Civ. P. 56);**

11

12

**DECLARATION OF JOE DUFFY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Fed. R. Civ. P. 56);**

13

**DECLARATION OF NATALIA FOSSI IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Fed. R. Civ. P. 56);**

14

**DECLARATION OF MATTHEW GREENE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Fed. R. Civ. P. 56);**

15

**DECLARATION OF MAURICIO HERNANDEZ IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Fed. R. Civ. P. 56);**

16

17

**DECLARATION OF WILLIAM HUGHEN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Fed. R. Civ. P. 56);**

18

**DECLARATION OF MARK LANGAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT  (Fed. R. Civ. P. 56);**

19

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS CITY AND COUNTY OF SAN FRANCISCO, WILLIAM HUGHEN, KEVIN BIRMINGHAM, NATALIA FOSSI, MAURICIO HERNANDEZ AND JOE DUFFY'S MOTION FOR SUMMARY JUDGMENT (Fed. R. Civ. P. 56); and**

20

21

**[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

22

on the following persons at the locations specified:

23

Patrick Gallagher
470 Coletas Way
Byron, CA 94514
Tel:  (925) 325-3911
Email: bigblockpat@gmail.com

24

25

26

*Plaintiff in Pro Per*

27

in the manner indicated below:

28

Notice and Motion for Summary Judgment
Case No. 23-cv-03579-SI (JCS)

n:\lit\li2023\230777\01878462.docx

**BY UNITED STATES MAIL**:  Following ordinary business practices, I sealed true and correct copies of the above documents in addressed envelope(s) and placed them at my workplace for collection and mailing with the United States Postal Service.  I am readily familiar with the practices of the San Francisco City Attorney's Office for collecting and processing mail.  In the ordinary course of business, the sealed envelope(s) that I placed for collection would be deposited, postage prepaid, with the United States Postal Service that same day.

**BY ELECTRONIC MAIL:**  I caused a copy of such document to be transmitted *via* electronic mail in portable document format ("PDF") Adobe Acrobat from the electronic address:  kathleen.hill@sfcityatty.org.

I declare under penalty of perjury pursuant to the laws of the State of California that the foregoing is true and correct.  Executed November 7, 2025, at San Francisco, California.

*/s/  Kathleen K. Hill*
KATHLEEN K. HILL