DAVID CHIU, State Bar #189542
City Attorney
JENNIFER E. CHOI, State Bar #184058
Chief Trial Deputy
HUNTER W. SIMS III, State Bar #266039
RENÉE E. ROSENBLIT, State Bar #304983
Deputy City Attorneys
Fox Plaza
1390 Market Street, Sixth Floor
San Francisco, California 94102-5408
Telephone:      (415) 554-4259 [Sims]
                (415) 554-3853 [Rosenblit]
Facsimile:      (415) 554-3837
E-Mail:         hunter.sims@sfcityatty.org
                renee.rosenblit@sfcityatty.org

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO;
WILLIAM HUGHEN; KEVIN BIRMINGHAM; NATALIA FOSSI
(ERRONEOUSLY SUED AS NATALIA KWAITKOWSKA);
MAURICIO HERNANDEZ; and JOE DUFFY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK GALLAGHER, | Case No. 23-cv-03579-SI (JCS) |
| Plaintiff, | **DECLARATION OF HUNTER W. SIMS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Fed. R. Civ. P. 56)** |
| vs. | |
| CITY AND COUNTY OF SAN FRANCISCO, BERNARD CURRAN, RODRIGO SANTOS, WILLIAM HUGHEN, KEVIN BIRMINGHAM, NATALIA KWAITKOWSKA, AND JOE DUFFY, | Hearing Date:    December 5, 2025<br>Time:            10:00 a.m.<br>Place:           Videoconference<br><br>Trial Date:      February 17, 2026 |
| Defendant. | |

## DECLARATION OF HUNTER W. SIMS III

I, Hunter W. Sims III, declare as follows:

1.      I am a Deputy City Attorney in the Office of the City Attorney for the City and County

of San Francisco.  I am the Deputy City Attorney assigned to the above-captioned matter.  I have

personal knowledge of the contents of this declaration, except where indicated otherwise, and I could and would testify competently thereto if called upon to do so.

2.      Attached as Exhibit A is a true and correct copy of the transcript of Plaintiff Patrick Gallagher's deposition taken on July 31, 2025.

3.      Attached as Exhibit B is a true and correct of copy of Exhibit 1 of Plaintiff's deposition.

4.      Attached as Exhibit C is a true and correct of copy of Exhibit 2 of Plaintiff's deposition.

5.      Attached as Exhibit D is a true and correct of copy of Exhibit 3 of Plaintiff's deposition.

6.      Attached as Exhibit E is a true and correct copy of Exhibit 4 of Plaintiff's deposition.

7.      Attached as Exhibit F is a true and correct copy of Exhibit 5 of Plaintiff's deposition.

8.      Attached as Exhibit G is a true and correct copy of Exhibit 6 of Plaintiff's deposition.

9.      Attached as Exhibit H is a true and correct copy of Exhibit 7 of Plaintiff's deposition.

10.     Attached as Exhibit I is a true and correct copy of Exhibit 8 of Plaintiff's deposition.

11.     Attached as Exhibit J is a true and correct copy of Exhibit 9 of Plaintiff's deposition.

12.     Attached as Exhibit K is a true and correct copy of Exhibit 10 of Plaintiff's deposition.

13.     Attached as Exhibit L is a true and correct copy of Exhibit 11 of Plaintiff's deposition.

14.     Attached as Exhibit M is a true and correct copy of Exhibit 12 of Plaintiff's deposition.

15.     Attached as Exhibit N is a true and correct copy of Exhibit 13 of Plaintiff's deposition.

16.     Attached as Exhibit O is a true and correct copy of Plaintiff's Second Amended Complaint, Dkt. No. 28, filed on November 9, 2023 ("SAC").

17.     Attached as Exhibit P is a true and correct copy of Plaintiff's Request for Variance.

18.     Attached as Exhibit Q is a true and correct copy of the San Francisco Planning Department's Variance Decision dated July 27, 2022.

19.     Attached as Exhibit R is a true and correct copy of Plaintiff's Appeal of Variance Decision.

20.     Attached as Exhibit S is a true and correct copy of the denial of Plaintiff's Appeal of Variance Decision.

21.    Attached as Exhibit T is a true and correct copy of the Criminal Complaint in the matter of *USA v. Curran et. al.,* Case No. 3:21-mj-713315-MAG.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 7th day of November 2025, at San Francisco, California.

*/s/  Hunter W. Sims III*
HUNTER W. SIMS III

Exhibit A

Transcript of the Testimony of:

# PATRICK GALLAGHER

GALLAGHER

vs.

CITY AND COUNTY OF SAN FRANCISCO, et al.

July 31, 2025

Volume I



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

| | |
|---|---|
| PATRICK GALLAGHER,                              ) | |
|                                                 ) | |
|                        Plaintiff,               ) | |
|                                                 ) | |
| vs.                                             ) | |
|                                                 ) | Case No. |
| CITY AND COUNTY OF SAN                           ) | 23-cv-03579-SI(JCS) |
| FRANCISCO, BERNARD CURRAN,                      ) | |
| RODRIGO SANTOS, WILLIAM HUGHEN,                 ) | |
| KEVIN BIRMINGHAM, NATALIA                        ) | |
| KWAITKOWSKA, AND JOE DUFFY,                      ) | |
|                                                 ) | |
|                        Defendant.               ) | |
| _____                ) | |

--oOo--

DEPOSITION OF

PATRICK GALLAGHER

VOLUME I, PAGES 1 - 188

Thursday, July 31, 2025

Reported by:

HEATHER M. LOFHOLM, CSR #11570

Patrick Gallagher                                                              July 31, 2025

```
 1                         APPEARANCES

 2

 3    For the Plaintiff (In Propria Persona):

 4          PATRICK GALLAGHER
            470 Coletas Way
 5          Byron, California 94514
            (925)325-3911
 6          bigblockpat@gmail.com

 7

 8    For the Defendants:

 9          OFFICE OF THE SAN FRANCISCO CITY ATTORNEY
            BY:  HUNTER W. SIMS III, DEPUTY CITY ATTORNEY
10              MEGHAN RIDDLESPURGER, INTERN
                TOMMY JUNG, INTERN
11          1390 Market Street, Sixth Floor
            San Francisco, California 94102-5408
12          (415)554-4259
            hunter.sims@sfcityattorney.org
13

14

15

16

17                       --oOo--

18

19

20

21

22

23

24

25
```

Patrick Gallagher                                              July 31, 2025

```
 1                    INDEX OF EXAMINATIONS

 2                                                  Page

 3   By Mr. Sims                                      5

 4

 5                        --oOo--

 6                    INDEX OF EXHIBITS

 7   Deposition
     Exhibit Number        Description            Page
 8

 9       1          Second Amended Complaint        52

10       2          Application for Building Permit,  96
                         Approved 8/10/18
11
         3          1/4/18 Notice of Violation      100
12                       Number 201721241

13       4          Application for Building Permit,  101
                         Approved 8/10/18
14
         5          10/3/18 Notice of Violation,    107
15                       Number 201895477

16       6          Application for Building Permit,  112
                         Approved 6/11/19
17
         7          5/17/21 Notice of Violation     116
18                       Number 202175602

19       8          6/8/21 Notice of Violation      116
                         Number 202175602
20
         9          Application for Building Permit,  116
21                       Approved 7/19/21

22      10          Certificate of Final Completion  119
                         and Occupancy
23
        11          8/20/20 Letter from Kathryn Briggs  150
24                       and Test Report

25
```

Patrick Gallagher                                              July 31, 2025

```
1                         INDEX OF EXHIBITS

2     Deposition
      Exhibit Number          Description                    Page
3

4        12              E-Mail Chain, starting with         165
                         6/8/23 E-Mail from Matthew Greene
5                             to Patrick Gallagher

6        13                 Verified Complaint               177

7

8

9

10                            --oOo--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      BE IT REMEMBERED that on Thursday, July 31, 2025, at

2   the hour of 11:16 a.m., of said day, at the Office of the

3   San Francisco City Attorney, 1390 Market Street,

4   Seventh Floor, San Francisco, California, before me,

5   HEATHER M. LOFHOLM, a Certified Shorthand Reporter,

6   personally appeared

7                        PATRICK GALLAGHER

8   called as a witness herein, having been first administered

9   an oath in accordance with CCP Section 2025, was examined

10  and testified as follows:

11        THE DEPOSITION REPORTER:  My name is Heather

12  Lofholm, and my certification number is 11570.

13                        EXAMINATION

14  BY MR. SIMS:

15     Q.   Could you please state and spell your name.

16     A.   Patrick Gallagher, P-a-t-r-i-c-k,

17  G-a-l-l-a-g-h-e-r.

18     Q.   Mr. Gallagher, have you ever had your deposition

19  taken before or testified in court?

20     A.   Yes.

21     Q.   How many times have you done so?

22     A.   Just once that I can remember.

23     Q.   Okay.  Was that a deposition or court testimony?

24     A.   Both.

25     Q.   Okay.  When was the last time you testified in a

1    legal setting such as this?

2        A.    I'd say 2018.

3        Q.    Okay.  Since it's been a little while since

4    you've testified, I'm going to go through some rules and

5    suggestions of a deposition, and hopefully, if you and I

6    both follow these rules and suggestions the process will

7    be as smooth as possible.

8            Number one, you've been brought here today

9    pursuant to a notice of deposition to testify in a case

10   that you filed against the City and County of

11   San Francisco and several other employees of the City and

12   County of San Francisco in connection with a lawsuit you

13   filed against those individuals.  Do you understand that,

14   sir?

15       A.    Yes.

16       Q.    Okay.  You have just taken an oath.  It's the

17   same oath that you would take in a court of law in front

18   of a judge and/or a jury, and it compels you to tell the

19   truth here today.  Do you have any issue complying with

20   the oath that you've been given?

21       A.    No.

22       Q.    Okay.  This is a question-and-answer session, so

23   I'm going to ask you questions about, you know, your

24   background and some of the issues that you're claiming in

25   your lawsuit, and you answer those questions the best you

1  can.  There's a couple things that you need to keep in

2  mind when we're doing the questions and answers.

3  Number one, the court reporter is going to write down

4  everything that you and I say, and in order to make her

5  job easier we need to do two things.  One, try to speak

6  slowly and clearly, and two, only one of us can be

7  speaking at the same time.  It's very difficult for her to

8  write two people speaking at the same time.  Okay?

9      A.    Okay.

10      Q.    This comes up mainly when I'm going to ask you a

11  question and you're going to anticipate what I'm getting

12  at and what I'm going to ask you, and you'll start your

13  answer before I've finished your question -- my question,

14  excuse me, and that's very difficult for her to --

15      A.    Okay.  I get it.

16      Q.    So if I ever put out my hand or tell you "Just

17  let me finish," I'm not trying to be rude when I do that.

18  I'm just trying to make sure that her job is as easy as

19  possible and we get a clear record.

20      A.    Okay.

21      Q.    All right.  The other thing that you need to keep

22  in mind is the court reporter is forbidden from

23  interpreting gestures.  That goes for nods of the heads.

24  It also goes for "uh-huh" and "huh-uh."  Those actually

25  show up the same on the transcript, so if you shake your

 1  head or give me an "uh-huh" or a "huh-uh," I'm likely to

 2  repeat what I think you're trying to communicate to me.

 3  Again, I'm not trying to be rude when I do that.  I'm just

 4  trying to make sure that our record is clear.

 5       A.    Okay.

 6       Q.    All right.  I'm going to be asking you a lot of

 7  questions about when certain events happen that are

 8  relevant to your lawsuit, specific dates and specific

 9  conversations related to certain events.  I have some

10  documents here that might help us --

11       A.    Okay.

12       Q.    -- track down the dates anyway and maybe some of

13  the topics of conversation, but this is not an instance

14  where you can't give me an estimate.  Okay?  For example,

15  if you think something happened in a certain month, in a

16  certain year, I'd like you to tell me what it is you

17  remember.

18            You're also allowed to give an estimate, right,

19  so that might come up in the context of conversations, so

20  if I ask you about a certain conversation that you had

21  with a certain, say, defendant in this case, even though

22  you can't remember exactly what words you said and what

23  the other person said, you might remember the gist of the

24  conversation, so you can do that kind of thing.

25            What you cannot do or what I'll ask that you

1    don't do is guess, and the terms "guess" and "estimate"

2    have kind of become synonymous in our nomenclature now,

3    and so I'm going to give you a quick example between a

4    guess and an estimate that I think will help you give your

5    best testimony here today.

6            So if I were to ask you how long is the table

7    that we're sitting in front of here, I know you have some

8    experience in construction.  You probably have a general

9    understanding of distance, and you can say -- even though

10    you didn't exactly measure the table, you could say,

11    "It's, I don't know, 15 feet," or whatever it is.  That

12    would be an estimate, right, because you can see

13    something.  You have a basic understanding of what I'm

14    asking you about, and you can give your best estimate.  If

15    I were to ask you how long is the kitchen table in my

16    house, that would be a complete guess, because, as far as

17    I know, you've never been to my house, and you don't know

18    if I have a kitchen table or not, much less how long it

19    is, so do you understand the difference between a guess

20    and an estimate?

21        A.    Yes.

22        Q.    Okay.  Great.  The last thing is I'm going to try

23    to be as efficient as I can.  Obviously, we've got a big

24    stack of documents that we've got to get through here

25    today, and so what I ask is that, you know, if you want to

1  take a break at any time just say, "I'd like to take a

2  break," and we can accommodate you.  If there's a question

3  pending I'd ask that you just answer the question before

4  you -- before you give your answer, and then we'll take a

5  break.  Just for your planning purposes, I'm hopeful that

6  we'll be done here before 5:00 p.m., but we'll see how it

7  goes.

8          One last thing that I typically do not tell

9  you -- or tell deponents, but since you're here

10 representing yourself today, I'd ask that you answer the

11 specific question that I'm asking.  I know there's certain

12 things you're going to want to tell me, and believe me, I

13 will do my best to ask questions that will get you to talk

14 about those things, but there are certain questions

15 especially pertaining to the documents that I really am

16 just looking for a yes-or-no answer, and so it will make

17 things a lot more efficient if we can just answer the

18 question that is being specifically asked.  Do you

19 understand that?

20     A.   Yep.

21     Q.   Okay.  Great.  All right.  Let's start with some

22 background information.  What's your date of birth?

23     A.   3-20-64.

24     Q.   And what's your current address?

25     A.   470 Coletas Way.

Patrick Gallagher                                                    July 31, 2025

```
 1        Q.   What's the town and state?
 2        A.   Byron, California.
 3        Q.   How long have you lived there?
 4        A.   Twenty-three years.
 5        Q.   Does anyone else live there with you?
 6        A.   No, not at the moment.
 7        Q.   Okay.  Are you married?
 8        A.   No.
 9        Q.   Divorced?
10        A.   Divorced.
11        Q.   Have you ever served in the military?
12        A.   No.
13        Q.   Have you ever been convicted of a felony?
14        A.   Yes.
15        Q.   When were you convicted of a felony?
16        A.   Back in the '80s.
17        Q.   Okay.  And what did it have to do with?
18        A.   Running from the police.
19        Q.   Okay.  Since then no felony convictions?
20        A.   No.
21        Q.   Okay.  Have you ever been convicted of a
22   misdemeanor that had to do with telling the truth?
23        A.   No.
24        Q.   Okay.  Are you currently employed?
25        A.   Retired.
```

1       Q.   And what did you do before retirement?

2       A.   Construction.

3       Q.   And what do you mean by that?

4       A.   Commercial construction, buildings like this one.

5       Q.   All right.  And were you a general contractor?

6       A.   No, I was superintendent.

7       Q.   Okay.  And what does that mean to you?

8       A.   It means I was in charge of everything and

9   everybody.

10      Q.   Do you mean like synonymous with, like, a

11  foreman?

12      A.   I had several foremen that worked under me.

13      Q.   I see.  And was -- did you work for a company?

14      A.   Berger Brothers is one of them.

15      Q.   Could you spell that for me.

16      A.   B-e-r-g-e-r.

17      Q.   And where -- is it, like "Berger Brothers LLP" or

18  "Company" or something like that?

19      A.   Berger Brothers Construction.

20      Q.   Okay.  And was that your title at Berger Brothers

21  Construction, Superintendent?

22      A.   Yes.

23      Q.   And how long did you work at Berger Brothers

24  Construction?

25      A.   Ten years.

1      Q.   And from when -- start date to end date?  Hold
2  on.  Let me make it a little easier for you.  When did you
3  retire?
4      A.   I retired in 2010.
5      Q.   Okay.  And would it be fair to say that the end
6  date for working at Berger Brothers would be 2010?
7      A.   Yeah.
8      Q.   Okay.  And do you remember how long you worked at
9  Berger Brothers?
10     A.   About ten years.
11     Q.   Okay.  So from 2000 to 2010, more or less, you
12  worked at Berger Brothers?
13     A.   Yeah.
14     Q.   Okay.  And were you -- did you always have the
15  title of Superintendent while you worked at Berger
16  Brothers Construction?
17     A.   No.
18     Q.   Okay.  What other titles did you have while you
19  worked at Berger Brothers Construction?
20     A.   Foreman.
21     Q.   Any others?
22     A.   No.
23     Q.   What did you do for work -- or who did you work
24  for prior to 2000?
25     A.   Anning & Johnson, A-n-n-i-n-g.

```
1        Q.    And Johnson?

2        A.    And Johnson.

3        Q.    Common spelling?

4        A.    Yeah.

5        Q.    Okay.  Do you know -- I'm sorry to jump back to

6    Berger Brothers, but do you know where -- well, first of

7    all, is Berger Brothers Construction still in business?

8        A.    No.

9        Q.    Okay.

10       A.    Well, not in San Francisco.

11       Q.    Okay.  Where -- did they have, like, a

12   headquarters or an address that they operate out of?

13       A.    Yeah.  I think it was 17th and Mission.

14       Q.    In San Francisco?

15       A.    In San Francisco, and then the main office is in

16   LA.

17       Q.    Do you know where in LA?

18       A.    No.

19       Q.    Okay.

20       A.    Never been there.

21       Q.    All right.  And then Anning & Johnson, what did

22   you do for them?

23       A.    Foreman.

24       Q.    And how long did you work for them?

25       A.    About 13, 14 years.
```

1    Q.    As a foreman the entire time?

2    A.    Yes.

3    Q.    Okay.  Since we're talking about kind of

4    construction-related issues here, do you have any trade

5    certificates or licenses in the construction field?

6    A.    Yes.

7    Q.    How many do you have?

8    A.    I don't know.

9    Q.    Okay.  Do you have an estimate?

10   A.    Five.

11   Q.    All right.  Could you list them.

12   A.    Two welding certificates.

13   Q.    Okay.

14   A.    Certified trainer on specialty equipment.

15   Q.    And I think there's two more.

16   A.    Yeah, I don't remember.

17   Q.    Can't remember?

18   A.    No.

19   Q.    Okay.  And the welding certificates, who are

20   those -- you know, is there an organization that you

21   obtained those certificates from?

22   A.    AWS.

23   Q.    And what about the specialty equipment training?

24   A.    I forget who issued that.

25   Q.    Okay.  And just because I'm curious, what type of

1  specialty equipment does your certificate allow you to

2  help train?

3      A.   Gradalls, scissor lifts, boom lifts.

4      Q.   Okay.  Are the certificates and the licenses that

5  you just mentioned -- are they current?

6      A.   I doubt it.

7      Q.   Okay.

8      A.   The welding certificates don't expire, but those

9  others I don't know.

10     Q.   All right.  Have you ever been a licensed general

11 contractor?

12     A.   No.

13     Q.   Have you ever had a license in any type of

14 construction trade, other than what you've just mentioned?

15     A.   No.

16     Q.   Okay.  I thought I saw somewhere that you were a

17 licensed carpenter.  Is that not true?

18     A.   You don't really get a license.

19     Q.   That's why I was asking.

20     A.   I'm a union carpenter.

21     Q.   Okay.

22     A.   So once you go through your apprenticeship, then,

23 you know, you're kind of certified as a journeyman, and

24 then from there you go to foreman, and then from there you

25 go to superintendent.

1      Q.   So when you -- so I understand what you're

2    saying.  I just want to make sure the record is clear when

3    I go back and look at this.  When you were saying your

4    position at Berger Brothers, for example -- you said you

5    were a superintendent?

6      A.   Uh-huh.

7      Q.   Is that your -- that's your level of expertise as

8    determined by the union, or was that the position that you

9    were hired as, or is there no difference?

10     A.   There's a difference.  The person paying you

11   needs you to have a certain amount of expertise in order

12   to hold that position.

13     Q.   Right.

14     A.   The union doesn't have anything to say about it.

15     Q.   Okay.  All right.  Did -- when you worked at

16   Berger Brothers Construction did you ever work on any

17   residential projects?

18     A.   Yes.

19     Q.   How many did you work on approximately?

20     A.   Two.

21     Q.   Okay.  And where were those projects located, if

22   you recall?

23     A.   Oakland Hills.

24     Q.   And the other one?

25     A.   Knightsen.

1    Q.   Can you spell that.

2    A.   K-n-i-g-h-t-s-e-n.

3    Q.   Where is Knightsen?

4    A.   It's northeast.

5    Q.   In California?

6    A.   Yeah.

7    Q.   Okay.  And were those two projects single-family

8  homes?

9    A.   Yes.

10    Q.   And I'm assuming -- well, were you -- in what

11  capacity did you work on those two single-family homes for

12  Berger Brothers?  As a foreman, superintendent?

13    A.   As a foreman.

14    Q.   Okay.

15    A.   And as a superintendent.  Both, yeah.

16    Q.   Okay.  Does that mean that maybe one of those

17  projects you were the foreman and the other was the

18  superintendent, or was it superintendent/foreman all

19  together?

20    A.   Superintendent/foreman all together.

21    Q.   I see.  Okay.

22    A.   In other words, I didn't have a foreman on either

23  one of those.

24    Q.   I understand.  Did you have a supervisor at

25  Berger Brothers?

Patrick Gallagher                                      July 31, 2025

1        A.    No.
2        Q.    Okay.  How would you know about the jobs that you
3    would be assigned to?
4        A.    Vice president.
5        Q.    Okay.
6        A.    And the estimator.
7        Q.    All right.  When you were working there who was
8    the vice president that you would interact with?
9        A.    Jesse Jones.
10       Q.    Is it "Jesse" with an I-E or an E?
11       A.    I think it's just an E.
12       Q.    Okay.  And then the estimator that you worked
13   with?
14       A.    I forget his name.
15       Q.    Okay.  All right.
16       A.    Jeremy.
17       Q.    And just so I understand kind of how it worked,
18   would you give either Jeremy or Mr. -- I'm assuming it's a
19   Mr. Jones -- periodic updates on the progress of the
20   projects that you would be assigned to?
21       A.    Yes.
22       Q.    And I'm assuming that, certainly in the instance
23   of Jeremy, they would be paying attention to how much
24   money was being put into the project?
25       A.    Yes.

1      Q.    Okay, okay.  Has any of your licenses or

2    certificates ever been suspended for any reason?

3      A.    No.

4      Q.    Have you ever been prevented from working on a

5    construction site before?

6      A.    No.

7      Q.    Okay.  So I'm just going to say this.  You've

8    been -- you have sued -- this lawsuit is brought on behalf

9    of yourself and as a trustee for the Madison Trust FBO

10   Patrick Gallagher.  Do you understand that?

11     A.    Yes.

12     Q.    All right.  And you are a trustee in the Madison

13   Trust?

14     A.    Yes.

15     Q.    Okay.  Are there any other trustees?

16     A.    No.

17     Q.    Okay.  How long has the Madison Trust existed?

18     A.    You're asking me to guess.

19     Q.    Okay.  Do you have an estimate?

20     A.    Fifteen years.

21     Q.    Okay.  Would it be fair to say it was created

22   after your retirement from Berger Brothers?

23     A.    Before.

24     Q.    Okay.  And at least at one point in time the

25   Madison Trust owned 200 Naples Street?

1        A.    Yes.

2        Q.    And that's the property that's the main subject

3   of your lawsuit, correct?

4        A.    Yes.

5        Q.    Okay.  If I ever refer to "the property," I'm

6   talking about 200 Naples, just so you and I understand

7   each other.

8        A.    Okay.

9        Q.    You'll understand that, right?

10       A.    Uh-huh, yes.

11       Q.    There you go.  Okay.  There was another entity

12  that came into ownership.

13       A.    GC Block Investments.

14       Q.    Are you associated with GC Block Investments?

15       A.    It's actually owned by Madison Trust FBO Patrick

16  Gallagher.

17       Q.    Okay.  I saw another Gallagher was part of the

18  management of GC Block Investments.  It looked like a -- I

19  didn't bring a copy of it, but a Ryan or a -- nobody?

20       A.    No.

21       Q.    Okay.  If I find it I'll show it to you later.

22  Well, are you -- I think you answered this, but just so

23  I'm reoriented, you are involved with GC Block

24  Investments, correct?

25       A.    No longer.

1       Q.    Okay.  Is GC Block Investments still a legal

2   entity, as far as you know?

3       A.    No.

4       Q.    Okay.  It's actually GCBlockInvestments.com,

5   right?

6       A.    Right.

7       Q.    When did GCBlockInvestments.com cease to exist?

8       A.    2021.

9       Q.    Okay.  And what was the reason that it ceased to

10  exist?

11      A.    It was no longer needed.

12      Q.    What do you mean by that?

13      A.    The trust had a single investment strategy, and

14  that was to invest into GCBlockInvestments.com.  Okay?  So

15  I'd have to get investment authorization from Madison

16  Trust FBO Patrick Gallagher, and that would be invested

17  into GC Block Investments.  It took about a week

18  sometimes, and then GC Block Investments would go purchase

19  the property, improve it, sell it, and then the proceeds

20  would go back to Madison Trust FBO Patrick Gallagher.

21      Q.    Okay.  Were you done?

22      A.    Yep.

23      Q.    Okay.  All right.  So -- and I'm just -- I'm not

24  trying to put words in your mouth here, but did

25  GCBlockInvestments.com basically renovate residential

1   properties?

2        A.   Yes.

3        Q.   Okay.  And what -- I understand the trust owned

4   GCBlockInvestments.com, but did you have a role in

5   GCBlockInvestments.com?

6        A.   Yes.

7        Q.   Were you the manager?

8        A.   Yes.

9        Q.   Were you the CEO?

10       A.   I believe I was titled as Manager.

11       Q.   Okay.  Were there any other employees at

12  GCBlockInvestments.com?

13       A.   No, not employees.  No.

14       Q.   It sounds like what you might be saying is that

15  GCBlockInvestments.com would hire people, but there were

16  no full-time employees, other than maybe yourself?

17       A.   Right.

18       Q.   And the people that GCBlockInvestments.com would

19  hire would be people who would work on the homes that you

20  were renovating?

21       A.   Electricians, plumbers, flooring people.

22       Q.   Okay.  But nobody was on the payroll full-time

23  there?

24       A.   No.

25       Q.   I see.  All right.  Okay.  Have you been

1   associated with any other companies, other than -- in a

2   personal capacity, not like, you know, you worked for the

3   Berger Brothers or that, but a company like

4   GCBlockInvestments.com, have you ever been involved with a

5   company like that before, other than that one?

6       A.    Not that I recall.

7       Q.    Okay, okay.  So how did -- and I'm going to refer

8   also to you, and when I say -- when I mean that I mean you

9   not only as your individual capacity but also as trustee

10  for the Madison Trust.  Okay?  Do you understand that?

11      A.    Yes.

12      Q.    All right.  If there's a difference between your

13  answer to a question that I ask between your individual

14  capacity and your capacity as trustee, just let me know,

15  please.

16      A.    Okay.

17      Q.    All right.  So when did -- when did you become

18  the owner of 200 Naples?

19      A.    On or about May 2018.

20      Q.    Okay.  And how did you come to purchase Naples?

21      A.    Through a real estate purchase.

22      Q.    Sure, but was it, like, in foreclosure or --

23      A.    No.

24      Q.    Okay.  Do you recall what the purchase price was?

25      A.    I think it was 795.

1      Q.    $795,000?

2      A.    Yeah.

3      Q.    And had you, the trust, or GCBlockInvestments.com

4   ever owned a property in San Francisco prior to May 2018?

5      A.    No.

6      Q.    Okay.  Had you ever worked on a residential

7   project -- residential construction project in the City

8   and County of San Francisco prior to this one?

9      A.    Yes.

10     Q.    Okay.  When was the last time you did not --

11  you'd done that?

12     A.    Probably early 2000s.

13     Q.    And do you remember anything about that project?

14  I know it was a while ago, so ...

15     A.    No.

16     Q.    Just that you worked on it and it was in the

17  City?

18     A.    Yes.

19     Q.    Okay.  And do you remember what capacity you had

20  in that project, the prior residential project?

21     A.    I don't recall.

22     Q.    Okay, okay.  All right.  And when -- when you

23  purchased the property did you have an idea of what you

24  wanted to do with it?

25     A.    Yes.

1      Q.    What was that?

2      A.    I wanted to add four dormers and renovate the

3   whole house.

4      Q.    All right.  When you say "dormers," what do you

5   mean by that?

6      A.    I don't know how else to explain it.

7      Q.    Okay.

8      A.    It's a dormer.

9      Q.    All right.  And when you say "renovate the whole

10  house," what do you mean by that?

11     A.    Soup to nuts.

12     Q.    Okay.  So are you demolishing the home itself?

13     A.    No.

14     Q.    Are you -- was your intention to rearrange the

15  floor plan of the home?

16     A.    No.

17     Q.    Was your intention just to -- I guess I'm trying

18  to figure out what you mean by "soup to nuts"

19  specifically.

20     A.    It needed all new plumbing.  It needed all new

21  electrical.  It needed all new flooring.  It needed all

22  new drywall, all new paint, all new appliances, all new

23  bathrooms, all new countertops, all new cabinets, so just

24  imagine the house with nothing in it.

25     Q.    Okay.  And were you -- was your intention to add

Patrick Gallagher                                      July 31, 2025

```
1  any additional, you know, bathrooms, kitchens, bedrooms,
2  anything of that to the existing floor plan when you
3  bought it?
4      A.   No.
5      Q.   Okay.  And who -- did you have a real estate
6  agent when you purchased the property?
7      A.   Yes.
8      Q.   And what was their name?
9      A.   Nancy Valverde.
10     Q.   Can you spell "Valverde."
11     A.   Probably no better than you can.
12     Q.   Okay.  All right.  Valverde, V-a-l-v-e-r-d-e?
13     A.   (Shrugging head.)
14     Q.   All right.  And had you and Ms. Valverde worked
15  together before?
16     A.   No.
17     Q.   Okay.  How did you -- how did you get -- you
18  know, how did you get hooked up with Ms. Valverde?
19     A.   My fiancee worked for her.
20     Q.   Okay.  Do you currently have a fiancee?
21     A.   No.
22     Q.   Your fiancee at the time?
23     A.   Right.
24     Q.   Okay.  I've just got to ask her name.  What's
25  your fiancee's name -- or ex-fiancee's name?
```

1        A.   Cathy Cross.

2        Q.   Is "Cathy" with a C or a K?

3        A.   C.

4        Q.   Okay.  And Cross?

5        A.   C.

6        Q.   Okay, okay.  And what company did Ms. Valverde

7   work for?

8        A.   Berkshire Hathaway.

9        Q.   At what location?

10       A.   Brentwood.

11       Q.   All right.  Okay, okay.  I'm going to kind of

12  skip ahead a little bit here and ask you a little bit

13  about the damages that you're claiming in this case.

14       A.   Okay.

15       Q.   And from your complaint I've seen -- there's some

16  specific items that you're claiming, mainly regarding the

17  window replacements that -- I think the complaint said

18  about $30,000 was what you estimated that to be.

19       A.   I think probably more than that.

20       Q.   Okay.  Well, I'm just trying to orient you right

21  now.

22       A.   Okay.

23       Q.   And then there's, I think, three instances of

24  potential sales that went through or that did not go

25  through?

Patrick Gallagher                                              July 31, 2025

```
 1        A.   Right.
 2        Q.   Okay.  So, I guess, what I wanted to ask you to
 3   start with was when did you first put the home or the
 4   property on the market to resell it?
 5        A.   I believe it was in 2021, but it might have been
 6   2020.
 7        Q.   Okay.
 8        A.   Actually, I think it was 2020, now that I think
 9   about it.
10        Q.   All right.  And do you have a month in 2020 when
11   you think it went on?
12        A.   No.
13        Q.   Okay.  Well, 2020 was a memorable year for a lot
14   of reasons.
15        A.   Uh-huh.
16        Q.   So was your recollection that it happened in 2020
17   after COVID hit?
18        A.   Yes.
19        Q.   Was it after the summer?
20        A.   Yes.
21        Q.   All right.  So somewhere in the fall or winter
22   before?
23        A.   Yes.
24        Q.   And did you have a real estate agent that was
25   representing you?
```

Patrick Gallagher                                                    July 31, 2025

```
 1        A.   Yes.
 2        Q.   And what was their name?
 3        A.   Nancy Valverde.
 4        Q.   Okay.  And what was the listing price for the
 5   property?
 6        A.   I don't recall.  I think it was 1.19.
 7        Q.   $1.19 million?
 8        A.   Yes.
 9        Q.   Okay.  When -- let me back up.  Sorry.
10             When you purchased the property initially did you
11   receive sale disclosures from the current owner?
12        A.   Yes.
13        Q.   And through those disclosures did you learn that
14   there were some pending notices of violation on the
15   property from the Department of Building Inspection?
16        A.   No.
17        Q.   Did you later learn that?
18        A.   Yes.
19        Q.   Okay.  Now, when you put the property on the
20   market in 2020 were there any pending NOV's or orders of
21   abatement on the property at that time?
22        A.   No.
23        Q.   Okay.  So as far as when you put it on the market
24   there were no -- there's no current enforcement action by
25   the San Francisco Department of Building Inspection?
```

Patrick Gallagher                                                July 31, 2025

```
 1        A.    None.
 2        Q.    Okay.  All right.  Okay.  So the property's
 3   put -- sorry.  Separate and apart from any enforcement
 4   from DBI, was there any other liens or any other
 5   encumbrances on the property at the time you put it back
 6   on the market in 2020?
 7        A.    No.
 8        Q.    Okay, okay.  Did the property get any interest as
 9   far as potential purchasers?
10        A.    Sort of.
11        Q.    What do you mean by that?
12        A.    Well, over 30 people called to view it, but at
13   that time there were so many restrictions because of COVID
14   that you had to fill out this nine-page questionnaire, and
15   they wanted to know everything, where you go to church,
16   where you go to lunch, and it was really intrusive, so we
17   got thirty inquiries or -- probably more than that, and
18   everybody that had to fill out this questionnaire just
19   walked.
20        Q.    Okay.  Just so I understand what I think you're
21   saying is of the 30 people who indicated interest in
22   purchasing your property, none of them actually went to
23   view the property, at least from a formal tour
24   perspective?
25        A.    I don't know that for sure.
```

Patrick Gallagher                                              July 31, 2025

1        Q.    Okay.

2        A.    A few might have, but I wasn't there to show it

3    to them.   That's why you hire a realtor, right?

4        Q.    Sure.

5        A.    But nobody wanted to fill out that questionnaire.

6        Q.    Okay.   I guess I'm just trying to figure out when

7    you said, you know, of the 30 people that filled out the

8    questionnaire, all of them walked --

9        A.    Yeah.

10       Q.    -- what do you mean by that?

11       A.    Nobody wanted to fill out that questionnaire.

12       Q.    Okay.   So was it a matter of Ms. Valverde saying,

13   "You've got to fill this questionnaire out if you want to

14   come look at the property," and everybody said, "I don't

15   want to do it"?

16       A.    That was the City of San Francisco's guidelines

17   at the time for this COVID thing.   You remember how crazy

18   it all got.

19       Q.    I do.

20       A.    Yeah.

21       Q.    All I want to understand is that, at least as far

22   as you understand it, you had 30 people interested or at

23   least that inquired about looking at this property?

24       A.    Right.

25       Q.    And not one of them agreed to fill out the

1  questionnaire that would allow them to come and look at

2  it?

3       A.    Right.

4       Q.    That's what you're saying?

5       A.    Yes.

6       Q.    Okay.  All right.  And do you -- well, there's

7  nothing in your lawsuit that has to do with the City's

8  restrictions on COVID, is there?

9       A.    No.

10       Q.    Okay.  And as far as the defendants in this case

11  go, Mr. Curran, Mr. Santos, Mr. Hughen, Mr. Birmingham and

12  Ms. Kwaitkowska, they didn't have anything to do with that

13  questionnaire, as far as you know?

14       A.    No.

15       Q.    Okay.  So would it be fair to say then, sir, that

16  the lack of people coming to see the property in the fall

17  of 2020 is not, in your mind, the fault of the City and

18  County of San Francisco?

19       A.    No.

20       Q.    Okay.  All right.  So 30 people call to view the

21  property.  Thirty people don't want to fill out the

22  questionnaire.  What do you recall happening next?

23       A.    We waited until '21.

24       Q.    So did you take the property off the market?

25       A.    Yes.

1    Q.   And then put it back on in 2021?

2    A.   Yes.

3    Q.   Do you remember the month when you put it back on

4    the property (verbatim)?

5    A.   I believe it was March, maybe April.

6    Q.   Okay.  Sometime in the spring?

7    A.   Yes, after they had lifted those idiotic

8    guidelines.

9    Q.   Okay.  When you put the property back on the

10   market in March and April of 2021 were there any existing

11   notices of violation on the property at that time?

12   A.   No.

13   Q.   Were there any existing orders of abatement on

14   the property at that time?

15   A.   No.

16   Q.   Was there any enforcement from the San Francisco

17   Planning Department at the property at that time?

18   A.   No.

19   Q.   Okay.  Any other liens or encumbrances that were

20   on the property when you put it back on the market in

21   March or April of 2021?

22   A.   No.

23   Q.   When the property was put back on the market in

24   the spring of 2021 was Ms. Valverde still your real estate

25   agent?

1      A.   No.

2      Q.   Who was your real estate agent at that time?

3      A.   Mike Aranda.

4      Q.   How do you spell "Aranda"?

5      A.   A-r-a-n-d-a.

6      Q.   Okay.  And how did you come to hire Mr. Aranda?

7      A.   He's the son of a friend of mine.

8      Q.   All right.  He's a licensed real estate agent?

9      A.   Yes.

10     Q.   And who does he work for at least?

11     A.   I forget.

12     Q.   Okay.  All right.  And was there a reason why you

13  didn't use Ms. Valverde?

14     A.   She wanted to continue using those guidelines

15  from 2020.

16     Q.   I see.  Okay.  And where was Mr. Aranda based out

17  of, his business?

18     A.   He lives in Livermore.  I don't know.

19     Q.   Okay.  How about this?  Was he based in the city,

20  Mr. Aranda?

21     A.   I don't know.  He does a lot of work on the

22  peninsula, so maybe.

23     Q.   Okay.  And what was the listing price for the

24  property at that time?

25     A.   I believe it was 1.2.

Patrick Gallagher                                                July 31, 2025

```
 1        Q.   Million, right?
 2        A.   Yes.
 3        Q.   So it went up a tick?
 4        A.   You're asking me to guess.
 5        Q.   Okay.
 6        A.   It was around there.
 7        Q.   All right.
 8        A.   You know, realtors try and do different things
 9   with the numbers, like eights are supposed to be lucky in
10   Chinese.  Do you know what I mean?
11        Q.   Yeah.
12        A.   Okay.
13        Q.   Okay.  And did the property have any interest?
14        A.   Yes.
15        Q.   And what do you remember in that regard?
16        A.   We had offers, several.
17        Q.   How many, if you remember?
18        A.   I think three.
19        Q.   Okay.  Do you remember specifically what the
20   offers were for?
21        A.   You mean the amount?
22        Q.   Yeah.
23        A.   Right around 1.2.
24        Q.   Okay.  Were they all -- well, I mean, do you have
25   a specific memory of one being higher than the others, or
```

```
1   were they all kind of generally in the same --
2       A.   I don't recall.
3       Q.   Okay, okay.  Did you actually select one of the
4   offers?
5       A.   Yes.
6       Q.   Okay.  And is it about -- the amount of the
7   offer, was it about 1.2 million?
8       A.   Yes.
9       Q.   Okay.  Do you remember who made the offer?
10      A.   No.
11      Q.   Do you remember whether or not the person who
12  made the offer -- the entity that made the offer, were
13  they represented by a real estate agent?
14      A.   Yes.
15      Q.   Do you remember who the real estate agent was?
16      A.   No.
17      Q.   Okay.  Did you have any personal involvement in
18  that part of the process?
19      A.   No.  The realtors took care of their jobs.
20      Q.   Okay.  Did that offer go into escrow?
21      A.   Yes.
22      Q.   Okay.  And, I mean, the sale was not finalized,
23  right?
24      A.   No.
25      Q.   And why was that?
```

Patrick Gallagher                                          July 31, 2025

1    A.   Because either mid or late May they red-tagged my
2  house.
3    Q.   When you say "they" who do you mean?
4    A.   The building department.
5    Q.   And we'll talk about some of the NOV's, but I
6  think when you say "red-tagged," there was a number of
7  notices of violation that were issued by the Department of
8  Building Inspection?
9    A.   At that time?
10   Q.   Correct.
11   A.   No, just the one.
12   Q.   Okay.  And so just so I understand the timing of
13 it, when did the property go into escrow?
14   A.   Late April, early May.
15   Q.   Okay.  So it was during the escrow period that
16 these -- that the home was red-tagged?
17   A.   Yeah.  It had four days to go to close escrow.
18   Q.   Okay.  All right.  And do you recall any of
19 the -- like what happened with the buyer?  Did they say,
20 "I don't want to deal with it," or how did it fall apart?
21   A.   No.  They were willing to wait until I was able
22 to straighten all this out, because I just thought it was
23 a mistake.  You know, they wrote me up for an expired
24 permit, and I had a certificate of completion in hand, so
25 I just figured it was an error.  They just got the wrong

 1  house.
 2      Q.    Okay.  I guess -- and I know this is going to be
 3  difficult, because I know you want to talk about that, but
 4  I guess what I'm trying to get at just now is what
 5  eventually happened that made the sale fall apart?
 6      A.    They red-tagged the house.
 7      Q.    No, I get that, but you just said -- I think I
 8  heard you say that the potential buyer was willing to work
 9  with you until the issues surrounding the red tag went
10  away, right?
11      A.    Right.
12      Q.    Correct?
13      A.    Yeah.
14      Q.    And then at some point their willingness to work
15  with you on that stopped?
16      A.    Right.
17      Q.    And when did that happen?
18      A.    It happened -- when I first got red-tagged I went
19  down to the building department and they said, "Oh, you
20  need to speak with Mauricio," so I spoke with Mauricio,
21  and Mauricio tells me "Oh, no, no.  You have to speak with
22  Joe Duffy on this matter, and he's out for two weeks," and
23  then Joe Duffy comes back after two weeks and tells me
24  "I'm assigning this to Mauricio."  It's like "Okay.  Well,
25  I already talked to Mauricio, and he said to talk to you."

1  He said, "Well, I'm assigning it to Mauricio."  I said,

2  "Okay.  Great.  Let's get Mauricio on it."  "Yeah, he's

3  out for two weeks."

4       Q.   Okay.

5       A.   And then that's when it fell apart.

6       Q.   Okay.  So more or less a month after this --

7       A.   Yes.

8       Q.   Just let me finish.  A month after the property

9  is red-tagged is when the sale -- the escrow and the

10 potential sale fell apart?

11      A.   Approximately.

12      Q.   Okay.  Yeah.  I get that.  So I think you said

13 that the home was red-tagged in mid to late May, so that

14 would put us in mid to late June 2021, correct?

15      A.   Right.

16      Q.   When the sale fell apart?

17      A.   Yes.

18      Q.   Okay.  All right.  And then did you put -- well,

19 were there any other interested buyers at that point, or

20 do you know whether or not your agent even inquired about

21 that?

22      A.   There still were.

23      Q.   Okay.  And did any of those potential buyers --

24 did you guys actually get into escrow on those?

25      A.   I don't recall.

1    Q.   Okay.

2    A.   It was -- later on we did again a couple more

3  times, but I don't believe with any of the other ones,

4  because we were all up in the air, didn't know what was

5  going on.

6    Q.   So let me ask it this way then.  How many other

7  times did the property go into escrow, other than the one

8  we just talked about in late April, May 2021?

9    A.   I believe two more times.

10   Q.   Okay.  Let's just talk about the second time --

11 the second of the three times.  When did that happen?

12   A.   I don't recall.  It had to have been -- I'd be

13 guessing.

14   Q.   Okay.

15   A.   It had to be '22.

16   Q.   2022?

17   A.   Yeah.

18   Q.   But you can't give me a month?

19   A.   No.

20   Q.   All right.  All right.  So do you remember the

21 purchase price when it went into escrow the second time?

22   A.   I believe it was about the same.

23   Q.   About 1.2 million?

24   A.   Yeah.

25   Q.   Okay.  And you might notice a pattern to my

1    questions, but at that time the second escrow, were there

2    any notices of violation on the property at that time?

3        A.    Yes.

4        Q.    Okay.  Was it the same notice of violation as

5    before, or were there different ones?

6        A.    No.

7        Q.    Different ones?

8        A.    It was a new one.

9        Q.    Okay.  Just one, though?

10       A.    There were the windows, and that happened twice.

11       Q.    Okay.  Was there any planning enforcement at your

12   property when it went into escrow a second time?

13       A.    Well, Kevin Birmingham came out and said my

14   windows were illegal.

15       Q.    Okay.  But he works for the Department of

16   Building Inspection?

17       A.    Right.

18       Q.    Right.  I guess I'm asking about planning now.

19   So did you have any planning enforcement at the property?

20       A.    No.

21       Q.    Okay.  All right.  And do you believe that the --

22   well, do you believe that -- I'm assuming the second

23   escrow period, that deal also fell apart?

24       A.    Yes.

25       Q.    All right.  And why do you believe it fell apart?

1      A.    Well, we still couldn't get another certificate

2    of completion.

3      Q.    Okay.

4      A.    They claimed the original had expired, which it

5    had not.  It had been completed, so they just continued

6    lying, and then Birmingham comes out and says, "Your

7    windows are illegal."  Well, the windows were spec'd by

8    Kathleen Campbell at SF DBI.  Planning specifically states

9    what windows you can and can't use.

10      Q.    Okay.  So would it be fair to say that the -- in

11    your opinion, the second sale -- potential sale fell

12    through because of the enforcement at DBI?

13      A.    Right.

14      Q.    Against the property?

15      A.    Right.

16      Q.    And your recollection for the second sale is that

17    it had to do with the windows?

18      A.    Right.

19      Q.    Okay.  All right.  But it would be fair to say,

20    though, that the purchase price -- at least the potential

21    purchase price was, essentially, the same between the

22    first escrow period and the second escrow period?

23      A.    Yes.

24      Q.    All right.  All right.  And then I think you

25    said -- oh, was -- Mr. Aranda, was he still your real

1  estate agent?

2      A.  Yes.

3      Q.  Okay.  And then, I believe, you said there was a

4  third escrow period that fell out?

5      A.  Yes.

6      Q.  Okay.  And when did that happen?

7      A.  '23.

8      Q.  Okay.  Hold on.  If you're looking at some

9  documents I need to look at what you're talking about.

10 Okay.  So I'm holding an e-mail that you brought in today

11 from a Kathy MacKenzie, M-a-c-K-e-n-z-i-e, Kathy with a K,

12 talking about an update for closing, so I think now would

13 be a good time to do something I should have done

14 initially.

15         Mr. Gallagher, before we started we had a brief

16 conversation about some documents that you brought in

17 today.

18     A.  Uh-huh.

19     Q.  Yes?

20     A.  Yes.

21     Q.  Okay.  And these are documents that appear to

22 have been responsive to prior discovery requests and that

23 you asked me -- these are actually not copies for me to

24 have but copies that I would need to make of these

25 documents?

```
 1        A.    Yes.
 2        Q.    And so what we agreed off the record was that a
 3   very cursory review of these records appear to be
 4   duplicates of things I already have, but if there are
 5   issues that I wanted to inquire about after this
 6   deposition, I'm going to keep it open and we'll sort out
 7   the scheduling of inquiring about these documents.
 8              Okay.  So one of the questions I wanted to ask
 9   you towards the end was who is Kathy MacKenzie, and I
10   think the e-mail that you just handed me answers that
11   question.  She was an escrow officer for you?
12        A.    Yes.
13        Q.    Okay.  And she worked with, I presume, your real
14   estate agent for the third escrow period that fell apart?
15        A.    Yes.
16        Q.    And the e-mail is dated July 19th, 2023, so does
17   that accurately reflect generally the escrow period for
18   the third sale --
19        A.    Yes.
20        Q.    -- potential sale?  All right.  I also see a name
21   here, charlesquan@corcoranicon.com,
22   c-o-r-c-o-r-a-n-i-c-o-n.  Who's Mr. Quan?
23        A.    He's my newest real estate agent.
24        Q.    Okay.  Did Mr. Quan represent you for the third
25   sale?
```

 1     A.   Yes.

 2     Q.   Or third escrow period, correct?

 3     A.   Yes.

 4     Q.   Okay.  And did you have a relationship with

 5  Mr. Quan -- professional relationship with Mr. Quan prior

 6  to the third potential sale?

 7     A.   We had talked.

 8     Q.   Okay.  But in your mind, he was never acting as

 9  an agent on your behalf prior to the third escrow period;

10  is that true?

11     A.   No, he was my listing agent.

12     Q.   Okay.

13     A.   First it was Nancy.  Then it was Mike, and then

14  it was Charles.

15     Q.   And when did Mr. Quan begin working for you?

16     A.   You're asking me to guess.  Late '22, early '23.

17     Q.   All right.

18     A.   Late '22.

19     Q.   Okay.  After the second escrow period but before

20  the third?

21     A.   Yes.

22     Q.   Okay.  All right.  And so, you know, I'm sorry.

23  Getting back to the second escrow period, you know, you

24  described after the first escrow period the potential

25  buyers were initially willing to work with you to help

1  abate some of the issues that DBI was saying existed at
2  the property.  For the second escrow period you were
3  saying that there was an issue with the windows.  Was
4  there any willingness on the behalf of the second escrow
5  buyer to work with you to resolve the issues?
6      A.   Not exactly.
7      Q.   Okay.
8      A.   The issue with the windows was a lot more
9  technical.  For one thing, Kevin Birmingham was lying
10 through his teeth.  He was making this crap up, so I got a
11 hold of the board of supervisors --
12     Q.   Okay.  Hold on.  I feel like I know where you're
13 going to go with this, and I just -- I'm asking a pretty
14 narrow question right now.  We're going to talk about that
15 stuff.  Don't you worry, but really what I want to know is
16 was there a willingness on behalf of the potential buyer
17 in the second escrow period to, you know, go through with
18 the sale, despite what was going on with DBI?
19     A.   No.
20     Q.   Okay.  So once they heard about what was going on
21 they're like "We're out"?
22     A.   Once they heard how long it was going to take.
23     Q.   Okay.  Great.  Now getting back to the third
24 escrow period, do you remember approximately what the
25 proposed purchase price was?

1       A.    It was about the same.

2       Q.    Okay.  So for the three potential escrow periods

3   or -- for the three escrow periods that you entered into

4   pertaining to the property, all of the purchase prices

5   were relatively the same?

6       A.    Yes.

7       Q.    All right.  What was your understanding of why

8   that sale fell apart?

9       A.    Second time?

10      Q.    The third time.  Excuse me.

11      A.    The third time they had went ahead and slapped

12  these abatements on the house.

13      Q.    Okay.

14      A.    Which hadn't been there before, and they're all

15  from before I even owned the place.

16      Q.    Okay.

17      A.    They're from 2018, 2017 and 2016.

18      Q.    Okay.  And when you say that you're pointing to

19  an e-mail that just says the complaint number with the

20  year in the first four digits, right?

21      A.    Right.

22      Q.    All right.

23      A.    And they did it purposely to stop the sale again.

24      Q.    Okay.  But the e-mail that you've showed me,

25  there's three orders of abatement, right?

1      A.    Right.

2      Q.    And the e-mail that you're putting in front of me

3  is an e-mail from Mr. Matthew Greene, correct?

4      A.    He's part of the thread, yes.

5      Q.    Well, the particular e-mail that I'm looking at

6  right now is from Matthew Greene, right?

7      A.    Okay.

8      Q.    I mean ...

9      A.    Yes.

10      Q.    Okay.  And in this e-mail dated June 8, 2023, he

11  tells you there are three orders of abatements, correct?

12      A.    Yes.

13      Q.    And one is recorded on February 3, 2019, correct?

14      A.    I don't believe so.  Yeah, they were all recorded

15  in 2019.

16      Q.    All three of the orders of abatement that

17  Mr. Greene is indicating that are against your property

18  were recorded in 2019?

19      A.    Right.

20      Q.    At least according to this e-mail?

21      A.    According to that e-mail.

22      Q.    Okay.  And that was after you purchased the

23  property?

24      A.    Yes.

25      Q.    Okay.  And this e-mail again is dated June 8,

Patrick Gallagher                                      July 31, 2025

```
 1   2023?
 2       A.   Right.
 3       Q.   Okay.  So are you saying that the -- you're not
 4   saying that the orders of abatement were recorded to
 5   prevent the sale of the property, are you?
 6       A.   Yes.
 7       Q.   Okay.  So are you saying that back in 2019 DBI
 8   was working to prevent you from selling the property?
 9       A.   No.
10       Q.   Okay.  Then what are you saying?
11       A.   I'm saying that these abatements were cleared in
12   2018, all three of them.  Okay?  Then he came in and
13   slapped them back on the house.
14       Q.   Okay.  So what you're saying is that the orders
15   of abatement that Mr. Greene is referencing in this e-mail
16   were abated, were cleared by the --
17       A.   Yes.
18       Q.   -- Department of Building Inspection?
19       A.   Yes.
20       Q.   And that he ignored that abatement or did
21   something to bring it back up at that time?
22       A.   Yes.
23       Q.   I see.  Okay.
24       A.   Yes.  And just because he's got something in
25   writing on an e-mail, I wouldn't count on the validity of
```

1   any of it.

2        Q.   I'm not getting into that right now.

3        A.   Okay.

4        Q.   Just you gave it to me so that's why I'm asking

5   you about it.  Okay.  All right.  And so would it be fair

6   to say then that the third escrow period fell apart for

7   the same reason as the second one?  In other words, there

8   was some enforcement going on with DBI that the potential

9   buyer didn't want to wait around to have resolved?

10       A.   Right.

11       Q.   Okay, okay.  And so I guess you're not claiming,

12  though, that the -- well, did you eventually sell the

13  property?

14       A.   Yes.

15       Q.   And when did that happen?

16       A.   A few months ago.

17       Q.   Okay.  This year?

18       A.   Yes.

19       Q.   Okay.  What was the purchase price?

20       A.   One million.

21       Q.   Okay.  And so would it be fair to say that part

22  of your damage claim is the .2 difference between the

23  prior escrow periods and what it eventually sold for?

24       A.   Yes.

25       Q.   Okay.  Who was your real estate agent for that

 1   transaction?

 2        A.   That was Delia Colmenares.

 3        Q.   You're going to have to spell that.

 4        A.   D-e-l-i-a, and then Colmenares.  I don't know.

 5        Q.   Okay.  That's a woman, right?

 6        A.   Yes.

 7        Q.   And Ms. Colmenares, is she associated with a real

 8   estate brokerage --

 9        A.   Yes.

10        Q.   -- outfit?  Which one?

11        A.   Homes by Delia.

12        Q.   And where is she based out of, location?

13        A.   Discovery Bay.

14        Q.   Do you know whether or not Ms. Colmenares had any

15   experience selling or purchasing homes in San Francisco?

16        A.   I don't know.

17             MR. SIMS:  I'm going to -- let's just mark this

18   as one.  Let me do one that's not stapled.

19                   (Deposition Exhibit Number 1

20                    was marked for identification.)

21   BY MR. SIMS:

22        Q.   Now, Mr. Gallagher, you have in front of you

23   what's been marked as Defendant's Exhibit 1.  Do you

24   recognize that document, sir?

25        A.   Yeah.

1       Q.   Do you recognize it as the operative complaint in
2    this case?
3       A.   Yes.
4       Q.   Okay.  I'd like you to turn to page 12, and look
5    at paragraph number 48.
6       A.   Okay.
7       Q.   And the last -- that paragraph describes work
8    that you performed regarding the windows at your property,
9    correct?
10      A.   Yes.
11      Q.   And you estimate the work associated with that --
12   the facts alleged in that paragraph to be approximately
13   $30,000?
14      A.   Yes.
15      Q.   Okay.  Do you -- you've produced documents in
16   this case, correct, sir?
17      A.   Yes.
18      Q.   Did you produce any receipts related to the
19   windows?
20      A.   Produce to whom?
21      Q.   To me or the City.
22      A.   No.
23      Q.   Okay.  Do you have any proof of the -- that the
24   work associated with paragraph 48 cost approximately
25   $30,000?

1      A.    Yes.

2      Q.    And what proof do you have?

3      A.    Bank records, cancelled checks.

4      Q.    Okay.  And why didn't you produce those?

5      A.    I'm trying to produce everything you asked for.

6    It's just, you know -- I don't know.  Did you ask for

7    them?

8      Q.    Yeah.

9      A.    I must have missed it.

10     Q.    Okay.  Do you still believe that the work cost

11   about $30,000?

12     A.    I think it probably cost more than that.

13     Q.    And how much more?

14     A.    I don't know.  $40,000.

15     Q.    Okay.  There's also -- and I forget where it is,

16   but there's an allegation that the assessed value of the

17   property from the tax assessor went up during your

18   ownership at 200 Naples.

19     A.    It went up August 27th of 2020.

20     Q.    Okay.  Do you believe that the named defendants

21   in this case had a hand in that occurring?  In other

22   words, is that part of your lawsuit?

23     A.    What's the question?

24     Q.    The increase in the assessed value and the

25   taxable assessed value of your property, is that part of

```
1    your damage claim in this lawsuit?
2        A.    No.
3        Q.    Okay.  Other than -- I'm assuming, though, that
4    the tax that you had to pay on the property between the
5    time you believe you should have sold it and when it was
6    eventually sold is something that you're claiming a
7    damage -- as damage in this case, right?
8        A.    Yes.
9        Q.    Okay.  Are there any other damages that you're
10   claiming in this case, other than what we talked about
11   regarding the windows and the difference between the
12   purchase price of the escrow periods and the eventual sale
13   price and the amount of tax that you paid on the property
14   between when you believe you should have sold it and when
15   it eventually sold?
16       A.    Seven years.  This project should have taken me
17   10 weeks and $100,000.  It took me seven years and well
18   over two million.
19       Q.    Okay.  Do you have any documents associated with
20   that claim?
21       A.    Yeah.
22       Q.    Okay.  And what documents do you have?
23       A.    Again, cancelled checks, bank records.
24       Q.    Okay.  And those documents are in your
25   possession?
```

1      A.   Yes.

2      Q.   Okay.

3      A.   You know, as I recall, I think I was going to

4  object to sending you financial records, but I guess I

5  can -- I can black out some of it and send the substantial

6  stuff.

7      Q.   Okay.  But other than -- I just want to make sure

8  I understand the universe of damages that you're claiming

9  in this case.  So we've got the difference in the escrow

10 and the sale price.  We've got the tax.  We've got, sounds

11 like, the time and money to get the property into

12 compliance with what DBI was telling you you needed to do,

13 right?

14     A.   Uh-huh, yes.

15     Q.   And the cost of the windows, correct?

16     A.   Well, there's more to it than that.

17     Q.   That's what I'm trying to ask you about.

18     A.   The holding costs alone were $7,000 a month.

19     Q.   What do you mean by "holding costs"?

20     A.   The mortgage, the insurance.

21     Q.   And you have documents that support that claim,

22 correct?

23     A.   Yes.

24     Q.   Okay.  All right.  Anything else?

25     A.   Lost income on the 1.2.

```
1      Q.   And we talked about that already, right?
2      A.   No.
3      Q.   We talked about the difference between the
4   sale -- the difference between the 1.2 escrow price and
5   the eventual sale price of the $1 million?
6      A.   That's not the lost income.
7      Q.   Okay.  Well, tell me what you mean by that.
8      A.   When I would buy a house, fix it up and sell it,
9   on average I made about 15 percent, so over the years, I'd
10  say, 2010 up to about 2018 I was making about $300,000 a
11  year on the principal, so we're looking at $300,000 a year
12  that I didn't earn for seven years.
13     Q.   I see.  So let me try and say it in a way that I
14  think you mean, that had this sale gone as you expected
15  it, you would have taken that money that you made from the
16  property and put it into another project?
17     A.   Yes.
18     Q.   And that money would have funded a different
19  house renovation project at a different location that
20  would have potentially made you another chunk of money?
21     A.   Yes.
22     Q.   And because this project was held up you were
23  prevented from doing that?
24     A.   Right.
25          MR. SIMS:  Okay.  I see.  Okay, okay.  I think I
```

 1    understand.  I'm at a good transition point.  Five

 2    minutes.

 3                      (Recess was taken.)

 4    BY MR. SIMS:

 5        Q.    All right.  Mr. Gallagher, we took a quick break,

 6    and before we start with a new line of questioning I just

 7    want to confirm there's nothing about your prior testimony

 8    that you wanted to add or modify.  Is that correct?

 9        A.    No.

10        Q.    Okay.  Great.  I'm only going to say this next

11    part because you are pro se, which is a legal term meaning

12    "representing yourself."  You've reviewed Exhibit 1

13    before, and are you aware that there was a motion to

14    dismiss that was granted by the judge in our case?

15        A.    Yes.

16        Q.    Okay.  And do you have an understanding that as a

17    result of that ruling that the -- there's two main legal

18    issues that you have against the City and its employees,

19    one, that the individual defendants that you have named

20    retaliated against you in their enforcement and that the

21    City has a policy and practice of doing that against

22    homeowners seeking to renovate homes in San Francisco?  Do

23    you understand that that's the legal claims that were made

24    in the case?

25        A.    They retaliated against me because of --

1      Q.   We're going to talk about the facts that support

2    your claims.  I'm just -- generally you understand that

3    those are the claims?

4      A.   Yes.

5      Q.   Okay.  Great.  And so the reason I said that is

6    because I'm going to go through the defendants that are

7    named in this case and ask you specific questions about

8    what you think each one of them did.

9      A.   Okay.

10     Q.   Okay?  So William Hughen -- and I'm not sure if

11   I'm pronouncing that right, but it's spelled H-u-g-h-e-n.

12   Do you know Mr. Hughen?

13     A.   Yes.

14     Q.   And how do you know Mr. Hughen?

15     A.   He's in planning.

16     Q.   And what capacity does he work in planning?

17     A.   He was the one I had to go through for the ADU

18   application.

19     Q.   Okay.  And did Mr. Hughen eventually approve your

20   ADU application?

21     A.   No.

22     Q.   Was that because he stopped working for the City?

23     A.   No, he ended up passing it off to Natalia.

24     Q.   Okay.  Do you know why that happened?

25     A.   Yes.

1      Q.    Why, or what's your understanding?

2      A.    At the time I was in contact with the board of

3  supervisors' office.

4      Q.    Okay.

5      A.    And so they had assigned me a representative from

6  their office to assist me.  I forget what his name was.

7  Ernest Jones, Ernest Jones.  They called him "EJ."  So

8  Will Hughen threw up every roadblock he could think of,

9  and he just made this stuff up.  None of it was actually

10  lawful.  It was actually all unlawful.  In the first

11  place --

12      Q.    Just hold on one second.  Sorry.  So my question

13  was why do you believe that the work from planning

14  associated with your ADU application transferred from

15  Mr. Hughen to Ms. Kwaitkowska, K-w-a-i-t-k-o-w-s-k-a?

16  Just that question right now.

17      A.    I think the board of supervisors came in and

18  cracked down on him.

19      Q.    So is it your belief that -- it wasn't the board

20  of supervisors.  It was employees of the supervisor in the

21  district that 200 Naples was in, correct?

22      A.    What's the question?

23      Q.    I guess it's -- you're not saying that the

24  collective board of supervisors -- in other words, all of

25  the board of supervisors -- cracked down on your ADU

```
 1   application?
 2       A.    The board of supervisors were on my side.
 3       Q.    Okay.  And so, I guess, Mr. Jones -- who did he
 4   work for?
 5       A.    The board of supervisors.
 6       Q.    The entirety of the board?
 7       A.    He was -- he worked for Ahsha.
 8       Q.    Right.  I got it.
 9       A.    I forget his full name, but he represents
10   District 10.
11       Q.    Okay.
12       A.    Safai Ahsha.
13             MR. SIMS:  I'll get you the spelling.
14       Q.    And so was that the only -- he was a member of
15   the board of supervisors?
16       A.    Yes.
17       Q.    And he represented the district in which your
18   property lays?
19       A.    Yes.
20       Q.    Okay.  That was the only person on the board of
21   supervisors that you were working with, correct?
22       A.    Yes.
23       Q.    Okay.  And so when you say the board of
24   supervisors cracked down on planning, do you mean that the
25   district supervisor for your district cracked down on
```

1  planning, or do you mean the entirety of the board of

2  supervisors cracked down?

3      A.   I don't know.

4      Q.   Okay.  All right.  And when you say that the

5  board of supervisors cracked down, what do you believe

6  they did?

7      A.   Well, what Will Hughen was doing was illegal.

8      Q.   Okay.

9      A.   He was making up his own laws.

10     Q.   Okay.  So what do you think the supervisor did

11 about that?

12     A.   I don't know, but he disappeared and Natalia

13 ended up taking over.

14     Q.   Okay.  So I think earlier you said that your

15 belief was that the -- Mr. Hughen's responsibility related

16 to your property was transferred to Ms. Kwaitkowska

17 because the board of supervisors cracked down on what

18 Mr. Hughen was doing?  Do I have that right?

19     A.   I believe so.

20     Q.   Okay.  And the basis for that statement, you have

21 no basis, right?

22     A.   No, I have a basis.

23     Q.   Okay.  What is it?

24     A.   Will Hughen instead of following the laws --

25     Q.   Okay.  I do appreciate that you believe that

Patrick Gallagher                                         July 31, 2025

1   Mr. Hughen was not following the laws.

2       A.    No, I know for a fact he wasn't following the

3   laws.

4       Q.    Fine, fine.  That's fine.  What I'm asking is

5   specifically what do you believe happened from the

6   supervisors' office that resulted in Mr. Hughen no longer

7   being involved in your project?

8       A.    I don't know.  I don't know what was said to him.

9       Q.    Okay.

10      A.    Just that it was taken away from him and sent

11  over to Natalia.

12      Q.    Okay.  So you can't say with any certainty that

13  that transfer happened for any other reason other than the

14  fact that you were speaking with the staff of a member of

15  the board of supervisors at the time?

16      A.    Right.

17      Q.    Okay.

18      A.    So --

19      Q.    Just hold on.

20      A.    Specifically Will Hughen I don't know, but later

21  on I can say for certainty what happened with planning

22  altogether.

23      Q.    Okay.  I'm just asking about Mr. Hughen right

24  now.

25      A.    Okay.  So we'll stick with Mr. Hughen.

1      Q.    Right.   So do you believe that Mr. Hughen -- it

2    sounds like the crux of what you have claimed against

3    Mr. Hughen is that he was misinterpreting the laws and

4    regulations pertaining to ADU's.

5      A.    No, he was ignoring.

6      Q.    Okay.

7      A.    And making up his own laws.

8      Q.    I see.   Okay.   So when did you first come in

9    contact with Mr. Hughen?

10     A.    When Mauricio forced me to apply for an ADU.

11     Q.    With planning?

12     A.    With planning.

13     Q.    And prior to -- prior to that had you ever

14   interacted with Mr. Hughen?

15     A.    I might have on the 2018 permit.

16     Q.    Okay.   Did that go to planning?

17     A.    It went through all the stations.

18     Q.    Okay.

19     A.    So that's why I say I might have.

20     Q.    But you don't have a specific recollection of

21   that?

22     A.    No.

23     Q.    Okay.   So -- you know, for purposes of this

24   question, you know, I appreciate what you're saying about

25   Mr. Hughen either misinterpreting or making up his own

1  rules pertaining to ADU's.  Why do you believe he was

2  doing that?

3      A.    I believe he was directed to by Joe Duffy.

4      Q.    Okay.  You believe that Mr. Hughen was behaving

5  or interpreting the laws in the ways that he did because

6  of Joe Duffy?

7      A.    Yes.

8      Q.    Okay.  And what is the basis for that statement,

9  sir?

10     A.    Well, have you ever heard of something called

11  "day law"?

12     Q.    I mean, kind of.

13     A.    It's nothing.  It doesn't exist.  It's not real.

14     Q.    Okay.

15     A.    So when you apply for an ADU, all right -- and

16  this is before.  That goes -- you start with planning, and

17  before you even get to planning you have to go through a

18  screening process, and in that screening process your

19  project has to fall under one of two ordinances.  In my

20  case I fell under 95-17.

21     Q.    What's the other one?

22     A.    It's 162 something.  I forget.

23     Q.    Okay.  And so -- so my question then is -- I'm

24  asking you why you believe Mr. Hughen did the things

25  you're alleging that he did because of Joe Duffy.

1    A.    Right.

2    Q.    Why?

3    A.    Because Joe Duffy told him to.

4    Q.    Okay.  Did you hear that continue -- was there a

5    conversation about that?

6    A.    No, but I had spoken enough to Joe Duffy to know

7    that he was really pissed off that I had spoken with the

8    FBI.

9    Q.    Okay.  So have you ever been present for a

10   conversation between yourself, Joe Duffy and Will Hughen?

11   A.    I believe so, once, yeah.

12   Q.    Okay.

13   A.    And Ernest Jones was there as well.

14   Q.    That was during a meeting that you had?

15   A.    Yes.

16   Q.    All right.  Other than that time, have you ever

17   been privy to conversations between Mr. Hughen and

18   Mr. Duffy?

19   A.    No.

20   Q.    Do you know who Mr. Duffy works for?

21   A.    Yeah.  He works for Patrick O'Riordan.

22   Q.    At the Department of Building Inspection?

23   A.    Yes.

24   Q.    And you just said Mr. Hughen works for the

25   planning department, right?

Patrick Gallagher                                                    July 31, 2025

1    A.   Right.
2    Q.   Do you believe that Mr. Duffy has any ability to
3  direct the conduct of Mr. Hughen?
4    A.   Yes.
5    Q.   And what's the basis of that?
6    A.   He's the head of the department.  He's the head
7  of building.
8    Q.   You understand that planning is a separate
9  department, correct?
10    A.   It's still all within San Francisco DBI.
11    Q.   That's what you believe?
12    A.   Yeah.
13    Q.   Okay.  You believe that the San Francisco
14  Planning Department is a subsidiary or part of the
15  San Francisco Building Department?
16    A.   Yes.
17    Q.   Okay, okay.  And that your understanding is that
18  because Mr. Duffy is high up in the building department,
19  he has the authority to direct the actions taken by
20  Mr. Hughen?
21    A.   Yes.
22    Q.   I see.  Okay.  And is that the only thing that
23  you think that Mr. Hughen did wrong, that he was taking
24  direction from Mr. Duffy?
25    A.   No.

1    Q.   Okay.

2    A.   He wouldn't follow the rules set forth.  So 95-17

3    is about that thick.

4    Q.   I understand.  I'm trying to avoid getting into

5    this part of the conversation with you right now because

6    I'm trying to really just hone in on what you think

7    Mr. Hughen did wrong, and I understand that you think that

8    he is either misinterpreting or making up his own rules

9    and interpretation of those rules pertaining to ADU's, and

10   what I'm hearing you saying is that at least part of the

11   reason why he was doing that was because Mr. Duffy told

12   him to do it.

13   A.   I believe so.

14   Q.   Okay.  Is that all you think Mr. Hughen did wrong

15   as it pertains to your case here?

16   A.   No.

17   Q.   Okay.  I mean --

18   A.   I keep trying to explain it to you, but you keep

19   cutting me off.

20   Q.   Okay.  I think what you're about to explain to me

21   is that he's misinterpreting 95-17.

22   A.   He's not even reading 95-17.  He's making up his

23   own laws.

24   Q.   Okay.

25   A.   When you asked if these people were making

1  policy, that's what I'm talking about.

2      Q.   So, I guess, what I'm getting at, Mr. Gallagher,

3  is why -- okay.  Other than working at the direction of

4  Mr. Duffy, why did Mr. Hughen, in your mind, take the

5  actions he took?

6      A.   To slow, obstruct, you know, derail the project.

7      Q.   Okay.  And why do you think he did that?

8      A.   I think Joe Duffy told him to because he was

9  pissed off that I had given the FBI a statement.

10     Q.   Okay.  Other than your belief that -- well, do

11  you believe that Mr. Hughen intentionally tried to delay

12  your project because Mr. Duffy told him to do it?

13     A.   Yes.

14     Q.   Do you believe that Mr. Hughen would have done it

15  anyway, even without Mr. Duffy telling him to do it?

16     A.   No.

17     Q.   So would it be fair to say then that the action

18  that you believe -- the unlawful actions of Mr. Hughen

19  were done at the direction of Mr. Duffy?  Correct?

20     A.   I believe so.

21     Q.   And they would not have happened had Mr. Duffy

22  not intervened himself?

23     A.   I'm not sure.

24     Q.   Okay.  You can't say one way or the other?  Just

25  answer --

1     A.   Hold on a second.  You're trying to pull this

2  apart in little tiny bits, right, instead of the context

3  of what actually happened.  All right?  He wasn't the only

4  one delaying me.  I mean, the whole department was doing

5  this, and then later -- I mean, Joe Duffy was pissed off

6  that I had talked to the FBI on more than one occasion,

7  and he was also ticked off that I had gone to the board of

8  supervisors.

9     Q.   Okay.  Right.  I think we're talking about

10 Mr. Duffy's motivations for doing what you think he did,

11 and so -- and I appreciate what you're saying about

12 context, right, but I am trying to parse this out because

13 that's what legally the case is about.  It's about what

14 individual did what, so I just want to finish this one

15 little part of the questioning about Mr. Hughen, and I

16 just want to make sure -- I think you just said this, that

17 you believe that Mr. Hughen delayed your ADU application

18 intentionally --

19     A.   Yes.

20     Q.   -- because Mr. Duffy told him to do that.

21     A.   Not just because, but -- I mean, it's kind of

22 like cops.  Right?  Cops don't rat out other cops, right,

23 so they're a wheel -- they're a unit.  This is SF DBI.

24 They all go to lunch together.  They all golf together.

25 So word gets around that office pretty quick about who to

1  obstruct and who not to, who to help and who to really

2  screw over.

3      Q.   Okay.  So do you think Mr. Hughen -- I'm really

4  not following what you're saying.  Let me try to ask it a

5  different way.  Other than your belief that Mr. Hughen was

6  taking direction from Mr. Duffy to delay your project, do

7  you have any other thoughts or facts to support that

8  Mr. Hughen retaliated against you?

9      A.   Sure.

10     Q.   Okay.  What are they?

11     A.   That's what I've been trying to explain to you.

12  He took the laws governing ADU's that go through planning

13  and just tossed it aside.

14     Q.   I get that, and I think --

15     A.   I don't think you do.

16     Q.   No, I don't think you're listening to me.  I

17  understand what you're saying about his interpretation of

18  ADU regulations, and I think you've already told me that

19  you don't know whether or not Mr. Hughen would have taken

20  the positions he did absent the intervention of Mr. Duffy.

21  Didn't you just say that?  You don't know one way or the

22  other what would have happened, right?

23     A.   I know that once a rumor gets circulated in that

24  building, specifically on the fourth floor, I think you're

25  sunk.  You're screwed.

1    Q.    Okay.  So do you have any information to support

2    the notion that Mr. Hughen knew you were talking to the

3    FBI?

4    A.    Yes.

5    Q.    And why do you believe that?

6    A.    Well, because I told him several times that I did

7    not rat out Bernie.

8    Q.    Okay.  And other than that, do you have any other

9    belief or basis to believe that Mr. Hughen was aware that

10   you were interviewed by the FBI?

11   A.    Sure.

12   Q.    Okay.  What else?

13   A.    I kept telling him, you know --

14   Q.    I'm saying other than what you were telling --

15   A.    I told him if the FBI is asking questions you

16   have to answer them.  Otherwise, I go to jail, right?  Who

17   cares if Bernie goes to jail?  I mean, he's the idiot that

18   got himself caught, but all these people, Bernie was their

19   friend.  You see when they red-tagged me in May this was

20   just days after Bernie got indicted.  That was not

21   coincidence.  The FBI didn't think so.  I didn't know what

22   the hell was going on.

23   Q.    Okay.  All right.  Mr. Gallagher, I am just

24   trying to get a simple question answered from you.  Okay?

25   And so the last question I asked you was do you have any

1   basis to believe, outside of what you personally told

2   Mr. Hughen, that he was aware that you were speaking with

3   the FBI?

4       A.   Yes.

5       Q.   Okay.  What's the basis of that?

6       A.   I already told you.  I said I had sent him e-mail

7   after e-mail telling him I did not rat out Bernie to the

8   FBI.

9       Q.   Right.  That's what I'm saying.  I don't think

10  you're listening.

11      A.   No, I am listening.

12      Q.   I'm asking --

13      A.   Listen.

14      Q.   Just hold on (unintelligible) --

15      A.   When they --

16                      (Overlapping voices.

17                      Reporter admonition.

18              The record was read back.)

19          THE WITNESS:  When they red-tagged the house in

20  May, right, Mauricio came back out, and the first thing he

21  said to me was "We know who you've been talking to," so

22  who does he mean by "we"?  Is it everybody on the fourth

23  floor?

24  BY MR. SIMS:

25      Q.   Okay.  All right.

1      A.   All right.

2      Q.   All right.  So you interpreted that statement by

3 Mr. Hernandez as Mr. Hughen knowing that you were talking

4 with the FBI?

5      A.   I believe the whole floor knew about it.

6      Q.   All right.  Where do you believe Mr. Hughen

7 worked at the time you were dealing with him?  Not

8 department but location.

9      A.   On Van Ness.

10      Q.   An address?

11      A.   Whatever the address is over there.  What is it,

12 55?

13      Q.   I'm asking you.

14      A.   I don't remember.

15      Q.   Okay.  All right.  So -- okay.  All right.  So

16 there's -- your belief that Mr. Hughen knew that you were

17 speaking with the FBI is based on statements that you made

18 to him personally and this one comment that Mr. Hernandez

19 made to you at your property, correct?

20      A.   Yeah, and I know how the rumor mill works in an

21 office building.

22      Q.   And Mr. Hughen was not there when Mr. Hernandez

23 made that statement to you?

24      A.   You know, a lot of people weren't at that

25 building any longer.  Everybody was working remotely, so

1  everything was going through e-mail channels.

2      Q.   Mr. Hughen was not present when Mr. Hernandez

3  made that statement to you that you just described?

4      A.   At the house?

5      Q.   Correct.

6      A.   No.

7      Q.   He was not there?

8      A.   No.

9      Q.   Okay.  All right.  So how long, as far as a

10  period of time goes, did Mr. Hughen work on your project?

11      A.   I'd say about -- he held it up for quite a while.

12  About six months, I'd say.

13      Q.   Okay.  And that's an estimate, correct?

14      A.   Yes.

15      Q.   Okay.  And then you said that Mr. Hughen delayed

16  and obstructed the approval of the permit?

17      A.   Yes.

18      Q.   Okay.  And what specifically do you mean by that?

19      A.   Under 95-17, okay, they have to ministerially --

20  you know the word -- approve the application within

21  90 days, so they didn't even come close to that.  I mean,

22  they threw that rule right out the window.

23      Q.   And is that -- do you believe that they had

24  90 days to approve it because you believe that your

25  project involved a voluntary seismic retrofit?

Patrick Gallagher                                                    July 31, 2025

1       A.    Yes.

2       Q.    All right.  Is that the only basis that you

3   believe that the application should have been approved

4   within 90 days for your ADU?

5       A.    Because of the seismic retrofit?

6       Q.    Correct.

7       A.    No.

8       Q.    What were the other bases that you believe the

9   application should have been approved within 90 days?

10      A.    Because it was a perfect spot for an ADU, and

11  Mauricio had directed that I apply for an ADU, even though

12  I didn't want an ADU, so I figured these guys must really

13  want an ADU out there, but they didn't.  They just wanted

14  to screw me over --

15      Q.    Okay.

16      A.    -- good as they could.

17      Q.    All right.  So other than -- so again, I'm just

18  trying to understand what you're claiming in this lawsuit.

19  I'm not trying to be difficult with you.

20      A.    Uh-huh.

21      Q.    So you believe that Mr. Hughen intentionally

22  obstructed and delayed the application at the direction of

23  Mr. Duffy, correct?

24      A.    Yes.

25      Q.    Okay.  And that part of the -- and because he was

1  aware that you had discussed Mr. Curran with the FBI,

2  correct?

3      A.   Yes.

4      Q.   And that you also believe that by -- part of his

5  efforts to obstruct your application was that he did not

6  comply with the 90-day approval requirement?

7      A.   That was one of the things.

8      Q.   Okay.

9      A.   That was just one of the things.

10     Q.   Okay.  All right.  What are some of the other

11 things?

12     A.   Well, the use of day law instead of 95-17.

13     Q.   Okay.  All right.  And then --

14     A.   There's no such thing as "day law."

15     Q.   All right.  And what else, other than -- okay.

16 So we've got that he didn't comply with the 90-day

17 requirement, that he used day law, which you believe is

18 not a thing, and then what else?

19     A.   And then he wouldn't approve the parking -- the

20 off-street parking.

21     Q.   All right.

22     A.   He kept calling it "illegal."

23     Q.   All right.  Okay.  Anything else that you believe

24 that he did to unnecessarily delay your permit for -- with

25 planning?

1    A.    It's all in the e-mails and in the complaint.

2  It's in there.

3    Q.    Okay.  All right.  And so you also -- on

4  Exhibit 1 I'd like you to turn to page 12, and look at

5  paragraph 49.  All right.  The first sentence reads "In or

6  around October of 2021, approval of Plaintiff's

7  application for an additional dwelling unit was

8  transferred to Hughen, Senior Planner with the City's

9  Planning department.  Hughen, and then Kwaitkowska,

10  Principal Planner with the City's Planning department,

11  egregiously delayed the approval of the application for

12  months on end, forcing Plaintiff to jump over more

13  arbitrary hurdles.  A process that should have taken a few

14  weeks, took over seven months before Plaintiff's initial

15  application for the additional unit was approved in or

16  around May of 2022."

17        So my question is is October 2021 when you first

18  started working with Mr. Hughen?

19    A.    It could have been.

20    Q.    Okay.  Well, do you disagree with what's written

21  in the complaint?

22    A.    No.

23    Q.    Okay.  Do you have any reason to believe what's

24  in the complaint is untrue?

25    A.    No.

Patrick Gallagher                                                July 31, 2025

```
 1        Q.    Okay.  All right.  So let me get back to the
 2   parking thing.  When you purchased the property was there
 3   an existing driveway?
 4        A.    Yes.
 5        Q.    And where was the driveway located?
 6        A.    On Naples.
 7        Q.    Okay.  And was there a curb cut on the sidewalk?
 8        A.    There was.
 9        Q.    When you purchased it?
10        A.    Yeah, but the neighbor had filled it in.
11        Q.    So when you purchased the property there was a
12   curb cut?
13        A.    Yeah.
14        Q.    And then the neighbor filled it in?
15        A.    Yeah.
16        Q.    Which neighbor?
17        A.    The neighbor just down on Naples.
18        Q.    Okay.
19        A.    Adjacent to the property.  See, my property sits
20   like this, where all the other homes sit like this, and
21   I'm at the top of the --
22                   (Reporter admonition.
23                   The record was read back.)
24            THE WITNESS:  So this guy right here.
25   ///
```

Patrick Gallagher                                          July 31, 2025

```
 1   BY MR. SIMS:
 2       Q.   The neighbor?
 3       A.   Right.
 4       Q.   I'm sorry.  You said "adjacent."  Was he next
 5   door to you or across the street?
 6       A.   Next door.
 7       Q.   Okay.  And so when did you become aware that the
 8   neighbor filled in your curb cut?
 9       A.   When I went back out there, when I got my guys
10   together.  I pulled an initial permit just to get started,
11   went through plan check, and at that time I told the guy
12   that "I don't know what we're going to need to do out
13   here.  I've just got to get started," so we started with
14   just cabinets and drywall, and really all we were doing
15   was dismantling the place, you know.
16       Q.   Okay.  So, it sounds like, what you're trying to
17   say is once you began working at the property is when you
18   became aware that there was no longer a curb cut on the
19   sidewalk?
20       A.   Right.  I had purchased -- I had looked at the
21   property in 2018, like on or about March, and I don't
22   think we closed on it until, like, May.
23       Q.   And when did you come out to begin work at the
24   property?
25       A.   In May.
```

1    Q.    Okay.  So sometime between -- according to you,

2    sometime between March and May 2018 the curb cut was

3    filled in by a neighbor?

4    A.    Right.

5    Q.    Okay.  And why do you believe a neighbor did it?

6    A.    Because all the other neighbors told me he had

7    done it.

8    Q.    Okay.  And -- okay.  I think you are aware

9    that -- you eventually worked with the Department of

10   Public Works about this issue, correct?

11   A.    Yes.

12   Q.    And did they tell you they had no evidence that

13   the curb cut existed?

14   A.    Yeah.  They said they couldn't Google it.

15   Q.    Okay.  But they didn't say, "We have a permit

16   that shows the curb cut being put in or removed"?

17   A.    No.

18   Q.    Okay.

19   A.    Just keep in mind it was built in 1907.

20   Q.    The curb cut?

21   A.    The house and the curb and the property, yes,

22   1907.

23   Q.    Okay.  You understand there's a difference

24   between the property -- the house that's on the property

25   and the sidewalk, correct?

1    A.   Yeah.

2    Q.   Okay.  And so are you saying that the sidewalk in

3  front of 200 Naples was made in 1907?

4    A.   Well, whenever it was made it included the curb

5  cut there.

6    Q.   How do you know that?

7    A.   Well, I've got photos of it, but I got Kevin and

8  Mauricio over there and explained to them "Look, this is

9  where he filled it in," and so they both looked at it and

10  they go "Yep, he sure did."

11    Q.   Okay.  So my question is when do you believe that

12  the curb cut was put into the sidewalk in front of

13  200 Naples?

14    A.   Initially?

15    Q.   Yeah.

16    A.   1907.

17    Q.   So you think that curb cut existed from 1907

18  until whenever your neighbor removed it?

19    A.   I know that there was a driveway there, you know.

20  Maybe they didn't pour that sidewalk until 1915.

21    Q.   You're just making up dates now?

22    A.   I don't know.

23    Q.   You don't know.

24    A.   Whenever they -- maybe there were no sidewalks

25  back in 1907.

1    Q.   Sure.

2    A.   I don't know.

3    Q.   Okay.  So you're not saying that the curb cut

4    existed when the house was initially built?

5    A.   I'm saying that was always a driveway from day

6    one.  Whether it was horse and buggy or automobiles, that

7    was always the driveway.

8    Q.   Okay.  You'd also agree that DPW has told you

9    anyway that there's no evidence from the permitting

10   perspective that that driveway ever existed?

11   A.   Right.

12   Q.   And so would you believe that it would be

13   unreasonable for Mr. Hughen to rely on DBI if they gave

14   him the same information -- I mean DPW?  Let me ask that

15   again.  Would you think it would be unreasonable for

16   Mr. Hughen to rely on DPW if they told him there's no

17   evidence from a permitting perspective that a driveway

18   ever existed at that location?

19   A.   You know, like I said, yeah, I think it would be

20   unreasonable to go by that.  I think he really would have

21   to stretch to make that one work, so that would be the

22   only house in the Excelsior that didn't have a driveway.

23   Is that more plausible, or is it more plausible that the

24   neighbor filled it in, it was always there, because they

25   don't have a permit for it -- they probably don't have a

1    permit for any of the driveways out there.

2        Q.   So are you saying that it would have been

3    reasonable for Mr. Hughen to hear that DPW had no evidence

4    a driveway had ever been there?

5        A.   No.

6        Q.   And then -- hold on.  I'm not done -- and then

7    take additional steps to either confirm or dispel what

8    they said?  An example you just gave was historical

9    research within the neighborhood itself.  That would have

10   been reasonable, in your opinion?

11       A.   I don't think it would have been reasonable

12   unless he really wanted to screw me over.

13       Q.   Okay.  All right.

14       A.   But no, I don't think it's reasonable to assume

15   that 200 Naples Street is the only property in the

16   Excelsior that doesn't have a driveway or never did or

17   whatever.

18       Q.   Right.  That's what I'm getting at.

19       A.   Right.

20       Q.   And I think that -- I'm just trying to confirm

21   what I think you're saying is that if Mr. Hughen got word

22   from DBI -- excuse me, from DPW that no permit ever

23   existed for a driveway where you said one existed, that he

24   should have taken extra steps to look at the character of

25   the neighborhood, and if he had done that he would have

1  learned that this is a unique property in that regard?

2      A.    I think it's unreasonable to assume that DPW

3  would have paperwork like that.

4      Q.    Okay.

5      A.    If they have no paperwork for Naples, then supply

6  all the permits for the rest of the homes on that street.

7  If you're going to make the assumption that 200 Naples

8  never had a driveway, "We don't have any paperwork on

9  that," even after I sent him the pictures -- have you seen

10  the photos?

11      Q.    You never gave them to me.

12      A.    Are you sure?

13      Q.    I am.

14      A.    All right.  Yeah.  I don't think it's reasonable

15  to assume that would be the only property in the Excelsior

16  that didn't have a driveway.  I think that would be very

17  unreasonable to assume that.

18      Q.    Right.  No, no, I guess -- that's what I'm trying

19  to understand from you.

20      A.    Okay.

21      Q.    That you believe that despite what Mr. Hughen may

22  have learned from other departments within the City and

23  County of San Francisco that he should have done his own

24  research, and you believe if he had done that your permit

25  would have been approved much faster, if he would have

1   seen your point of view?

2        A.   I don't know about that.

3        Q.   That's what I'm trying to figure out.

4        A.   Well, I think he was -- his motivation was to

5   delay it and obstruct it as much as he possibly could.

6        Q.   Right.  Putting that aside, right -- let's just

7   assume for purposes of what we're talking about that

8   there's no -- there is no Bernie Curran involved with

9   this.  There's no, you know, alleged personal animosity

10  between you and anybody else at the City, that what you're

11  saying is that Mr. Hughen should have done independent

12  research to look into the validity of what other City

13  departments were telling him, right?

14       A.   If that's what they told him.

15       Q.   Right.  Okay.

16       A.   But I don't think that's what happened.

17       Q.   I'm not asking you about that.  I'm just saying

18  you believe that if he had done this extra research, he

19  would have seen your point of view and approved the

20  driveway cutout or the driveway parking permit much

21  faster?

22       A.   If he'd have done any diligence whatsoever he

23  would have approved it like he was supposed to.

24       Q.   Okay.  And do you know what he actually did,

25  Mr. Hughen?

1      A.    He delayed and obstructed as much as he possibly

2    could until finally it got handed over to Natalia, and

3    then she delayed and obstructed as much as she possibly

4    could and made up her own laws.

5      Q.    Right.  So -- but as far as, like, the specifics

6    of what Mr. Hughen did with -- as it relates to your

7    permits, you don't know exactly what he was doing, other

8    than the communications that you had with him directly?

9    Like you don't have a bug in his office, right?

10     A.    No.

11     Q.    And you don't have a bug on his computer?

12     A.    No, but I did e-mail back and forth.

13     Q.    Other than the communications that you had.

14   That's what I just said.  So other than what you've

15   communicated with him, you didn't know what Mr. Hughen was

16   doing at all --

17                     (Reporter admonition.

18                      The record was read back.)

19   BY MR. SIMS:

20     Q.    -- the communications that you had with

21   Mr. Hughen, you didn't know what he was doing as it

22   pertains to your project at all?

23     A.    Yes, I did.

24     Q.    Okay.  I mean, other than not approving it, not

25   doing --

1       A.    He was going out of his way to obstruct it.

2       Q.    I guess that's what I'm getting at

3   (unintelligible) --

4       A.    He was making up --

5                       (Overlapping voices.

6                       Reporter admonition.

7                   The record was read back.)

8           THE WITNESS:  Here's what he did.  All right?

9   First he comes up with day law.  Instead of 95-17 --

10                      (Reporter admonition.

11                  The record was read back.)

12          THE WITNESS:  -- instead of the actual laws

13  governing ADU's, and then on the drawings, the drawing

14  said restore curb for driveway access -- said restore curb

15  for driveway access, and he went out of his way to say,

16  "No, that means remove the curb."  "That's not what it

17  means, Will."  "Yeah, that's what it means.  Besides,

18  we're not going by 95-17 anymore.  We're using day law."

19  BY MR. SIMS:

20      Q.    All right.  I think I understand what you're

21  saying.  You also say in page -- on page 8 -- and I'll ask

22  this for all the defendants -- at page 38 -- well, let's

23  look at paragraph 37.  It says "At or around this time,

24  Plaintiff was contacted by the Federal Bureau of

25  Investigation, discussing his dealings with Curran and

1   Santos concerning the apparent scheme that was perpetrated

2   against him."

3            Paragraph 38 reads "At or around this time, the

4   City, namely Duffy, Birmingham, Hernandez, Hughen, and

5   Kwaitkowska, close associates with both Curran and Santos,

6   became aware and/or were under the belief that Plaintiff

7   had discussions with the FBI concerning Curran and

8   Santos."  So my question is -- I think we've covered why

9   you believe they became aware that you had had discussions

10  with the FBI.  My question is what facts do you have that

11  Mr. Hughen was close associates with Mr. Curran?

12       A.   They all work in the same office.

13       Q.   Okay.  Is that it?

14       A.   Yeah.

15       Q.   All right.  Would that be true of

16  Ms. Kwaitkowska?

17       A.   Well, they all know each other.

18       Q.   It's just that they work together, correct?

19       A.   Yeah.

20       Q.   And that's the same for Mr. Hernandez, correct?

21       A.   When I would talk to either Duffy or Birmingham

22  or Mauricio they would refer to Hughen and -- actually,

23  her name is Fossi now, but they would refer to them by

24  name.

25       Q.   Right.  I guess what I'm asking -- these are

1   really -- so listen.  This is going to take -- we're not

2   going to get out of here until, like, 10:00 o'clock at

3   night --

4       A.   Yeah.  Well ...

5       Q.   So I'm trying to ask specific questions about

6   allegations you've made in your complaint.

7       A.   Right.

8       Q.   And I understand that you have reasons that you

9   think certain things should have gone differently, but if

10  you listen to what I'm asking, normally what I'm asking

11  requires a yes-or-no answer.  Okay?  That's designed on

12  purpose to make it go faster.  All right?  So I'm just

13  telling you that because I think it might make it a lot

14  easier if you just listen to what I'm asking.  Okay?

15      A.   Go ahead.

16      Q.   All right.  Is your belief that Mr. Hernandez was

17  a close associate of Mr. Curran -- it's just because they

18  work together, correct?

19      A.   Well, they knew each other.

20      Q.   Because they work together?

21      A.   Yeah.

22      Q.   Okay.  And that's it, right?

23      A.   I don't know.  How am I supposed to know that?

24      Q.   That's exactly what I'm -- I just need to answer

25  this question.  All right?  Would that be true with

1    Mr. Birmingham, that your belief that they -- he is a

2    close associate with Mr. Curran is because they work

3    together?

4         A.   He refers to both of them by name.

5         Q.   So is that a "yes"?

6         A.   I don't know.

7         Q.   You don't know?  Okay.

8         A.   No.  Do they golf together?  I don't know.

9         Q.   Great.  Mr. Duffy, same question.  Is your belief

10   that Mr. Duffy is a close associate with Mr. Curran based

11   on the fact that they work together?

12        A.   Yes.

13        Q.   Okay.  All right.  And just to reiterate the

14   point that you just made, you don't know anything about

15   the personal relationship, if one even exists, between

16   Mr. Duffy and Mr. Curran and Mr. Birmingham and Mr. Curran

17   and so on and so forth?

18        A.   That's not entirely true.

19        Q.   Okay.  Do you have information that they have a

20   relationship beyond a working relationship as colleagues?

21        A.   Well, I came across some information last night

22   that a Margaret Duffy resided at 27 Escondido Avenue in

23   San Francisco.

24        Q.   Okay.

25        A.   That's Bernie's house.

 1        Q.   Okay.  So what?

 2        A.   Oh, no.  Margaret Duffy, not Margaret Curran.

 3    Margaret Duffy resided -- I don't know who Margaret Duffy

 4    is, but she resided at Bernie's house.

 5        Q.   Margaret Duffy resides at Bernie's house?

 6        A.   Yeah.

 7        Q.   Okay.

 8        A.   At Bernie Curran's house, or did.

 9        Q.   All right.

10        A.   So who's Margaret Duffy?

11        Q.   I don't know.

12        A.   I don't either.

13        Q.   Okay.

14        A.   That's what I'm trying to find out.

15        Q.   All right.  So you think it's suspicious that

16    Mr. Duffy and this other Duffy -- that Margaret Duffy used

17    to live or lives with Mr. Curran?

18        A.   What I think is that -- I think Bernie and Joe

19    and Kevin are all friends, but not just because they work

20    together.

21        Q.   Okay.

22        A.   I don't know if they all play golf together or go

23    canoeing.  I don't know what they do, but I think they're

24    tighter than just work friends.

25        Q.   Why?

1     A.   I just do.

2     Q.   You can't express it?

3     A.   No.

4     Q.   Okay.  Do you have any documents supporting what

5  you just said?

6     A.   I have a document showing Margaret Duffy residing

7  at Bernie's house.

8     Q.   Right.  But you don't know who she is, right?

9     A.   I don't know who she is.

10     Q.   Okay.  All right.  Okay.  If I can get through

11  this a little faster I will do that.  Ms. Kwaitkowska, she

12  took over the review of your ADU permit, correct?

13     A.   Yes.

14     Q.   And I think you said that Mr. Hughen was working

15  on this -- your permit for about seven months, or was that

16  how long it took for the permit to be approved?

17     A.   No, it took -- it took longer than seven months.

18     Q.   Okay.  Well, when did Ms. Kwaitkowska begin

19  working on your permit review?

20     A.   I don't know.  Hughen disappeared, and I was

21  informed that she was taking over.

22     Q.   Okay.  But you can't tell me when that happened?

23     A.   I'd have to go back through my notes.

24     Q.   All right.  And would it be fair to say that, at

25  least in your mind, Ms. Kwaitkowska continued the

1  misconduct that you described as it pertained to

2  Mr. Hughen?

3      A.    Even worse.

4      Q.    Okay.  And would it be fair to say that you

5  believe that she was doing that at the direction of

6  Mr. Duffy?

7      A.    No.  I think she was doing that at the direction

8  of Will Hughen.

9      Q.    Okay.  So do you believe that Mr. Hughen

10 continued to work at the planning department after he was

11 taken off your case?

12     A.    I believe so, and, you know, there was another

13 thing that he did that wasn't mentioned in the complaint.

14     Q.    Okay.

15     A.    He rezoned my house.

16     Q.    Okay.  What did he rezone it from?

17     A.    He claimed that the front of my house was no

18 longer Naples, and now the front of my house was now on

19 Avalon.  Therefore, no permit can be issued for the

20 driveway, because now it's the back of the house, whereas

21 Avalon is the front.  Do you see what I mean?  It's just

22 ridiculous.

23     Q.    Okay.  All right.  Let's concentrate on

24 Ms. Kwaitkowska.

25     A.    Okay.

1    Q.   So do you believe that she did the actions that
2  you believe she did at the direction of Mr. Duffy?
3    A.   Mr. Hughen.
4    Q.   Mr. Hughen?  Okay.  And do you -- and that's
5  because you believe that Mr. Hughen was her superior at
6  the planning department?
7    A.   I don't know about that.
8    Q.   Okay.  And is it your belief that Mr. Hughen was
9  taking those actions because of the reasons you already
10  stated, that Mr. Duffy told him to do it and that he was
11  aware that you were speaking with Mr. Curran -- I mean,
12  with the FBI?
13    A.   Or that the whole office was aware.
14    Q.   Uh-huh.  Okay.
15    A.   You know, the rumor mill.
16    Q.   Okay.  And that assertion is just based on your
17  general belief that people who work together talk,
18  right?
19    A.   Yeah.
20    Q.   Okay.
21    A.   Well, there's no other way to put any reason to
22  what these people were doing.  Nothing they were doing was
23  either legal or reasonable.
24          MR. SIMS:  Okay.  I'm going to start with these.
25  Let's mark this as two.

```
 1                  (Deposition Exhibit Number 2

 2               was marked for identification.)

 3   BY MR. SIMS:

 4      Q.   Okay.  Mr. Gallagher, do you recognize the

 5   document that's in front of you that's been marked

 6   Exhibit 2?

 7      A.   Yes.

 8      Q.   And what is it?

 9      A.   It's the very first permit, I believe, that I

10   pulled.

11      Q.   For renovation to 200 Naples?

12      A.   Yes.

13      Q.   All right.  Do you see handwriting on this

14   document, the first page of the document?

15      A.   Yes.

16      Q.   Is any of that your handwriting?

17      A.   About half of it.

18      Q.   Okay.  On the first page at the bottom right-hand

19   corner is a signature.  Do you see that, sir?

20      A.   Yes.

21      Q.   Is that your signature?

22      A.   Yes.

23      Q.   Okay.  Now, do you see the entry 14 where it says

24   "General Contractor"?

25      A.   No.
```

1     Q.    It's in about the middle of the page on the
2   left-hand side.
3     A.    No, I see where it says "Owner Builder."
4     Q.    But above that it says "General Contractor,"
5   correct?
6     A.    I don't know.  I'd have to get my glasses.  Is it
7   small or -- where are you seeing this?
8     Q.    Right above where -- well, did you write "Owner
9   Builder"?
10    A.    Yeah.
11    Q.    Okay.  And below that it says "Owner,"
12  GCBlockInvestment.com, with a PO box in Byron, California.
13  Do you see that?
14    A.    Right.
15    Q.    And there's a phone number next to that, and is
16  that your phone number?
17    A.    Yes.
18    Q.    Okay.  Did you write what I just read out?
19    A.    Yes.
20    Q.    Is that your handwriting?
21    A.    Yes.  I don't see where it said "Contractor,"
22  though.
23    Q.    Well, okay.  It doesn't really matter.
24    A.    It says "to be constructed."  Oh, "General
25  Contractor," number 14.  So yeah, I filled in where it

1    says "General Contractor."  I filled in "Owner Builder."

2        Q.    Right.

3        A.    Okay.

4        Q.    And you understand that the rules and

5    responsibilities of acting as an owner-builder in the City

6    and County of San Francisco, correct?

7        A.    Yes.

8        Q.    And you understand that as the owner-builder you

9    absorbed the liability associated with the work that you

10   were performing at your residence, correct?

11       A.    Absorbed the liability?

12       Q.    Of the work that is going on at your property.

13       A.    Right.

14       Q.    Okay.  On the last page of Exhibit 2 you signed

15   an acknowledgment of the rules and responsibilities

16   associated with acting as an owner-builder, correct?

17       A.    Yes.

18       Q.    Now, for this particular permit it says that it

19   was submitted -- well, it doesn't say when it was

20   submitted.  No.  It says it was issued on August 10th,

21   2018.  Do you see that?

22       A.    Yes.

23       Q.    And then it was for -- the description is --

24   could you just read that out loud.

25       A.    "Kitchen & bath cabinets, paint, drywall,

1    flooring and to comply with violation notice 201721241."

2        Q.    Okay.  And the stamp on the top indicates that

3    the permit was approved in August 2013 -- excuse me, 2018.

4    Do you see that?

5        A.    Yes.

6        Q.    Okay.  Let me ask you this.  Did you begin

7    construction work at 200 Naples prior to the issuance of

8    this -- to the approval of this permit?

9        A.    I don't believe so, no.

10       Q.    Okay.  It appears to me that -- well, that part

11   of this permit is to comply with an NOV that you just read

12   the number out for, correct?

13       A.    Well, there were more than that.  If you look at

14   the top, she's got 2016 up there, and then she's got

15   another one, 2017, and then another one, 2017 -- so she's

16   got the 2017, and she's got another one from 2016, so

17   there's two that we're trying to comply with.

18       Q.    Okay.

19       A.    So yeah, there's two.  On this particular permit

20   there are two.

21       Q.    All right.  And it would be fair to say that the

22   NOV's -- at least the number indicated in this permit

23   application, that those NOV's pre-dated your ownership of

24   200 Naples?

25       A.    Yes.

1      Q.    And you understood when you purchased the
2   property that you would be responsible for abating those
3   NOV's that you inherited?
4      A.    Not at the time I purchased it.
5      Q.    Okay.
6      A.    At the time I went and pulled the permit, that's
7   when those come up.
8      Q.    Right.
9      A.    Right.
10     Q.    Okay.
11     A.    So any outstanding abatements, NOV's, come up
12   when you go to pull a permit.
13     Q.    Okay.
14     A.    And those have to be paid for at the time you're
15   pulling the permit, so yeah, that's --
16     Q.    So are you saying that the first you learned that
17   200 Naples had NOV's on it when you purchased it was when
18   you applied for the permit in Exhibit 2?
19     A.    Yes.
20          MR. SIMS:   Okay.  And let's just -- this is
21   Exhibit 3.
22               (Deposition Exhibit Number 3
23                was marked for identification.)
24   BY MR. SIMS:
25     Q.    That's the NOV that is referenced in Exhibit 2,

1    correct?

2         A.    Yes.

3         Q.    Okay.  And this is the NOV 201721241 that you

4    sought to abate through the permit that's identified as

5    Exhibit 2, correct?

6         A.    Yes.

7         Q.    Okay.  And I think this next exhibit -- oh,

8    sorry.  Going back to Exhibit 2, I don't think you ever

9    answered my question, but at the bottom right-hand corner

10   that's your signature, correct, on the first page?

11        A.    Yes.

12             MR. SIMS:  Okay.  Now Exhibit 4.

13                  (Deposition Exhibit Number 4

14                   was marked for identification.)

15   BY MR. SIMS:

16        Q.    Now, Mr. Gallagher, you recognize Exhibit 4,

17   correct?

18        A.    Yes.

19        Q.    All right.  And this permit was issued the same

20   day as the permit in Exhibit 2, correct?

21        A.    Yes.

22        Q.    And you are listed as the owner-builder for this

23   permit as well, right?

24        A.    Yes.

25        Q.    And can you just read the description of work in

1    this permit.

2         A.    "Reroof & gutters and to comply with violation

3    201644272."

4         Q.    Okay.  So on August 10th, 2018, you go into DBI

5    and pull -- did you personally pull these two permits?

6         A.    Yes.

7         Q.    Okay.  And did you have what -- you know, a build

8    team or a design team at that time?

9         A.    Yes.

10        Q.    All right.  And who were part of that design team

11   or build team?

12        A.    Bill Manfredi, I think.

13        Q.    Okay.  And what did Mr. Manfredi do for you?

14        A.    He designed 200 Naples.

15        Q.    He was an architect?

16        A.    Yes.

17        Q.    Okay.  Did you have anybody else on your team at

18   that time?

19        A.    I had two guys, I believe.  I don't know if we

20   had started working on it yet, but I had two guys lined

21   up.

22        Q.    What type of guys?

23        A.    Carpenters.

24        Q.    Okay.  And what were their names?

25        A.    I don't remember.  I'd have to go back through my

1   notes.

2        Q.   Okay.  Other than an architect and two

3   carpenters, that was -- that was the core group?

4        A.   Yes.

5        Q.   All right.  And so let me ask you this.  Why --

6   and I think I've got it on my desk, but the 2016 NOV that

7   is -- that is referenced in Exhibit 4, the permit

8   application, did they want you to have a separate permit

9   to deal with each NOV?

10       A.   No.

11       Q.   Okay.  So why did you pull two separate permits?

12       A.   Well, San Francisco does it kind of goofy.  They

13  go a long way around the barn.  Normally when you go

14  remodel a house or build a house or whatever, right, you

15  go pull a permit, and if it needs electrical, then you add

16  the electrical.  If it needs plumbing, then you add the

17  plumbing to it, but San Francisco, you go pull a general

18  improvement permit, and then you have to go pull a roofing

19  permit.

20            Then you have to pull a separate permit for

21  windows.  Then you have to pull a separate permit for the

22  plumbing.  Then you have to pull a separate permit for the

23  electrical, and if there's something you need to do on the

24  sidewalk, you have to go pull a separate permit for that,

25  and then after getting the permit for the driveway, then

1    you have to go get another permit for right-of-way.  It's
2    nuts.
3         Q.    Okay.
4         A.    It's nuts.
5         Q.    So just to get a clear answer, it's your
6    understanding that you pulled two permits because they
7    were required by the department?
8         A.    Right.
9         Q.    Okay.  All right.  And at least -- so viewing
10   them together, your intention as far as work to be done at
11   the house was to -- Exhibit 2 says "kitchen & bath
12   cabinets, paint, drywall, flooring."  Does that mean that
13   you're going to install new kitchen and bath cabinets --
14        A.    Yes.
15        Q.    -- and paint the house and redo the drywall?
16        A.    Yes.
17        Q.    And replace the flooring?
18        A.    Yes.
19        Q.    Okay.  And then looking at Exhibit 4, you were
20   also going to put a new roof on the house and replace the
21   gutters?
22        A.    Yes.
23        Q.    Now, I think you talked about earlier your
24   intention for what the house would look like at the end as
25   far as redoing -- I think you said "soup to nuts."

1      A.    Right.

2      Q.    Okay.  Now, when you said "soup to nuts," is all

3   the work that you had, in your mind, covered in these two

4   permits?

5      A.    No.

6      Q.    Okay.  And why not?

7      A.    Like I said, you've got to pull a separate permit

8   for the plumbing.  You've got to pull a separate permit

9   for the electrical.  You've got to pull a separate permit

10  for everything.

11     Q.    Did you do that?

12     A.    Yes.

13     Q.    On August 10th?

14     A.    No.

15     Q.    Okay.  Why did you wait?

16     A.    Because my architect was still drawing the

17  house.

18     Q.    I see.

19     A.    We were going to add dormers.

20     Q.    Okay.  All right.  And the plans had not been

21  completed for that yet?

22     A.    They -- well, yes and no.

23     Q.    Okay.

24     A.    What they do is you submit the plans and they

25  don't just approve them.  Okay?  They make comments on

1  them, so then you have to address the comments, and then

2  they'll send it to the next station, and then those guys

3  make more comments, and then you've got to address those

4  comments, and then it goes to another station, so if I'm

5  in Martinez I take the plans in.  They look at them.  They

6  stamp.  You're done.  That's not how San Francisco does

7  it.

8       Q.   Yeah.  My question is -- it sounds like you

9  didn't do that for everything on the 10th of August in

10  2018.

11      A.   No.  I didn't know what I was going to need to do

12  at that time.

13      Q.   That's all I want to hear.

14      A.   Okay.

15      Q.   Okay.  So, it seems like, you can't remember

16  whether or not you began work at the property before

17  August 10th, 2018, correct?

18      A.   Well, as far as construction, no.  I'm pretty

19  sure there was no construction being done, but some of

20  these NOV's, like one is really expensive.  It's a $3,000

21  abatement order, and that's because the backyard was full

22  of garbage.  Then the other one, from 2016, was a very

23  simple one.  It was actually for a broken gutter, easy

24  enough to fix.  So as far as that stuff goes, we might

25  have been -- you've got to get a dumpster out there, you

1    know, which is difficult.

2        Q.    Okay.

3        A.    So we might have started cleaning up the place.

4              MR. SIMS:  All right.  Okay.  So let's do next in

5    order here.

6                    (Deposition Exhibit Number 5

7                     was marked for identification.)

8              THE WITNESS:  And it was also different before

9    COVID.

10   BY MR. SIMS:

11       Q.    All right.  Now, Mr. Gallagher, I think before we

12   marked this exhibit, whether or not you began working, you

13   know, at the property or actually doing construction work

14   before the initial round of permits were issued or

15   submitted by you, it would be fair to say that the

16   construction work began certainly after the permits were

17   approved by the building department in August of 2018,

18   correct?

19       A.    Yes.

20       Q.    Okay.  Now, Exhibit 5 is a notice of violation

21   dated October 3rd, 2018.  Do you see that, sir?

22       A.    Yep.

23       Q.    Do you recognize this?

24       A.    Yes.

25       Q.    And do you recognize it as an NOV that you

1   received regarding work at 200 Naples?

2       A.   That's hard to answer.  I believe so.

3       Q.   Okay.  And do you see the contact inspector at

4   the bottom?

5       A.   Yes.

6       Q.   And who is that?

7       A.   Phil Saunders.

8       Q.   And what it says -- as far as the violation

9   descriptions go, it says that additional work permit

10  required; is that right?

11      A.   Yes.

12      Q.   And that it's -- it was deemed to be an unsafe

13  building by Inspector Saunders, S-a-u-n-d-e-r-s?  That's

14  what the NOV says, correct?

15      A.   Not that I know of.  Where's it say that?

16      Q.   Do you see "Violation Description"?

17      A.   Yeah, I see it now.

18      Q.   It says "Unsafe Building," right?

19      A.   That's what he said, yeah.

20      Q.   Right.  That's what the NOV says?

21      A.   Right.

22      Q.   All right.  So let me ask you this.  It says

23  "Owner/Agent," Francis Lau.  Do you see that?

24      A.   Yeah.

25      Q.   And an address in Daly City, correct?

1      A.   Yes.

2      Q.   And then it also says "Person Contacted at Site,"

3   and then it says "Lau Francis."  Do you see that?

4      A.   Yes.

5      Q.   Do you know who Francis Lau is?

6      A.   I believe -- I don't know for a fact, but I

7   believe he was the previous owner.  I think he's the guy I

8   bought the place from.

9      Q.   Okay.  But this NOV is dated October 3rd, 2018,

10  correct?

11     A.   Yes.

12     Q.   And that was after you purchased the property?

13     A.   Yes.

14     Q.   Okay.  Well, I guess what I'm getting at is that

15  Mr. Lau wasn't -- Francis Lau was not involved with the

16  construction at the property at that time?

17     A.   No.

18     Q.   Okay.  So then getting further down under "Unsafe

19  Building" it says -- well, I'll read it.  "Site

20  investigation revealed that building has been gutted and

21  construction in progress of multiple dormers without

22  proper permits and inspections.  Work beyond scope of

23  PA201808107075, 201808107063 and does not have Planning

24  Department approval."

25     A.   Actually, I did.  He was incorrect about that.

1    Q.    "Debris pile in backyard is leaning on neighbor's

2    building."  Did I read that accurately?

3    A.    Yeah.  He made all kinds of accusations.

4    Q.    Okay.  So you talked about your intention was to

5    install the dormers or include the dormers in your project

6    in August of 2018 when you initially went for these

7    permits but that the drawings had not yet been completed

8    or something like that?

9    A.    No, they had been completed.  They were being

10   commented on.

11   Q.    Okay.

12   A.    They were at the building department.  The plans

13   were.  The plans were in the works.

14   Q.    What permit number or application did that exist

15   on?

16   A.    It was another 2018 permit.  I believe it was

17   6049, the last letters -- numbers.

18   Q.    Okay.  And what you're saying is that you applied

19   for that permit -- for the permit pertaining to the

20   dormers sometime after August 10th, 2018, but before

21   August 3rd, 2018?

22   A.    I believe in September.

23   Q.    Okay.  So yes --

24   A.    Yes.

25   Q.    -- is the answer to that question?  All right.

1   But you would also agree that that permit had not yet been

2   approved at the time this NOV was issued?

3       A.   No, but I had three others that had been

4   approved.

5       Q.   So my question is when the NOV shown in Exhibit 5

6   was issued on October 3rd, 2018, you did not have an

7   approved permit for the dormers?

8       A.   I had a roofing permit.

9       Q.   Okay.

10      A.   But approval for the dormers, no.

11      Q.   Okay.  All right.  So you don't contest the fact

12  that Mr. Saunders showed that you were -- quote,

13  "construction in progress of multiple dormers without

14  proper permits"?  That was true, correct?

15      A.   Yeah.

16      Q.   Okay.  And that the work that you were doing at

17  the property at that time was beyond the scope of the

18  permits that we have attached as Exhibits 2 and 4,

19  correct?

20      A.   No, not necessarily.

21      Q.   Well, does the word "dormer" appear in permit

22  application -- the permit application that was marked as

23  Exhibit 2?

24      A.   No, but I had already gone through planning for

25  the dormers.

1    Q.   Does the word "dormers" appear in the permit

2  application for what's been marked as Exhibit 4?

3    A.   No.

4    Q.   Okay.  And I think what you were about to say is

5  that you thought it was okay to proceed on a permit that,

6  I guess, was pending in planning at the time?

7    A.   Yes.

8    Q.   Okay.  And is it your belief as a construction

9  professional and veteran of the construction industry that

10  it is okay to do work on a permit that has been submitted

11  for approval but not yet approved?

12    A.   Yes.

13    Q.   That is part of the custom and practice of a

14  construction --

15    A.   Yes.

16    Q.   -- professional to work without an approved

17  permit?

18    A.   It's called "fast tracking."

19    Q.   Okay.

20    A.   And there's another term for it called "design

21  build."

22         MR. SIMS:  There's another -- Exhibit 6.

23              (Deposition Exhibit Number 6

24              was marked for identification.)

25  ///

Patrick Gallagher                                          July 31, 2025

1   BY MR. SIMS:

2       Q.    Okay.  Now, Mr. Gallagher, you have in front of

3   you a document that's been marked as Exhibit 6.  Do you

4   recognize this document?

5       A.    Yes.

6       Q.    Is this a permit that you submitted for approval

7   from DBI pertaining to your work at 200 Naples?

8       A.    Yes.

9       Q.    And let me ask you this.  Generally speaking,

10  were you the one personally submitting permit applications

11  pertaining to 200 Naples?

12      A.    Yes.

13      Q.    And did anyone assist you in that?

14      A.    Yes.

15      Q.    Who?

16      A.    Patrick O'Riordan.

17      Q.    Oh, I'm sorry.  Not internal DBI people but part

18  of your team in the submission of the applications.

19      A.    No.

20      Q.    So you would be the one that would fill them out

21  and then put -- give them to DBI?

22      A.    Yes.

23      Q.    Okay.  All right.  And I think you'll notice a

24  pattern in these questions, but you see your handwriting

25  on Exhibit 6, correct?

Patrick Gallagher                                              July 31, 2025

```
 1        A.   Yes.
 2        Q.   You signed it in the bottom right-hand corner,
 3   correct?
 4        A.   Yes.
 5        Q.   And for the description of the work that you're
 6   seeking the permit for, could you just read that out,
 7   please.
 8        A.   Yeah.  I didn't write all of it.  Like I said,
 9   Patrick O'Riordan wrote some of it.  "Remove," something,
10   "Dormers add 2 to each side, Structural strengthening
11   include removing & replacing the 2nd floor framing, Demo
12   existing laundry."
13        Q.   Okay.  Let me ask you this.  Who's -- is that
14   your writing?
15        A.   Not all of it, no.
16        Q.   What part is not your writing?
17        A.   The part in the middle, structural strengthening
18   include remove and replacing floor framing, that's not
19   mine.
20        Q.   Okay.  But you wrote "Demo existing laundry" --
21        A.   Yeah.
22        Q.   -- "2nd floor"?
23        A.   Yes.
24        Q.   And you wrote "Remove one" -- "Remove dormers,
25   add 2 to" --
```

Patrick Gallagher                                           July 31, 2025

1      A.   Each side.

2      Q.   -- "each side"?

3      A.   "Remove 1 dormer," I think is what it says.

4      Q.   All right.

5      A.   Yeah, that rings a bell.

6      Q.   Okay.

7      A.   Because there was a funky one up there that they

8   had over the stairs.

9      Q.   So you could also agree that above the portion

10  that you just read, the purpose of this permit, Exhibit 6,

11  was to comply with the NOV that we talked about in

12  Exhibit 5?

13     A.   Yeah.  It says that on here.

14     Q.   And just for the record, that NOV in Exhibit 5 is

15  201895477?

16     A.   Right.

17     Q.   Okay.  So is this -- is Exhibit 6 the permit that

18  you were talking about for the dormers?

19     A.   Yeah.

20     Q.   Okay.  And so the date filed on that is

21  October 25, 2018, correct?

22     A.   Date filed?  Yeah, I guess so.

23     Q.   Okay.  All right.

24          THE DEPOSITION REPORTER:  Counsel, can you let me

25  know when it's a good time for a break.

```
 1              MR. SIMS:  We can do now.
 2                      (Recess was taken.
 3           Deposition Exhibit Numbers 7 through 9
 4               were marked for identification.
 5                      The record was read back.)
 6  BY MR. SIMS:
 7      Q.   All right.  Mr. Gallagher, we just marked some
 8  exhibits here, seven, eight and nine.  Could you look at
 9  Exhibit 7.
10      A.   Uh-huh, yes.
11      Q.   Do you recognize that document?
12      A.   Yes.
13      Q.   That is an NOV that you received pertaining to
14  your work at 200 Naples, correct?
15      A.   Yes.
16      Q.   And it is issued to your trust, correct?
17      A.   Yes.
18      Q.   And the violation description says you are
19  working on an expired or cancelled -- well, "Expired" is
20  checked -- cancelled permit.
21                      (Reporter clarification.
22                      The record was read back.)
23              MR. SIMS:  Let me strike that.
24      Q.   The violation description is for a cancelled
25  permit, correct?
```

Patrick Gallagher                                          July 31, 2025

```
 1        A.   Expired permit.
 2        Q.   You're right.  I'm sorry.  I'm not reading very
 3   good right now.  So violation description is for an
 4   expired permit, correct?
 5        A.   Correct.
 6        Q.   Okay.  And so the inspector on this NOV is
 7   Mr. Keane, Thomas Keane?
 8        A.   Okay.
 9        Q.   Do you see that at the bottom?
10        A.   No, but I believe you.
11        Q.   Okay.  And just for the record, this is NOV
12   number 202175602, correct?
13        A.   Yes.
14        Q.   And it's issued on May 17th, 2021?
15        A.   Yes.
16        Q.   Okay.  And so the nature of the violation says
17   "Research in response to a complaint for the above address
18   has revealed that PA 201810183586 has expired without
19   obtaining all the necessary sign offs to complete the
20   permit."  Did I read that correctly?
21        A.   Yes.
22        Q.   Okay.  Now I would ask you to look at what has
23   been marked as Exhibit -- this one here.  So that's six,
24   which I believe is the permit application referenced in
25   the NOV in number seven.  Is that true?
```

Patrick Gallagher                                          July 31, 2025

1    A.   It appears to be.
2    Q.   Okay.  And so do you dispute the validity of the
3  allegations contained in the NOV that's marked as
4  Exhibit 7?
5    A.   Yes.
6    Q.   Okay.  And in what way, sir?
7    A.   It hadn't expired.  It was completed.
8    Q.   Okay.  Had the necessary sign-offs been obtained?
9    A.   Yes.
10   Q.   And, I believe -- are you referring to -- you
11 made mention earlier of a CFC from Mr. Curran that you
12 had?
13   A.   Yes.
14   Q.   And that you believed that that was -- that would
15 negate the NOV in Exhibit 7?
16   A.   Yes.
17   Q.   Okay.  Do you recall getting this NOV?
18   A.   Yes.
19   Q.   And do you recall Mr. Keane coming to your
20 house -- to your property?
21   A.   No.
22   Q.   Were you not there?
23   A.   Nobody was there.
24   Q.   Okay.
25   A.   Nobody had been working on it since August.  It

```
 1   was in escrow at the time.
 2        Q.   I see.
 3             MR. SIMS:  Let's mark this as ten.
 4                  (Deposition Exhibit Number 10
 5                   was marked for identification.)
 6   BY MR. SIMS:
 7        Q.   Okay.  So Mr. Gallagher, Exhibit 10, is that the
 8   certificate of final completion that you were referencing
 9   just a moment ago?
10        A.   Yes.
11        Q.   And so you received -- did Mr. Curran give this
12   to you?
13        A.   Yes.
14        Q.   And did Mr. Curran indicate to you that this was
15   a pre-final inspection?
16        A.   No.
17        Q.   Did he indicate anything other than that this was
18   a final completion of the work?
19        A.   No.  He said, "You're all done.  Here you go."
20        Q.   Okay.  And would -- the permit application number
21   here is 201810183586.  Do you see that?
22        A.   Yes.
23        Q.   And that's the same permit application number
24   that's described in Exhibit 7 -- the NOV in Exhibit 7,
25   correct?
```

1    A.   Yes.

2    Q.   Now, did you ever learn why building inspection

3  said that this particular document, Exhibit 10, was no

4  good?

5    A.   Yeah.  Joe Duffy said it never got filed

6  correctly.

7    Q.   Okay.  And did he say why?

8    A.   No.

9    Q.   Okay.  Did he ever tell you that the permit

10 application indicated in Exhibit 10 expired prior to the

11 date Mr. Curran authored this document?

12   A.   No.

13   Q.   Did you ever show this to anyone at DBI?

14   A.   Yes.

15   Q.   Who did you show it to?

16   A.   Everybody.

17   Q.   Anybody?

18   A.   Everybody that had anything to do with it.  I

19 showed it to Kevin, Mauricio, Joe Duffy.  I showed it to

20 Keane.  There was one other guy.

21   Q.   Okay, okay.  And then if you look at Exhibit 8,

22 do you recognize that document?

23   A.   No.

24   Q.   Okay.  You would agree that this is a notice of

25 violation, correct?

Patrick Gallagher                                                    July 31, 2025

1      A.   It appears to be.

2      Q.   Okay.  And the number in the top right corner is

3  202175602.  Do you see that?

4      A.   Yes.

5      Q.   And the date is June 8th, 2021, correct?

6      A.   Yes.

7      Q.   Okay.  And if you look at the second page, the

8  contact inspector is Mauricio Hernandez; is that true?

9      A.   Right.

10      Q.   Okay.  And so this particular NOV is to amend the

11  NOV that we discussed in Exhibit 7, correct, that was

12  issued on May 17th, 2021?

13      A.   The one for expired permit?

14      Q.   Correct.

15      A.   Yes.

16      Q.   Okay.  And it references a site visit on

17  June 3rd, 2021, and -- to identify the following

18  deviations from approved PA 201810183586 and approved

19  plans.  Do you see that?

20      A.   Yeah.

21      Q.   And that PA number is the same PA number that is

22  indicated in Exhibit 10, right?

23      A.   Right.

24      Q.   Okay.  And so do you recall a site visit on --

25      A.   Yes.

1    Q.   -- June 3rd?  Do you recall Mr. Hernandez being

2  present at that site visit?

3    A.   Yes.

4    Q.   Was there any other employees from the City and

5  County of San Francisco during that site visit?

6    A.   I believe Kevin was there.

7    Q.   Mr. Birmingham?

8    A.   Yes.

9    Q.   Okay.  Anybody else?

10    A.   No.

11    Q.   Okay.  How long did that site visit last for?

12    A.   About an hour.

13    Q.   Okay.  And, I'm assuming, you were also there,

14  right?

15    A.   Yes.

16    Q.   And was there anyone else there that was working

17  on your behalf or on the behalf of your trust?

18    A.   No.

19    Q.   Okay.  So would it be fair to say it was just the

20  three of you?

21    A.   Yes.

22    Q.   All right.  And you mentioned earlier a statement

23  that Mr. Hernandez made about something like -- something

24  to the effect of like "We know who you've been talking

25  to"?

```
 1        A.    Exactly.
 2        Q.    Okay.  Is that -- was that statement made during
 3   this meeting?
 4        A.    Yes.
 5        Q.    Okay.  And so did -- was there a discussion at
 6   that time about Exhibit 10?
 7        A.    Yes.
 8        Q.    And what do you recall in that regard?
 9        A.    They said it never got filed.
10        Q.    Okay.  And when you say "they" who do you mean?
11        A.    Kevin and Mauricio.
12        Q.    They both said it?
13        A.    Yeah.
14        Q.    Okay.  And --
15        A.    Well, Kevin didn't.  He was -- he stayed silent
16   the whole time.  So Kevin didn't really say anything at
17   that meeting.
18        Q.    But Mr. Hernandez did?
19        A.    Mr. Hernandez did.
20        Q.    And he was the one that explained to you that
21   this certificate of final completion never got filed?
22        A.    Right.
23        Q.    Okay.  And did Mr. Hernandez explain to you that
24   because it was never filed, as far as the building
25   department was concerned, it didn't exist?
```

1      A.   Exactly.

2      Q.   Okay.  And so you had been working with

3  Mr. Curran for some time on your construction project,

4  correct?

5      A.   Yes.

6      Q.   And did you come in contact with Mr. Curran after

7  the first NOV that we discussed that Mr. Saunders gave

8  you?

9      A.   No.

10      Q.   When --

11      A.   Oh, wait.  Yes.

12      Q.   Okay.

13      A.   Yes, I did.

14      Q.   And you reached out to Mr. Curran because he was

15  the senior district inspector for your area?

16      A.   No.  He just showed up on site.

17      Q.   Okay.

18      A.   I was complaining -- do you want to know all

19  this, or do you just want me to answer your questions?

20      Q.   So you were about to say you were complaining to

21  someone.  Who were you complaining to?

22      A.   I was complaining to Patrick O'Riordan.

23      Q.   And I think I have some e-mails, but you were

24  telling Mr. O'Riordan that you thought Mr. Saunders was --

25  not in these words, but being a bit unreasonable with his

```
 1   enforcement efforts?
 2       A.   Yes.
 3       Q.   Okay.  And it was at that time that Mr. Curran
 4   became involved in your property?
 5       A.   Yes.
 6       Q.   And Mr. Curran gave you advice as to how to
 7   navigate the issues that were arising at your property,
 8   correct?
 9       A.   He said I had to pull a structural -- I had to
10   hire a structural engineer.
11       Q.   Okay.  And he recommended Mr. Rodrigo Santos?
12       A.   Yes.
13       Q.   Okay.  Did you ever -- did you ever bribe
14   Mr. Curran?
15       A.   Not knowingly.
16       Q.   Okay.  What do you mean by that?
17       A.   Well, at first I was -- I had completely
18   disagreed with Bernie on the structural engineer thing.  I
19   told him "I already have an architect.  According to
20   California Building Code, I don't need a structural
21   engineer until we're over three stories, so according to
22   California Building Code, I do not need a structural
23   engineer," and he kept insisting "You have to hire a
24   structural engineer or your permit's going nowhere, and
25   this is the guy you need to call," and he went to his car,
```

1   got Rodrigo Santos's card, Santos & Urrutia.

2                   (Reporter clarification.)

3           THE WITNESS:  Yeah.  He said, "Call this guy.

4   He'll smooth out all the bumps and, you know, we'll get

5   you going.  It will be smooth sailing," so when I first

6   talked to Rodrigo they needed 3,000 up front in cash.

7   BY MR. SIMS:

8       Q.   Okay.

9       A.   And then over the course of the next six months

10  he just kept hitting me up for more and more money.

11      Q.   Okay.

12      A.   And so then I fired him after six or

13  seven months.

14      Q.   When did you fire Mr. Santos?

15      A.   You're asking me to guess.  It was about six or

16  seven months into the project.  Maybe even seven months

17  after I had hired him.

18      Q.   The first NOV I think we talked about

19  Mr. Saunders issued was -- that was dated October 2018,

20  right?

21      A.   Yeah, I think you're right.

22      Q.   So Mr. Curran gets involved sometime after

23  October 2018, right?

24      A.   Right.

25      Q.   And then he makes a recommendation for

 1   Mr. Santos, who you then retain and then fire, it sounds
 2   like, within -- probably early 2019?
 3       A.   Probably, like, May of 2018.
 4       Q.   Okay.  All right.  And so when you say you didn't
 5   knowingly bribe Mr. Curran, is that what you're talking
 6   about, that you felt like it was a bribe to Mr. Curran to
 7   retain Mr. Santos?
 8       A.   Well, yeah.
 9       Q.   Okay.
10       A.   I mean, 3,000 cash up front.
11       Q.   Right.  Is that all you mean by that?
12       A.   No.  I had to keep giving him money the whole
13   time, and I wasn't getting anything for it.
14       Q.   Okay.
15       A.   I never got a completed set of drawings.
16       Q.   All right.  And are you aware that Mr. Santos
17   does not work for the City and County of San Francisco?
18       A.   Yes, I'm aware of that.
19       Q.   Okay.
20       A.   I'm aware that he did.
21       Q.   Well, what do you mean by that?
22       A.   He worked for the building department.  He
23   retired from the building department and went into
24   business with Albert Urrutia.
25       Q.   Okay.  So I don't think that's right.  He was on

1  a committee associated with the building department, but

2  he was never employed by the City and County, but that's

3  just what you've heard?

4        A.   Yeah.

5        Q.   Okay.  All right.  Have you ever made a donation

6  to Golden Gate Youth Rugby?

7        A.   No.

8        Q.   When were -- you said several times today that

9  you had been contacted -- were contacted or reached out to

10 the FBI.  I can't remember which one it was.  Did the FBI

11 contact you, or did you contact the FBI?

12       A.   At first the FBI had contacted me.

13       Q.   And how did they do that?

14       A.   I'm not sure.  I guess they went through Rodrigo

15 and Albert's records.

16       Q.   Okay.  I mean more like did they call you?  Did

17 they e-mail you?

18       A.   Yeah, they called me.

19       Q.   Okay.  And do you remember the name of the person

20 that called you?

21       A.   Allie Lopez.

22                  (Cell phone interruption.)

23 BY MR. SIMS:

24       Q.   And did Ms. Lopez identify herself?

25       A.   Yes.

Patrick Gallagher                                                July 31, 2025

```
 1        Q.   And who did she say she was?
 2        A.   FBI.
 3        Q.   Okay.  Did she say she was an agent?
 4        A.   Special agent.
 5        Q.   Okay.  And what specifically did she say to
 6   you --
 7        A.   Well, she asked --
 8        Q.   -- as far as why she was calling?
 9        A.   She asked me if I had hired Santos & Urrutia, and
10   I said yes, and then she asked regarding the 200 Naples
11   Street, and I said yes.  She said, "How's that going?"  I
12   said, "I just got a red tag stuck on my door for expired
13   permit, and I can't figure out what the hell's going on
14   here," and then she explained to me what was going on.
15   That's when she had mentioned that Bernie had just been
16   indicted and that the red tag was not a coincidence.
17        Q.   Okay.  So when you say the building was
18   red-tagged --
19        A.   Yeah.
20        Q.   -- are you referring to the NOV that has been
21   marked as Exhibit 8?
22        A.   Yeah.
23        Q.   Okay.  And so is it your recollection that the
24   conversation you had with Agent Lopez occurred shortly
25   after June 8, 2021?
```

1     A.    I don't know about after.

2     Q.    Well, if she's talking about the -- you have a

3  specific memory of her discussing the red tag with you?

4     A.    Yeah.

5     Q.    And you have a specific memory of her telling you

6  that it's not a coincidence that the building had been

7  red-tagged, right?

8     A.    Right.

9     Q.    And so I'm just -- logically it would mean that

10  the red tag had already happened?

11     A.    Well, let me see which one this is.  No, no.  No.

12     Q.    It could be --

13     A.    I got red-tagged the first time in May of '21.

14     Q.    Okay.

15     A.    And that was just within days of when Bernie had

16  been indicted, and then Mauricio and Kevin came out and

17  wrote up a secondary one to amend the first one, right?

18     Q.    Right.

19     A.    Okay.  And that was in June, so in between May

20  and June is when I spoke to Allie Lopez.

21     Q.    All right.  Between May and June 2021?

22     A.    Right.

23     Q.    Okay.  So this conversation that you had with

24  Agent Lopez occurred at some point between the NOV that

25  was marked as Exhibit 7, I believe --

1      A.    Right.

2      Q.    -- and the NOV that has been marked as Exhibit 8?

3      A.    Right.

4      Q.    Okay.  And just so we're all clear on our dates

5    here, you talked with Special Agent Lopez sometime between

6    May 17th, 2021, and June 8th, 2021?

7      A.    Yes.

8      Q.    Okay.  And how long did the conversation last

9    between you and Ms. Lopez?

10     A.    I don't remember.  I spoke to her more than once.

11     Q.    Okay.  How many times did you speak with her?

12     A.    I'd say three or four.

13     Q.    Okay.  Over what period of time?

14     A.    The next year.

15     Q.    Okay.  And so were you identified as a victim of

16   Mr. Santos's?

17     A.    You know, I don't know.  I explained to her what

18   happened and that I had fired him and then hired Base

19   Design instead.  I don't know if she considered me a

20   victim or not.  She knew I was out 13 grand.

21     Q.    Okay.  Well, the term -- I'm using the term

22   "victim" in more of a legal sense in that it would entitle

23   you to some type of restitution as a victim of a crime of

24   Mr. Santos, and it sounds like that never happened.

25     A.    Well, he embezzled $13,000 from me.

1    Q.   No.  I hear that, but, I guess, what I'm saying

2   is did you submit any documentation of that to the judge

3   overseeing the criminal proceedings?

4    A.   No.  I just gave a statement to the FBI.

5    Q.   Okay.  And did she tell you -- did Special Agent

6   Lopez tell you she was recording your conversation?

7    A.   Yes.

8    Q.   And you said you talked to her about three times

9   over the course of a year?

10    A.   Yeah, maybe four.  Yeah.

11    Q.   All right.  And, I mean, without getting into the

12   specifics, the gist of the conversation was "I paid

13   Mr. Santos for services he never performed"?

14    A.   Yes.

15    Q.   Okay.  Did she ever talk to you about Mr. Curran?

16    A.   Yes.

17    Q.   And in what context did she talk to you about

18   Mr. Curran?

19    A.   That he'd just been indicted.

20    Q.   All right.  And did you say anything to Special

21   Agent Lopez about Mr. Curran at all?  I guess what I'm

22   getting at is that it sounds like from what you've

23   described here is she had some specific information when

24   she called you initially about Mr. Santos, right?  She

25   knew that you worked with him at 200 Naples?

```
 1      A.   Yeah.

 2      Q.   Right?

 3      A.   I guess so.

 4      Q.   Okay.  And did she have the same kind of

 5  information about Mr. Curran?

 6      A.   I believe so, yeah.

 7      Q.   And why do you say that?

 8      A.   Well, she asked me how the heck I had ended up

 9  hiring Santos, and so I told her, you know.  Bernie wasn't

10  going to approve the permit that I had outstanding unless

11  I hired Santos, and even though under California Building

12  Code I'm not required to have a structural engineer, I was

13  forced to hire this idiot anyways.

14      Q.   Okay.  So the context that Mr. Curran came up

15  with your conversations with Agent Lopez had more to do

16  with how you came in contact with Mr. Santos?

17      A.   Right.

18      Q.   Okay.  But she wasn't asking about separate

19  things connected to Mr. Curran when she talked to you?

20      A.   Asking?  I don't know.  I don't recall all that

21  stuff.  I do know that she was explaining to me exactly

22  what Santos had done and what Bernie had done and was

23  being indicted for and that "Unfortunately, you got caught

24  in the middle of this."

25      Q.   Okay.
```

Patrick Gallagher                                              July 31, 2025

1      A.    So that was basically our conversation.

2      Q.    Did Agent Lopez ask you if you bribed Mr. Curran?

3      A.    Yeah, she did.

4      Q.    And did you tell her no?

5      A.    I told her the same thing I told you.

6      Q.    Okay.

7      A.    Not knowingly.

8      Q.    All right.  And did she ask you whether or not

9  Mr. Curran solicited a bribe from you?

10     A.    I don't -- I don't recall.  She might have.  I

11 don't know.

12     Q.    You know what I mean, though, right?

13     A.    Yeah, yeah.

14     Q.    And the answer was the same, not knowingly,

15 right?

16     A.    Well, Bernie never asked me for money.

17     Q.    Okay.

18     A.    Ever.

19     Q.    All right.  Okay.  So let me get this -- let me

20 just -- I'm trying to create a timeline here of what

21 you're trying to say, and so would you agree that the main

22 source or the motive behind the retaliation that you're

23 alleging in this lawsuit stems from this conversation that

24 you had or the conversations that you had with Special

25 Agent Lopez?

1      A.   Concerning Bernie.

2      Q.   Concerning Bernie?

3      A.   Specifically.

4      Q.   Right.  And the first of those conversations

5   occurred either in May or June of 2021?

6      A.   Right.

7      Q.   Correct?

8      A.   Yeah.

9      Q.   Okay.  Would you agree then that the defendants

10  that you've named in this case were not attempting to

11  retaliate against you before that occurred?

12     A.   I would agree.

13     Q.   Okay.  So --

14     A.   I had a certificate of completion in hand at the

15  time.

16     Q.   I see.  I understand.  So, for example -- okay.

17  So just so I've got it, you agree that prior to being

18  contacted by Ms. Lopez -- Special Agent Lopez, excuse me,

19  you do not believe the building department or any members

20  of the planning department were conspiring to retaliate

21  against you?

22     A.   No.

23     Q.   Okay.  You agree with that?

24     A.   Yes.

25     Q.   Okay.  The double negative there.  Okay.  So --

1   but it would also be fair to say that you do believe that

2   after you began speaking with Agent Lopez, that's when the

3   retaliation began?

4        A.   Right.

5        Q.   I see.  Okay.  So let me get back to Exhibit 8.

6   All right?  So this is the NOV to amend the NOV, and do

7   you agree -- well, so first of all, I think you said that

8   you did not need a structural engineer because the

9   building code did not require -- the California Building

10  Code --

11       A.   Right.

12       Q.   -- did not require it?

13                        (Overlapping voices.

14                        Reporter admonition.

15                   The record was read back.)

16            THE WITNESS:  Right.

17  BY MR. SIMS:

18       Q.   Do you know whether or not the San Francisco

19  Building Code is more restrictive than the California

20  Building Code in that regard?

21       A.   No.

22       Q.   You don't know one way or the other?

23       A.   No.

24       Q.   Okay.  And so your understanding is that a

25  structural engineer -- I think you said this, so I just

1  want to make sure I got it right.  A structural engineer

2  is not required if it's just a two-story residence?

3      A.   Right.

4      Q.   Okay.  All right.  So getting back to NOV

5  number 8, the first dash says "Stairs leading to 3rd floor

6  not installed to approved plans."  Do you see that

7  statement?

8      A.   Yeah.

9      Q.   Okay.  And so where -- what did the stairs look

10 like in the improved plans?

11     A.   They went up to a landing and then turned and

12 went back up the other way.

13     Q.   Okay.  Is that what Mr. Hernandez is referring to

14 as called out for "U-shaped detail"?

15     A.   Yes.

16     Q.   Okay.  And so he's saying instead of having that

17 the stair configuration that you just described, the

18 stairs are built as a straight run up?

19     A.   Right.

20     Q.   Okay.  And that one did not comply with the plans

21 that you submitted to DBI?

22     A.   They differed from the plans.

23     Q.   Uh-huh.

24     A.   Because we couldn't get them in the way the plans

25 had them.

1    Q.   Okay.

2    A.   Not -- I mean, we had problems with head heights

3  and risers and tread length, and so we tried several

4  different configurations on the stairs.

5    Q.   Okay.  And the configuration that you landed on

6  did not -- did not comply with what had been approved

7  already, right?

8    A.   It was different than what had been approved.

9    Q.   Okay.  And then the next thing down, it says

10  "Stairs leading from 1st floor to 2nd floor was not

11  constructed."  Do you see that?

12    A.   Yes.

13    Q.   And were there no stairs leading from the first

14  floor to the second floor?

15    A.   No.

16    Q.   There were not?

17    A.   There were not.

18    Q.   Okay.  And had -- the next sentence says "A

19  mechanical closet for furnace has been added on both

20  floors modifying the existing and propose plans of having

21  a communicating stairs from 1st floor to 2nd floor."  Did

22  you add a mechanical closet for a furnace that was not in

23  the plans?

24    A.   It got -- I guess it -- the plans were changed so

25  many times that things got moved around and missed and all

1  this other stuff, but both furnaces were inspected and

2  passed.

3      Q.   I'm asking about whether or not you added a

4  mechanical closet for a furnace that was not included in

5  the plans.

6      A.   It wasn't on the plans, but it had been there

7  before.

8      Q.   Okay.  The next thing down is windows had been

9  replaced throughout.  Did you replace the windows at your

10 property?

11     A.   Yeah.

12     Q.   Now, it says -- the next one down is -- it says

13 that the "1st floor area has been converted to an ADU by

14 adding a full kitchen with stove, sink and cabinets."  Did

15 you add a kitchen to the first floor area?

16     A.   No.

17     Q.   Did you add a stove to the first-floor area?

18     A.   I staged it with a stove.

19     Q.   So --

20     A.   And on the stove it said this is not permitted,

21 but owner will help with ADU permit if requested.

22     Q.   So when you staged the property for sale you had

23 a stove?

24     A.   It was a dummy stove.

25     Q.   But a stove?

1      A.    Yeah.

2      Q.    Okay.  And did you add a sink to the first-floor

3  area?

4      A.    No, it already had a sink.

5      Q.    Okay.  And did you add cabinets to the

6  first-floor area?

7      A.    Yes.

8      Q.    Okay.  Now, the next thing down talks about how

9  it shows this next thing Mr. Hernandez wrote is that

10  "Plans for PA201810183586 show an existing ceiling height

11  of 8 feet and a propose height of 8 feet on 1st floor

12  level."  Do you see that?

13      A.    Yes.

14      Q.    And do you agree that the plans in PA201810183586

15  called for an existing ceiling height of eight feet and a

16  proposed ceiling height of eight feet on first-floor

17  level?

18      A.    Yes.

19      Q.    Okay.  And that the next sentence says "Site

20  conditions observed approximately 7 feet in kitchen area

21  (approved as storage area)."  Do you see that?

22      A.    Yes, sir.

23      Q.    Was the seven -- was the ceiling at seven feet in

24  the first -- the kitchen area?

25      A.    Well, it wasn't a kitchen area.  It was a laundry

Patrick Gallagher                                           July 31, 2025

1  area.

2      Q.   Okay.  Was it at seven feet in what you're

3  calling the laundry area?

4      A.   Yes.

5      Q.   Okay.  All right.  Then it says "Plans for

6  PA201810183586 show an existing ceiling height of 8 feet

7  and a propose height of 8 feet on 1st floor level.  Site

8  conditions observe approximately 7 feet 3 inches in

9  approved lower bedroom."  Do you see that?

10     A.   Yes.

11     Q.   Did the plans for PA 201810183586 call for an

12 eight-foot ceiling height?

13     A.   Well, yes, it did, and it was.

14     Q.   Okay.  So do you believe that the condition of

15 the lower bedroom had an eight-foot ceiling?

16     A.   It did before.

17     Q.   Before what?

18     A.   Before we had to pour the new foundation.

19     Q.   Okay.  And then after you poured the new

20 foundation?

21     A.   Yeah.  Then -- the plans showed it existing as

22 eight-foot, and it was, right, and then you go to the

23 structural drawings, and then those call out -- you need

24 this thick a slab over this much rebar and, you know,

25 points out all the structural modifications that need to

1   be made, and so what happens is you lose ceiling height,

2   because you just gained floor height, because you just

3   poured a bunch of concrete down there, so yeah, it's one

4   of those things that got missed on the architecturals, but

5   it was clear on the structurals.

6       Q.   Okay.  So would you agree then that at least when

7   Mr. Hernandez came to your property on June 3rd, 2021, the

8   ceiling height and the lower bedroom was approximately

9   seven feet three inches?

10      A.   I would disagree.

11      Q.   Okay.  In what way?

12      A.   That he was measuring off the carpet.

13      Q.   Okay.  And where do you believe he should have

14  started his measurement?

15      A.   Well, not off the carpet.  You start -- you take

16  your measurements from the subfloor, not from the carpet.

17      Q.   Okay.  And what do you think the difference of

18  height would be between the carpet and the subfloor?

19      A.   Two inches.

20      Q.   Okay.  So you think the proper measurements

21  should have been seven feet five inches?

22      A.   Yeah.

23      Q.   Okay.  And do you believe that had he done the

24  proper measurement of seven feet five inches, that would

25  have complied with the submitted plans?

1      A.    No.  He was looking for anything he could find.

2      Q.    Okay.  So you would agree that even under your

3  measurement, the ceiling height would have not complied

4  with the accepted plans?

5      A.    No.

6      Q.    It would not have?

7      A.    No.

8      Q.    It would not have complied, right?

9      A.    It would not have complied with the plans.

10     Q.    Okay.  All right.  Okay, okay.

11     A.    However, it was measured by everybody that came

12  out there, and nobody had a problem with it.

13     Q.    Okay.

14     A.    Nobody had a problem with it.  Bernie didn't have

15  a problem with it.  Bill didn't have a problem with it.

16  Nobody had ever pointed out the anomaly on the plans.

17     Q.    Okay.  Let's look at Exhibit 9.

18     A.    Okay.

19     Q.    It's a permit application.  You know, as with the

20  other questions I've asked you about, this permit

21  application, this permit was submitted by you, correct?

22     A.    Yes.

23     Q.    And that's your signature at the bottom in the

24  bottom right corner, correct?

25     A.    Yes.

1    Q.   And could you read to me the description of the

2    work.

3    A.   (Reading) "Document all changes to 201810183586.

4    Legalize new windows previously shown existing.  Document

5    change to stairwell.  Show existing mechanical closet and

6    seismic retrofit."

7    Q.   So this permit, Exhibit 9, is -- it says "To

8    partially comply with NOV 202175602," which is what we

9    just talked about in Exhibit 8, correct?

10   A.   Yeah.

11   Q.   Okay.  All right.  And that permit was submitted

12   or filed by you on July 2nd, 2021, correct?

13   A.   Yep.

14   Q.   And it was approved on July 19th, 2021, correct?

15   A.   I guess.

16   Q.   That's what the stamp says, right?

17   A.   Okay, if that's what it says.

18   Q.   Okay.

19        THE WITNESS:  Can we pause for a moment?

20        MR. SIMS:  Sure.

21        (Discussion was held off the record.)

22   BY MR. SIMS:

23   Q.   Okay.

24   A.   This is about as nitpicky as it can get, just so

25   you know.

Patrick Gallagher                                              July 31, 2025

1        Q.    The permit?

2        A.    The notice of violation.

3        Q.    Okay.

4        A.    The correction notice.

5        Q.    All right.  So it seems like after the permit is

6    pulled for -- wait a minute.  Let me just stop.  You're

7    pointing at Exhibit 9 when you say this was about as

8    nitpicky as it can get, right?

9        A.    Yes.

10       Q.    So, I think, what I'm hearing you say is that you

11   know these are technical violations, but not things that

12   you believe required the level of enforcement that you

13   received?

14       A.    Right.

15       Q.    Okay.

16       A.    Because nobody cared about any of this stuff

17   before.

18       Q.    Okay.  So I've got just a couple more.  It seems

19   that you are then doing work pursuant to some of these

20   permits and some others, and your frustration level -- I

21   don't want to put words in your mouth, but, I assume, it's

22   increasing as time goes on?

23       A.    All I was -- we weren't actually doing work to

24   the house.  All this was was just revising the drawings.

25   That was it.

1      Q.   Okay.  And do you understand -- do you understand
2  the importance of having drawings that match the existing
3  conditions at a property?
4      A.   To a point.
5      Q.   Okay.  But you understand that it's important for
6  a building inspection department to understand what things
7  are supposed to look like after something is approved,
8  right?
9      A.   Right.
10     Q.   And that that allows an inspector that comes by
11  200 Naples in a year or a decade when a different project
12  is coming to say, "Okay.  This is what it's supposed to
13  look like before, and this is what it's supposed to look
14  like now," right?
15     A.   It's really nitpicky.
16     Q.   I'm just talking generally right now.
17     A.   Generally speaking, it's really, really nitpicky.
18     Q.   All right.  But generally speaking, as far as the
19  function of DBI, you understand that it's important for
20  them to know what is existing and what the proposed
21  changes are, right?
22     A.   I don't think it's important at all.
23     Q.   Okay.  You don't think that they should know
24  what's going on on properties around the city?
25     A.   I think -- stupid stuff like this?  No.

1        Q.    I'm not talking about your case.

2        A.    Well, that's what we're talking about

3    specifically, this case.

4        Q.    I'm talking about -- the question I have for you

5    is about the function of the building inspection

6    department.  So all I'm just asking you generally is you

7    know there's a reason you have to apply for a permit,

8    right?

9        A.    Yeah.

10       Q.    Okay.  And you understand that reason to be that

11   it's important for the building department to know what

12   somebody wants to do at a property, correct?

13       A.    No.  That's not why the building department

14   exists.  The building department was started in the very

15   first place to keep homeowners from getting ripped off by

16   contractors, to make sure that the contractor -- because

17   guys like you, you're an attorney, right?  I'm a builder.

18   I can build anything.  I can't litigate like you can, and

19   you can't build like I can, so you would ask the building

20   department "Look, here's what I want to do," and then it's

21   their job to make sure that I do it, but stuff like this,

22   no.  It's not important that they know any of this stuff.

23   None of it's important.

24       Q.    All right.  So you don't think it's important for

25   the building inspection department to know what a

1    contractor or a homeowner wants to do with their property?

2        A.    In this case, no.

3        Q.    All right.

4        A.    In this particular case, no.

5        Q.    Putting aside this particular case, generally

6    speaking, you think it's not important?

7        A.    It depends on what it is.

8        Q.    Okay.  So in some cases it is important, and in

9    some other cases it's not?

10       A.    Right.

11       Q.    Okay.

12       A.    Like one of the things he tried to write me up

13   for was where the refrigerator was on the drawings as

14   opposed to where it ended up, so like I said, he was

15   looking for anything he could find.  Even the

16   refrigerator -- he finally gave up on the refrigerator,

17   but that's how nitpicky he was getting.  The refrigerator

18   was supposed to be a foot over this way, not here.

19       Q.    Do you know what special inspections are?

20       A.    Yeah.

21       Q.    What are special inspections?

22       A.    Special inspections are everything that the

23   building department can't or won't do.

24       Q.    Okay.  Pertaining to what?

25       A.    Usually structural engineering, framing.

Patrick Gallagher                                            July 31, 2025

1       Q.    Welding?

2       A.    Yeah.

3       Q.    Concrete testing?

4       A.    Yeah.

5       Q.    Testing bolts?

6       A.    Yeah.

7       Q.    Weight-bearing types of construction features?

8       A.    Yeah.

9       Q.    Okay.  Were you required to do special

10   inspections at 200 Naples?

11      A.    Yes.

12      Q.    Did you handle those special inspections?

13      A.    Yes.

14      Q.    So did you retain the person who performed the

15   special inspections?

16      A.    Yes.

17      Q.    And who did you retain to do those special

18   inspections?

19      A.    I don't remember.

20      Q.    Okay.  Did you hire someone named JB Goode?

21                 (Reporter clarification.)

22            MR. SIMS:  JB Goode, G-o-o-d, and I believe

23   it's e.

24            THE WITNESS:  I don't remember.

25   ///

1   BY MR. SIMS:

2       Q.   Okay.  Did you -- were you the only person that

3   handled obtaining the special inspections?

4       A.   I was there for the nailing inspection.

5       Q.   Okay.  And once you obtained the special

6   inspections reports did you provide them to the new

7   structural engineer that you had hired?

8       A.   Base Design?

9       Q.   Yeah.

10      A.   Correct.

11      Q.   Ms. Kathryn Briggs?

12      A.   Yeah.

13      Q.   Okay.  And were you intending to retain a

14  qualified structural engineer to perform the special

15  inspections reports?

16      A.   A couple times.

17          MR. SIMS:  Okay.  I'm going to mark this as

18  Exhibit 11.

19                  (Deposition Exhibit Number 11

20                  was marked for identification.)

21  BY MR. SIMS:

22      Q.   All right.  Mr. Gallagher, you have in front of

23  you what's been marked as Exhibit 11.  Do you recognize

24  this document?

25      A.   No, not really, but it looks correct.

1    Q.    Okay.  This is a letter from a Ms. Kathryn Briggs

2  from Base Design.  Do you see that?

3    A.    Yes.

4    Q.    And that's the person that you hired as your

5  structural engineer for this project?

6    A.    Yes.

7    Q.    And in this letter that she is -- she has

8  indicated that "pull testing was provided at the holdown

9  anchor rods epoxied into the existing concrete by

10  JB Goodie," G-o-o-d-i-e, "Structural Engineers."  Do you

11  see that?

12    A.    Yeah.

13    Q.    Okay.  And then page 2 of this document is a test

14  report.  Do you see that?

15    A.    Yeah.

16    Q.    And just so I'm clear, based on what you've told

17  me, you were responsible for obtaining this test report

18  from JB Goodie Structural Engineers; is that true?

19    A.    No, no.  I was out there and it was a different

20  guy, I think, R & S Engineers doing the pull test.

21    Q.    Okay.

22    A.    So maybe he worked for R & S.

23    Q.    Do you recall JB Goodie performing special

24  inspection reports at your property?

25    A.    No.

1    Q.   Do you know why this document was submitted to
2  the building inspection department?
3    A.   Well, because they can't perform the inspections.
4    Q.   Okay.  Do you dispute that it was presented to
5  the building inspection department?
6    A.   No.
7    Q.   Okay.  I'm asking because JB Goodie has never
8  been a registered structural engineer with the State of
9  California.  Does it surprise you to learn that?
10    A.   Yeah.
11    Q.   Okay.
12    A.   But like I said, I used R & S.
13    Q.   Okay.  Let me get back -- you know how we were
14  talking about the retaliation and what we talked about,
15  and you recall we talked about Mr. Hughen and
16  Ms. Kwaitkowska.  I'm going to do the same thing with the
17  building inspection defendants, okay, the employees of the
18  San Francisco Building Department.  All right?  So I think
19  we've already established that prior to May 2021 or -- May
20  or June 2021, you do not believe that any of the employees
21  at the San Francisco Building Department had a reason to
22  retaliate against you?
23    A.   Right.
24    Q.   Okay.  So let's start with Mr. Duffy.  Okay?
25    A.   Okay.

1    Q.   Well, do you recall when I was asking you about

2  Mr. Hughen that he -- you said that it was your belief

3  that Mr. Hughen acted, at least in part, in the way that

4  he did pertaining to your job was because Mr. Duffy told

5  him that you were talking with the FBI?  Do you recall

6  that testimony?

7    A.   I believe I responded with "could be," but it

8  could have been just the rumor mill around the building

9  department as well.

10    Q.   Right.

11    A.   I had gotten a bad rap, or rep.

12    Q.   Right.  And so my question is do you have any

13  information about when specifically Mr. Duffy learned that

14  you were speaking with the FBI about Mr. Curran?

15    A.   Well, you're asking me to guess when he found

16  out.

17    Q.   So you can't answer that question, right, because

18  it would be speculation?

19    A.   Right.

20    Q.   Okay.  So you don't know?

21    A.   I don't know when he found out.

22    Q.   Okay.  Do you know that -- I mean, you assume he

23  did find out eventually, correct?

24    A.   He ended up with Bernie's job.

25    Q.   Right.  So at some point he learned that

 1    Mr. Curran was at least indicted or under investigation,
 2    correct?
 3        A.   Correct.
 4        Q.   Okay.  And so --
 5        A.   Well, the day Bernie got indicted, he also had to
 6    resign that very day.
 7        Q.   Okay.
 8        A.   And then Joe Duffy got his job.
 9        Q.   Right.  And so -- and so is it your belief that
10    because Mr. Curran was criminally indicted it was at that
11    point that employees of the San Francisco Department of
12    Building Inspection learned that you had had a hand in
13    that indictment?
14        A.   Yeah.
15        Q.   Okay.  And it was at that moment that
16    Mr. Duffy -- specifically Mr. Duffy decided that he was
17    going to retaliate against you for your conversations with
18    the special agent?
19        A.   That's what I think, because why would he claim
20    that this never got filed correctly?
21        Q.   Other than the fact that the certificate of
22    completion -- of final completion that Mr. Curran provided
23    you was no good, is that what you're thinking Mr. Duffy
24    did to retaliate against you?
25        A.   I'm positive of it.

1     Q.    Okay.  And that's your belief, correct?

2     A.    I can prove that this was filed correctly.

3     Q.    Okay.  How can you --

4     A.    So why would he lie about that?

5     Q.    How can you prove that?

6     A.    Well, that's something we'll have to get into a

7  little later.

8     Q.    Well, I'm asking now.

9     A.    These documents were altered --

10    Q.    Okay.

11    A.    -- after Bernie got indicted.

12    Q.    So you're saying Exhibit 10 was altered after

13 Mr. Curran was indicted?

14    A.    Right.

15    Q.    Okay.  And in what way were they altered?

16    A.    Instead of marked as "Completed," the permit was

17 marked as "Expired."

18    Q.    Okay.  So you're not saying that Exhibit 10 was

19 altered, right?

20    A.    Not in itself.

21    Q.    Okay.

22    A.    I'm saying the building department records were

23 altered.

24    Q.    Okay.  And what building department records were

25 altered -- that you believe were altered?

1      A.   The whole history of 3586.  Instead of marking it
2  as "Completed," which it was, they changed that to
3  "Expired."
4      Q.   Okay.
5      A.   So why would they do that?
6      Q.   Who do you believe did that?
7      A.   Well, I think it would have to be somebody high
8  up in the building department to go in there and change
9  and falsify department records.
10     Q.   Okay.
11     A.   So that's why I think it was Joe Duffy.
12     Q.   Okay.  And your belief that Mr. Duffy falsified
13 the records is due to his position within DBI, correct?
14     A.   Right.
15     Q.   And because he is high up in the hierarchy,
16 correct?
17     A.   Right.
18     Q.   All right.  And outside of just his position at
19 the time this happened, do you have any direct evidence
20 that Mr. Duffy was the one that committed the fraud that
21 you're describing?
22     A.   No.  It would be more circumstantial.
23     Q.   Okay.
24     A.   Like --
25     Q.   Just --

1    A.   -- who is Margaret Duffy, and why is she living

2  at Bernie's house, right?

3    Q.   That's a great question.  So just so I'm clear,

4  it's by way of Mr. Duffy's position within DBI that you

5  believe he has committed fraud?

6    A.   I'm positive he committed fraud.

7    Q.   Okay.  And it's just because of who he is within

8  that organization?

9    A.   No.

10   Q.   Okay.  What else do you --

11   A.   I have paper documents as late as March of '21 --

12   Q.   Okay.

13   A.   -- that show this certificate filed correctly,

14  and the records showed that 3586 had been completed.

15   Q.   Okay.  But why do you think Mr. Duffy is the one

16  who changed it, other than just the fact that he's a boss?

17   A.   Well, when all this first happened I went and

18  talked to Mauricio, and he said, "No, no.  You've got to

19  go talk to Joe Duffy.  Joe Duffy is the only one that can

20  handle this right now."  I said, "Okay.  Where's Joe

21  Duffy?"  "He's gone for two weeks.  You're going to have

22  to wait until he gets back," and so he gets back and he

23  tells me "No, no, no.  This is no good.  This is no good.

24  No, no.  It didn't get filed correctly, Pat.  It's no

25  good."

1    Q.    Okay.  So my question is why do you think

2    Mr. Duffy -- I'm going to ask it one more time.  I don't

3    think you can answer it.  That's just me, but why do you

4    think it was Mr. Duffy that committed the fraud you

5    described?

6    A.    He was the one in charge of the whole thing.

7    Q.    Okay.

8    A.    Mauricio made that clear.  This can only go

9    through Joe Duffy.

10    Q.    All right.  I got it.  Other than directing other

11    City employees and this fraud you described, do you think

12    Mr. Duffy personally participated in any of the

13    retaliation that is the subject of your lawsuit?

14    A.    Yeah.

15    Q.    Okay.  So how?

16    A.    I think he spread through the rumor mill and then

17    just directed everybody to obstruct, delay, "Make stuff up

18    if you have to."

19    Q.    Okay.

20    A.    Just otherwise, how do you explain a project that

21    was supposed to take ten weeks took seven years?

22    Q.    Okay.  So that is -- what you just said is just

23    your interpretation of the delays, correct?

24    A.    From May 17th of '21, okay, up until December of

25    '24.  We had these simple changes that had to be made,

1    right, on Exhibit 9, and all these were were clerical.

2    The place didn't require any work.

3        Q.   Okay.  All right.  Let me ask you about a meeting

4    that you had with the supervisor.  I'm trying to find a

5    spelling for you here.

6            MR. SIMS:  Can we go off the record.

7              (Discussion was held off the record.)

8            MR. SIMS:  Back on the record.

9        Q.   Now, Mr. Gallagher, you described a meeting that

10   you had with at least some employees of Supervisor Safai.

11   I believe you referenced specifically EJ --

12       A.   Right.

13       Q.   -- Mr. Jones.  Did the supervisor or former

14   supervisor Safai, did he actually attend that meeting?

15       A.   We might have had a three-way call.

16       Q.   Okay.

17       A.   Oh, you mean when we met with the building

18   department?

19       Q.   Correct.

20       A.   No, just Ernest Jones was there.

21       Q.   And that meeting, I believe, occurred on May 4th,

22   2022.  Does that sound right to you?

23       A.   Sounds about right.

24       Q.   Okay.  And during that meeting there was a

25   discussion between yourself, Mr. Duffy -- was Mr. Greene

1  there, Matthew Greene?

2      A.   I don't know.

3      Q.   Okay.

4      A.   I know Birmingham was.

5      Q.   Mr. Birmingham was there?

6      A.   Yeah.

7      Q.   Okay.  Was Mr. Hernandez there?

8      A.   Yes.

9      Q.   Okay.  Was anyone from the San Francisco Planning

10  Department there?

11     A.   No.

12     Q.   Okay.  And then it was -- it was Mr. Jones?

13     A.   Right.

14     Q.   And during that meeting there was a discussion of

15  what the building department was requiring of you to get

16  your property into compliance, correct?

17     A.   Right.

18     Q.   Okay.  And did you find that to be a productive

19  meeting?

20     A.   No.

21     Q.   And why?

22     A.   Well, first of all, I wanted to know who

23  invalidated this.  Right?  That was my very first

24  question, and Joe again was like "No, no, no.  No, that's

25  no good, and we want that back.  You've got to give that

1    back.  We want that back."  I'm like "I'm not giving it

2    back."

3            Anyways, so -- and then they -- so first

4    document 9.  Right?  So Mauricio calls out document

5    changes to the stairs, right, and show the mechanical

6    closet, all nitpicky crap, and then he says to legalize

7    the new windows that had previously been approved, and so

8    that had to go through planning, the windows, and even get

9    the historic commission involved in it, right, and so

10   planning had actually spec'd out these windows.

11           So Mauricio tells me "Legalize new windows."

12   Well, that's just a simple declaration.  It's just filling

13   out another piece of paper, and so I did everything they

14   asked on this correction notice right here.  Right?  I

15   revised all the drawings, showed all the changes or

16   deviations, and I legalized the windows, and so then I go

17   back.  I'm like "Okay.  Can we sign off on this now?"

18   "No."  "Why not?"  You have to change out your windows."

19       Q.   And why did they tell you you needed to change

20   out your windows?

21       A.   Well, first Kevin came up with a bunch of BS and

22   he said, "You are not allowed to egress out those

23   windows."  I said, "Sure, you can."  He goes "You can

24   egress them to anything that's safe.  There are no

25   trespassing laws when your house is on fire.  That's

1    ridiculous, but they wouldn't budge, and neither would Joe
2    Duffy, you know, and so now they're telling me "You have
3    to change out those windows, second floor, twenty feet up
4    scaffolding and stucco," and so I had talked to Ernest,
5    and he said, "I don't get these guys, Pat.  I don't get
6    where they're coming from.  You're probably going to have
7    to start litigating this thing.  You're probably going to
8    have to sue them."
9          Then that just kept going and going and going,
10   you know, so I spent 30-something-thousand dollars
11   changing out the windows, and then, of course, the stucco
12   had a color coat, and we were never going to be able to
13   get that to match again.
14       Q.   Just can I stop you right there, because --
15           MR. SIMS:  Can you just read him the question
16   that I actually asked him, please.
17                   (The record was read back.)
18   BY MR. SIMS:
19       Q.   So I think you said because there was an egress
20   issue that Mr. Birmingham raised.
21       A.   Right.
22       Q.   Okay.  And did he tell you the code section that
23   supported what he was saying?
24       A.   No.
25       Q.   Okay.  And you disagreed with what Mr. Birmingham

1    thought as far as the windows went?

2        A.   Yes.

3        Q.   Okay.  Other than the windows, were there

4    anything else -- was there any other issues discussed at

5    the meeting, other than the CFC that we've already talked

6    about?

7        A.   Well, he went on about -- Joe Duffy went on about

8    how everybody in the building department really works hard

9    and does the best they can and blah, blah, blah.  Then I

10   told him -- I said, "Look, Joe.  I didn't call the FBI.

11   They called me.  What am I supposed to do?  Lie to the

12   FBI?"  Then he kind of threw a fit, and then the meeting

13   was over.

14       Q.   Okay.  And so after the meeting happened -- well,

15   how long was the meeting?

16       A.   I'd say about an hour.

17       Q.   Okay.  And so did you eventually do the work with

18   the windows that you just described they wanted you to do?

19       A.   Yeah.

20       Q.   All right.  And when was that completed?

21       A.   Shortly after that meeting.  I mean, I got on it

22   as fast as I could.

23       Q.   Okay.

24       A.   But here's the thing.  Planning spec'd those

25   windows out specifically because they thought the house

1    may have some historic value.  Right?

2        Q.   Okay.

3        A.   So why would planning tell me "These are the

4    windows you need to use" and then after Bernie gets

5    busted, now I'm told "You've got to get rid of these

6    windows"?

7        Q.   Okay.  So when did you finish the windows?

8        A.   I don't know.  Like I said, shortly after that

9    meeting.

10       Q.   And when -- and then after the window issue was

11   resolved you had some other problems with the ADU and the

12   ceiling heights, correct?

13       A.   Well, I didn't think so, because I called Joe and

14   I told him -- I said, "Look, it's not seven-three.  Okay?

15   It's seven-foot-five, and if we're not going to be able to

16   issue an ADU for any of this stuff, then let's just" --

17   "let's just cancel the ADU altogether," but Mauricio kept

18   saying, "No, no.  You have to file for the ADU."

19            So San Francisco for many years has had its own

20   building codes.  You know what I mean?  They're called

21   objective building codes for the City of San Francisco,

22   but they're not allowed to do that sort of stuff anymore.

23   So in California the legal height for an ADU is

24   seven-foot.  For a family residence it's seven-foot-six,

25   but Matt Greene wouldn't let that one go, and this is what

1   they do.  They start off with Bernie, and then they move

2   it to Mauricio.  Then Mauricio moves it over to -- what

3   was this guy's name?  Somebody else, and then that guy

4   sends it over to Matt Greene, and then Matt Greene sends

5   it over to somebody else.

6          When I finished this correction notice I asked

7   Mauricio to sign off on it, seeing how he's the one that

8   wrote it up.  Right?  He wouldn't do it.  He passed it off

9   to Kevin, and Kevin wanted the windows taken out, and

10  Kevin sends it over to some other guy who wants the

11  driveway filled in, and then he sends it over to Matt

12  Greene, who wants the whole thing nixed in the first

13  place, because he doesn't agree with the ceiling height,

14  so if it wasn't retaliation, why didn't Mauricio just sign

15  off on this correction notice in the first place and we'd

16  have been done with it?

17         MR. SIMS:  All right.  Can we mark that now.

18              (Deposition Exhibit Number 12

19               was marked for identification.)

20  BY MR. SIMS:

21    Q.    All right.  I have just some general questions

22  about your e-mail address.  Is your e-mail address

23  bigblockpat@gmail.com?

24    A.    Yes.

25    Q.    And does anyone else, as far as you know, have

1    access to that e-mail address, other than you?

2        A.    My ex.

3        Q.    Okay.  Did you ever -- are you aware of an

4    instance where your ex has sent an e-mail that you did not

5    send from --

6        A.    No.

7        Q.    -- from bigblockpat@gmail.com?

8        A.    No.

9        Q.    Okay.  Would it be fair to say that instead of

10   going through each of these large stack of e-mails that

11   you sent or received from various employees of the City

12   and County of San Francisco that you'll stipulate that any

13   e-mail that is either sent from bigblockpat@gmail.com or

14   received by bigblockpat.com (verbatim) was either sent or

15   read by you?

16       A.    Okay.

17       Q.    You stipulate to that, right?

18       A.    Okay.  Yes.

19       Q.    Okay.  All right.  Let me ask you some questions

20   about Exhibit 12, and I want -- I'm going to go backwards,

21   because that's chronologically how they read.  And so the

22   second page of Exhibit 12 is an e-mail from Matthew Greene

23   to you, dated March 10th, 2023.  Do you see that?

24       A.    Yes.

25       Q.    All right.  And it reads "Mr. Gallagher, Per your

1    request, please see the below for the specific

2    requirements to receive final sign off for building permit

3    application number 202108096049 (for a new ADU) at

4    200 Naples)."  Do you see that?

5         A.   Yes.

6         Q.   Okay.  Do you remember receiving this e-mail?

7         A.   Vaguely.

8         Q.   Okay.  And do you remember reading it?

9         A.   I don't know.

10        Q.   Okay.  Well --

11        A.   Yeah.  I'm pretty sure I did, because I was

12   pretty hot.

13        Q.   All right.  So would you agree that this e-mail,

14   at least as you interpret it, is an attempt by Mr. Greene

15   to let you know exactly what it is you need to do in order

16   to get a certificate of completion related to your ADU

17   unit?

18        A.   No.

19        Q.   Okay.  What do you interpret this e-mail to be?

20        A.   BS.

21        Q.   Okay.  You just disagree with the content of the

22   e-mail?

23        A.   I disagree with the intent, the content, the

24   whole thing.

25        Q.   Okay.  And what do you believe Mr. Greene's

```
 1   intent was by sending this e-mail?
 2       A.   To delay the project even more.
 3       Q.   Okay.  Would you agree if Mr. Greene's intent was
 4   to delay the project he would not e-mail you at all?
 5       A.   No.
 6       Q.   Okay.  So I understand it, this e-mail -- this
 7   e-mail, at least according to you, from the chief building
 8   inspector is to delay your project?
 9       A.   It's CYA.
10       Q.   Okay.
11       A.   It's BS, like I said before.
12       Q.   What part of it is BS?
13       A.   All of it.
14       Q.   Every single word of it?
15       A.   Yep.
16       Q.   Okay.  What about the words "Mr. Gallagher"?  Is
17   that BS?
18       A.   No, that's okay.
19       Q.   Okay.  Every other word, though?
20       A.   Yeah, everything else in here.  For one thing,
21   when you apply for a permit, like I said earlier, any and
22   all abatements on that property have to be paid for and
23   cleared right then and there when you apply for the
24   permit.  That's when these abatements were cleared.  Back
25   in 2018 they were cleared.
```

1    Q.   So your --

2    A.   He brought them out of mothballs -- let me

3  finish -- so he could delay my project some more, because

4  we were back in escrow, and then they pop up again, these

5  abatements, again.

6    Q.   I'm not asking you about that.  I'm asking you

7  about the e-mail he sent on March 10, 2023.  It's not on

8  the page you're looking at.

9    A.   Okay.

10    Q.   Okay?  You believe -- look at the -- can you

11  review that e-mail for me.  It starts right there at the

12  bottom of that page.

13    A.   Yeah.  Again, BS.

14    Q.   Okay.  What is it BS about?  Hold on.  Actually,

15  I'm withdrawing that question, because I don't -- do you

16  believe that the building code in San Francisco states

17  that habitable space shall, quote, "have a ceiling height

18  of not less than 7 feet 6 inches above the finished

19  floor"?

20    A.   Do I agree with it?

21    Q.   No.  Do you believe that the building code says

22  that?

23    A.   I believe the San Francisco Building Code says

24  that.

25    Q.   Okay.  Do you see number two on the e-mail dated

1  March 10th?  It's the next page.

2      A.   Yes.

3      Q.   Okay.  So according -- in this section of the

4  e-mail Mr. Greene is communicating to you that the window

5  in the bedroom, there must be a five-foot clear opening,

6  and the interior height cannot be higher than

7  forty-four inches above the finished floor.  Do you see

8  that part?

9      A.   Yes.

10     Q.   And then he embeds a photo of what, I believe,

11 are plans, and he's saying at the site visit on March 2nd

12 the sill height, presumably the windowsill height, was

13 measured to be 48 inches and not meeting the minimum

14 requirements of the code.  Do you see that sentence, sir?

15     A.   Yes.

16     Q.   Do you agree with Mr. Greene that the sill height

17 on the window in the bedroom was 48 inches?

18     A.   No.

19     Q.   Okay.  Why do you believe it was something

20 different?

21     A.   Because I had already addressed that when Kevin

22 had me change out the windows the first time and the

23 second time.

24     Q.   Okay.  So you believe that the measurement was

25 done incorrectly?

1    A.   Yes.

2    Q.   Okay.

3    A.   There was a step there, an easy fix.

4    Q.   Okay.  So was it -- when you say it's a step, do

5  you believe that the measurement was just started at an

6  incorrect place?

7    A.   Yeah.  He started off the floor instead of off

8  the step.

9    Q.   Okay.  So when Mr. Greene says "the interior sill

10  height cannot be higher than 44 inches above the finish

11  floor," you interpret that to mean above the step that you

12  had installed?

13    A.   That's it, yeah.  What he's saying is incorrect.

14    Q.   I see.  Okay.  Number three, talks about official

15  sign-off for an electrical permit.  Do you see that?

16    A.   Yes.

17    Q.   Was that outstanding at the time this e-mail was

18  drafted?

19    A.   No.

20    Q.   Okay.  You believe you had sign-off on

21  electrical -- the electrical permit referenced here?

22    A.   Yes.

23    Q.   Okay.  And is that because you had the

24  certificate of completion?

25    A.   No.

1      Q.    That was a different thing?

2      A.    Yes.

3      Q.    Okay.  Did you ever apply for -- we talked about

4   the curb cuts this morning.  Did you ever apply to DPW to

5   reinstate the curb cut?

6      A.    Yes.

7      Q.    Okay.  And did they approve that?

8      A.    Yes.

9      Q.    Okay.  And so the hang-up with the parking was

10  with planning allowing you to put the spaces on your

11  property, correct?

12     A.    No.

13     Q.    Okay.  What was the hang-up with the parking?

14     A.    Well, there wasn't any until Matthew Greene came

15  out there.  Everybody was fine with it except for Matthew

16  Greene.

17     Q.    Okay.  So you did request a variance, though,

18  correct, from the planning department?

19     A.    Which wasn't required, but yes, that was what

20  Natalia made me go through.

21     Q.    Okay.  And that variance request was denied,

22  correct?

23     A.    Right.

24     Q.    And that was not denied -- it was not denied by

25  Natalia, right?

```
 1        A.   It was denied by Natalia, but what you're
 2   referring to is the variance here.
 3        Q.   No, no.  Well, maybe.
 4        A.   Yeah.
 5        Q.   The variance hearing was conducted by Mr. Corey
 6   Teague, T-e-a-g-u-e, correct?
 7        A.   The first one, yes.
 8        Q.   Correct.
 9        A.   And then the second one was done down here in the
10   city.
11        Q.   The board of appeals?
12        A.   Right.
13        Q.   And that was also denied?
14        A.   Right.
15        Q.   Okay.  And do you believe that the people
16   involved with the determination of your variance request
17   were also retaliating against you?
18        A.   No.
19        Q.   Okay.  So do you believe -- well, I presume you
20   disagree with the outcome of that variance request.
21        A.   So did the board of supervisors.
22        Q.   Okay.
23        A.   They were watching --
24        Q.   Just let me finish my question, sir.  While you
25   disagree with the outcome of the variance request and your
```

1  hearing at the board of appeal, you do not believe that

2  those decisions were made for any improper purpose?

3      A.   You're putting words in my mouth that I would

4  never use.

5      Q.   Okay.

6      A.   I think they were stupid.  They didn't listen.

7  They didn't follow the law.

8      Q.   Okay.  But I'm asking about -- that has to do

9  with outcome, right?  That has to do with their decision.

10     A.   Right.

11     Q.   I'm asking whether you think that they railroaded

12 you because you talked to the FBI.

13     A.   Maybe.

14     Q.   But you don't know, right?

15     A.   Their decision made no sense whatsoever, none.

16     Q.   Okay.  In fact, at the hearing, the board of

17 appeal hearing, several of the members of the board of

18 appeals told you that your reading of the laws that you

19 were citing was incorrect.

20     A.   No, that never happened.

21     Q.   Okay.  You did appear there, though, right?

22     A.   Yeah.

23     Q.   And you were not represented by any lawyer?

24     A.   Right.

25     Q.   And you made arguments on your own behalf?

1    A.    Right.

2    Q.    The first e-mail of Exhibit 11 from Mr. Greene,

3  dated June 8, 2023, do you see that?

4    A.    Yeah.

5    Q.    I think we talked about this this morning, but

6  you believe that Mr. Greene mentioned these orders of

7  abatements that had been recorded against your property at

8  this time because he was trying to retaliate against you?

9    A.    Yeah, because he was trying to stop the sale of

10  the house again.

11    Q.    Okay.  And how do you know that he knew that the

12  sale was pending?

13    A.    There's a big sign right out in front.

14    Q.    So there's a "For Sale" sign?

15    A.    Yeah.

16    Q.    And do you know whether or not Mr. Greene saw

17  that sign?

18    A.    I'm sure he did.

19    Q.    I mean, is that just your suspicion or were you

20  there when he saw it?

21    A.    I don't know.

22    Q.    You don't know whether you were there when he saw

23  it?

24    A.    You're asking me for hypotheticals.  You're

25  asking me to guess again.

1     Q.    I'm actually asking you for what you know.

2    That's really all I really care about, so if you don't

3    know something, just say you don't know it.

4        A.    I know that these are BS.

5        Q.    And what do you mean by that?

6        A.    When you file for -- when you pull a permit, if

7    there are any abatements against the property you have to

8    take care of them right then and there at that time.  How

9    many permits have I pulled, and how many times does it say

10   on here to comply with NOV such-and-such, to comply with

11   NOV such-and-such, to comply with NOV such-and-such, and

12   guess what numbers are right here?  All these numbers to

13   comply with NOV such-and-such, he brings these back.

14       Q.    So these are NOV's that were -- you were

15   attempting to abate during the course of your remodel,

16   right?

17       A.    From 2018.

18       Q.    Right.  And because of the DBI's enforcement

19   process, orders of abatement were eventually recorded

20   against your property, correct?

21       A.    Before I even bought it.

22       Q.    Well, some of these orders of abatement,

23   according to Mr. Greene, were recorded in February of

24   2019.

25       A.    Now, how can that be?

1    Q.    I'm asking about whether you see that on the

2  document.

3    A.    That's another reason why I'm calling it BS.

4    Q.    Okay.  Well, do you dispute that it was recorded

5  against the property on February 3rd, 2019?

6    A.    I don't see how it could have been.

7    Q.    Okay.

8    A.    Look at all the permits I pulled that pre-date

9  2019 to comply.  This is NOV 2018.  This is NOV 2016 and

10  2017, so just from these two permits those three

11  abatements were cleared before they even were supposedly

12  recorded.

13    Q.    So you think an abatement -- an order of

14  abatement gets cleared once a permit is issued?

15    A.    Shouldn't it?

16    Q.    Well, wouldn't it make sense that the issue in

17  need of abatement would still exist when the permit is

18  issued if you're working pursuant to a permit?

19    A.    From 2016?

20        MR. SIMS:  All right.  We're going to take a

21  five-minute break.

22                    (Recess was taken.

23              Deposition Exhibit Number 13

24              was marked for identification.)

25  ///

```
 1   BY MR. SIMS:
 2       Q.   All right.  Mr. Gallagher, we've marked as
 3   Exhibit 13, I believe, the initial lawsuit you filed
 4   against the City and its employees in this case.  Do you
 5   see that?
 6       A.   Yes.
 7       Q.   And this is something that you submitted to the
 8   San Francisco Superior Court?
 9       A.   Yes.
10       Q.   And something that you wrote, correct?  Well, how
11   about this.  Let's turn to the last page.  Do you see the
12   verification there?
13       A.   Yes.
14       Q.   That's your signature at the bottom?
15       A.   Yes.
16       Q.   And it's dated March 8th, 2023, correct?
17       A.   Yes.
18       Q.   And in this verification you are attesting
19   that -- under penalty of perjury that "the matters stated
20   in the foregoing document or this complaint are true to my
21   own knowledge, except those matters that are stated on
22   information and belief"?  Is that true?
23       A.   Yes.
24       Q.   And it was true when you wrote this document,
25   correct?
```

Patrick Gallagher                                             July 31, 2025

```
 1      A.   Yes.
 2      Q.   And submitted it to the court -- the court in
 3  San Francisco?
 4      A.   Yes.
 5      Q.   Okay.  I want you to review this document real
 6  quick, and turn to page 5.
 7      A.   Okay.
 8      Q.   Do you see paragraph 16?
 9      A.   Yes.
10      Q.   Okay.  In paragraph 16 you were trying to allege
11  that Messrs. Curran and Santos were arrested and charged
12  by the United States government.  Is that true?
13      A.   Yes.
14      Q.   Okay.  Now, is there any -- and then in other
15  parts of your complaint you are making allegations against
16  Mr. Duffy and Mr. Birmingham and Ms. Kwaitkowska for
17  generally obstructing your project, correct?
18      A.   Yes.
19      Q.   Okay.  There's no allegation in here that the
20  reason for the obstruction was due to your participation
21  in the investigation of Messrs. Curry and Santos?
22      A.   Okay.
23      Q.   Do you agree with that?
24      A.   No, but --
25      Q.   Take your time and read it, and let me know.
```

```
 1                  MR. SIMS:  We can do that off the record.
 2                       (Pause in the proceedings.)
 3                  MR. SIMS:  Could you just read that question back
 4      to him.
 5                            (The record was read back.)
 6      BY MR. SIMS:
 7          Q.   Now, Mr. Gallagher, we just read back some
 8      questions and you've had an opportunity to review the
 9      complaint that you filed.  Are there any allegations in
10      this complaint marked as Exhibit 12 -- 13, excuse me, that
11      talk about retaliation for your participation in the
12      investigation of Mr. Curran or Mr. Santos?
13          A.   Not in those words.
14          Q.   Okay.  In fact, the words "FBI" don't appear
15      anywhere, correct?
16          A.   I would agree.
17          Q.   Or more specifically, the words "Federal Bureau
18      of Investigation" do not appear, correct?
19          A.   Correct.
20          Q.   And when you submitted this lawsuit you were
21      upset, correct?
22          A.   Yes.
23          Q.   You were upset with the way the project at
24      200 Naples had gone, correct?
25          A.   Yes.
```

1    Q.    And you had felt that you were being treated

2  unfairly?

3    A.    Yes.

4    Q.    And in order to communicate that you were intent

5  on, one, being truthful in your pleading, correct?

6    A.    Right.

7    Q.    Which is why you made it under penalty of

8  perjury?

9    A.    Right.

10    Q.    And the second thing is that you wanted to

11  include everything that would allow you to get the damages

12  that you describe later on in the complaint, right?

13    A.    Yes.

14    Q.    Okay.

15    A.    And this was later amended.

16    Q.    I've got a couple more nits and gnats, and then

17  we'll get you out of here.  There's an e-mail address that

18  I saw in one of the e-mails.  The address is

19  jneal_dc@comcast.net.

20    A.    Yes.

21    Q.    Does that e-mail address mean anything to you?

22    A.    J. Neal was one of my drafters, architects, if

23  you want to call -- I don't think he was a certified

24  architect, but he helped me make a bunch of the changes to

25  the drawings that were spelled out by Mauricio.

```
 1      Q.   Okay.  So Mr. Neal assisted you in drawing plans
 2  to comply with some of the NOV's that we talked about
 3  today?
 4      A.   Yes.
 5      Q.   And most notably, the NOV that was authored by
 6  Mr. Hernandez?
 7      A.   Yes.
 8      Q.   Okay.  And you said he's not a licensed
 9  architect?
10      A.   I don't believe so.  He might be, but I don't
11  think he is.
12      Q.   Okay.  Did he provide structural or architectural
13  drawings to DBI?
14      A.   No.
15      Q.   Okay.  What is his actual name?
16      A.   John Neal.
17      Q.   And "Neal" is spelled like the e-mail address?
18      A.   N-e-a-l.
19      Q.   Okay.  And where -- do you have an address for
20  him?
21      A.   I do, but I couldn't tell you what it is offhand.
22      Q.   Okay.  And have you worked with him on any other
23  projects, other than this one?
24      A.   No.
25      Q.   Okay.  There's another name that I didn't know,
```

1   Meghan O'Halloran, M-e-g-h-a-n, O, apostrophe,

2   H-a-l-l-o-r-a-n?

3       A.   Yes.

4       Q.   Do you know who that person is?

5       A.   Yes.

6       Q.   And who is it?

7       A.   Meghan, she kind of -- what is her profession?

8   What she does is she waits this line for you.  You give

9   her either the blueprints or the application or whatever

10  and she'll do all the waiting and go through all the

11  stations.  See, now after COVID everything's done on

12  computer now online, but back then you had to go from

13  station to station physically, station to station to

14  station to station to get everything approved, and

15  normally that would take all day, so that's what Meghan

16  does.  She'll do that for you.

17      Q.   Okay.

18      A.   But I don't know what --

19      Q.   She's a permit expediter?

20      A.   Okay.  That makes sense.

21      Q.   All right.  Just to reiterate what we discussed

22  earlier today, it sounds like not only did you bring some

23  documents that had not yet been produced but there's some

24  other documents that you referenced, namely some

25  photographs that you wanted to show me and you said you're

1   going to show me, so I'm done with the questioning for

2   today, but per our agreement we may reschedule and talk

3   about some of these new documents that, at least in my

4   opinion, should have been produced before today and

5   certainly after, so I'm going to reserve my right to ask

6   you about those documents once I receive them at a later

7   date.

8        A.   Okay.

9        Q.   And we can agree that that can be done just by

10  agreement with the parties, correct?

11       A.   Sure.

12       Q.   Okay.  The reason I'm asking that in that way is

13  because the discovery cutoff is next week, and I can't

14  imagine you're going to get me all these papers and the

15  photos in time to reschedule something before the cutoff,

16  so --

17       A.   I'll get them to you tomorrow.

18       Q.   Okay.  Well, I'm going to be out of town next

19  week, so I can't do it next week, so we're going to

20  just -- all I'm saying is we don't have to file motions

21  and stuff like that with the court, just sort it out.  It

22  may not be necessary.

23       A.   I really thought I had sent you the pictures

24  because the pictures are very --

25            MR. SIMS:  Okay.  Let's just finish that -- we

Patrick Gallagher                                                    July 31, 2025

1  can talk off the record.

2        (Volume I of the deposition of Patrick Gallagher

3                  concluded at 4:16 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Patrick Gallagher                                           July 31, 2025

1                              --o0o--

2

3

4

5           I do solemnly declare under penalty of perjury,

6    under the laws of the State of California, that the

7    foregoing is my deposition under oath; that these are the

8    questions asked of me and my answers thereto; that I have

9    read same and have made the necessary corrections,

10   additions, or changes to my answers that I deem necessary.

11          In witness thereof, I hereby subscribe my name

12   this _____ day of _____, 20_____.

13

14                        _____

15                              PATRICK GALLAGHER

16

17

18

19

20

21

22

23

24

25

Patrick Gallagher                                                    July 31, 2025

```
 1                    CERTIFICATE OF REPORTER

 2

 3        I, HEATHER M. LOFHOLM, a Certified Shorthand

 4   Reporter, hereby certify that the witness in the foregoing

 5   deposition, PATRICK GALLAGHER, was by me duly administered

 6   an oath in accordance with CCP Section 2025 to tell the

 7   truth, the whole truth and nothing but the truth in the

 8   within-entitled cause; that the testimony of said witness

 9   was taken down in shorthand by me, a Certified Shorthand

10   Reporter and disinterested person, at the time and place

11   herein stated, and that the testimony of the said witness

12   was thereafter reduced to typewriting, by computer, under

13   my direction and supervision.

14        I further certify that I am not of counsel or

15   attorney for either or any of the parties to the said

16   deposition, nor in any way interested in the outcome of

17   this cause, and that I am not related to any of the

18   parties thereto.

19        I hereto declare under penalty of perjury that the

20   foregoing is true and correct.  I have hereunto set my

21   hand on August 15, 2025.

22

23

24              Heather M. Lofholm, CSR No. 11570

25
```

Patrick Gallagher                                              July 31, 2025

```
 1                    CORRECTION CERTIFICATE

 2   To add testimony, indicate "Add" and print the exact
     words you wish to add. To delete testimony, indicate
 3   "Delete" and print the exact words you wish to delete.

 4

 5   Deposition of:     Patrick Gallagher
     Proceedings Date:  July 31, 2025
 6

 7   I, Patrick Gallagher,
     have the following changes to my proceedings transcript:
 8

 9   PAGE    LINE       CHANGE TESTIMONY TO READ AS FOLLOWS:

10   _____   _____      _____

11   _____   _____      _____

12   _____   _____      _____

13   _____   _____      _____

14   _____   _____      _____

15   _____   _____      _____

16   _____   _____      _____

17   _____   _____      _____

18   _____   _____      _____

19   _____   _____      _____

20   _____   _____      _____

21   _____   _____      _____

22   _____   _____      _____

23

24   _____Date_____
     Patrick Gallagher
25
```

Patrick Gallagher                                                        July 31, 2025

**Exhibits**

**Ex 0001 Patrick Gallagher 07312**
**5** 52:19,23 58:12 78:4

**Ex 0002 Patrick Gallagher 07312**
**5** 96:1,6 98:14 100:18,25 101:5, 8,20 104:11 111:23

**Ex 0003 Patrick Gallagher 07312**
**5** 100:21,22

**Ex 0004 Patrick Gallagher 07312**
**5** 101:12,13,16 103:7 104:19 112:2

**Ex 0005 Patrick Gallagher 07312**
**5** 107:6,20 111:5 115:12,14

**Ex 0006 Patrick Gallagher 07312**
**5** 112:22,23 113:3, 25 115:10,17

**Ex 0007 Patrick Gallagher 07312**
**5** 116:9 118:4,15 119:24 121:11 130:25

**Ex 0008 Patrick Gallagher 07312**
**5** 120:21 129:21 131:2 136:5 144:9

**Ex 0009 Patrick Gallagher 07312**
**5** 143:17 144:7 145:7 159:1

**Ex 0010 Patrick Gallagher 07312**
**5** 119:4,7 120:3,10 121:22 123:6 155:12,18

**Ex 0011 Patrick Gallagher 07312**
**5** 150:18,19,23 175:2

**Ex 0012 Patrick Gallagher 07312**
**5** 165:18 166:20, 22 180:10

**Ex 0013 Patrick Gallagher 07312**
**5** 177:23 178:3

---

**$**

**$1** 57:5

**$1.19** 30:7

**$100,000** 55:17

**$13,000** 131:25

**$3,000** 106:20

**$30,000** 28:18 53:13,25 54:11

**$300,000** 57:10, 11

**$40,000** 54:14

**$7,000** 56:18

**$795,000** 25:1

---

**1**

**1** 52:19,23 58:12 78:4 115:3

**1.19** 30:6

**1.2** 35:25 36:23 37:7 41:23 56:25 57:4

**10** 55:17 61:10 119:4,7 120:3,10 121:22 123:6 155:12,18 169:7

**10:00** 90:2

**10th** 98:20 102:4 105:13 106:9,17 110:20 166:23 170:1

**11** 150:18,19,23 175:2

**11570** 5:12

**11:16** 5:2

**12** 53:4 78:4 165:18 166:20,22 180:10

**13** 14:25 131:20 177:23 178:3 180:10

**1390** 5:3

**14** 14:25 96:23 97:25

**15** 9:11 57:9

**16** 179:8,10

**162** 65:22

**17th** 14:13 117:14 121:12 131:6 158:24

**1907** 81:19,22 82:3,16,17,25

**1915** 82:20

**19th** 45:16 144:14

**1st** 138:10,21 139:13 140:11 141:7

---

**2**

**2** 51:22 96:1,6 98:14 100:18,25 101:5,8,20 104:11 111:18,23 114:10, 25 151:13

**200** 20:25 21:6 24:18 54:18 60:21 82:3,13 84:15 85:7 96:11 99:7, 24 100:17 102:14 108:1 113:7,11 116:14 129:10 132:25 146:11 149:10 167:4 180:24

**2000** 13:11,24

**2000s** 25:12

**2010** 13:4,6,11 57:10

**2013** 99:3

**2016** 48:17 99:14, 16 103:6 106:22 177:9,19

**201644272** 102:3

**2017** 48:17 99:15, 16 177:10

**201721241** 99:1 101:3

**2018** 6:2 24:19 25:4 48:17 50:12 57:10 64:15 80:21 81:2 98:21 99:3 102:4 106:10,17 107:17,21 109:9 110:6,16,20,21 111:6 115:21 126:19,23 127:3 168:25 176:17 177:9

**201808107063** 109:23

**201810183586** 117:18 119:21 121:18 141:11 144:3

**201895477** 115:15

**2019** 49:13,15,18 50:7 127:2 176:24 177:5,9

**2020** 29:6,8,10, 13,16 30:20 31:6 33:17 35:15 54:19

**2021** 22:8 29:5 34:1,10,21,24 40:14 41:8 78:6, 17 117:14 121:5, 12,17 129:25 130:21 131:6 135:5 142:7 144:12,14 152:19, 20

**202108096049** 167:3

**202175602** 117:12 121:3 144:8

**2022** 41:16 78:16 159:22

**2023** 45:16 49:10 50:1 166:23 169:7 175:3 178:16

**2025** 5:1,9

**21** 33:23 130:13 157:11 158:24

**22** 41:15 46:16,18

**23** 44:7 46:16

**24** 158:25

**25** 115:21

**27** 91:22

**27th** 54:19

**2nd** 114:11,22 138:10,21 144:12 170:11

---

**3**

**3** 49:13 100:21,22 141:8

**3,000** 126:6 127:10

**3-20-64** 10:23

**30** 31:12,21 32:7, 22 33:20

**30-something-thousand** 162:10

**31** 5:1

**3586** 156:1 157:14

**37** 88:23

**38** 88:22 89:3

**3rd** 107:21 109:9 110:21 111:6 121:17 122:1 137:5 142:7 177:5

Patrick Gallagher

July 31, 2025

**4**

**4** 101:12,13,16 103:7 104:19 111:18 112:2

**44** 171:10

**470** 10:25

**48** 53:5,24 170:13, 17

**49** 78:5

**4:16** 185:3

**4th** 159:21

**5**

**5** 107:6,20 111:5 115:12,14 179:6

**55** 74:12

**5:00** 10:6

**6**

**6** 112:22,23 113:3, 25 115:10,17 169:18

**6049** 110:17

**7**

**7** 116:3,9 118:4,15 119:24 121:11 130:25 140:20 141:8 169:18

**795** 24:25

**8**

**8** 49:10,25 88:21 120:21 129:21,25 131:2 136:5 137:5 140:11 141:6,7 144:9 175:3

**80s** 11:16

**8th** 121:5 131:6 178:16

**9**

**9** 116:3 143:17 144:7 145:7 159:1 161:4

**90** 75:21,24 76:4,9

**90-day** 77:6,16

**95-17** 65:20 68:2, 21,22 75:19 77:12 88:9,18

**A**

**A-N-N-I-N-G** 13:25

**A-R-A-N-D-A** 35:5

**a.m.** 5:2

**abate** 47:1 101:4 176:15

**abated** 50:16

**abatement** 30:21 34:13 48:25 49:16 50:4,15,20 106:21 176:19,22 177:13, 14,17

**abatements** 48:12 49:11 50:11 100:11 168:22,24 169:5 175:7 176:7 177:11

**abating** 100:2

**ability** 67:2

**absent** 71:20

**absorbed** 98:9, 11

**accepted** 143:4

**access** 88:14,15 166:1

**accommodate** 10:2

**accordance** 5:9

**accurately** 45:17 110:2

**accusations** 110:3

**acknowledgment** 98:15

**acted** 153:3

**acting** 46:8 98:5, 16

**action** 30:24 69:17

**actions** 67:19 69:5,18 95:1,9

**actual** 88:12 182:15

**add** 26:2,25 58:8 103:15,16 105:19 114:10,25 138:22 139:15,17 140:2,5

**added** 138:19 139:3

**adding** 139:14

**additional** 27:1 78:7,15 84:7 108:9

**address** 10:24 14:12 74:10,11 106:1,3 108:25 117:17 165:22 166:1 181:17,18, 21 182:17,19

**addressed** 170:21

**adjacent** 79:19 80:4

**administered** 5:8

**admonition** 73:17 79:22 87:17 88:6,10 136:14

**ADU** 59:17,20 60:14,25 64:10 65:15 70:17 71:18 76:4,10,11,12,13 93:12 139:13,21 164:11,16,17,18, 23 167:3,16

**ADU's** 64:4 65:1

**68:9 71:12 88:13**

**advice** 125:6

**agent** 27:6 29:24 34:25 35:2,8 37:13,15 40:20 44:1 45:14,23 46:9,11 51:25 129:3,4,24 130:24 131:5 132:5,21 133:15 134:2,25 135:18 136:2 154:18

**agree** 83:8 111:1 115:9 120:24 134:21 135:9,12, 17,23 136:7 140:14 142:6 143:2 165:13 167:13 168:3 169:20 170:16 179:23 180:16 184:9

**agreed** 32:25 45:2

**agreement** 184:2,10

**ahead** 28:12 48:11 90:15

**Ahsha** 61:7,12

**air** 41:4

**Albert** 127:24

**Albert's** 128:15

**allegation** 54:16 179:19

**allegations** 90:6 118:3 179:15 180:9

**allege** 179:10

**alleged** 53:12 86:9

**alleging** 65:25 134:23

**Allie** 128:21 130:20

**allowed** 8:18 161:22 164:22

**allowing** 172:10

**altered** 155:9,12, 15,19,23,25

**altogether** 63:22 164:17

**amend** 121:10 130:17 136:6

**amended** 181:15

**amount** 17:11 36:21 37:6 55:13

**anchor** 151:9

**and/or** 6:18 89:6

**animosity** 86:9

**Anning** 13:25 14:21

**anomaly** 143:16

**answers** 7:2 45:10

**anticipate** 7:11

**anymore** 88:18 164:22

**apostrophe** 183:1

**apparent** 89:1

**appeal** 174:1,17

**appeals** 173:11 174:18

**appeared** 5:6

**appears** 99:10 118:1 121:1

**appliances** 26:22

**application** 59:18,20 60:14 61:1 70:17 75:20 76:3,9,22 77:5 78:7,11,15 99:23 103:8 110:14 111:22 112:2 117:24 119:20,23 120:10 143:19,21 167:3 183:9

**applications** 113:10,18

Patrick Gallagher                                                      July 31, 2025

**applied** 100:18 110:18

**apply** 64:10 65:15 76:11 147:7 168:21,23 172:3,4

**apprenticeship** 16:22

**approval** 75:16 77:6 78:6,11 99:8 109:24 111:10 112:11 113:6

**approve** 59:19 75:20,24 77:19 105:25 133:10 172:7

**approved** 76:3,9 78:15 85:25 86:19,23 93:16 99:3 107:17 111:2,4,7 112:11,16 121:18 137:6 138:6,8 140:21 141:9 144:14 146:7 161:7 183:14

**approving** 87:24

**approximately** 17:19 40:11 47:24 53:12,24 140:20 141:8 142:8

**April** 34:5,10,21 38:14 41:8

**Aranda** 35:3,4,6, 16,20 43:25

**arbitrary** 78:13

**architect** 102:15 103:2 105:16 125:19 181:24 182:9

**architects** 181:22

**architectural** 182:12

**architecturals** 142:4

**area** 124:15 139:13,15,17

140:3,6,20,21,24, 25 141:1,3

**arguments** 174:25

**arising** 125:7

**arrested** 179:11

**assertion** 95:16

**assessed** 54:16, 24,25

**assessor** 54:17

**assigned** 19:3,20 60:5

**assigning** 39:24 40:1

**assist** 60:6 113:13

**assisted** 182:1

**associate** 90:17 91:2,10

**associates** 89:5, 11

**assume** 84:14 85:2,15,17 86:7 145:21 153:22

**assuming** 18:10 19:18,22 42:22 55:3 122:13

**assumption** 85:7

**attached** 111:18

**attempt** 167:14

**attempting** 135:10 176:15

**attend** 159:14

**attention** 19:23

**attesting** 178:18

**attorney** 5:3 147:17

**August** 54:19 98:20 99:3 102:4 105:13 106:9,17 107:17 110:6,20, 21 118:25

**authored** 120:11 182:5

**authority** 67:19

**authorization** 22:15

**automobiles** 83:6

**Avalon** 94:19,21

**Avenue** 91:22

**average** 57:9

**avoid** 68:4

**aware** 58:13 72:9 73:2 77:1 80:7,18 81:8 89:6,9 95:11, 13 127:16,18,20 166:3

**AWS** 15:22

**B**

**B-E-R-G-E-R** 12:16

**back** 11:16 14:5 17:3 22:20 30:9 31:5 34:1,3,9,20, 23 39:23 46:23 47:23 50:7,13,21 73:18,20 79:1,23 80:9 82:25 87:12, 18 88:7,11 93:23 94:20 101:8 102:25 116:5,22 136:5,15 137:4,12 152:13 157:22 159:8 160:25 161:1,2,17 162:17 168:24 169:4 176:13 180:3,5,7 183:12

**background** 6:24 10:22

**backwards** 166:20

**backyard** 106:21 110:1

**bad** 153:11

**bank** 54:3 55:23

**barn** 103:13

**Base** 131:18 150:8 151:2

**based** 35:16,19 52:12 74:17 91:10 95:16 151:16

**bases** 76:8

**basic** 9:13

**basically** 22:25 134:1

**basis** 62:20,21,22 65:8 67:5 72:9 73:1,5 76:2

**bath** 98:25 104:11,13

**bathrooms** 26:23 27:1

**Bay** 52:13

**bedroom** 141:9, 15 142:8 170:5,17

**bedrooms** 27:1

**began** 80:17 106:16 107:12,16 136:2,3

**begin** 46:15 80:23 93:18 99:6

**behalf** 20:8 46:9 47:4,16 122:17 174:25

**behaving** 65:4

**belief** 60:19 62:15 69:10 71:5 72:9 74:16 89:6 90:16 91:1,9 95:8,17 112:8 153:2 154:9 155:1 156:12 178:22

**believed** 118:14

**bell** 115:5

**Berger** 12:14,17, 19,20,23 13:6,9, 12,15,19 14:6,7 17:4,16 18:12,25 20:22 24:3

**bank** 54:3 55:23

**Berkshire** 28:8

**Bernie** 72:7,17, 18,20 73:7 86:8 92:8,18 125:18 129:15 130:15 133:9,22 134:16 135:1,2 143:14 154:5 155:11 164:4 165:1

**Bernie's** 91:25 92:4,5 93:7 153:24 157:2

**big** 9:23 175:13

**bigblockpat. com** 166:14

**bigblockpat@ gmail.com** 165:23 166:7,13

**Bill** 102:12 143:15

**Birmingham** 33:11 42:13 43:6 47:9 89:4,21 91:1, 16 122:7 160:4,5 162:20,25 179:16

**birth** 10:22

**bit** 28:12 124:25

**bits** 70:2

**black** 56:5

**blah** 163:9

**Block** 21:13,14, 18,23 22:1,17,18

**blueprints** 183:9

**board** 47:11 60:2, 17,19,24,25 61:2, 5,6,15,20,23 62:1, 5,17 63:15 70:7 173:11,21 174:1, 16,17

**bolts** 149:5

**boom** 16:3

**boss** 157:16

**bottom** 96:18 101:9 108:4 114:2 117:9 143:23,24 169:12 178:14

Patrick Gallagher                                                                                    July 31, 2025

bought 27:3 109:8 176:21

box 97:12

break 10:1,2,5 58:5 115:25 177:21

Brentwood 28:10

bribe 125:13 127:5,6 134:9

bribed 134:2

Briggs 150:11 151:1

bring 21:19 50:21 183:22

brings 176:13

broken 106:23

brokerage 52:8

Brothers 12:14, 17,19,20,23 13:6, 9,12,16,19 14:6,7 17:4,16 18:12,25 20:22 24:3

brought 6:8 20:8 44:10,16 169:2

BS 161:21 167:20 168:11,12,17 169:13,14 176:4 177:3

budge 162:1

bug 87:9,11

buggy 83:6

build 102:7,11 103:14 112:21 147:18,19

builder 97:3,9 98:1 147:17

building 30:15, 25 38:4,8 39:19 42:16 50:18 66:22 67:7,15,18 71:24 74:21,25 107:17 108:13,18 109:19, 20 110:2,12 120:2 123:24 125:20,22

127:22,23 128:1 129:17 130:6 133:11 135:19 136:9,19,20 146:6 147:5,11,13,14, 19,25 148:23 152:2,5,17,18,21 153:8 154:12 155:22,24 156:8 159:17 160:15 163:8 164:20,21 167:2 168:7 169:16,21,23

buildings 12:4

built 81:19 83:4 137:18

bumps 126:4

bunch 142:3 161:21 181:24

Bureau 88:24 180:17

business 14:7 35:17 127:24

busted 164:5

buy 57:8

buyer 38:19 39:8 47:5,16 51:9

buyers 40:19,23 46:25

Byron 11:2 97:12

—————

C

c-o-r-c-o-r-a-n-i-c-o-n 45:22

cabinets 26:23 80:14 98:25 104:12,13 139:14 140:5

California 5:4 11:2 18:5 97:12 125:20,22 133:11 136:9,19 152:9 164:23

call 33:20 125:25 126:3 128:16 141:11,23 159:15

163:10 181:23

called 5:8 31:12 60:7 65:10 112:18,20 128:18, 20 132:24 137:14 140:15 163:11 164:13,20

calling 77:22 129:8 141:3 177:3

calls 161:4

Campbell 43:8

cancel 164:17

cancelled 54:3 55:23 116:19,20, 24

canoeing 92:23

capacity 18:11 24:2,9,14 25:19 59:16

car 125:25

card 126:1

care 37:19 176:2, 8

cared 145:16

cares 72:17

carpenter 16:17, 20

carpenters 102:23 103:3

carpet 142:12,15, 16,18

case 6:9 8:21 28:13 33:10 53:2, 16 54:21 55:7,10 56:9 58:14,24 59:7 65:20 68:15 70:13 94:11 135:10 147:1,3 148:2,4,5 178:4

cases 148:8,9

cash 126:6 127:10

Cathy 28:1,2

caught 72:18

133:23

CCP 5:9

cease 22:7

ceased 22:9

ceiling 140:10, 15,16,23 141:6, 12,15 142:1,8 143:3 164:12 165:13 169:17

cell 128:22

CEO 23:9

certainty 63:12, 21

certificate 16:1 38:24 43:1 119:8 123:21 135:14 154:21 157:13 167:16 171:24

certificates 15:5, 12,19,21 16:4,8 20:2

certification 5:12

certified 5:5 15:14 16:23 181:23

CFC 118:11 163:5

change 144:5 156:8 161:18,19 162:3 170:22

changed 138:24 156:2 157:16

changing 162:11

channels 75:1

character 84:24

charge 12:8 158:6

charged 179:11

Charles 46:14

charlesquan@ corcoranicon. com 45:21

check 80:11

checked 116:20

checks 54:3 55:23

chief 168:7

Chinese 36:10

chronologically 166:21

chunk 57:20

church 31:15

circulated 71:23

circumstantial 156:22

citing 174:19

city 5:3 6:10,11 25:7,17 32:16 33:17 35:19 53:21 58:18,21 59:22 85:22 86:10,12 89:4 98:5 108:25 122:4 127:17 128:2 146:24 158:11 164:21 166:11 173:10 178:4

City's 33:7 78:8, 10

claim 51:22 55:1, 20 56:21 154:19

claimed 43:4 64:2 94:17

claiming 6:24 28:13,16 51:11 55:6,10 56:8 76:18

claims 58:23 59:2,3

clarification 116:21 126:2 149:21

cleaning 107:3

clear 7:19 8:4 17:2 104:5 131:4 142:5 151:16 157:3 158:8 170:5

cleared 50:11,16

Patrick Gallagher                                                July 31, 2025

168:23,24,25
177:11,14

clerical 159:1

close 38:17 75:21
89:5,11 90:17
91:2,10

closed 80:22

closet 138:19,22
139:4 144:5 161:6

closing 44:12

coat 162:12

code 125:20,22
133:12 136:9,10,
19,20 162:22
169:16,21,23
170:14

codes 164:20,21

coincidence
72:21 129:16
130:6

Coletas 10:25

colleagues
91:20

collective 60:24

Colmenares
52:2,4,7,14

color 162:12

comment 74:18

commented
110:10

comments
105:25 106:1,3,4

Commercial
12:4

commission
161:9

committed
156:20 157:5,6
158:4

committee 128:1

Common 14:3

communicate
8:2 181:4

communicated
87:15

communicating
138:21 170:4

communication
s 87:8,13,20

companies 24:1

company 12:13,
18 24:3,5 28:6

compels 6:18

complaining
124:18,20,21,22

complaint 28:15,
17 48:19 53:1
78:1,21,24 90:6
94:13 117:17
178:20 179:15
180:9,10 181:12

complete 9:16
117:19

completed 43:5
105:21 110:7,9
118:7 127:15
155:16 156:2
157:14 163:20

completely
125:17

completion
38:24 43:2 119:8,
18 123:21 135:14
154:22 167:16
171:24

compliance
56:12 160:16

complied 142:25
143:3,8,9

comply 77:6,16
99:1,11,17 102:2
115:11 137:20
138:6 144:8
176:10,11,13
177:9 182:2

complying 6:19

computer 87:11
183:12

concentrate

94:23

concerned
123:25

concluded 185:3

concrete 142:3
149:3 151:9

condition 141:14

conditions
140:20 141:8
146:3

conduct 67:3

conducted 173:5

configuration
137:17 138:5

configurations
138:4

confirm 58:7
84:7,20

connected
133:19

connection 6:12

considered
131:19

conspiring
135:20

constructed
97:24 138:11

construction 9:8
12:2,4,19,21,24
13:16,19 14:7
15:5 16:14 17:16
20:5 25:7 99:7
106:18,19 107:13,
16 109:16,21
111:13 112:8,9,14
124:3 149:7

construction-
related 15:4

contact 60:2 64:9
108:3 121:8 124:6
128:11 133:16

contacted 88:24
109:2 128:9,12
135:18

contained 118:3

content 167:21,
23

contest 111:11

context 8:19
70:2,12 132:17
133:14

continue 35:14
66:4

continued 43:5
93:25 94:10

contractor 12:5
16:11 96:24 97:4,
21,25 98:1 147:16
148:1

contractors
147:16

conversation
8:13,20,24 44:16
66:5,10 68:5
129:24 130:23
131:8 132:6,12
134:1,23

conversations
8:9,19 66:17
133:15 134:24
135:4 154:17

converted
139:13

convicted 11:13,
15,21

convictions
11:19

copies 44:23,24

cops 70:22

copy 21:19

core 103:3

Corey 173:5

corner 96:19
101:9 114:2 121:2
143:24

correct 21:3,24
38:10 39:12 40:14
46:2 49:3,11,13
53:9,16 56:15,22

58:8 60:21 61:21
67:9 69:19 74:19
75:5,13 76:6,23
77:2 81:10,25
89:18,20 90:18
93:12 97:5 98:6,
10,16 99:12
101:1,5,10,17,20
106:17 107:18
108:14,25 109:10
111:14,19 113:25
114:3 115:21
116:14,16,25
117:4,5,12 119:25
120:25 121:5,11,
14 124:4 125:8
135:7 143:21,24
144:9,12,14
147:12 150:10,25
153:23 154:2,3
155:1 156:13,16
158:23 159:19
160:16 164:12
172:11,18,22
173:6,8 176:20
178:10,16,25
179:17 180:15,18,
19,21,24 181:5
184:10

correction 145:4
161:14 165:6,15

correctly 117:20
120:6 154:20
155:2 157:13,24

cost 53:24 54:10,
12 56:15

costs 56:18,19

Counsel 115:24

count 50:25

countertops
26:23

County 6:10,12
25:8 33:18 85:23
98:6 122:5 127:17
128:2 166:12

couple 7:1 41:2
145:18 150:16
181:16

court 5:19,23
6:17 7:3,22 178:8

Patrick Gallagher                                                July 31, 2025

179:2 184:21

**covered** 89:8
105:3

**COVID** 29:17
31:13 32:17 33:8
107:9 183:11

**cracked** 60:18,25
61:24,25 62:2,5,
17

**crap** 47:10 161:6

**crazy** 32:17

**create** 134:20

**created** 20:21

**crime** 131:23

**criminal** 132:3

**criminally**
154:10

**Cross** 28:1,4

**crux** 64:2

**curb** 79:7,12
80:8,18 81:2,13,
16,20,21 82:4,12,
17 83:3 88:14,16
172:4,5

**curious** 15:25

**Curran** 33:11
77:1 86:8 88:25
89:5,7,11 90:17
91:2,10,16 92:2,
17 95:11 118:11
119:11,14 120:11
124:3,6,14 125:3,
6,14 126:22
127:5,6 132:15,
18,21 133:5,14,19
134:2,9 153:14
154:1,10,22
155:13 179:11
180:12

**Curran's** 92:8

**current** 10:24
16:5 30:11,24

**Curry** 179:21

**cursory** 45:3

**custom** 112:13

**cut** 79:7,12 80:8,
18 81:2,13,16,20
82:5,12,17 83:3
172:5

**cutoff** 184:13,15

**cutout** 86:20

**cuts** 172:4

**cutting** 68:19

**CYA** 168:9

---

**D**

**D-E-L-I-A** 52:4

**Daly** 108:25

**damage** 51:22
55:1,7

**damages** 28:13
55:9 56:8 181:11

**dash** 137:5

**date** 10:22 13:1,6
115:20,22 120:11
121:5 184:7

**dated** 45:16
49:10,25 107:21
109:9 126:19
166:23 169:25
175:3 178:16

**dates** 8:8,12
82:21 131:4

**day** 5:2 65:11
77:12,14,17 83:5
88:9,18 101:20
154:5,6 183:15

**days** 38:17 72:20
75:21,24 76:4,9
130:15

**DBI** 31:4 43:8,12
47:1,18 50:7 51:8
56:12 67:10 70:23
83:13 84:22 102:4
113:7,17,21
120:13 137:21
146:19 156:13
157:4 182:13

**DBI's** 176:18

**deal** 38:20 42:23
103:9

**dealing** 74:7

**dealings** 88:25

**Debris** 110:1

**decade** 146:11

**December**
158:24

**decided** 154:16

**decision** 174:9,
15

**decisions** 174:2

**declaration**
161:12

**deemed** 108:12

**defendant** 8:21

**Defendant's**
52:23

**defendants**
33:10 54:20 58:19
59:6 88:22 135:9
152:17

**delay** 69:11 71:6
77:24 86:5 158:17
168:2,4,8 169:3

**delayed** 70:17
75:15 76:22 78:11
87:1,3

**delaying** 70:4

**delays** 158:23

**Delia** 52:2,11

**Demo** 114:11,20

**demolishing**
26:12

**denied** 172:21,24
173:1,13

**department**
30:15,25 34:17
38:4,7 39:19
42:15 50:18
66:22,25 67:6,9,
14,15,18 70:4

74:8 78:9,10 81:9
94:10 95:6 104:7
107:17 109:24
110:12 123:25
127:22,23 128:1
135:19,20 146:6
147:6,11,13,14,
20,25 148:23
152:2,5,18,21
153:9 154:11
155:22,24 156:8,9
159:18 160:10,15
163:8 172:18

**departments**
85:22 86:13

**depends** 148:7

**deponents** 10:9

**deposition** 5:11,
18,23 6:5,9 45:6
52:19 96:1 100:22
101:13 107:6
112:23 115:24
116:3 119:4
150:19 165:18
177:23 185:2

**derail** 69:6

**describe** 181:12

**describes** 53:7

**describing**
156:21

**description**
98:23 101:25
108:16 114:5
116:18,24 117:3
144:1

**descriptions**
108:9

**design** 102:8,10
112:20 131:19
150:8 151:2

**designed** 90:11
102:14

**desk** 103:6

**detail** 137:14

**determination**
173:16

**determined** 17:8

**deviations**
121:18 161:16

**differed** 137:22

**difference** 9:19
17:9,10 24:12
51:22 55:11 56:9
57:3,4 81:23
142:17

**differently** 90:9

**difficult** 7:7,14
39:3 76:19 107:1

**digits** 48:20

**diligence** 86:22

**direct** 67:3,19
156:19

**directed** 65:3
76:11 158:17

**directing** 158:10

**direction** 67:24
69:3,19 71:6
76:22 94:5,7 95:2

**directly** 87:8

**disagree** 78:20
142:10 167:21,23
173:20,25

**disagreed**
125:18 162:25

**disappeared**
62:12 93:20

**disclosures**
30:11,13

**discovery** 44:22
52:13 184:13

**discussed** 77:1
121:11 124:7
163:4 183:21

**discussing**
88:25 130:3

**discussion**
123:5 144:21
159:7,25 160:14

**discussions**
89:7,9

Patrick Gallagher                                                                                      July 31, 2025

**dismantling** 80:15

**dismiss** 58:14

**dispel** 84:7

**dispute** 118:2 152:4 177:4

**distance** 9:9

**district** 60:21 61:10,17,25 124:15

**Divorced** 11:9,10

**document** 52:24 93:6 96:5,14 113:3,4 116:11 120:3,11,22 144:3,4 150:24 151:13 152:1 161:4 177:2 178:20,24 179:5

**documentation** 132:2

**documents** 8:10 9:24 10:15 44:9, 16,21,25 45:7 53:15 55:19,22,24 56:21 93:4 155:9 157:11 183:23,24 184:3,6

**dollars** 162:10

**donation** 128:5

**door** 80:5,6 129:12

**dormer** 26:8 111:21 115:3

**dormers** 26:2,4 105:19 109:21 110:5,20 111:7, 10,13,25 112:1 114:10,24 115:18

**double** 135:25

**doubt** 16:6

**DPW** 83:8,14,16 84:3,22 85:2 172:4

**drafted** 171:18

**drafters** 181:22

**drawing** 88:13 105:16 182:1

**drawings** 88:13 110:7 127:15 141:23 145:24 146:2 148:13 161:15 181:25 182:13

**driveway** 79:3,5 82:19 83:5,7,10, 17,22 84:4,16,23 85:8,16 86:20 88:14,15 94:20 103:25 165:11

**driveways** 84:1

**drywall** 26:22 80:14 98:25 104:12,15

**due** 156:13 179:20

**Duffy** 39:22,23 65:3,6,25 66:3,6, 10,18,20 67:2,18, 24 68:11 69:4,8, 12,15,19,21 70:5, 20 71:6,20 76:23 89:4,21 91:9,10, 16,22 92:2,3,5,10, 16 93:6 94:6 95:2, 10 120:5,19 152:24 153:4,13 154:8,16,23 156:11,12,20 157:1,15,19,21 158:2,4,9,12 159:25 162:2 163:7 179:16

**Duffy's** 70:10 157:4

**dummy** 139:24

**dumpster** 106:25

**duplicates** 45:4

**dwelling** 78:7

---

**E**

**e-mail** 44:10

45:10,16 48:19,24 49:2,3,5,10,20,21, 25 50:15,25 73:6, 7 75:1 87:12 128:17 165:22 166:1,4,13,22 167:6,13,19,22 168:1,4,6,7 169:7, 11,25 170:4 171:17 175:2 181:17,21 182:17

**e-mails** 78:1 124:23 166:10 181:18

**earlier** 62:14 104:23 118:11 122:22 168:21 183:22

**early** 25:12 38:14 46:16 127:2

**earn** 57:12

**easier** 7:5 13:2 90:14

**easy** 7:18 106:23 171:3

**effect** 122:24

**efficient** 9:23 10:17

**efforts** 77:5 125:1

**egregiously** 78:11

**egress** 161:22,24 162:19

**eight-foot** 141:12,15,22

**eights** 36:9

**EJ** 60:7 159:11

**electrical** 26:21 103:15,16,23 105:9 171:15,21

**Electricians** 23:21

**embeds** 170:10

**embezzled** 131:25

**employed** 11:24 128:2

**employees** 6:11 23:11,13,16 58:18 60:20 122:4 152:17,20 154:11 158:11 159:10 166:11 178:4

**encumbrances** 31:5 34:19

**end** 13:1,5 45:9 78:12 104:24

**ended** 59:23 62:13 133:8 148:14 153:24

**enforcement** 30:24 31:3 34:16 42:11,19 43:12 51:8 58:20 125:1 145:12 176:18

**engineer** 125:10, 18,21,23,24 133:12 136:8,25 137:1 150:7,14 151:5 152:8

**engineering** 148:25

**Engineers** 151:10,18,20

**entered** 48:3

**entire** 15:1

**entirety** 61:6 62:1

**entitle** 131:22

**entity** 21:11 22:2 37:12

**entry** 96:23

**epoxied** 151:9

**equipment** 15:14,23 16:1

**Ernest** 60:7 66:13 159:20 162:4

**error** 38:25

**Escondido** 91:22

**escrow** 37:20 38:13,15,17 40:9,

24 41:7,21 42:1, 12,23 43:22 44:4 45:11,14,17 46:2, 9,19,23,24 47:2,4, 17,24 48:2,3 51:6, 23 55:12 56:9 57:4 119:1 169:4

**essentially** 43:21

**established** 152:19

**estate** 24:21 27:5 29:24 34:24 35:2, 8 37:13,15 44:1 45:14,23 51:25 52:8

**estimate** 8:14,18 9:1,4,12,14,20 15:9 20:19 53:11 75:13

**estimated** 28:18

**estimator** 19:6, 12

**events** 8:7,9

**eventual** 55:12 57:5

**eventually** 39:5 51:12,23 55:6,15 59:19 81:9 153:23 163:17 176:19

**everything's** 183:11

**evidence** 81:12 83:9,17 84:3 156:19

**ex-fiancee's** 27:25

**EXAMINATION** 5:13

**examined** 5:9

**Excelsior** 83:22 84:16 85:15

**excuse** 7:14 48:10 84:22 99:3 135:18 180:10

**exhibit** 52:19,23 58:12 78:4 96:1,6

Patrick Gallagher                                                    July 31, 2025

98:14 100:18,21,
22,25 101:5,7,8,
12,13,16,20 103:7
104:11,19 107:6,
12,20 111:5,23
112:2,22,23
113:3,25 115:10,
12,14,17 116:3,9
117:23 118:4,15
119:4,7,24 120:3,
10,21 121:11,22
123:6 129:21
130:25 131:2
136:5 143:17
144:7,9 145:7
150:18,19,23
155:12,18 159:1
165:18 166:20,22
175:2 177:23
178:3 180:10

**exhibits** 111:18
116:8

**exist** 22:7,10
65:13 110:14
123:25 177:17

**existed** 20:17
47:1 81:13 82:17
83:4,10,18 84:23

**existing** 27:2
34:10,13 79:3
114:12,20 138:20
140:10,15 141:6,
21 144:4,5 146:2,
20 151:9

**exists** 91:15
147:14

**expected** 57:14

**expediter** 183:19

**expensive**
106:20

**experience** 9:8
52:15

**expertise** 17:7,
11

**expire** 16:8

**expired** 38:23
43:4 116:19
117:1,4,18 118:7
120:10 121:13

129:12 155:17
156:3

**explain** 26:6
68:18,20 71:11
123:23 158:20

**explained** 82:8
123:20 129:14
131:17

**explaining**
133:21

**express** 93:2

**extra** 84:24 86:18

———————

**F**

**fact** 63:2,14 91:11
109:6 111:11
154:21 157:16
174:16 180:14

**facts** 53:12 59:1
71:7 89:10

**fair** 13:5 20:21
33:15 43:10,19
51:5,21 69:17
93:24 94:4 99:21
107:15 122:19
136:1 166:9

**fall** 29:21 33:16
38:20 39:5 65:19

**falsified** 156:12

**falsify** 156:9

**family** 164:24

**fast** 112:18
163:22

**faster** 85:25
86:21 90:12 93:11

**fault** 33:17

**FBI** 66:8 69:9 70:6
72:3,10,15,21
73:3,8 74:4,17
77:1 89:7,10
95:12 128:10,11,
12 129:2 132:4
153:5,14 163:10,
12 174:12 180:14

**FBO** 20:9 21:15

22:16,20

**features** 149:7

**February** 49:13
176:23 177:5

**Federal** 88:24
180:17

**feel** 47:12

**feet** 9:11 140:11,
15,16,20,23
141:2,6,7,8 142:9,
21,24 162:3
169:18

**fell** 40:5,10,16
42:23,25 43:11
44:4 45:14 48:8
51:6 65:20

**felony** 11:13,15,
19

**felt** 127:6 181:1

**fiancee** 27:19,20,
22

**fiancee's** 27:25

**field** 15:5

**Fifteen** 20:20

**figure** 26:18 32:6
86:3 129:13

**figured** 38:25
76:12

**file** 164:18 176:6
184:20

**filed** 6:10,13
115:20,22 120:5
123:9,21,24
144:12 154:20
155:2 157:13,24
178:3 180:9

**fill** 31:14,18 32:5,
11,13,25 33:21
113:20

**filled** 32:7 79:10,
14 80:8 81:3 82:9
83:24 97:25 98:1
165:11

**filling** 161:12

**final** 119:8,18
123:21 154:22
167:2

**finalized** 37:22

**finally** 87:2
148:16

**financial** 56:4

**find** 21:21 92:14
143:1 148:15
153:23 159:4
160:18

**fine** 63:4 172:15

**finish** 7:17 40:8
70:14 164:7 169:3
171:10 173:24
184:25

**finished** 7:13
165:6 169:18
170:7

**fire** 126:14 127:1
161:25

**fired** 126:12
131:18

**first-floor** 139:17
140:2,6,16

**fit** 163:12

**five-foot** 170:5

**five-minute**
177:21

**fix** 57:8 106:24
171:3

**floor** 5:4 26:15
27:2 71:24 73:23
74:5 114:11,18,22
137:5 138:10,14,
21 139:13,15
140:11 141:7
142:2 162:3
169:19 170:7
171:7,11

**flooring** 23:21
26:21 99:1
104:12,17

**floors** 138:20

**follow** 6:6 68:2
174:7

**foot** 148:18

**forbidden** 7:22

**forced** 64:10
133:13

**forcing** 78:12

**foreclosure**
24:22

**foregoing** 178:20

**foreman** 12:11
13:20 14:23 15:1
16:24 18:12,13,
17,22

**foremen** 12:12

**forget** 15:24
19:14 35:11 54:15
60:6 61:9 65:22

**formal** 31:23

**forty-four** 170:7

**Fossi** 89:23

**found** 153:15,21

**foundation**
141:18,20

**fourth** 71:24
73:22

**framing** 114:11,
18 148:25

**Francis** 108:23
109:3,5,15

**Francisco** 5:3,4
6:11,12 14:10,14,
15 25:4,8 30:25
33:18 34:16 52:15
58:22 67:10,13,15
85:23 91:23 98:6
103:12,17 106:6
122:5 127:17
136:18 152:18,21
154:11 160:9
164:19,21 166:12
169:16,23 178:8
179:3

**Francisco's**
32:16

**fraud** 156:20
157:5,6 158:4,11

friend 35:7 72:19

friends 92:19,24

front 6:17 9:7 49:2 52:22 82:3, 12 94:17,18,21 96:5 113:2 126:6 127:10 150:22 175:13

frustration 145:20

full 61:9 106:21 139:14

full-time 23:16, 22

function 146:19 147:5

funded 57:18

funky 115:7

furnace 138:19, 22 139:4

furnaces 139:1

**G**

G-A-L-L-A-G-H-E-R 5:17

G-O-O-D 149:22

G-O-O-D-I-E 151:10

gained 142:2

Gallagher 5:7,16, 18 20:10 21:16,17 22:16,20 44:15 52:22 58:5 69:2 72:23 96:4 101:16 107:11 113:2 116:7 119:7 150:22 159:9 166:25 168:16 178:2 180:7 185:2

garbage 106:22

Gate 128:6

gave 51:4 83:13 84:8 85:11 124:7 125:6 132:4 148:16

GC 21:13,14,18, 23 22:1,17,18

GCBLOCKINVE STMENT.COM 97:12

GCBLOCKINVE STMENTS.COM 22:4,7,25 23:4,5, 12,15,18 24:4 25:3

Gcblockinvestm ents.com. 22:14

general 9:8 12:5 16:10 95:17 96:24 97:4,24 98:1 103:17 165:21

generally 37:1 45:17 59:2 113:9 146:16,17,18 147:6 148:5 179:17

gestures 7:23

gist 8:23 132:12

give 8:1,14,18 9:3,4,14 10:4 19:18 41:18 113:21 119:11 160:25 183:8

giving 127:12 161:1

glasses 97:6

gnats 181:16

Golden 128:6

golf 70:24 91:8 92:22

good 44:13 58:1 76:16 115:25 117:3 120:4 154:23 157:23,25 160:25

Goode 149:20,22

Goodie 151:10, 18,23 152:7

goofy 103:12

Google 81:14

governing 71:12 88:13

government 179:12

Gradalls 16:3

grand 131:20

granted 58:14

great 9:22 10:21 40:2 47:23 58:10 59:5 91:9 157:3

Greene 49:3,6,17 50:15 159:25 160:1 164:25 165:4,12 166:22 167:14 170:4,16 171:9 172:14,16 175:2,6,16 176:23

Greene's 167:25 168:3

group 103:3

guess 9:1,4,16, 19 20:18 26:17 29:2 32:6 36:4 39:2,4 42:18 46:16 51:11 56:4 60:23 61:3 69:2 85:18 88:2 89:25 109:14 112:6 115:22 126:15 128:14 132:1,21 133:3 138:24 144:15 153:15 175:25 176:12

guessing 41:13

guidelines 32:16 34:8 35:14

gutted 109:20

gutter 106:23

gutters 102:2 104:21

guy 79:24 80:11 109:7 120:20 125:25 126:3 151:20 165:3,10

guy's 165:3

guys 40:24 76:12

80:9 102:19,20,22 106:2 147:17 162:5

**H**

H-A-L-L-O-R-A-N 183:2

H-U-G-H-E-N 59:11

habitable 169:17

half 96:17

hand 7:16 38:24 54:21 135:14 154:12

handed 45:10 87:2

handle 149:12 157:20

handled 150:3

handwriting 96:13,16 97:20 113:24

hang-up 172:9, 13

happen 8:7 39:17 41:11 44:6 51:15

happened 8:15 29:16 38:19 39:5, 18 42:10 59:24 63:5,13,21 69:21 70:3 71:22 86:16 93:22 130:10 131:18,24 156:19 157:17 163:14 174:20

happening 33:22

hard 108:2 163:8

Hathaway 28:8

He'll 126:4

head 8:1 27:13 67:6 138:2

headquarters 14:12

heads 7:23

hear 66:4 84:3 106:13 132:1

heard 39:8 47:20, 22 65:10 128:3

hearing 68:10 145:10 173:5 174:1,16,17

Heather 5:5,11

heck 133:8

height 140:10,11, 15,16 141:6,7,12 142:1,2,8,18 143:3 164:23 165:13 169:17 170:6,12,16 171:10

heights 138:2 164:12

held 57:22 75:11 144:21 159:7

hell 72:22

hell's 129:13

helped 181:24

Hernandez 74:3, 18,22 75:2 89:4, 20 90:16 121:8 122:1,23 123:18, 19,23 137:13 140:9 142:7 160:7 182:6

hierarchy 156:15

high 67:18 156:7, 15

higher 36:25 170:6 171:10

Hills 17:23

hire 23:15,19 32:3 35:6 125:10,23 133:13 149:20

hired 17:9 126:17 129:9 131:18 133:11 150:7 151:4

hiring 133:9

historic 161:9

Patrick Gallagher                                          July 31, 2025

164:1

historical 84:8

history 156:1

hit 29:17

hitting 126:10

hold 13:1 17:12
44:8 47:11,12
60:12 63:19 70:1
73:14 84:6 169:14

holding 44:10
56:18,19

holdown 151:8

home 26:12,15
29:3 38:16 40:13

homeowner
148:1

homeowners
58:22 147:15

homes 18:8,11
23:19 52:11,15
58:22 79:20 85:6

hone 68:6

hooked 27:18

hopeful 10:5

horse 83:6

hot 167:12

hour 5:2 122:12
163:16

house 9:16,17
26:3,10,24 38:2
39:1,6 48:12
50:13 57:8,19
73:19 75:4 81:21,
24 83:4,22 91:25
92:4,5,8 93:7
94:15,17,18,20
103:14 104:11,15,
20,24 105:17
118:20 145:24
157:2 161:25
163:25 175:10

How's 129:11

Hughen 33:11
59:10,12,14,19
60:8,15 62:7,18,

24 63:1,6,20,23,
25 64:1,3,9,14,25
65:4,24 66:10,17,
24 67:3,20,23
68:7,14 69:4,11,
14,18 70:15,17
71:3,5,8,19 72:2,9
73:2 74:3,6,16,22
75:2,10,15 76:21
78:8,9,18 83:13,
16 84:3,21 85:21
86:11,25 87:6,15,
21 89:4,11,22
93:14,20 94:2,8,9
95:3,4,5,8 152:15
153:2,3

Hughen's 62:15

huh-uh 7:24 8:1

hurdles 78:13

hypotheticals
175:24

_____

I

I-E 19:10

idea 25:23

identification
52:20 96:2 100:23
101:14 107:7
112:24 116:4
119:5 150:20
165:19 177:24

identified 101:4
131:15

identify 121:17
128:24

idiot 72:17 133:13

idiotic 34:7

ignoring 64:5

illegal 42:14 43:7
62:7 77:22

imagine 26:24
184:14

importance
146:2

important 146:5,
19,22 147:11,22,

23,24 148:6,8

improper 174:2

improve 22:19

improved 137:10

improvement
103:18

inches 141:8
142:9,19,21,24
169:18 170:7,13,
17 171:10

include 110:5
114:11,18 181:11

included 82:4
139:4

income 56:25
57:6

incorrect 109:25
171:6,13 174:19

incorrectly
170:25

increase 54:24

increasing
145:22

independent
86:11

indicating 49:17

indicted 72:20
129:16 130:16
132:19 133:23
154:1,5,10
155:11,13

indictment
154:13

individual 24:9,
13 58:19 70:14

individuals 6:13

industry 112:9

information
10:22 72:1 83:14
91:19,21 132:23
133:5 153:13
178:22

informed 93:21

inherited 100:3

initial 78:14 80:10
107:14 178:3

initially 30:10
44:14 46:25 82:14
83:4 110:6 132:24

inquire 45:5

inquired 32:23
40:20

inquiries 31:17

inquiring 45:7

insisting 125:23

inspected 139:1

inspection
30:15,25 38:8
42:16 50:18 66:22
119:15 120:2
146:6 147:5,25
150:4 151:24
152:2,5,17 154:12

inspections
109:22 148:19,21,
22 149:10,12,15,
18 150:3,6,15
152:3

inspector 108:3,
13 117:6 121:8
124:15 146:10
168:8

install 104:13
110:5

installed 137:6
171:12

instance 8:13
19:22 166:4

instances 28:23

insurance 56:20

intending 150:13

intent 167:23
168:1,3 181:4

intention 26:14,
17,25 104:10,24
110:4

intentionally
69:11 70:18 76:21

interact 19:8

interacted 64:14

interest 31:8,21
36:13

interested 32:22
40:19

interior 170:6
171:9

internal 113:17

interpret 167:14,
19 171:11

interpretation
68:9 71:17 158:23

interpreted 74:2

interpreting 7:23
65:5

interruption
128:22

intervened 69:22

intervention
71:20

interviewed
72:10

intrusive 31:16

invalidated
160:23

invest 22:14

invested 22:16

investigation
88:25 109:20
154:1 179:21
180:12,18

investment
22:13,15

Investments
21:13,14,18,24
22:1,17,18

involved 21:23
24:4 63:7 75:25
86:8 109:15 125:4
126:22 161:9
173:16

involvement
37:17

Patrick Gallagher                                                                July 31, 2025

**issuance** 99:7

**issue** 6:19 47:3,8
81:10 162:20
164:10,16 177:16

**issued** 15:24
38:7 94:19 98:20
101:19 107:14
111:2,6 116:16
117:14 121:12
126:19 177:14,18

**issues** 6:24 15:4
39:9 45:5 47:1,5
58:18 125:7 163:4

**items** 28:16

___

**J**

**jail** 72:16,17

**JB** 149:20,22
151:10,18,23
152:7

**Jeremy** 19:16,18,
23

**Jesse** 19:9,10

**jneal_dc@
comcast.net.**
181:19

**job** 7:5,18 147:21
153:4,24 154:8

**jobs** 19:2 37:19

**Joe** 39:22,23
65:3,6,25 66:3,6,
10 69:8 70:5
92:18 120:5,19
154:8 156:11
157:19,20 158:9
160:24 162:1
163:7,10 164:13

**John** 182:16

**Johnson** 13:25
14:1,2,21

**Jones** 19:9,19
60:7 61:3 66:13
159:13,20 160:12

**journeyman**
16:23

**judge** 6:18 58:14
132:2

**July** 5:1 45:16
144:12,14

**jump** 14:5 78:12

**June** 40:14 49:10,
25 121:5,17 122:1
129:25 130:19,20,
21 131:6 135:5
142:7 152:20
175:3

**jury** 6:18

___

**K**

**K-N-I-G-H-T-S-E-
N** 18:2

**K-W-A-I-T-K-O-
W-S-K-A** 60:15

**Kathleen** 43:8

**Kathryn** 150:11
151:1

**Kathy** 44:11 45:9

**Keane** 117:7
118:19 120:20

**Kevin** 42:13 47:9
82:7 92:19 120:19
122:6 123:11,15,
16 130:16 161:21
165:9,10 170:21

**kind** 8:24 9:2 15:3
16:23 19:17 28:11
37:1 65:12 70:21
103:12 133:4
163:12 183:7

**kinds** 110:3

**kitchen** 9:15,18
98:25 104:11,13
139:14,15 140:20,
24,25

**kitchens** 27:1

**knew** 72:2 74:5,
16 90:19 131:20
132:25 175:11

**Knightsen** 17:25
18:3

**knowing** 74:3

**knowingly**
125:15 127:5
134:7,14

**knowledge**
178:21

**Kwaitkowska**
33:12 60:15 62:16
78:9 89:5,16
93:11,18,25 94:24
152:16 179:16

___

**L**

**LA** 14:16,17

**lack** 33:16

**landed** 138:5

**landing** 137:11

**large** 166:10

**late** 38:1,14
40:13,14 41:8
46:16,18 157:11

**Lau** 108:23 109:3,
5,15

**laundry** 114:12,
20 140:25 141:3

**law** 6:17 65:11
77:12,14,17 88:9,
18 174:7

**lawful** 60:10

**laws** 62:9,24
63:1,3 64:3,7 65:5
68:23 71:12 87:4
88:12 161:25
174:18

**lawsuit** 6:12,25
8:8 20:8 21:3 33:7
54:22 55:1 76:18
134:23 158:13
178:3 180:20

**lawyer** 174:23

**lays** 61:18

**leading** 137:5
138:10,13

**leaning** 110:1

**learn** 30:13,17
120:2 152:9

**learned** 85:1,22
100:16 153:13,25
154:12

**left-hand** 97:2

**legal** 6:1 22:1
58:11,17,23 95:23
131:22 164:23

**legalize** 144:4
161:6,11

**legalized** 161:16

**legally** 70:13

**length** 138:3

**letter** 151:1,7

**letters** 110:17

**level** 17:7 140:12,
17 141:7 145:12,
20

**liability** 98:9,11

**license** 16:13,18

**licensed** 16:10,
17 35:8 182:8

**licenses** 15:5
16:4 20:1

**lie** 155:4 163:11

**liens** 31:4 34:19

**lifted** 34:7

**lifts** 16:3

**lined** 102:20

**list** 15:11

**listed** 101:22

**listen** 73:13 90:1,
10,14 174:6

**listening** 71:16
73:10,11

**listing** 30:4 35:23
46:11

**litigate** 147:18

**litigating** 162:7

**live** 11:5 92:17

**lived** 11:3

**Livermore** 35:18

**lives** 35:18 92:17

**living** 157:1

**LLP** 12:17

**located** 17:21
79:5

**location** 28:9
52:12 57:19 74:8
83:18

**Lofholm** 5:5,12

**logically** 130:9

**long** 9:6,15,18
11:3 12:23 13:8
14:24 20:17 47:22
75:9 93:16 103:13
122:11 131:8
163:15

**longer** 21:25
22:11 63:6 74:25
80:18 93:17 94:18

**looked** 21:18
80:20 82:9

**Lopez** 128:21,24
129:24 130:20,24
131:5,9 132:6,21
133:15 134:2,25
135:18 136:2

**lose** 142:1

**lost** 56:25 57:6

**lot** 8:6 10:17
29:13 35:21 47:8
74:24 90:13

**loud** 98:24

**lower** 141:9,15
142:8

**lucky** 36:9

**lunch** 31:16
70:24

**lying** 43:6 47:9

Patrick Gallagher                                                July 31, 2025

## M

**M-A-C-K-E-N-Z-I-E** 44:11

**M-E-G-H-A-N** 183:1

**Mackenzie** 44:11 45:9

**made** 37:9,12 39:5 57:9,15,20 58:23 60:9 74:17, 19,23 75:3 82:3,4 87:4 90:6 91:14 110:3 118:11 122:23 123:2 128:5 142:1 158:8,25 172:20 174:2,15,25 181:7

**Madison** 20:9,12, 17,25 21:15 22:15,20 24:10

**main** 14:15 21:2 58:17 134:21

**make** 7:4,18 8:4 10:16 13:2 17:2 44:24 56:7 70:16 83:21 85:7 90:12, 13 105:25 106:3 137:1 147:16,21 158:17 177:16 181:24

**makes** 126:25 183:20

**making** 47:10 57:10 62:9 64:7, 25 68:8,22,25 82:21 88:4 179:15

**management** 21:18

**manager** 23:7,10

**Manfredi** 102:12, 13

**March** 34:5,10,21 80:21 81:2 157:11 166:23 169:7 170:1,11 178:16

**Margaret** 91:22

92:2,3,5,10,16 93:6 157:1

**mark** 52:17 95:25 119:3 150:17 165:17

**marked** 52:20,23 96:2,5 100:23 101:14 107:7,12 111:22 112:2,24 113:3 116:4,7 117:23 118:3 119:5 129:21 130:25 131:2 150:20,23 155:16, 17 165:19 177:24 178:2 180:10

**market** 5:3 29:4 30:20,23 31:6 33:24 34:10,20,23

**marking** 156:1

**married** 11:7

**Martinez** 106:5

**match** 146:2 162:13

**Matt** 164:25 165:4,11

**matter** 32:12 39:22 97:23

**matters** 178:19, 21

**Matthew** 49:3,6 160:1 166:22 172:14,15

**Mauricio** 39:20, 21,24,25 40:1,2 64:10 73:20 76:11 82:8 89:22 120:19 121:8 123:11 130:16 157:18 158:8 161:4,11 164:17 165:2,7,14 181:25

**meaning** 58:11

**means** 12:8 88:16,17

**measure** 9:10

**measured** 143:11 170:13

**measurement** 142:14,24 143:3 170:24 171:5

**measurements** 142:16,20

**measuring** 142:12

**mechanical** 138:19,22 139:4 144:5 161:5

**meeting** 66:14 123:3,17 159:3,9, 14,21,24 160:14, 19 163:5,12,14, 15,21 164:9 170:13

**Meghan** 183:1,7, 15

**member** 61:14 63:14

**members** 135:19 174:17

**memorable** 29:13

**memory** 36:25 130:3,5

**mention** 118:11

**mentioned** 16:5, 14 94:13 122:22 129:15 175:6

**Messrs** 179:11, 21

**met** 159:17

**mid** 38:1 40:13,14

**middle** 97:1 114:17 133:24

**Mike** 35:3 46:13

**military** 11:11

**mill** 74:20 95:15 153:8 158:16

**million** 30:7 36:1 37:7 41:23 51:20 55:18 57:5

**measured**
143:11 170:13

**mind** 7:2,22 33:17 46:8 69:4 81:19 93:25 105:3

**mine** 35:7 114:19

**minimum** 170:13

**ministerially** 75:19

**minute** 145:6

**minutes** 58:2

**misconduct** 94:1

**misdemeanor** 11:22

**misinterpreting** 64:3,25 68:8,21

**missed** 54:9 138:25 142:4

**Mission** 14:13

**mistake** 38:23

**modifications** 141:25

**modify** 58:8

**modifying** 138:20

**moment** 11:6 119:9 144:19 154:15

**money** 19:24 56:11 57:15,18,20 126:10 127:12 134:16

**month** 8:15 29:10 34:3 40:6,8 41:18 56:18

**months** 51:16 75:12 78:12,14 93:15,17 126:9, 13,16

**morning** 172:4 175:5

**mortgage** 56:20

**mothballs** 169:2

**motion** 58:13

**motions** 184:20

**motivation** 86:4

**motivations** 70:10

**motive** 134:22

**mouth** 22:24 145:21 174:3

**move** 165:1

**moved** 138:25

**moves** 165:2

**multiple** 109:21 111:13

## N

**N-E-A-L** 182:18

**nailing** 150:4

**named** 54:20 58:19 59:7 135:10 149:20

**names** 102:24

**Nancy** 27:9 30:3 46:13

**Naples** 20:25 21:6 24:18,20 54:18 60:21 79:6, 17 82:3,13 84:15 85:5,7 94:18 96:11 99:7,24 100:17 102:14 108:1 113:7,11 116:14 129:10 132:25 146:11 149:10 167:4 180:24

**narrow** 47:14

**Natalia** 59:23 62:12 63:11 87:2 172:20,25 173:1

**nature** 117:16

**navigate** 125:7

**Neal** 181:22 182:1,16,17

**necessarily** 111:20

**needed** 22:11 26:20,21 56:12 126:6 161:19

**negate** 118:15

**negative** 135:25

**neighbor** 79:10, 14,16,17 80:2,8 81:3,5 82:18 83:24

**neighbor's** 110:1

**neighborhood** 84:9,25

**neighbors** 81:6

**Ness** 74:9

**newest** 45:23

**night** 90:3 91:21

**nine-page** 31:14

**nitpicky** 144:24 145:8 146:15,17 148:17 161:6

**nits** 181:16

**nixed** 165:12

**nods** 7:23

**nomenclature** 9:2

**northeast** 18:4

**notably** 182:5

**notes** 93:23 103:1

**notice** 6:9 41:25 42:4 99:1 107:20 113:23 120:24 145:2,4 161:14 165:6,15

**notices** 30:14 34:11 38:7 42:2

**notion** 72:2

**NOV** 99:11 100:25 101:3 103:6,9 107:25 108:14,20 109:9 111:2,5 115:11,14 116:13 117:6,11, 25 118:3,15,17

119:24 121:10,11 124:7 126:18 129:20 130:24 131:2 136:6 137:4 144:8 176:10,11, 13 177:9 182:5

**NOV's** 30:20 38:5 99:22,23 100:3, 11,17 106:20 176:14 182:2

**number** 5:12 6:8 7:3 38:6 48:19 52:19 53:5 96:1 97:15,16,25 99:12,22 100:22 101:13 107:6 110:14 112:23 117:12,25 119:4, 20,23 121:2,21 137:5 150:19 165:18 167:3 169:25 171:14 177:23

**numbers** 36:9 110:17 116:3 176:12

**nuts** 26:11,18 104:2,4,25 105:2

---

**O**

**O'HALLORAN** 183:1

**O'RIORDAN** 66:21 113:16 114:9 124:22,24

**Oakland** 17:23

**oath** 5:9 6:16,17, 20

**object** 56:4

**objective** 164:21

**observe** 141:8

**observed** 140:20

**obstruct** 69:6 71:1 77:5 86:5 88:1 158:17

**obstructed** 75:16 76:22 87:1,

3

**obstructing** 179:17

**obstruction** 179:20

**obtained** 15:21 118:8 150:5

**obtaining** 117:19 150:3 151:17

**occasion** 70:6

**occurred** 129:24 130:24 135:5,11 159:21

**occurring** 54:21

**October** 78:6,17 107:21 109:9 111:6 115:21 126:19,23

**off-street** 77:20

**offer** 37:7,9,12,20

**offers** 36:16,20 37:4

**offhand** 182:21

**office** 5:2 14:15 60:3,6 63:6 70:25 74:21 87:9 89:12 95:13

**officer** 45:11

**official** 171:14

**offs** 117:19

**online** 183:12

**open** 45:6

**opening** 170:5

**operate** 14:12

**operative** 53:1

**opinion** 43:11 84:10 184:4

**opportunity** 180:8

**opposed** 148:14

**order** 7:4 17:11 106:21 107:5

167:15 177:13 181:4

**orders** 30:20 34:13 48:25 49:11,16 50:4,14 175:6 176:19,22

**ordinances** 65:19

**organization** 15:20 157:8

**orient** 28:20

**original** 43:4

**outcome** 173:20, 25 174:9

**outfit** 52:10

**outstanding** 100:11 133:10 171:17

**overlapping** 73:16 88:5 136:13

**overseeing** 132:3

**owned** 20:25 21:15 23:3 25:4 48:15

**owner** 24:18 30:11 97:3,8,11 98:1 109:7 139:21

**owner-builder** 98:5,8,16 101:22

**Owner/agent** 108:23

**ownership** 21:12 54:18 99:23

---

**P**

**P-A-T-R-I-C-K** 5:16

**p.m.** 10:6 185:3

**PA** 117:18 121:18,21 141:11

**PA20180810707 5** 109:23

**PA20181018358 6** 140:10,14 141:6

**paid** 55:13 100:14 132:12 168:22

**paint** 26:22 98:25 104:12,15

**paper** 157:11 161:13

**papers** 184:14

**paperwork** 85:3, 5,8

**paragraph** 53:5, 7,12,24 78:5 88:23 89:3 179:8, 10

**parking** 77:19,20 79:2 86:20 172:9, 13

**parse** 70:12

**part** 21:17 37:18 49:4 51:21 54:22, 25 58:11 67:14 68:5,10 70:15 76:25 77:4 99:10 102:10 112:13 113:17 114:16,17 153:3 168:12 170:8

**partially** 144:8

**participated** 158:12

**participation** 179:20 180:11

**parties** 184:10

**parts** 179:15

**passed** 139:2 165:8

**passing** 59:23

**Pat** 157:24 162:5

**Patrick** 5:7,16 20:10 21:15 22:16,20 66:21 113:16 114:9 124:22 185:2

**pattern** 41:25

113:24

**pause** 144:19 180:2

**pay** 55:4

**paying** 17:10 19:23

**payroll** 23:22

**penalty** 178:19 181:7

**pending** 10:3 30:14,20 112:6 175:12

**peninsula** 35:22

**people** 7:8 23:15, 18,19,21 31:12,21 32:7,22 33:16,20, 21 68:25 72:18 74:24 95:17,22 113:17 173:15

**percent** 57:9

**perfect** 76:10

**perform** 150:14 152:3

**performed** 53:8 132:13 149:14

**performing** 98:10 151:23

**period** 38:15 42:23 43:22 44:4 45:14,17 46:2,9, 19,23,24 47:2,17, 24 51:6 75:10 131:13

**periodic** 19:19

**periods** 48:2,3 51:23 55:12

**perjury** 178:19 181:8

**permit** 38:24 64:15 75:16 77:24 80:10 81:15 83:25 84:1,22 85:24 86:20 93:12,15, 16,19 94:19 96:9 98:18 99:3,8,11, 19,22 100:6,12,

15,18 101:4,19, 20,23 102:1 103:7,8,15,18,19, 20,21,22,24,25 104:1 105:7,8,9 108:9 110:14,16, 19 111:1,7,8,21, 22 112:1,5,10,17 113:6,10 114:6 115:10,17 116:20, 25 117:1,4,20,24 119:20,23 120:9 121:13 129:13 133:10 139:21 143:19,20,21 144:7,11 145:1,5 147:7 155:16 167:2 168:21,24 171:15,21 176:6 177:14,17,18 183:19

**permit's** 125:24

**permits** 85:6 87:7 102:5 103:11 104:6 105:4 107:14,16 109:22 110:7 111:14,18 145:20 176:9 177:8,10

**permitted** 139:20

**permitting** 83:9, 17

**perpetrated** 89:1

**person** 8:23 17:10 37:11 61:20 109:2 128:19 149:14 150:2 151:4 183:4

**personal** 24:2 37:17 86:9 91:15

**personally** 5:6 73:1 74:18 102:5 113:10 158:12

**perspective** 31:24 83:10,17

**pertained** 94:1

**pertaining** 10:15 48:4 64:4 65:1 68:9 110:19 113:7,11 116:13

148:24 153:4

**pertains** 68:15 87:22

**Phil** 108:7

**phone** 97:15,16 128:22

**photo** 170:10

**photographs** 183:25

**photos** 82:7 85:10 184:15

**physically** 183:13

**pictures** 85:9 184:23,24

**piece** 161:13

**pile** 110:1

**pissed** 66:7 69:9 70:5

**place** 48:15 60:11 80:15 107:3 109:8 147:15 159:2 165:13,15 171:6

**Plaintiff** 78:12 88:24 89:6

**Plaintiff's** 78:6, 14

**plan** 26:15 27:2 80:11

**Planner** 78:8,10

**planning** 10:5 34:17 42:11,18,19 43:8 59:15,16 60:13 61:24 62:1 63:21 64:11,12,16 65:16,17 66:25 67:8,14 71:12 77:25 78:9,10 94:10 95:6 109:23 111:24 112:6 135:20 160:9 161:8,10 163:24 164:3 172:10,18

**plans** 105:20,24 106:5 110:12,13 121:19 137:6,10,

20,22,24 138:20, 23,24 139:5,6 140:10,14 141:5, 11,21 142:25 143:4,9,16 170:11 182:1

**plausible** 83:23

**play** 92:22

**pleading** 181:5

**plumbers** 23:21

**plumbing** 26:20 103:16,17,22 105:8

**PO** 97:12

**point** 20:24 39:14 40:19 58:1 86:1, 19 91:14 130:24 146:4 153:25 154:11

**pointed** 143:16

**pointing** 48:18 145:7

**points** 141:25

**police** 11:18

**policy** 58:21 69:1

**pop** 169:4

**portion** 115:9

**position** 17:4,8, 12 156:13,18 157:4

**positions** 71:20

**positive** 154:25 157:6

**possession** 55:25

**possibly** 86:5 87:1,3

**potential** 28:24 31:9 39:8 40:10, 23 43:11,20 45:20 46:6,24 47:16 48:2 51:8

**potentially** 57:20

**pour** 82:20 141:18

**poured** 141:19 142:3

**practice** 58:21 112:13

**pre-date** 177:8

**pre-dated** 99:23

**pre-final** 119:15

**present** 66:9 75:2 122:2

**presented** 152:4

**president** 19:4,8

**presume** 45:13 173:19

**pretty** 47:13 70:25 106:18 167:11,12

**prevent** 50:5,8

**prevented** 20:4 57:23

**previous** 109:7

**previously** 144:4 161:7

**price** 24:24 30:4 35:23 41:21 43:20,21 47:25 51:19 55:12,13 56:10 57:4,5

**prices** 48:4

**principal** 57:11 78:10

**prior** 13:24 25:4, 8,20 44:22 46:5,9 51:23 58:7 64:13 99:7 120:10 135:17 152:19

**privy** 66:17

**pro** 58:11

**problem** 143:12, 14,15

**problems** 138:2 164:11

Patrick Gallagher                                                           July 31, 2025

proceed 112:5

proceedings 132:3 180:2

proceeds 22:19

process 6:6 37:18 65:18 78:13 176:19

produce 53:18, 20 54:4,5

produced 53:15 183:23 184:4

productive 160:18

profession 183:7

professional 46:5 112:9,16

progress 19:19 109:21 111:13

project 19:24 25:7,13,20 55:16 57:16,19,22 63:7 65:19 69:6,12 71:6 75:10,25 87:22 110:5 124:3 126:16 146:11 151:5 158:20 168:2,4,8 169:3 179:17 180:23

projects 17:17, 21 18:7,17 19:20 182:23

pronouncing 59:11

proof 53:23 54:2

proper 109:22 111:14 142:20,24

properties 23:1 146:24

property 21:2,5 22:19 25:4,23 27:6 29:4 30:5,10, 15,19,21 31:5,8, 22,23 32:14,23 33:16,21,24 34:4, 9,11,14,17,20,23 35:24 36:13 38:13 40:8 41:7 42:2,12,

19 43:14 47:2 48:4 49:17,23 50:5,8 51:13 53:8 54:17,25 55:4,13 56:11 57:16 61:18 62:16 74:19 79:2, 11,19 80:17,21,24 81:21,24 84:15 85:1,15 98:12 100:2 106:16 107:13 109:12,16 111:17 118:20 125:4,7 139:10,22 142:7 146:3 147:12 148:1 151:24 160:16 168:22 172:11 175:7 176:7,20 177:5

property's 31:2

propose 138:20 140:11 141:7

proposed 47:25 140:16 146:20

prove 155:2,5

provide 150:6 182:12

provided 151:8 154:22

Public 81:10

pull 70:1 100:12 102:5 103:11,15, 17,18,20,21,22,24 105:7,8,9 125:9 151:8,20 176:6

pulled 80:10 96:10 100:6 104:6 145:6 176:9 177:8

pulling 100:15

purchase 22:18 24:20,21,24 41:21 43:20,21 47:25 48:4 51:19 55:12

purchased 25:23 27:6 30:10 49:22 79:2,9,11 80:20 100:1,4,17 109:12

purchasers 31:9

purchasing 31:22 52:15

purpose 90:12 115:10 174:2

purposely 48:23

purposes 10:5 64:23 86:7

pursuant 6:9 145:19 177:18

put 7:16 19:24 22:24 29:3 30:19, 23 31:3,5 34:1,3, 9,20,23 40:14,18 57:16 81:16 82:12 95:21 104:20 113:21 145:21 172:10

putting 49:2 86:6 148:5 174:3

---

**Q**

qualified 150:14

Quan 45:22,24 46:5,15

question 7:11,13 10:2,3,11,18 24:13 45:11 47:14 54:23 60:12,16,22 64:24 65:23 72:24,25 78:17 82:11 89:8,10 90:25 91:9 101:9 106:8 110:25 111:5 147:4 153:12,17 157:3 158:1 160:24 162:15 169:15 173:24 180:3

question-and-answer 6:22

questioning 58:6 70:15 184:1

questionnaire 31:14,18 32:5,8, 11,13 33:1,13,22

questions 6:23, 25 7:2 8:7 10:13,

14 42:1 45:8 59:7 72:15 90:5 113:24 124:19 143:20 165:21 166:19 180:8

quick 9:3 58:5 70:25 179:6

quote 111:12 169:17

---

**R**

railroaded 174:11

raised 162:20

rap 153:11

rat 70:22 72:7 73:7

reached 124:14 128:9

read 73:18 79:23 87:18 88:7,11 97:18 98:24 99:11 101:25 109:19 110:2 114:6 115:10 116:5,22 117:20 136:15 144:1 162:15,17 166:15,21 179:25 180:3,5,7

reading 68:22 117:2 144:3 167:8 174:18

reads 78:5 89:3 166:25

real 24:21 27:5 29:24 34:24 35:2, 8 37:13,15 43:25 45:13,23 51:25 52:7 65:13 179:5

realtor 32:3

realtors 36:8 37:19

rearrange 26:14

reason 20:2 22:9 35:12 51:7 59:5 63:13 68:11 78:23

95:21 147:7,10 152:21 177:3 179:20 184:12

reasonable 84:3, 10,11,14 85:14 95:23

reasons 29:14 90:8 95:9

rebar 141:24

recall 17:22 24:6, 24 25:21 30:6 33:22 37:2 38:18 40:25 41:12 56:3 118:17,19 121:24 122:1 123:8 133:20 134:10 151:23 152:15 153:1,5

receipts 53:18

receive 30:11 167:2 184:6

received 108:1 116:13 119:11 145:13 166:11,14

receiving 167:6

recess 58:3 116:2 177:22

recognize 52:24 53:1 96:4 101:16 107:23,25 113:4 116:11 120:22 150:23

recollection 29:16 43:16 64:20 129:23

recommendation 126:25

recommended 125:11

record 7:19 8:4 17:2 45:2 73:18 79:23 87:18 88:7, 11 115:14 116:5, 22 117:11 136:15 144:21 159:6,7,8 162:17 180:1,5 185:1

Patrick Gallagher                                                                July 31, 2025

**recorded** 49:13, 14,18 50:4 175:7 176:19,23 177:4, 12

**recording** 132:6

**records** 45:3 54:3 55:23 56:4 128:15 155:22,24 156:9,13 157:14

**red** 39:9 129:12, 16 130:3,10

**red-tagged** 38:1, 6,16 39:6,18 40:9, 13 72:19 73:19 129:18 130:7,13

**redo** 104:15

**redoing** 104:25

**refer** 21:5 24:7 89:22,23

**referenced** 100:25 103:7 117:24 159:11 171:21 183:24

**references** 121:16

**referencing** 50:15 119:8

**referring** 118:10 129:20 137:13 173:2

**refers** 91:4

**reflect** 45:17

**refrigerator** 148:13,16,17

**regard** 36:15 85:1 123:8 136:20

**registered** 152:8

**regulations** 64:4 71:18

**reinstate** 172:5

**reiterate** 91:13 183:21

**related** 8:9 53:18 62:15 167:16

**relates** 87:6

**relationship** 46:4,5 91:15,20

**relevant** 8:8

**rely** 83:13,16

**remember** 5:22 8:17,22,23 13:8 15:16,17 25:13,19 32:17 34:3 36:15, 17,19 37:9,11,15 41:20 47:24 74:14 102:25 106:15 128:10,19 131:10 149:19,24 167:6,8

**REMEMBERED** 5:1

**remodel** 103:14 176:15

**remotely** 74:25

**remove** 88:16 114:9,18,24 115:3

**removed** 81:16 82:18

**removing** 114:11

**renovate** 22:25 26:2,9 58:22

**renovating** 23:20

**renovation** 57:19 96:11

**reoriented** 21:23

**rep** 153:11

**repeat** 8:2

**replace** 104:17, 20 139:9

**replaced** 139:9

**replacements** 28:17

**replacing** 114:11,18

**report** 151:14,17

**reporter** 5:5,11 7:3,22 73:17 79:22 87:17 88:6, 10 115:24 116:21

**reports** 150:6,15 151:24

**represent** 45:24

**representative** 60:5

**represented** 37:13 61:17 174:23

**representing** 10:10 29:25 58:12

**represents** 61:9

**request** 167:1 172:17,21 173:16, 20,25

**requested** 139:21

**requests** 44:22

**require** 136:9,12 159:2

**required** 104:7 108:10 133:12 137:2 145:12 149:9 172:19

**requirement** 77:6,17

**requirements** 167:2 170:14

**requires** 90:11

**requiring** 160:15

**Reroof** 102:2

**reschedule** 184:2,15

**research** 84:9 85:24 86:12,18 117:17

**resell** 29:4

**reserve** 184:5

**resided** 91:22 92:3,4

**residence** 98:10 137:2 164:24

**residential** 17:17 22:25 25:6,7,20

**resides** 92:5

**residing** 93:6

**resign** 154:6

**resolve** 47:5

**resolved** 51:9 164:11

**responded** 153:7

**response** 117:17

**responsibilities** 98:5,15

**responsibility** 62:15

**responsible** 100:2 151:17

**responsive** 44:22

**rest** 85:6

**restitution** 131:23

**restore** 88:14

**restrictions** 31:13 33:8

**restrictive** 136:19

**result** 58:17

**resulted** 63:6

**retain** 127:1,7 149:14,17 150:13

**retaliate** 135:11, 20 152:22 154:17, 24 175:8

**retaliated** 58:20, 25 71:8

**retaliating** 173:17

**retaliation** 134:22 136:3 152:14 158:13 165:14 180:11

**retire** 13:3

**retired** 11:25 13:4 127:23

**retirement** 12:1 20:22

**retrofit** 75:25 76:5 144:6

**revealed** 109:20 117:18

**review** 45:3 93:12,19 169:11 179:5 180:8

**reviewed** 58:12

**revised** 161:15

**revising** 145:24

**rezone** 94:16

**rezoned** 94:15

**rid** 164:5

**ridiculous** 94:22 162:1

**right-hand** 96:18 101:9 114:2

**right-of-way** 104:1

**rings** 115:5

**ripped** 147:15

**risers** 138:3

**roadblock** 60:8

**Rodrigo** 125:11 126:1,6 128:14

**rods** 151:9

**role** 23:4

**roof** 104:20

**roofing** 103:18 111:8

**round** 107:14

**rude** 7:17 8:3

**Rugby** 128:6

**rule** 75:22

**rules** 6:4,6 65:1 68:2,8,9 98:4,15

Patrick Gallagher                                                                    July 31, 2025

**ruling** 58:17

**rumor** 71:23 74:20 95:15 153:8 158:16

**run** 137:18

**Running** 11:18

**Ryan** 21:19

---

**S**

**S-A-U-N-D-E-R-S** 108:13

**Safai** 61:12 159:10,14

**safe** 161:24

**sailing** 126:5

**sale** 30:11 37:22 39:5 40:9,10,16 43:11,16 45:18, 20,25 46:6 47:18 48:8,23 50:5 55:12 56:10 57:4, 5,14 139:22 175:9,12,14

**sales** 28:24

**San** 5:3,4 6:11,12 14:10,14,15 25:4, 8 30:25 32:16 33:18 34:16 52:15 58:22 67:10,13,15 85:23 91:23 98:6 103:12,17 106:6 122:5 127:17 136:18 152:18,21 154:11 160:9 164:19,21 166:12 169:16,23 178:8 179:3

**Santos** 33:11 89:1,5,8 125:11 126:1,14 127:1,7, 16 129:9 131:24 132:13,24 133:9, 11,16,22 179:11, 21 180:12

**Santos's** 126:1 131:16

**Saunders** 108:7, 13 111:12 124:7, 24 126:19

**scaffolding** 162:4

**scheduling** 45:7

**scheme** 89:1

**scissor** 16:3

**scope** 109:22 111:17

**screening** 65:18

**screw** 71:2 76:14 84:12

**screwed** 71:25

**secondary** 130:17

**section** 5:9 162:22 170:3

**seeking** 58:22 114:6

**seismic** 75:25 76:5 144:6

**select** 37:3

**sell** 22:19 51:12 57:8

**selling** 50:8 52:15

**send** 56:5 106:2 166:5

**sending** 56:4 168:1

**sends** 165:4,10, 11

**senior** 78:8 124:15

**sense** 131:22 174:15 177:16 183:20

**sentence** 78:5 138:18 140:19 170:14

**separate** 31:3 67:8 103:8,11,20, 21,22,24 105:7,8,

9 133:18

**September** 110:22

**served** 11:11

**services** 132:13

**session** 6:22

**set** 68:2 127:15

**setting** 6:1

**seven-foot** 164:24

**seven-foot-five** 164:15

**seven-foot-six** 164:24

**seven-three** 164:14

**Seventh** 5:4

**SF** 43:8 70:23

**shake** 7:25

**she'll** 183:10,16

**Shorthand** 5:5

**shortly** 129:24 163:21 164:8

**show** 7:25 21:21 32:2 120:13,15 140:10 141:6 144:5 157:13 161:5 183:25 184:1

**showed** 48:24 111:12 120:19 124:16 141:21 157:14 161:15

**showing** 93:6

**shown** 111:5 144:4

**shows** 81:16 140:9

**shrugging** 27:13

**side** 61:2 97:2 114:10 115:1,2

**sidewalk** 79:7 80:19 81:25 82:2,

12,20 103:24

**sidewalks** 82:24

**sign** 117:19 161:17 165:7,14 167:2 175:13,14, 17

**sign-off** 171:15, 20

**sign-offs** 118:8

**signature** 96:19, 21 101:10 143:23 178:14

**signed** 98:14 114:2

**silent** 123:15

**sill** 170:12,16 171:9

**simple** 72:24 106:23 158:25 161:12

**SIMS** 5:14 52:17, 21 57:25 58:4 61:13 73:24 80:1 87:19 88:19 95:24 96:3 100:20,24 101:12,15 107:4, 10 112:22 113:1 116:1,6,23 119:3, 6 126:7 128:23 136:17 144:20,22 149:22 150:1,17, 21 159:6,8 162:15,18 165:17, 20 177:20 178:1 180:1,3,6 184:25

**single** 22:13 168:14

**single-family** 18:7,11

**sink** 139:14 140:2,4

**sir** 6:14 33:15 52:24 53:16 65:9 96:19 107:21 118:6 140:22 170:14 173:24

**sit** 79:20

**site** 20:5 109:2,19 121:16,24 122:2, 5,11 124:16 140:19 141:7 170:11

**sits** 79:19

**sitting** 9:7

**skip** 28:12

**slab** 141:24

**slapped** 48:11 50:13

**slow** 69:6

**slowly** 7:6

**small** 97:7

**smooth** 6:7 126:4,5

**sold** 51:23 55:5,6, 14,15

**solicited** 134:9

**son** 35:7

**sort** 31:10 45:6 164:22 184:21

**sought** 101:4

**sound** 159:22

**sounds** 23:14 56:10 64:2 80:16 106:8 127:1 131:24 132:22 159:23 183:22

**soup** 26:11,18 104:25 105:2

**source** 134:22

**space** 169:17

**spaces** 172:10

**speak** 7:5 39:20, 21 131:11

**speaking** 7:7,8 63:14 73:2 74:17 95:11 113:9 136:2 146:17,18 148:6 153:14

**spec'd** 43:7 161:10 163:24

**special** 129:4 131:5 132:5,20 134:24 135:18 148:19,21,22 149:9,12,15,17 150:3,5,14 151:23 154:18

**specialty** 15:14, 23 16:1

**specific** 8:8 10:11 28:16 36:25 59:7 64:20 90:5 130:3,5 132:23 167:1

**specifically** 10:18 26:19 36:19 43:8 63:5,20 71:24 75:18 129:5 135:3 147:3 153:13 154:16 159:11 163:25 180:17

**specifics** 87:5 132:12

**speculation** 153:18

**spell** 5:15 12:15 18:1 27:10 35:4 52:3

**spelled** 59:11 181:25 182:17

**spelling** 14:3 61:13 159:5

**spent** 162:10

**spoke** 39:20 130:20 131:10

**spoken** 66:6,7

**spot** 76:10

**spread** 158:16

**spring** 34:6,24

**stack** 9:24 166:10

**staff** 63:14

**staged** 139:18,22

**stair** 137:17

**stairs** 115:8

137:5,9,18 138:4, 10,13,21 161:5

**stairwell** 144:5

**stamp** 99:2 106:6 144:16

**stapled** 52:18

**start** 7:12 10:21 13:1 29:3 58:6 65:16 95:24 142:15 152:24 162:7 165:1

**started** 44:15 78:18 80:10,13 102:20 107:3 142:14 147:14 171:5,7

**starts** 169:11

**state** 5:15 11:1 152:8

**stated** 95:10 178:19,21

**statement** 62:20 65:8 69:9 74:2,23 75:3 122:22 123:2 132:4 137:7

**statements** 74:17

**states** 43:8 169:16 179:12

**station** 106:2,4 183:13,14

**stations** 64:17 183:11

**stayed** 123:15

**stems** 134:23

**step** 171:3,4,8,11

**steps** 84:7,24

**stick** 63:25

**stipulate** 166:12, 17

**stop** 48:23 145:6 162:14 175:9

**stopped** 39:15 59:22

**storage** 140:21

**stories** 125:21

**stove** 139:14,17, 18,20,23,24,25

**straight** 137:18

**straighten** 38:22

**strategy** 22:13

**street** 5:3 20:25 80:5 84:15 85:6 129:11

**strengthening** 114:10,17

**stretch** 83:21

**strike** 116:23

**structural** 114:10,17 125:9, 10,18,20,22,24 133:12 136:8,25 137:1 141:23,25 148:25 150:7,14 151:5,10,18 152:8 182:12

**structurals** 142:5

**stucco** 162:4,11

**stuck** 129:12

**stuff** 47:15 56:6 60:9 106:24 133:21 139:1 145:16 146:25 147:21,22 158:17 164:16,22 184:21

**stupid** 146:25 174:6

**subfloor** 142:16, 18

**subject** 21:2 158:13

**submission** 113:18

**submit** 105:24 132:2

**submitted** 98:19, 20 107:15 112:10 113:6 137:21

142:25 143:21 144:11 152:1 178:7 179:2 180:20

**submitting** 113:10

**subsidiary** 67:14

**substantial** 56:5

**such-and-such** 176:10,11,13

**sue** 162:8

**sued** 20:8

**suggestions** 6:5, 6

**summer** 29:19

**sunk** 71:25

**superintendent** 12:6,21 13:15 16:25 17:5 18:12, 15,18

**superintendent/ foreman** 18:18, 20

**superior** 95:5 178:8

**supervisor** 18:24 60:20 61:25 62:10 159:4,10,13,14

**supervisors** 47:11 60:17,20, 24,25 61:2,5,15, 21,24 62:2,5,17 63:15 70:8 173:21

**supervisors'** 60:3 63:6

**supply** 85:5

**support** 56:21 59:1 71:7 72:1

**supported** 162:23

**supporting** 93:4

**supposed** 36:9 86:23 90:23 146:7,12,13 148:18 158:21

163:11

**supposedly** 177:11

**surprise** 152:9

**surrounding** 39:9

**suspended** 20:2

**suspicion** 175:19

**suspicious** 92:15

**synonymous** 9:2 12:10

---

**T**

**T-E-A-G-U-E** 173:6

**table** 9:6,10,15,18

**tag** 39:9 129:12, 16 130:3,10

**taking** 62:13 67:23 71:6 93:21 95:9

**talk** 10:13 38:5 39:3,25 41:10 47:14 59:1 89:21 95:17 132:15,17 157:19 180:11 184:2 185:1

**talked** 39:25 41:8 46:7 55:10 57:1,3 70:6 104:23 110:4 115:11 126:6,18 131:5 132:8 133:19 144:9 152:14,15 157:18 162:4 163:5 172:3 174:12 175:5 182:2

**talking** 15:3 21:6 44:9,12 69:1 70:9 72:2 73:21 74:3 86:7 115:18 122:24 127:5 130:2 146:16 147:1,2,4 152:14 153:5

Patrick Gallagher                                                    July 31, 2025

**talks** 140:8 171:14

**tax** 54:17 55:4,13 56:10

**taxable** 54:25

**Teague** 173:6

**team** 102:8,10,11, 17 113:18

**technical** 47:9 145:11

**teeth** 47:10

**telling** 11:22 56:12 69:15 72:13,14 73:7 86:13 90:13 124:24 130:5 162:2

**tells** 39:21,23 49:11 157:23 161:11

**ten** 12:25 13:10 119:3 158:21

**term** 58:11 112:20 131:21

**terms** 9:1

**test** 151:13,17,20

**testified** 5:10,19, 25 6:4

**testify** 6:9

**testimony** 5:23 9:5 58:7 153:6

**testing** 149:3,5 151:8

**thick** 68:3 141:24

**thing** 7:21 8:24 9:22 10:8 32:17 47:9 67:22 73:20 77:14,18 79:2 94:13 125:18 134:5 138:9 139:8 140:8,9 152:16 158:6 162:7 163:24 165:12 167:24 168:20 172:1 181:10

**things** 7:1,5 10:12,14,17 36:8 45:4 65:24 77:7,9, 11 90:9 133:19 138:25 142:4 145:11 146:6 148:12

**thinking** 154:23

**thirty** 31:17 33:21

**Thomas** 117:7

**thought** 16:16 38:22 112:5 124:24 163:1,25 184:23

**thoughts** 71:7

**thread** 49:4

**three-way** 159:15

**threw** 60:8 75:22 163:12

**Thursday** 5:1

**tick** 36:3

**ticked** 70:7

**tighter** 92:24

**time** 5:25 7:7,8 10:1 15:1 20:24 25:10 27:22 30:21 31:5,13 32:17 34:11,14,17 35:2, 24 38:9 41:10,21 42:1,2,12 44:13 48:9,10,11 50:21 55:5 56:11 60:2 63:15 66:16 74:7 75:10 80:11 88:23 89:3 100:4,6,14 102:8,18 106:12 109:16 111:2,17 112:6 115:25 119:1 123:6,16 124:3 125:3 127:13 130:13 131:13 135:15 145:22 156:19 158:2 170:22,23 171:17 175:8 176:8 179:25 184:15

**timeline** 134:20

**times** 5:21 41:3,7, 9,11 72:6 128:8 131:11 132:8 138:25 150:16 176:9

**timing** 38:12

**tiny** 70:2

**title** 12:20 13:15

**titled** 23:10

**titles** 13:18

**today** 6:8,19 9:5, 25 10:10 44:10,17 128:8 182:3 183:22 184:2,4

**told** 66:3 68:11 69:8,12 70:20 71:18 72:6,15 73:1,6 80:11 81:6 83:8,16 86:14 95:10 125:19 133:9 134:5 151:16 153:4 163:10 164:5,14 174:18

**tomorrow** 184:17

**top** 79:21 99:2,14 121:2

**topics** 8:13

**tossed** 71:13

**tour** 31:23

**town** 11:1 184:18

**track** 8:12

**tracking** 112:18

**trade** 15:4 16:14

**train** 16:2

**trainer** 15:14

**training** 15:23

**transaction** 52:1

**transcript** 7:25

**transfer** 63:13

**transferred** 60:14 62:16 78:8

**transition** 58:1

**tread** 138:3

**treated** 181:1

**trespassing** 161:25

**true** 16:17 46:10 89:15 90:25 91:18 111:14 117:25 121:8 151:18 178:20,22,24 179:12

**trust** 20:9,13,17, 25 21:15 22:13, 16,20 23:3 24:10 25:3 116:16 122:17

**trustee** 20:9,12 24:9,14

**trustees** 20:15

**truth** 6:19 11:22

**truthful** 181:5

**turn** 53:4 78:4 178:11 179:6

**turned** 137:11

**twenty** 162:3

**Twenty-three** 11:4

**two-story** 137:2

**type** 15:25 16:13 102:22 131:23

**types** 149:7

**typically** 10:8

---

**U**

**U-SHAPED** 137:14

**uh-huh** 7:24 8:1 17:6 21:10 29:15 44:18 56:14 76:20 95:14 116:10 137:23

**understand** 6:13 9:19 10:19 17:1 18:24 19:17 20:10

21:6,9 23:3 24:10 31:20 32:21,22 38:12 56:8 58:1, 23 59:2 67:8 68:4, 7 71:17 76:18 81:23 85:19 88:20 90:8 98:4,8 135:16 146:1,5,6, 19 147:10 168:6

**understanding** 9:9,13 48:7 58:16 60:1 67:17 104:6 136:24

**understood** 100:1

**unfairly** 181:2

**unintelligible** 73:14 88:3

**union** 16:20 17:8, 14

**unique** 85:1

**unit** 70:23 78:7,15 167:17

**United** 179:12

**universe** 56:8

**unlawful** 60:10 69:18

**unnecessarily** 77:24

**unreasonable** 83:13,15,20 85:2, 17 124:25

**unsafe** 108:12,18 109:18

**untrue** 78:24

**update** 44:12

**updates** 19:19

**upset** 180:21,23

**Urrutia** 126:1 127:24 129:9

---

**V**

**V-A-L-V-E-R-D-E** 27:12

Patrick Gallagher                                                                    July 31, 2025

**Vaguely** 167:7

**validity** 50:25
 86:12 118:2

**Valverde** 27:9,
 10,12,14,18 28:6
 30:3 32:12 34:24
 35:13

**Van** 74:9

**variance** 172:17,
 21 173:2,5,16,20,
 25

**verbatim** 34:4
 166:14

**verification**
 178:12,18

**veteran** 112:9

**vice** 19:4,8

**victim** 131:15,20,
 22,23

**view** 31:12,23
 33:20 86:1,19

**viewing** 104:9

**violation** 30:14
 34:11 38:7 42:2,4
 99:1 102:2 107:20
 108:8,16 116:18,
 24 117:3,16
 120:25 145:2

**violations**
 145:11

**visit** 121:16,24
 122:2,5,11 170:11

**voices** 73:16 88:5
 136:13

**volume** 185:2

**voluntary** 75:25

---

**W**

**wait** 38:21 51:9
 105:15 124:11
 145:6 157:22

**waited** 33:23

**waiting** 183:10

**waits** 183:8

**walked** 31:19
 32:8

**wanted** 25:24
 26:2 29:2 31:15
 32:5,11 35:14
 45:5,8 58:8 76:13
 84:12 160:22
 163:18 165:9
 181:10 183:25

**watching** 173:23

**ways** 65:5

**week** 22:17
 184:13,19

**weeks** 39:22,23
 40:3 55:17 78:14
 157:21 158:21

**Weight-bearing**
 149:7

**welding** 15:12,19
 16:8 149:1

**whatsoever**
 86:22 174:15

**wheel** 70:23

**William** 59:10

**willingness**
 39:14 47:4,16

**window** 28:17
 75:22 164:10
 170:4,17

**windows** 42:10,
 14 43:7,9,17 47:3,
 8 53:8,19 55:11
 56:15 103:21
 139:8,9 144:4
 161:7,8,10,11,16,
 18,20,23 162:3,11
 163:1,3,18,25
 164:4,6,7 165:9
 170:22

**windowsill**
 170:12

**winter** 29:21

**withdrawing**
 169:15

**woman** 52:5

**word** 70:25 75:20
 84:21 111:21
 112:1 168:14,19

**words** 8:22 18:22
 22:24 51:7 54:22
 60:24 124:25
 145:21 168:16
 174:3 180:13,14,
 17

**work** 12:13,23
 13:23 14:24
 17:16,19 18:11
 23:19 28:7 35:10,
 21 39:8,14 46:25
 47:5 53:7,11,24
 54:10 59:16 60:13
 61:4 75:10 80:23
 83:21 89:12,18
 90:18,20 91:2,11
 92:19,24 94:10
 95:17 98:9,12
 99:7 101:25
 104:10 105:3
 106:16 107:13,16
 108:1,9 109:22
 111:16 112:10,16
 113:7 114:5
 116:14 119:18
 127:17 144:2
 145:19,23 159:2
 163:17

**worked** 12:12
 13:8,12,15,19
 17:15 19:12,17
 24:2 25:6,16
 27:14,19 45:13
 61:7 74:7 81:9
 127:22 132:25
 151:22 182:22

**working** 13:6
 19:7 20:4 46:15
 50:8 59:22 61:21
 69:3 74:25 78:18
 80:17 91:20
 93:14,19 102:20
 107:12 116:19
 118:25 122:16
 124:2 177:18

**works** 42:15
 66:20,21,24 74:20
 81:10 110:13

163:8

**worry** 47:15

**worse** 94:3

**write** 7:3,8 97:8,
 18 114:8 148:12

**writing** 50:25
 114:14,16

**written** 78:20

**wrong** 38:25
 67:23 68:7,14

**wrote** 38:23
 114:9,20,24
 130:17 140:9
 165:8 178:10,24

---

**Y**

**year** 8:16 29:13
 48:20 51:17 57:11
 131:14 132:9
 146:11

**years** 11:4 12:25
 13:10 14:25 20:20
 55:16,17 57:9,12
 158:21 164:19

**yes-or-no** 10:16
 90:11

**Youth** 128:6

# Exhibit B

1
**CALLAHAN & BLAINE, APLC**
Javier H. van Oordt (Bar No. 184879)
2   Jonathan W. Hornberger (Bar No. 311144)
3 Hutton Centre Drive, Ninth Floor
3   Santa Ana, California 92707
Telephone: (714) 241-4444
4   Facsimile: (714) 241-4445
Email: jvo@callahan-law.com
5           jhornberger@callahan-law.com

6   Attorneys for Plaintiff PATRICK GALLAGHER

7

8                      UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11   PATRICK GALLAGHER,                    Case No: 23-cv-03579-SI

12                      Plaintiff,         Judge: Hon. Susan Illston

13          vs.                            **SECOND AMENDED COMPLAINT FOR:**

14   CITY AND COUNTY OF SAN                1. **SLANDER OF TITLE**
     FRANCISCO, BERNARD CURRAN,
15   RODRIGO SANTOS, WILLIAM               2. **INVERSE CONDEMNATION**
     HUGHEN, KEVIN BIRMINGHAM,
16   NATALIA KWAITKOWSKA, AND JOE          3. **INTENTIONAL INTERFERENCE**
     DUFFY,                                   **WITH PROSPECTIVE**
17                                            **ECONOMIC RELATIONS**

18                      Defendants.        4. **VIOLATION OF CIVIL RIGHTS,**
                                              **42 U.S.C. § 1983**
19
                                           5. **INTENTIONAL INFLICTION OF**
20                                            **EMOTIONAL DISTRESS**

21                                         6. **NEGLIGENCE**

22                                         7. **DECLARATORY RELIEF**

23                                         **DEMAND FOR JURY TRIAL**

24

25          Plaintiff PATRICK GALLAGHER, as an individual and as trustee for the Madison Trust

26   FBO Patrick Gallagher, hereby alleges as follows:

27                                                    **EXHIBIT**
                                                    ___1___ ᴍ
28                                                  GALLAGHER 7-3/...

                                      - 1 -

Second Amended Complaint - Case No.: 23-cv-03579-SI

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

**INTRODUCTION**

1.    In 2018, Plaintiff PATRICK GALLAGHER ("Plaintiff"), a veteran in the construction industry for over forty-five (45) years, purchased a single family home in San Francisco with the intention of renovating and selling the property.

2.    During the initial renovation process, Plaintiff was the victim of a pay-to-play fraud by employees of Defendant CITY AND COUNTY OF SAN FRANCISCO ("CITY").  The pay-to-play fraud was known, encouraged, formulated, and tolerated by the CITY and targeted individuals, such as Plaintiff, who were renovating homes for re-sell.  As part of the fraud, the CITY would not issue Plaintiff permits necessary to complete work, would not approve work that had been completed in compliance with all CITY ordinances, and threatened frivolous code enforcement violations unless Plaintiff agreed to use the services of certain consultants or engineers recommended to Plaintiff by the CITY.

3.    After uncovering the truth behind these deceptive practices and refusing to participate, Plaintiff spoke with the Federal Bureau of Investigation concerning this illegal and fraudulent scheme. The FBI had already been conducting an investigation into several CITY officials including Defendant BERNARD CURRAN ("CURRAN"), former Building Inspector for San Francisco's Department of Building Inspection ("SFDBI"), who specifically perpetrated this scheme against Plaintiff. CURRAN was eventually arrested and charged with accepting gratuities as rewards for approving building permits.

4.    Due to Plaintiff's participation in the FBI's investigation and refusal to participate in the pay-to-play fraud, Plaintiff was subjected to brazen retaliation by SFDBI employees and other CITY officials. Such retaliation included, without limitation, issuing and refusing to release frivolous code enforcement liens, issuing and refusing to release notices of violation, issuing and refusing to release abatement orders, revoking permits, and revoking a certificate of completion. The subject property has been in escrow on three (3) separate occasions, all of which have fallen through due to the CITY's retaliation and unjustified taking.

5.    The CITY has a pattern, custom, and/or practice of retaliatory conduct against those who speak out against wrongful and illegal actions. Namely, much like the facts in this case, a

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 2 -

1.2

1  CITY Planning Commissioner, who also owned an investment property in San Francisco, recently

2  filed suit alleging that he was retaliated against by SFDBI employees after making complaints and

3  speaking out against its pay-to-play scheme and corrupt practices. The Commissioner alleged that

4  after he called on the City Attorney to conduct an investigation, SFDBI employees riddled the

5  Commissioner's property with erroneous complaints, unnecessary inspections, unwarranted

6  notices of violation, and revoked nine (9) permits, all related to completed work that had already

7  been approved, permitted, and inspected by SFDBI. The retaliation caused the value of the

8  Commissioner's property to depreciate and caused other significant damages. The Commissioner

9  named Defendant MAURICIO HERNANDEZ ("HERNANDEZ"), a SFDBI Building Inspector,

10 as a defendant in his case, alleging that he was one of the employees who retaliated against him.

11 The Commissioner settled his case against the CITY for $1.8 Million dollars.

12      6.      As of the filing of this Complaint, the subject property has been in escrow on three

13 (3) occasions and has not sold as a result of the CITY's retaliation and unjustified taking.

14      7.      Plaintiff has suffered and continues to suffer severe damages including, without

15 limitation, lost profits, lost income, lost interest, expenditures for unnecessary repairs, increased

16 taxes, severe emotional distress, and irreparable harm to reputation.

17      8.      This Complaint addresses the CITY's unlawful and wrongful conduct against

18 Plaintiff and seeks to shed light on its practices that undermine the public trust in government and

19 present a threat to public safety.

20                                    **PARTIES**

21      9.      At all relevant times, Plaintiff PATRICK GALLAGHER ("Plaintiff") is and was a

22 resident of the County of San Francisco, State of California. Plaintiff brings this action

23 individually and as trustee for the Madison Trust FBO Patrick Gallagher.

24      10.     Plaintiff is informed, believes, and based thereon alleges that at all relevant times,

25 Defendant CITY AND COUNTY OF SAN FRANCISCO ("CITY") is and was a public entity

26 duly organized and existing under and by virtue of the laws of the State of California. The San

27 Francisco Department of Building Inspection ("SFDBI") is the CITY's agency responsible for

28 issuing permits and overseeing the enforcement of state and local building codes and regulations.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 3 -

1.3

1  Employees of the SFDBI are local officials of the CITY.

2      11.    Plaintiff is informed, believes, and based thereon alleges that at all relevant times,

3  Defendant BERNARD CURRAN ("CURRAN") is and was a resident of the County of San

4  Francisco, State of California and was employed by the CITY as a Building Inspector with the

5  SFDBI. At all times, he was acting individually and/or within the course and scope of his

6  employment with the CITY.

7      12.    Plaintiff is informed, believes, and based thereon alleges that at all relevant times,

8  Defendant RODRIGO SANTOS ("SANTOS") is and was a resident of the County of San

9  Francisco, State of California and was a former employee of the CITY.

10      13.    Plaintiff is informed, believes, and based thereon alleges that at all relevant times,

11  Defendant JOE DUFFY ("DUFFY") is and was a resident of the County of San Francisco, State of

12  California and was employed by the CITY as the Deputy Director of SFDBI. At all times, he was

13  acting individually and/or within the course and scope of his employment with the CITY.

14      14.    Plaintiff is informed, believes, and based thereon alleges that at all relevant times,

15  Defendant KEVIN BIRMINGHAM ("BIRMINGHAM") is and was a resident of the County of

16  San Francisco, State of California and was employed by the CITY as a Building Inspector with the

17  SFDBI. At all times, he was acting individually and/or within the course and scope of his

18  employment with the CITY.

19      15.    Plaintiff is informed, believes, and based thereon alleges that at all relevant times,

20  Defendant MAURICIO HERNANDEZ ("HERNANDEZ") is and was a resident of the County of

21  San Francisco, State of California and was employed by the CITY as a Building Inspector with the

22  SFDBI. At all times, he was acting individually and/or within the course and scope of his

23  employment with the CITY.

24      16.    Plaintiff is informed, believes, and based thereon alleges that at all relevant times,

25  Defendant WILLIAM HUGHEN ("HUGHEN") is and was a resident of the County of San

26  Francisco, State of California and was employed by the CITY as a Senior Planner with San

27  Francisco Planning. At all times, he was acting individually and/or within the course and scope of

28  his employment with the CITY.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 4 -

Second Amended Complaint - Case No.: 23-cv-03579-SI

1.4

1    17.    Plaintiff is informed, believes, and based thereon alleges that at all relevant times,

2    Defendant NATALIA KWAITKOWSKA ("KWAITKOWSKA") is and was a resident of the

3    County of San Francisco, State of California and was employed by the CITY as a Principal

4    Planner with San Francisco Planning. At all times, he was acting individually and/or within the

5    course and scope of his employment with the CITY.

6    18.    Plaintiff is ignorant of the true names and capacities of defendants sued in this

7    Complaint as DOES 1 through 100, inclusive, and therefore Plaintiff sues these defendants by

8    these fictitious names.  Plaintiff is informed, believes, and thereon alleges that each of the

9    defendants designated herein as a DOE negligently, carelessly, and tortiously is responsible in

10   some manner for the events and happenings herein referred to and proximately caused injury and

11   damages to Plaintiff as herein alleged.  Plaintiff will amend this Complaint to allege their true

12   names and capacities when ascertained.

13   19.    Plaintiff is informed, believes, and based thereon alleges that, at all times herein

14   mentioned, Defendants CITY, DUFFY, CURRAN, SANTOS, BIRMINGHAM, HERNANDEZ,

15   HUGHEN, KWAITKOWSKA, and DOES 1 through 100, inclusive, and each of them, were the

16   agents, servants, representatives, employees, and employers of each remaining defendant, and in

17   doing the things alleged in this Complaint, were acting within the course, scope, and purpose of

18   said agency and employment and in said capacity.

19   20.    Defendants CITY, DUFFY, CURRAN, SANTOS, BIRMINGHAM,

20   HERNANDEZ, HUGHEN, KWAITKOWSKA, and DOES 1 through 100, inclusive, at times

21   hereinafter shall be collectively referred to as "Defendants".

22   **JURISDICTION AND VENUE**

23   21.    Plaintiff filed his original Complaint in the Superior Court, State of California in

24   and for the County of San Francisco. Plaintiff maintained that the Superior Court had jurisdiction

25   over this action and the venue was proper pursuant to *California Code of Civil Procedure* § 395.5

26   in that the conduct took place in the County of San Francisco, the work on the home was to be

27   performed in the County of San Francisco, the property at the center of this dispute is located in

28   the County of San Francisco, and the amount in controversy is more than $25,000.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 5 -

1.5

22.     CITY removed this action to its current venue, the United States District Court, Northern District of California on July 19, 2023, pursuant to 28 U.S.C. §§ 1441 and 1446.

### SATISFACTION OF GOVERNMENT CLAIMS ACT REQUIREMENTS

23.     Plaintiff has complied with all applicable government claims act requirements.

24.     Plaintiff timely presented a claim for damages to CITY on or about September 8, 2022, within six (6) months of the incidents giving rise to this litigation. On or about October 6, 2022, CITY served a written rejection of Plaintiff's claim.

25.     Thus, this action has been filed within the allowable time limit.

### PUBLIC ENTITY LIABILITY

26.     Defendants and DOES 1 through 100, inclusive, are liable to Plaintiff pursuant to, without limitation, *Government Code* § 815.2(a).

### FACTUAL ALLEGATIONS

27.     Plaintiff alleges the following upon reasonable information and belief and without limitation:

28.     For the past twelve (12) years, Plaintiff, a veteran of the construction industry for over forty-five (45) years, has been involved in the business of purchasing and renovating homes. It was this type of business that he was involved in when he purchased a single family home through his trust, the Madison Trust FBO Patrick Gallagher, in or around the summer of 2018, located at 200 Naples Street, San Francisco, California 94112 ("subject property" or "property").

29.     The subject property was originally built in 1907 and is the only sub-dividable or expandable lot in the neighborhood with the best views. The property was in need of a large amount of repairs.

30.     Once Plaintiff started the renovation process, SFDBI inspectors, including Philip Saunders, routinely showed up to the subject property threatening Plaintiff and his workers with code enforcement violations for standard work that was being performed. The unwarranted threats and harassment from SFDBI got significantly worse, such that two (2) of Plaintiff's employees were forced to quit.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 6 -

1.6

1   31.    To begin substantive work on the property, Plaintiff needed to obtain an all-

2   encompassing permit from the CITY. CURRAN, an SFDBI Building Inspector at the time, told

3   Plaintiff that in order to obtain the permit and begin the full renovation process, Plaintiff needed to

4   hire a structural engineer for the project. Plaintiff was confused and disagreed with CURRAN,

5   stating that a structural engineer for a two-story single family home was completely unnecessary.

6   Nevertheless, CURRAN insisted that Plaintiff hire a structural engineer or the permit would not be

7   granted. What's more, Curran insisted that Plaintiff hire SANTOS, a former SFDBI employee

8   who was now operating a business that specialized in structural engineering. To ensure the permit

9   would be issued and to move the already delayed project along, Plaintiff complied with

10  CURRAN's mandate and hired SANTOS.

11  32.    Work that was supposed to take approximately two (2) weeks turned into ten (10)

12  months. SANTOS continually delayed the project and kept demanding more money from Plaintiff

13  for specious and unnecessary work. By the time SANTOS had completed his drawings for the

14  project, they were completely wrong and called for more work than was necessary for a home that

15  size. Plaintiff at this point had paid SANTOS approximately $13,000 in fees and wasted a

16  significant amount of time and resources for work that was essentially useless. Consequently,

17  Plaintiff fired SANTOS and hired a different firm that was unaffiliated with SFDBI. The new firm

18  completed the work in approximately two (2) weeks for a fraction of the cost.

19  33.    After the significant delay, Plaintiff was issued the all-encompassing permit in or

20  around June of 2019 and began the main renovation process.

21  34.    In or around August of 2020, the project was complete and CURRAN issued

22  Plaintiff a signed certificate of completion.

23  35.    In or around May of 2021, Plaintiff entered into an agreement to sell the subject

24  property and it went into escrow.

25  36.    At or around this time, the Federal Bureau of Investigation was conducting an

26  investigation into CURRAN and SANTOS related to, among other things, an illegal "pay to play"

27  scheme. CURRAN was forced to resign from SFDBI due to the investigation.

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 7 -

1.7

1    37.    At or around this time, Plaintiff was contacted by the Federal Bureau of

2    Investigation, discussing his dealings with CURRAN and SANTOS concerning the apparent

3    scheme that was perpetrated against him.

4    38.    At or around this time, the CITY, namely DUFFY, BIRMINGHAM,

5    HERNANDEZ, HUGHEN, and KWAITKOWSKA, close associates with both CURRAN and

6    SANTOS, became aware and/or were under the belief that Plaintiff had discussions with the FBI

7    concerning CURRAN and SANTOS.

8    39.    Approximately four (4) days prior to escrow closing on the subject property,

9    SFDBI issued Plaintiff a notice of violation for an expired permit and an illegal downstairs unit.

10   The taxes on the property were also raised. SFDBI falsely claimed that the certificate of

11   completion that CURRAN signed never got filed correctly and was now void. SFDBI also falsely

12   claimed that a realtor had reported the illegal downstairs unit after discovering it at an open house,

13   despite the fact that Plaintiff never held an open house and did not intend for the space to be used

14   as an additional dwelling unit. SFDBI told Plaintiff that the entire property would need to be re-

15   inspected and approved. Escrow did not close and the sale of the subject property fell through. The

16   CITY's retaliation against Plaintiff and its unjustified taking of the subject property had begun.

17   40.    The CITY has a pattern, custom, and/or practice of retaliatory conduct against those

18   who speak out against wrongful and illegal actions. Namely, much like the facts in this case, a

19   CITY Planning Commissioner, who also owned an investment property in San Francisco, recently

20   filed suit alleging that he was retaliated against by SFDBI employees after making complaints and

21   speaking out against its pay-to-play scheme and corrupt practices. Specifically, the Commissioner

22   raised numerous concerns to CITY officials and called for investigations into SFDBI's corrupt

23   practice of approving and issuing unqualified permits and work for certain development projects

24   in exchange for kickbacks. One of these projects involved two convicted felons who were believed

25   to have close relationships with SFDBI employees. The Commissioner alleged that SFDBI

26   employees were approving grossly misrepresented permit applications, allowing work to be done

27   on projects far beyond the scope permitted, failing to conduct sufficient inspections, and failing to

28   stop serial permitting, among others. Less than a month after the Commissioner called for an

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 8 -

Second Amended Complaint - Case No.: 23-cv-03579-SI

1.8

1  investigation to be conducted by the City Attorney, SFDBI employees, including HERNANDEZ,

2  an SFDBI Building Inspector, began targeting the Commissioner's investment property. SFDBI

3  riddled the property with erroneous complaints, unnecessary inspections, unwarranted notices of

4  violations, and revoked nine (9) permits, all related to completed work that had already been

5  approved, permitted, and inspected by SFDBI. Notably, the Commissioner alleged that

6  HERNANDEZ made statements to other officials that they were going to come down hard on the

7  Commissioner's property. HERNANDEZ was named as individual defendant in the

8  Commissioner's case. The Commissioner settled his case against the CITY for $1.8 Million

9  dollars.

10        41.      Much like the Commissioner's case, HERNANDEZ and BIRMINGHAM, another

11  SFDBI Building Inspector, began the retaliation campaign against Plaintiff. HERNANDEZ and

12  BIRMINGHAM re-inspected the property and issued another notice of violation, falsely claiming

13  that the windows located on the second floor were illegal. The windows in question had been in

14  existence since the house was built and had already been approved twice. They demanded that

15  Plaintiff submit an application to legalize the windows. They also told Plaintiff that he needed to

16  submit an application for an additional dwelling unit and revise the plans for the property to more

17  accurately reflect the stairs as built. During the inspection, HERNANDEZ sneered at Plaintiff,

18  telling him "we know who you've been talking to".

19        42.      Plaintiff had no choice but to comply with SFDBI's demands related to these

20  unfound violations and submitted his applications and revised plans accordingly.

21        43.      Without cause, BIRMINGHAM subsequently rejected Plaintiff's application

22  related to the windows on the second floor, demanding Plaintiff to now close off the windows

23  completely. Plaintiff strongly objected. Closing off the windows would cost a significant amount

24  of money and further delay Plaintiff's ability to sell the property. Again, these windows had been

25  approved twice before and Plaintiff had already received a certificate of completion for the entire

26  property.

27        44.      Upset, frustrated, and losing more money, Plaintiff contacted the CITY's Board of

28  Supervisors for help. The Board facilitated a meeting between Plaintiff and SFDBI.

- 9 -

Second Amended Complaint - Case No.: 23-cv-03579-SI

45.    At the meeting, Plaintiff aired his grievances. Plaintiff presented evidence showing that the subject property had already received a certificate of completion and that the recent demands by SFDBI were unreasonable and excessive. Plaintiff was frustrated and wanted to know why SFDBI made him jump through more hoops after he had already secured a valid certificate of completion. DUFFY, SFDBI's Deputy Director, dismissed Plaintiff's concerns and ignored the validity of his claims, refusing to approve his plans or his applications. DUFFY demanded that the windows on the second floor be closed off completely. What's more, DUFFY, then expressed to Plaintiff during this meeting that he had no doubt that Plaintiff had spoken to the FBI concerning his dealings with CURRAN and SANTOS. Plaintiff was shocked and dismayed. The CITY's retaliation against Plaintiff was unequivocal at this point and DUFFY was not only ratifying and approving the unlawful conduct, he was spearheading it.

46.    DUFFY, as SFDBI's Deputy Director, was in charge of and had complete oversight of SFDBI and all of its employees. He was a final policymaker acting under the color of his authority and had the power to approve, deny, and/or overturn any decisions made by SFDBI employees concerning their "regulation" of the subject property to ensure conformance with CITY policies. All of the wrongful conduct complained of herein including, without limitation, issuing and refusing to release frivolous code enforcement liens, issuing and refusing to release notices of violation, issuing and refusing to release abatement orders, revoking permits, and revoking a valid certificate of completion, was at the behest and/or endorsement of DUFFY.

47.    DUFFY's job duties and responsibilities as Deputy Director included, without limitation:

a.    Planning, directing, and evaluating the work of SFDBI employees, including all Building Inspectors, who provide information regarding inspection services to the public, review plans and permits, and perform inspections in connection with the construction and modification of buildings or other structures, and of buildings under investigation for code violations in order to ensure that department policies and procedures are adhered to and the applicable codes, ordinances, and laws are properly enforced;

- 10 -

Second Amended Complaint - Case No.: 23-cv-03579-SI

1.10

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1        b.       Interpreting and explaining codes, related laws and ordinances which
2   govern building construction in the City such as the building code, housing code, mechanical
3   code, state building standards, appeal procedures, abatement process and permit processing to staff
4   and others including architects, engineers, contractors, and the general public to ensure that the
5   information concerning the department is disseminated accurately;
6        c.       Representing SFDBI at meetings, hearings, and in court by preparing
7   evidence and/or appearing before such bodies as the Board of Supervisors, Building Inspection
8   Commission, judicial committees, Access Appeals Commission, Board of Permit Appeals,
9   Abatement Appeals Board, and Board of Examiners in order to testify or present information
10  regarding code violation cases;
11       d.       Directing the preparation and maintenance of records and reports on
12  abatement appeals board cases, statistical analyses, inspection activities, work orders, contracts,
13  specifications, plans, cost estimates, emergency orders, and operational activities by assigning,
14  reviewing, and revising when necessary, to ensure that such work is correct, complete, and in
15  conformance with departmental policies and procedures;
16       e.       Reviewing complaints regarding inspection services, plan reviews, code
17  interpretations, and/or code violations from property owners, general public, other City
18  departments, and various civic groups by researching pertinent codes, ordinances, laws and
19  conducting investigations, taking appropriate actions, and informing complainant of findings in
20  order to clarify and resolve problems;
21       f.       Establishing inspection and operational procedures by reviewing existing
22  policies and procedures and when necessary, revising or creating new procedures in order to
23  effectively maximize staff and resources and/or conform to current laws, regulations, ordinances
24  and codes regulating the construction and modification of buildings and other structures;
25       g.       Reviewing current codes, administrative bulletins and code rulings in order
26  to inform staff of revisions and/or additions, and to provide management with input regarding the
27  feasibility of such revisions or additions on current work processes and, if necessary, prepares
28  recommendations for revisions or additions.

- 11 -

Second Amended Complaint - Case No.: 23-cv-03579-SI

1.11

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

48.     Again, having no choice but to comply with SFDBI's demands, Plaintiff closed off the windows on the second floor completely, requiring, among other things, demolition, scaffolding, installation of new material, and painting. The additional work cost Plaintiff approximately $30,000.

49.     In or around October of 2021, approval of Plaintiff's application for an additional dwelling unit was transferred to HUGHEN, Senior Planner with the CITY's Planning department. HUGHEN, and then KWAITKOWSKA, Principal Planner with the CITY's Planning department, egregiously delayed the approval of the application for months on end, forcing Plaintiff to jump over more arbitrary hurdles. A process that should have taken a few weeks, took over seven (7) months before Plaintiff's initial application for the additional unit was approved in or around May of 2022.

50.     During the pendency of Plaintiff's application for the additional dwelling unit, HUGHEN placed yet another baseless roadblock in front of Plaintiff. HUGHEN, citing to an erroneous ordinance and law, claimed that the driveway on the subject property was out of code and could not be used for off street parking anymore. Again, the driveway had been in existence since the property was built and had already been approved.  This would place a significant limitation on the property and greatly affect its overall value. On-site parking for a single family home in San Francisco is essential. Plaintiff, after contacting the CITY attorney's office, provided HUGHEN with the applicable laws and ordinances showing that the driveway was code complaint. HUGHEN dismissed Plaintiff's pleas and demanded that he now apply for a variance. Plaintiff was truly at a loss.

51.     Again, having no choice, Plaintiff complied with the CITY's demands. His applications for the additional dwelling unit and the driveway were subsequently approved in or around May of 2022 and he received the necessary permits.

52.     At or around this time, Plaintiff entered into another agreement to sell the subject property and it again entered escrow. Although Plaintiff had not received a new certificate of completion, he needed to sell the property and was willing to do so at a discount. Selling the property without a certificate of completion significantly affected its value.

- 12 -

Second Amended Complaint - Case No.: 23-cv-03579-SI

53.    In or around July of 2022, while the subject property was still in escrow, Plaintiff was informed by SFDBI that his permit for the additional dwelling unit and the driveway were being revoked. SFDBI falsely claimed that the CITY's Planning department had mistakenly provided him these permits and that he actually needed approval from SFDBI as it was within their purview. They demanded Plaintiff submit new applications, new revised plans, and go through the entire process again. Plaintiff was shocked, confused, and defeated. The CITY's wrongful conduct was relentless. Unfortunately, the sale of the subject property fell through for a second time.

54.    Approximately six (6) months later, after another long, arbitrary, and arduous process, Plaintiff was finally issued new permits by SFDBI in or around January of 2023 for the additional dwelling unit and the driveway. Plaintiff hoped that the CITY's retribution had concluded and he would now be able to obtain a final certificate of completion and sell the property accordingly. Although Plaintiff had obtained new permits, he still needed to go through additional inspections in order to receive the final certificate of completion.

55.    Unfortunately, the CITY's retaliation against Plaintiff and its unjustified taking of his property continued and continues as of the filing of this Complaint. Although Plaintiff possesses valid permits, inspections have led to new, unfound, and vindictive violations concerning, among other things, the legality of the windows located on the first floor of the property. Windows that have been in existence since the property was built and approved many times before.

56.    In or around February of 2023, Plaintiff was again forced to forgo additional revenue and enter into another agreement to sell the property without a certificate of completion. This is the third time the property has been in escrow. Due to the numerous abatements and notices of violation that remain on the property, the sale fell through in or around August of 2023.

57.    The CITY has intentionally and vindictively drawn out the renovation process for the property for the past five (5) years. Plaintiff has lost a significant amount of money in lost profits, lost income, lost interest, expenditures for unnecessary repairs, and increased taxes. Plaintiff has also suffered severe emotional distress and irreparable harm to reputation.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 13 -

1.13

58.    The CITY's conduct was intentional, punitive, and non-discretionary, causing Plaintiff to sustain and to continue to sustain severe economic, non-economic, and pecuniary damages and all other damages available by law.

### FIRST CAUSE OF ACTION

### SLANDER OF TITLE

### (By Plaintiff against all Defendants and DOES 1 through 100, inclusive)

59.    Plaintiff re-alleges as though fully set forth at length and incorporates herein by reference all of the allegations and statements contained within this Complaint.

60.    At all relevant times, Plaintiff, through his trust, the Madison Trust FBO Patrick Gallagher, owned the subject property.

61.    Defendants disparaged the quality of the subject property including, without limitation, issuing and refusing to release frivolous code enforcement liens, issuing and refusing to release notices of violation, issuing and refusing to release abatement orders, revoking permits, and revoking a certificate of completion.

62.    Defendants' statements were made to members of the public, including real estate agents or brokers and prospective purchasers of the subject property.

63.    Defendants' statements were without privilege and/or justification as they were false and done with the intention of suggesting that the subject property was unfit to be sold.

64.    Defendants knew that their statements were false and/or acted with reckless disregard of the truth or falsity of the statements.

65.    Defendants knew or should have recognized that someone else might act or forbear action in reliance on their statements.

66.    Defendants made their statements with the intent or reasonable belief that the statements would cause financial loss to Plaintiff.

67.    Defendants' statements have placed an untenable cloud on the title to the subject property, in that the property remains vacant and cannot be sold.

68.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered direct and immediate financial loss including, without limitation, decrease in market value of the subject

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 14 -

1.14

1  property, lost profits, lost income, lost interest, expenditures for unnecessary repairs, and increased

2  taxes. Plaintiff has also lost time and suffered inconvenience.

3      69.    As a direct and proximate result of Defendants' actions, Plaintiff has been required

4  to retain counsel to bring an action to clear title to the subject property. Plaintiff is entitled to

5  recover all attorney fees and costs incurred in bringing the action.

**SECOND CAUSE OF ACTION**

**INVERSE CONDEMNATION**

**(By Plaintiff against CITY and DOES 1 through 100, inclusive)**

9      70.    Plaintiff re-alleges as though fully set forth at length and incorporate herein by

10  reference all of the allegations and statements contained within this Complaint.

11      71.    Article I, Section 19 of the California Constitution, prohibits the taking, including

12  the temporary or permanent deprivation of private property, for a public use without just

13  compensation, where such deprivation amounts to the abridgment or destruction, by reason of the

14  actions for the government body, of the lawful rights of an individual to the possession, use, or

15  enjoyment of his land. It has also been held that an undue restriction on the use of property is as

16  much a taking for constitutional purposes as is an appropriation or destruction.

17      72.    At all relevant times, Plaintiff, through his trust, the Madison Trust FBO Patrick

18  Gallagher, owned the subject property.

19      73.    Defendants have unlawfully taken and/or damaged the subject property without

20  providing Plaintiff just compensation. Defendants have abridged and/or destructed Plaintiff's

21  rights to the possession, use, and/or enjoyment of his land. Such conduct includes, without

22  limitation, issuing and refusing to release frivolous code enforcement liens, issuing and refusing to

23  release notices of violation, issuing and refusing to release abatement orders, revoking permits,

24  and revoking a certificate of completion.

25      74.    Defendants by their intentional conduct have sacrificed the economic interests of

26  Plaintiff in order to benefit their own interests. Plaintiff should not be forced to bear these burdens

27  for the benefit of the Defendants.

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 15 -

1.15

75.    Plaintiff alleges that these intentional actions of the Defendants constitute a direct, substantial and peculiar burden on Plaintiff's property interests and a taking of his property without payment of just compensation in violation of the California Constitution.

76.    Plaintiff further alleges that Defendants' intentional actions against Plaintiff failed to advance a legitimate state interest and deprived Plaintiff of the viable use and value of his property interest and caused the damages alleged herein.

77.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered direct and immediate financial loss including, without limitation, decrease in market value of the subject property, lost profits, lost income, lost interest, expenditures for unnecessary repairs, and increased taxes.

78.    As a direct and proximate result of Defendants' actions, Plaintiff has been required to retain counsel to bring an action. Plaintiff is entitled to recover all attorney fees and costs incurred in bringing the action.

## THIRD CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

### (By Plaintiff against all Defendants and DOES 1 through 100, inclusive)

79.    Plaintiff re-alleges as though fully set forth at length and incorporate herein by reference all of the allegations and statements contained within this Complaint.

80.    At all relevant times, Plaintiff, through his trust, the Madison Trust FBO Patrick Gallagher, owned the subject property.

81.    Plaintiff established an economic relationship with various real estate agents or brokers, purchasers, and prospective purchasers related to the property that would have resulted in an economic benefit to Plaintiff by leading to the sale of the subject property.

82.    Defendants knew of the relationship.

83.    Defendants engaged in conduct intended to falsely signal to the real estate agents or brokers, purchasers, and prospective purchasers that there were issues with the subject property so as to affect their decision to proceed with a purchase of the property, encouraging them instead to avoid any consideration or purchase of the property. The subject property has gone into escrow on

- 16 -

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1.16

1    multiple occasions and has failed to sell due to Defendants' actions in disrupting the relationship.

2        84.    By engaging in this conduct, Defendants intended to disrupt the economic

3    relationship between Plaintiff and the real estate agents or brokers, purchasers, and prospective

4    purchasers.

5        85.    The relationship was disrupted.

6        86.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered

7    financial loss including, without limitation, decrease in market value of the subject property, lost

8    profits, lost income, lost interest, expenditures for unnecessary repairs, and increased taxes.

9    Plaintiff has also suffered severe emotional distress and irreparable harm to reputation.

10       87.    As a direct and proximate result of Defendants' actions, Plaintiff has been required

11   to retain counsel to bring an action. Plaintiff is entitled to recover all attorney fees and costs

12   incurred in bringing the action.

13       88.    Defendants' actions were a substantial factor in causing the harm suffered by

14   Plaintiff.

15                    **FOURTH CAUSE OF ACTION**

16              **VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983**

17      **(By Plaintiff against all Defendants and DOES 1 through 100, inclusive)**

18       89.    Plaintiff re-alleges as though fully set forth at length and incorporate herein by

19   reference all of the allegations and statements contained within this Complaint.

20       90.    Every person who, under color of any statute, ordinance, regulation, custom, or

21   usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected,

22   any citizen of the United States or other person within the jurisdiction thereof to the deprivation of

23   any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the

24   party injured in an action at law, suit in equity, or other proper proceeding for redress.

25       91.    Plaintiff had discussions with the FBI concerning their criminal investigation into

26   the corruptive practices of CURRAN, SANTOS, and the Defendants.

27

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 17 -

1.17

92.    Plaintiff refused to participate in the ongoing scheme that was being perpetrated against him by CURRAN, SANTOS, and the Defendants, including, without limitation, firing Santos as the structural engineer on his renovation project for the subject property.

93.    Defendants were aware and/or were under the belief that Plaintiff had discussions with the FBI and were aware and/or were under the belief that he refused to participate in the ongoing scheme.

94.    Defendants acted under color of local ordinance and law by using their authority to retaliate against Plaintiff and deprive him of his right to freedom of speech guaranteed by the First and Fourteenth Amendment of the United States Constitution. Defendants' unlawful actions included, without limitation, issuing and refusing to release frivolous code enforcement liens, issuing and refusing to release notices of violation, issuing and refusing to release abatement orders, revoking permits, revoking a certificate of completion, and making disparaging statements related to the subject property.

95.    Defendants intentionally targeted the subject property because of Plaintiff's property interests and rights therein.

96.    Defendants' actions were in direct response to and meant to cause the deprivation of Plaintiff's exercise of his right of freedom of speech.

97.    Defendants' actions were in response to Plaintiff's statements concerning matters of public concern.

98.    Plaintiff was harmed as a result of Defendants' actions.

99.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered financial loss including, without limitation, decrease in market value of the subject property, lost profits, lost income, lost interest, expenditures for unnecessary repairs, and increased taxes. Plaintiff has also suffered severe emotional distress and irreparable harm to reputation.

100.    As a direct and proximate result of Defendants' actions, Plaintiff has been required to retain counsel to bring an action. Plaintiff is entitled to recover all attorney fees and costs incurred in bringing the action.

Second Amended Complaint - Case No.: 23-cv-03579-SI

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1.18

**FIFTH CAUSE OF ACTION**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(By Plaintiff against all Defendants and DOES 1 through 100, inclusive)**

101.    Plaintiff re-alleges as though fully set forth at length and incorporate herein by reference all of the allegations and statements contained within this Complaint.

102.    Defendants acted outrageously in committing the acts alleged herein. Defendants abused their positions of authority to retaliate against and harass Plaintiff.

103.    Defendants intended to cause, or acted with reckless disregard that they would cause, Plaintiff severe emotional distress.

104.    Plaintiff has suffered emotional distress including, without limitation, shock, anxiety, stress, depression, humiliation, irreparable and physical manifestations of such distress as a result of Defendants' actions.

105.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered severe injuries and sustained economic, non-economic, and pecuniary damages and all other damages available by law.

106.    As a direct and proximate result of Defendants' actions, Plaintiff has been required to retain counsel to bring an action. Plaintiff is entitled to recover all attorney fees and costs incurred in bringing the action.

107.    Defendants' actions were a substantial factor in causing the harm suffered by Plaintiff.

**SIXTH CAUSE OF ACTION**

**NEGLIGENCE**

**(By Plaintiff against all Defendants and DOES 1 through 100, inclusive)**

108.    Plaintiff re-alleges as though fully set forth at length and incorporate herein by reference all of the allegations and statements contained within this Complaint.

109.    Defendants were negligent in committing the acts or omissions alleged herein.

110.    Defendants owed a duty of care to Plaintiff to act in a reasonable, professional, honest, and timely manner.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 19 -

1.19

1    111.    Defendants breached the duty of care owed to Plaintiff.

2    112.    As a direct and proximate result of Defendants' actions or inactions, Plaintiff has

3    suffered severe injuries and sustained economic, non-economic, and pecuniary damages and all

4    other damages available by law.

5    113.    As a direct and proximate result of Defendants' actions, Plaintiff has been required

6    to retain counsel to bring an action. Plaintiff is entitled to recover all attorney fees and costs

7    incurred in bringing the action.

8    114.    Defendants' actions were a substantial factor in causing the harm suffered by

9    Plaintiff.

10                          **SEVENTH CAUSE OF ACTION**

11                              **DECLARATORY RELIEF**

12          **(By Plaintiff against all Defendants and DOES 1 through 100, inclusive)**

13    115.    Plaintiff re-alleges as though fully set forth at length and incorporate herein by

14    reference all of the allegations and statements contained within this Complaint.

15    116.    At all relevant times, Plaintiff, through his trust, the Madison Trust FBO Patrick

16    Gallagher, owned the subject property.

17    117.    Defendants' refusal to, without limitation, release frivolous code enforcement liens,

18    release notices of violation, release abatement orders, issue permits, and issue a certificate of

19    completion has placed an untenable cloud on the title to the subject property, in that the property

20    remains vacant and cannot be sold.

21    118.    An actual controversy has arisen and now exists between Defendants and Plaintiff

22    in connection with the matters alleged herein.

23    119.    No adequate remedy other than that herein prayed for exists by which the rights of

24    the parties may be determined. A judicial determination resolving this actual controversy is

25    necessary and appropriate at this time.

26                                  **PRAYER**

27    WHEREFORE, Plaintiff prays for relief as follows:

28    1.    For general damages (also known as non-economic damages), according to proof;

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 20 -

Second Amended Complaint - Case No.: 23-cv-03579-SI

1        2.     For special damages (also known as economic damages), according to proof;

2        3.     For compensatory damages, according to proof;

3        4.     For treble damages pursuant to Civil Code § 3345;

4        5.     For an order enjoining Defendants from violating Plaintiff's constitutional rights;

5        6.     For injunctive relief;

6        7.     For punitive damages, according to proof;

7        8.     For prejudgment interest and pretrial interest, according to proof;

8        9.     For attorneys' fees and costs, according to proof;

9        10.    For damages for Plaintiff's other losses, according to proof;

10       11.    For all statutorily allowed damages; and

11       12.    For such other and further relief as the Court deems proper.

12

13   Dated:  November 9, 2023            **CALLAHAN & BLAINE, APLC**

14

15              By:   */s/ Jonathan W. Hornberger*

16                    Javier H. van Oordt

17                    Jonathan W. Hornberger
                      Attorneys for Plaintiff Patrick Gallagher

18

19

20

21

22

23

24

25

26

27

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

Second Amended Complaint - Case No.: 23-cv-03579-SI

1.21

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on each and all of the causes of action set forth in this Complaint.


Dated: November 9, 2023                    **CALLAHAN & BLAINE, APLC**


                                   By:   */s/ Jonathan W. Hornberger*
                                         Javier H. van Oordt
                                         Jonathan W. Hornberger
                                         Attorneys for Plaintiff Patrick Gallagher

Second Amended Complaint - Case No.: 23-cv-03579-JCS

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1.22

Exhibit C

**APPROVED**
Dept. of Building Insp.

AUG 10 2018

*Tom C. Hui*
TOM C. HUI, S.E.
DIRECTOR
DEPT OF BUILDING INSPECTION

**EXHIBIT**
2 1/2
GALLAGHER 7-3-25

BLDG. FORM 3/8

APPROVED FOR ISSUANCE

APPLICATION NUMBER 201802020013

OSHA APPROVAL NUMBER
OSHA APPROVAL REC'D □

FOR OFFICE USE ONLY
201644272, 20180202013

## APPLICATION FOR BUILDING PERMIT
### ADDITIONS, ALTERATIONS OR REPAIRS

FORM 3 □ OTHER AGENCIES REVIEW REQUIRED
FORM 8 ☑ OVER-THE-COUNTER ISSUANCE
□ NUMBER OF PLAN SETS

### CITY AND COUNTY OF SAN FRANCISCO
### DEPARTMENT OF BUILDING INSPECTION

APPLICATION IS HEREBY MADE TO THE DEPARTMENT OF BUILDING INSPECTION OF SAN FRANCISCO FOR PERMISSION TO BUILD IN ACCORDANCE WITH THE PLANS AND SPECIFICATIONS SUBMITTED HEREWITH AND ACCORDING TO THE DESCRIPTION AND FOR THE PURPOSE HEREINAFTER SET FORTH.

▼ DO NOT WRITE ABOVE THIS LINE ▼

DATE FILED | FILING FEE RECEIPT NO. | (1) STREET ADDRESS OF JOB: 200 NAPLES ST. | BLOCK/LOT 6988 / 010

PERMIT NO. 9471086 | ISSUED 08/10/2018 | (2A) ESTIMATED COST OF JOB 25,000 | (2B) REVISED COST $36,000 Wilbang 8/10/18

## INFORMATION TO BE FURNISHED BY ALL APPLICANTS
### LEGAL DESCRIPTION OF EXISTING BUILDING

(4A) TYPE OF CONSTR. V | (5A) NO. OF STORIES OF OCCUPANCY: 2 | (6A) NO. OF BASEMENTS AND CELLARS: | (7A) PRESENT USE: RESIDENTIAL SINGLE | (8A) OCCUP CLASS R3 | (9A) NO. OF DWELLING UNITS: 2

### DESCRIPTION OF BUILDING AFTER PROPOSED ALTERATION

(4) TYPE OF CONSTR. V | (5) NO. OF STORIES OF OCCUPANCY: 2 | (6) NO. OF BASEMENTS AND CELLARS: | (7) PROPOSED USE (LEGAL USE): SINGLE FAMILY RES. | (8) OCCUP CLASS R3 | (9) NO. OF DWELLING UNITS:

(10) IS ANY RUNWAY TO BE CONSTRUCTED OR ALTERED? YES ☑ NO □ | (11) WILL STREET SPACE BE USED DURING CONSTRUCTION? YES □ NO ☑ | (12) ELECTRICAL WORK TO BE PERFORMED? YES ☑ NO □ | (13) PLUMBING WORK TO BE PERFORMED? YES ☑ NO □

(14) GENERAL CONTRACTOR OWNER BUILDER | ADDRESS | ZIP | PHONE | CALIF. LIC. NO. | EXPIRATION DATE

(15) OWNER - LESSEE (CROSS OUT ONE) G.L. BLACK INV. COR. | ADDRESS PO BOX 523 | ZIP BYRON 94514 | BTRC# | PHONE (FOR CONTACT BY DEPT.) 925-325-3811

(16) WRITE IN DESCRIPTION OF ALL WORK TO BE PERFORMED UNDER THIS APPLICATION (REFERENCE TO PLANS IS NOT SUFFICIENT)
KITCHEN & BATH CABINETS, PAINT, DRYWALL, FLOORING AND TO COMPLY WITH VIOLATION NOTICE 201721241

### ADDITIONAL INFORMATION

(17) DOES THIS ALTERATION CREATE ADDITIONAL HEIGHT OR STORY TO BUILDING? YES □ NO ☑ | (18) IF (17) IS YES, STATE NEW HEIGHT AT CENTER LINE OF FRONT | (19) DOES THIS ALTERATION CREATE DECK OR HORIZ. EXTENSION TO BUILDING? YES □ NO ☑ | (20) IF (19) IS YES, STATE NEW GROUND FLOOR AREA 450 SQ. FT.

(21) WILL SIDEWALK OVER SUB-SIDEWALK SPACE BE REPAIRED OR ALTERED? YES □ NO ☑ | (22) WILL BUILDING EXTEND BEYOND PROPERTY LINE? YES □ NO ☑ | (23) ANY OTHER EXISTING BLDG. ON LOT? (IF YES, SHOW ON PLOT PLAN) YES □ NO ☑ | (24) DOES THIS ALTERATION CONSTITUTE A CHANGE OF OCCUPANCY? YES □ NO ☑

(25) ARCHITECT OR ENGINEER (DESIGN □ CONSTRUCTION □) | ADDRESS | CALIF. CERTIFICATE NO.

(26) CONSTRUCTION LENDER (ENTER NAME AND BRANCH DESIGNATION IF ANY. IF THERE IS NO KNOWN CONSTRUCTION LENDER, ENTER "UNKNOWN") | ADDRESS

### IMPORTANT NOTICES

No change shall be made in the character of the occupancy or use without first obtaining a Building Permit authorizing such change. See San Francisco Building Code and San Francisco Housing Code.

No portion of building or structure or scaffolding used during construction is to be closer than 6'0" to any wire containing more than 750 volts. See Sec 385, California Penal Code.

Pursuant to San Francisco Building Code, the building permit shall be posted on the job. The owner is responsible for approved plans and application being kept at building site.

Grade lines are shown on drawings accompanying this application are assumed to be correct. If actual grade lines are not the same as shown, revised drawings showing correct grade lines, cuts and fills, and complete details of retaining walls and wall footings must be submitted to this department for approval.

ANY STIPULATION REQUIRED HEREIN OR BY CODE MAY BE APPEALED.

BUILDING NOT TO BE OCCUPIED UNTIL CERTIFICATE OF FINAL COMPLETION IS POSTED ON THE BUILDING OR PERMIT OF OCCUPANCY GRANTED, WHEN REQUIRED.

APPROVAL OF THIS APPLICATION DOES NOT CONSTITUTE AN APPROVAL FOR THE ELECTRICAL WIRING OR PLUMBING INSTALLATIONS. A SEPARATE PERMIT FOR THE WIRING AND PLUMBING MUST BE OBTAINED. SEPARATE PERMITS ARE REQUIRED IF ANSWER IS "YES" TO ANY OF ABOVE QUESTIONS (10) (11) (12) (13) (22) OR (24).

THIS IS NOT A BUILDING PERMIT. NO WORK SHALL BE STARTED UNTIL A BUILDING PERMIT IS ISSUED.

In dwellings, all insulating materials must have a clearance of not less than two inches from all electrical wires or equipment.

CHECK APPROPRIATE BOX
□ OWNER □ ARCHITECT
□ LESSEE □ AGENT
□ CONTRACTOR □ ENGINEER

### APPLICANT'S CERTIFICATION
I HEREBY CERTIFY AND AGREE THAT IF A PERMIT IS ISSUED FOR THE CONSTRUCTION DESCRIBED IN THIS APPLICATION, ALL THE PROVISIONS OF THE PERMIT AND ALL LAWS AND ORDINANCES THERETO WILL BE COMPLIED WITH.

REV 06/13

### NOTICE TO APPLICANT

HOLD HARMLESS CLAUSE. The permittee(s) by acceptance of the permit, agree(s) to indemnify and hold harmless the City and County of San Francisco from and against any and all claims, demands and actions for damages resulting from operations under this permit, regardless of negligence of the City and County of San Francisco, and to assume the defense of the City and County of San Francisco against all such claims, demands or actions.

In conformity with the provisions of Section 3800 of the Labor Code of the State of California, the applicant shall have worker's compensation coverage under (i) or (ii) designated below, or shall indicate item (iii), (iv), or (v), whichever is applicable. If however item (v) is checked, then (iv) must be checked as well. Mark the appropriate method of compliance below.

I hereby affirm under penalty of perjury one of the following declarations:

( ) I.  I have and will maintain a certificate of consent to self-insure for worker's compensation, as provided by Section 3700 of the Labor Code, for the performance of the work for which this permit is issued.

( ) II.  I have and will maintain worker's compensation insurance, as required by Section 3700 of the Labor Code, for the performance of the work for which this permit is issued. My worker's compensation insurance carrier and policy number are:
Carrier ____
Policy Number ____

( ) III.  The cost of the work to be done is $100 or less.

( ) IV.  I certify that in the performance of the work for which this permit is issued, I shall not employ any person in any manner so as to become subject to the worker's compensation laws of California. I further acknowledge that I understand that in the event that I should become subject to the worker's compensation provisions of the Labor Code of California and fail to comply forthwith with the provisions of Section 3800 of the Labor Code, that the permit herein applied for shall be deemed revoked.

( ) V.  I certify as the owner (or the agent for the owner) that in the performance of the work for which this permit is issued, I will employ a contractor who complies with the worker's compensation laws of California and who, prior to the commencement of any work, will file a completed copy of this form with the Central Permit Bureau.

Signature of Applicant or Agent ____ Date ____
OFFICE COPY

2.1

## CONDITIONS AND STIPULATIONS

OFFICIAL COPY

DBI
DEPARTMENT OF
BUILDING INSPECTION
SAN FRANCISCO

REFER | APPROVED:
TO

Matthew Ralls, DBI
AUG 10 2018

FOR OFFICE USE ONLY | BUILDING INSPECTOR, DEPT. OF BLDG. INSP.

DATE: AUG 1 0 2018
REASON:
OK To process
NOTIFIED MR.

APPROVED:

DEPARTMENT OF CITY PLANNING

DATE: _____
REASON:
NOTIFIED MR.

APPROVED:

BUREAU OF FIRE PREVENTION & PUBLIC SAFETY

DATE: _____
REASON:
NOTIFIED MR.

APPROVED:

MECHANICAL ENGINEER, DEPT. OF BLDG. INSPECTION

DATE: _____
REASON:
NOTIFIED MR.

APPROVED:

CIVIL ENGINEER, DEPT. OF BLDG. INSPECTION

DATE: _____
REASON:
NOTIFIED MR.

APPROVED:

BUREAU OF ENGINEERING

DATE: _____
REASON:
NOTIFIED MR.

APPROVED:

DEPARTMENT OF PUBLIC HEALTH

DATE: _____
REASON:
NOTIFIED MR.

APPROVED:

REDEVELOPMENT AGENCY

DATE: _____
REASON:
NOTIFIED MR.

APPROVED:

FOR WORK STATED ONLY

8/10/18

HOUSING INSPECTION DIVISION

DATE: _____
REASON:
NOTIFIED MR.

HOLD SECTION - NOTE DATES AND NAMES OF ALL PERSONS NOTIFIED DURING PROCESSING

I agree to comply with all conditions or stipulations of the various bureaus or departments noted on this application, and attached statements of conditions or stipulations, which are hereby made a part of this application.

Number of attachments [  ]

_____
OWNER'S AUTHORIZED AGENT

2.2





City and County of San Francisco
Department of Building Inspection

**Mark Farrell, Mayor**
**Tom C. Hui, S.E., C.B.O., Director**

OFFICIAL COPY

DEPARTMENT OF
BUILDING INSPECTION
FOR OFFICE USE ONLY

# PROPERTY OWNER'S PACKAGE

## Disclosures & Forms for Owner-Builders Applying for Construction Permits

*IMPORTANT!* NOTICE TO PROPERTY OWNER

Dear Property Owner:

An application for a building permit has been submitted in your name listing yourself as the builder of the property improvements specified at ___*200 NAPLES ST. SF*___ .

We are providing you with an Owner-Builder Acknowledgment and Information Verification Form to make you aware of your responsibilities and possible risk you may incur by having this permit issued in your name as the Owner-Builder. **We will not issue a building permit until you have read, initialed your understanding of each provision, signed, and returned this form to us at our official address indicated.** An agent of the owner cannot execute this notice unless you, the property owner, obtain the prior approval of the permitting authority.

## OWNER'S ACKNOWLEDGMENT AND VERIFICATION OF INFORMATION

*DIRECTIONS: Read and initial each statement below to signify you understand or verify this information.*

____1. I understand a frequent practice of unlicensed persons is to have the property owner obtain an "OwnerBuilder" building permit that erroneously implies that the property owner is providing his or her own labor and material personally. I, as an Owner-Builder, may be held liable and subject to serious financial risk for any injuries sustained by an unlicensed person and his or her employees while working on my property. My homeowner's insurance may not provide coverage for those injuries. I am willfully acting as an Owner-Builder and am aware of the limits of my insurance coverage for injuries to workers on my property.

____2. I understand building permits are not required to be signed by property owners unless they are *responsible* for the construction and are not hiring a licensed Contractor to assume this responsibility.

____3. I understand as an "Owner-Builder" I am the responsible party of record on the permit. I understand that I may protect myself from potential financial risk by hiring a licensed Contractor and having the permit filed in his or her name instead of my own.

____4. I understand Contractors are required by law to be licensed and bonded in California and to list their license numbers on permits and contracts.

____5. I understand if I employ or otherwise engage any persons, other than California licensed Contractors, and the total value of my construction is at least five hundred dollars ($500), including labor and materials, I may be considered an "employer" under state and federal law.

____6. I understand if I am considered an "employer" under state and federal law, I must register with the state and federal government, withhold payroll taxes, provide workers' compensation disability insurance, and contribute to unemployment compensation for each "employee." I also understand my failure to abide by these laws may subject me to serious financial risk.

____7. I understand under California Contractors' State License Law, an Owner-Builder who builds single-family residential structures cannot legally build them with the intent to offer them for sale, unless *all* work is performed by licensed subcontractors and the number of structures does not exceed four within any calendar year, or all of the work is performed under contract with a licensed general building Contractor.

**1660 Mission Street – San Francisco CA 94103**
**Office (415) 558-6088 – FAX (415) 558-6401**
**Website: www.sfdbi.org**

2.3

_____ 8. I understand as an Owner-Builder if I sell the property for which this permit is issued, I may be held liable for any financial or personal injuries sustained by any subsequent owner(s) that result from any latent construction defects in the workmanship or materials.

_____ 9. I understand I may obtain more information regarding my obligations as an "employer" from the Internal Revenue Service, the United States Small Business Administration, the California Department of Benefit Payments, and the California Division of Industrial Accidents. I also understand I may contact the California Contractors' State License Board (CSLB) at 1-800-321-CSLB (2752) or www.cslb.ca.gov for more information about licensed contractors.

_____ 10. I am aware of and consent to an Owner-Builder building permit applied for in my name, and understand that I am the party legally and financially responsible for proposed construction activity at the following address: _____

_____ 11. I agree that, as the party legally and financially responsible for this proposed construction activity, I will abide by all applicable laws and requirements that govern Owner-Builders as well as employers.

_____ 12. I agree to notify the issuer of this form immediately of any additions, deletions, or changes to any of the information I have provided on this form. Licensed contractors are regulated by laws designed to protect the public. If you contract with someone who does not have a license, the Contractors' State License Board may be unable to assist you with any financial loss you may sustain as a result of a complaint. Your only remedy against unlicensed Contractors may be in civil court. It is also important for you to understand that if an unlicensed Contractor or employee of that individual or firm is injured while working on your property, you may be held liable for damages. If you obtain a permit as Owner-Builder and wish to hire Contractors, you will be responsible for verifying whether or not those Contractors are properly licensed and the status of their workers' compensation insurance coverage.

**Before a building permit can be issued, this form must be completed and signed by the property owner and returned to the agency responsible for issuing the permit.** *Note: A copy of the property owner's driver's license, form notarization, or other verification acceptable to the agency is required to be presented when the permit is issued to verify the property owner's signature.*

Signature of property owner _____   Date: ___8/10/18___

*Note: The following Authorization Form is required to be completed by the property owner only when designating an agent of the property owner to apply for a construction permit for the Owner-Builder.*

## AUTHORIZATION OF AGENT TO ACT ON PROPERTY OWNER'S BEHALF

Excluding the Notice to Property Owner, the execution of which I understand is my personal responsibility, I hereby authorize the following person(s) to act as my agent(s) to apply for, sign, and file the documents necessary to obtain an Owner-Builder Permit for my project.

Scope of Construction Project (or Description of Work): _____

Project Location or Address: _____

Name of Authorized Agent: _____  Tel No. _____

Address of Authorized Agent: _____

I declare under penalty of perjury that I am the property owner for the address listed above and I personally filled out the above information and certify its accuracy. *Note: A copy of the owner's driver's license, form notarization, or other verification acceptable to the agency is required to be presented when the permit is issued to verify the property owner's signature.*

Property Owner's Signature: _____  Date: _____

**1660 Mission Street – San Francisco CA 94103**
**Office (415) 558-6088 – FAX (415) 558-6401**
**Website: www.sfdbi.org**

2.4

Exhibit D

# NOTICE OF VIOLATION
### of the San Francisco Municipal Codes Regarding Unsafe,
### Substandard or Noncomplying Structure or Land or Occupancy

**DEPARTMENT OF BUILDING INSPECTION**    **NOTICE:** 1
City and County of San Francisco                           **NUMBER:** 201721241
49 South Van Ness Ave, Suite 400 San Francisco, CA         **DATE:** 04-JAN-18

**ADDRESS:** 200 NAPLES ST
**OCCUPANCY/USE:** ()                                **BLOCK:** 6008  **LOT:** 001

☐ If checked, this information is based upons site-observation only.  Further research may indicate that legal use is different.  If so, a revised Notice of Violation will be issued.

**OWNER/AGENT:** HILLSTOCK LOUIS & IDA                **PHONE #:** --
**MAILING**    HILLSTOCK LOUIS & IDA
**ADDRESS**    200 NAPLES ST
              SAN FRANCISCO CA
                            94112
**PERSON CONTACTED @ SITE:** HILLSTOCK LOUIS & IDA       **PHONE #:** --

# VIOLATION DESCRIPTION:

| | CODE/SECTION# |
|---|---|
| ☐ **WORK WITHOUT PERMIT** | 103A |
| ☐ **ADDITIONAL WORK-PERMIT REQUIRED** | 106A.4.7 |
| ☐ **EXPIRED OR ☐ CANCELLED PERMIT PA#:** | 106A.4.4; 106A.3.7 |
| ☑ **UNSAFE BUILDING**    ☐ **SEE ATTACHMENTS** | 102A.1 |

A complaint investigation revealed a building without proper weatherization and no guardrail at rear deck.
Code sec: 102A

# CORRECTIVE ACTION:

☑ **STOP ALL WORK SFBC 104.2.4**

☑ **FILE BUILDING PERMIT WITHIN** 7 **DAYS**    ☐ **(WITH PLANS)** A copy of This Notice Must Accompany the Permit Application
☑ **OBTAIN PERMIT WITHIN** 14 **DAYS AND COMPLETE ALL WORK WITHIN** 30 **DAYS, INCLUDING FINAL INSPECTION AND** SIGN OFF.
☐ **CORRECT VIOLATIONS WITHIN DAYS.**    ☐ **NO PERMIT REQUIRED**
☐ YOU FAILED TO COMPLY WITH THE NOTICE(S) DATED , THEREFORE THIS DEPT. HAS INITIATED ABATEMENT PROCEEDINGS.

• **FAILURE TO COMPLY WITH THIS NOTICE WILL CAUSE ABATEMENT PROCEEDINGS TO BEGIN.**
  **SEE ATTACHMENT FOR ADDITIONAL WARNINGS.**
Obtain a building permit with Planning Department approval to mitigate unsafe conditions.
**INVESTIGATION FEE OR OTHER FEE WILL APPLY**
☐ 9x FEE (WORK W/O PERMIT AFTER  9/1/60)    ☐ 2x FEE (WORK EXCEEDING SCOPE OF PERMIT)
☐ OTHER:    ☐ REINSPECTION FEE $    ☑ NO PENALTY
                                                      (WORK W/O PERMIT PRIOR TO 9/1/60)
**APPROX. DATE OF WORK W/O PERMIT**    **VALUE OF WORK PERFORMED W/O PERMITS $**

**BY ORDER OF THE DIRECTOR, DEPARTMENT OF BUILDING INSPECTION**
CONTACT INSPECTOR: Carl W Weaver
PHONE # 628-652-3636    DIVISION:  BID    DISTRICT :
By:(Inspectors's Signature) _____



EXHIBIT
3 HL
GALLAGHER 7-31-25

3.1



# NOTICE OF VIOLATION

### of the San Francisco Municipal Codes Regarding Unsafe, Substandard or Noncomplying Structure or Land or Occupancy

FOR OFFICE USE ONLY

Pursuant to SFBC 107A.5 and 106A 4.7 investigation fees are charged for work begun or performed without permits or for work exceeding the scope of permits. Such fees may be appealed to the Board of Permit Appeals within 15 days of permit issuance, at 49 South Van Ness Ave., Suite 1475 (14th Floor). (628) 652-1150.

**WARNING:** Failure to take immediate action as required to correct the above violations will result in abatement proceedings by the Department of Building Inspection. If an Order of Abatement is recorded against this property, the owner will be billed or the property will be liened for all costs incurred in the code enforcement process from the posting of the first 'Notice of Violation' until all costs are paid, SFBC 102A.2 & 110A.

**WARNING:** Section 204 of the San Francisco Housing Code provides for immediate fines of $100 for each instance of initial non-compliance, followed by $200 fines per violation for the second instance of non-compliance, up to a maximum of $7,500 per day. This section also provides for issuance of a criminal charge as a misdemeanor for each violation, resulting in fines of not less than $1,000 per day or six months' imprisonment or both.

**WARNING:** Anyone who derives rental income from housing determined by the Department of Building Inspection to be substandard cannot deduct from state personal income tax and bank and corporate income tax interest, depreciation or taxes attributable to such substandard structure. If correction work is not completed or being diligently, expeditiously and continuously prosecuted after six (6) months from the date of this notice, notification will be sent to the Franchise Tax Board as provided in Section 17264(6) of the Revenue and Taxation Code.

**WARNING:** Section 103A of the San Francisco Building Code provides for civil fines of up to $500 per day for any person who violates, disobeys, omits, neglects or refuses to comply with or opposes the execution of any provisions of this code. This section also provides for misdemeanor fines, if convicted, of up to $500 and/or imprisonment up to six months for each separate offense for every day such offense occurs.

De acuerdo a las Secciones 107A.5 y 106A 4.7 de el Codigo de Construcción de Edificios de San Francisco, gastos de investigación serán cobrados por trabajo empezado o realizado sin los debidos permisos o por trabajo que exceda el límite estipulado en los permisos. Dichos cobros pueden ser apelados ante la Junta de Apelaciones de Permisos (Board of Permit Appeals) dentro de los primeros quince dias de haberse obtenido el permiso. Las apelaciones se hacen en el 49 South Van Ness Ave., Suite 1475 (14th Floor), telefono (628) 652-1150.

**ADVERTENCIA:** Si no cumple con las acciones immediatas requeridas para corregir las infracciones, el Departamento de Inspección de Edificios tendrá el derecho de iniciar el proceso de mitigación. Si una Orden de Mitigación es registrada contra dicha propiedad, los gastos incurridos durante el proceso de aplicación del código, desde la primera puesta del Aviso de Infracción hasta que todos los gastos estén pagados, se le cobraran al dueño del edificio o la propiedad será embargada para recuperar dichos gastos. Referencia a la Sección 102A.2 y 110A de el Código de Construcción de Edificios.

**ADVERTENCIA:** La Sección 204 del Código de Vivienda de San Francisco permite que se multe inmediatamente $100 por cada primer caso de inconformidad, seguida por una multa, de $200 por cada segunda infracción de inconformidad, aumentando hasta un máximo de $7,500 por cada edificio. Esta Sección también permite obtener cargos criminales como delito menor, resultando en multas de no menos de $1,000 diarios ó 6 meses de encarcelamiento o ambas sanciones.

**ADVERTENCIA:** Cualquier persona que reciba renta por una vivienda que haya sido declarada que no satisface las normas requeridas por el Departamento de Inspección de Edificios, no puede deducir del estado ingresos personales, de banco o empresa, depreciacion o taxes atribuidos sobre dicha estructura. Si el trabajo de reparación no se termina o esta diligentemente, rapidamente y continuamente acusado despues de seis(c) meses de la fecha de este aviso, se le enviara una notificación a la Junta de Concesion de Impuestos (Franchise Tax Board) de acuerdo a la Sección 1264(c) del Código de Ingresos e Impuestos (Revenue and Taxation Code).

**ADVERTENCIA:** La Sección 103A de el Código de edificios de San Francisco impone multas cviles hasta de $500 por cada dia a cualquier persona que infrinja, desobedezca, omita, descuide, se niega a cumplir, resiste o se opone a la ejecución de las provisiones de este codigo. Esta sección tambien impone multas per delito menor, si es declarado culpable, de hasta $500 o encarcelamiento de hasta 6 meses, o ambas sanciones, por cada una de las ofensas y por cada dia que dicha ofensa ocurra.

Sang-ayon sa SFBC 107A.5 at 106A.4.7 ang bayad sa pagsusuri ay sisingilin sa mga gusaling naumpisahan na o ginawa na walang permit o sa mga gawaing tabis sa sakop ng permit. Ang gayong singil ay maaring iapela sa Board of Permit Appeals sa loob ng 15 na araw mula sa pag-isyu ng permit sa 49 South Van Ness Ave., suite 1475 (14th palapag), (628)652-1150.

**BABALA:** Ang kabiguan na gumawa ng aksiyon tulad ng kinakailangan upang iwasto ang mga nasabing paglabag ay magreresulta sa paglilits ng abatement ng Kagawaran ng Inspeksyon ng Gusali. Kung meron Order of Abatement ang naitala laban sa isang ari-arian, ang may-ari ay sisingilin o di kaya ang ari-arian ay gagamitin na lien sa lahat ng mga gastos na natamo sa proseso ng pagpapatapat mula sa unang "Paunawa sa Paglabag" hanggang sa lahat ng gastos ay mabayaran, SFBC 102A.2 & 110A.

**BABALA:** Ang Sekyson 204 ng Housing Code ng San Francisco ay nagtatadka ng agad-agad na multa na $100 sa bawat halimbawa ng unang hindi pagsunod, at susundan ng multa na $200 sa bawat paglabag sa pangalawang hindi pagsunod, hanggang sa sukdulan na $7.500 sa bawat gusali. Ang seksyon na ito ay itinatakda na magsasampa rin ng kasong kriminal bilang isang misdemeanor sa bawat paglabag at magreresulta sa multa na hindi bababa ng $1,000 sa bawat araw o di kaya sa anim na buwan na pagkabilanggo o parehong ipapataw.

**BABALA:** Sinumang kumikita sa pag-upa ng pabahay na tinukoy ng Kagawaran ng Inspeksyon ng Gusali na substandard, ay hindi maaring ibawas ang ganoong kita sa buwis sa estado ng kitang personal, at gayundin sa buwis na kita sa interes sa bangko at korporasyon, at sa depreaasyon o mga buwis na mailugnay sa gusaling substandard. Kung ang Gawain sa pagpawasto ay hindi nakumpleto o hindi macigasig, mabilis at tuloy-tuloy ang paggawa matapos ang anim (6) na buwan mula sa petsa nitong paunawa, ay magpapadala ng abiso sa Franchise Tax Board na ilinakda sa Seksyon 17264(6) ng Revenue and Taxation code.

**BABALA:** Ang Sekyson 103A ng Building Code ng San Francisco ay nagtatakda ng mga multang sibil hanggang sa $500 sa bawat araw sa sinumang lumabag, sumuway, magtanggal, magpabaya o tumangging sumunod o di kaya sumalungat sa pagpatupad ng mga probisyon nitong code. Nagpapataw din itong seksyon ng multang misdemeanor kapag nahatulan, na hanggang sa $500 at o di kaya anim na buwan na pagkabilanggo sa bawat magkakahiwalay na pagkasala para sa bawat araw na nangyari ang ganoong pagkasala.

根據《三藩市建築物條例》第107.5條和106.4.7條款，對未經許可的建築工程或要工程起過許可証範圍的檢查，將會收取檢查費用。對該費用可以作上訴，可以在許可證發出的15天之內，向「上訴委員會」（Board of Appeals）作出上訴。上訴委員會地址：49 South Van Ness Ave., Suite 1475 (14th floor)。電話：(628) 652-1150。

警告：如果沒有立即採取行動更正以上的違例情況，可能會引致樓宇檢查局展開執法行動。如果執法命令正式紀錄於該物業，業主可能會收到賬單，或者該物業會被抵押，用於支付從發出第一張"違例通知"開始，在執法過程中所產生的所有費用，直至所有費用付清為止。《三藩市建築物條例》第102.2條款和第110條款。

警告：三藩市房屋條例第204條對首初的違例會立即處以每條100元的罰款，接下來發生第二次的違例處以每項200元的罰款，最高可以對每幢違建罰款達到7,500元的罰款。該條例還可以對每項違例處以輕微罪行的刑事檢控，可處以每日最少1,000元的罰款或6個月的監禁，或兩者並罰。

警告：任何從樓宇檢查局認定為低於標準的房屋中獲取租金收入的個人，對於該低於標準的建築結構，將不能用於該免州的個人所得稅和銀行以及企業的所得稅利息、折舊或繳用於該房屋的稅項。如果在該過6日期的6個月之後，更正工程尚未完成，或者沒有勤力、快速和繼續進行有關工程，有關通知將會根據《收入及稅務條例》第17264（6）條給會將有知項稅通知。

警告：三藩市建築物條例第103條款可處予每天最高可罰$500的行政罰款。對任何違反、不履行、遺漏、疏忽或拒絕遵守或反對執行該條例的任何條款，該條款可處予輕微罪行的罰款，一經定罪，可以對每一項單獨的違例，違例期間的每一天，處於最高500元和/或處於6個月的監禁。

Exhibit E

APPROVED
Dept. of Building Insp.

AUG 1 0 2018

FOR OFFICE USE ONLY

REROOFING

PLEASE CALL THE INSPECTION SERVICES AT
575-6955 FOR A FINAL INSPECTION ACCORDINGLY.
NEW OR REPLACEMENT SHEATING AND SKYLIGHTS
REQUIRES A SEPARATE BUILDING PERMIT.

BLDG. FORM 3/8

APPROVED FOR ISSUANCE

APPLICATION NUMBER 201608061065

OSHA APPROVAL REQ'D ☐
APPROVAL NUMBER

## APPLICATION FOR BUILDING PERMIT
## ADDITIONS, ALTERATIONS OR REPAIRS

FORM 3 ☐ OTHER AGENCIES REVIEW REQUIRED
FORM 8 ☑ OVER-THE-COUNTER ISSUANCE

NUMBER OF PLAN SETS

### CITY AND COUNTY OF SAN FRANCISCO
### DEPARTMENT OF BUILDING INSPECTION

APPLICATION IS HEREBY MADE TO THE DEPARTMENT OF
BUILDING INSPECTION OF SAN FRANCISCO FOR
PERMISSION TO BUILD IN ACCORDANCE WITH THE PLANS
AND SPECIFICATIONS SUBMITTED HEREWITH AND
ACCORDING TO THE DESCRIPTION AND FOR THE PURPOSE
HEREINAFTER SET FORTH.

▼ DO NOT WRITE ABOVE THIS LINE ▼

| DATE FILED | FILING FEE RECEIPT NO. | (1) STREET ADDRESS OF JOB | BLOCK & LOT |
|---|---|---|---|
| | | 200 Naples St. | |

| PERMIT NO. | ISSUED 08/10/2018 | (2A) ESTIMATED COST OF JOB 8,000 | (2B) REVISED COST: 8000 |
|---|---|---|---|

## INFORMATION TO BE FURNISHED BY ALL APPLICANTS
### LEGAL DESCRIPTION OF EXISTING BUILDING

| (4A) TYPE OF CONSTR. | (5A) NO. OF STORIES OF OCCUPANCY: | (6A) NO. OF BASEMENTS AND CELLARS: | (7A) PRESENT USE: | (8A) OCCUP. CLASS | (9A) NO. OF DWELLING UNITS: |
|---|---|---|---|---|---|
| | 2 | | Single Family Res | R3 | |

### DESCRIPTION OF BUILDING AFTER PROPOSED ALTERATION

| (4) TYPE OF CONSTR. | (5) NO. OF STORIES OF OCCUPANCY: | (6) NO. OF BASEMENTS AND CELLARS: | (7) PROPOSED USE (LEGAL USE) | (8) OCCUR. CLASS | (9) NO. OF DWELLING UNITS: |
|---|---|---|---|---|---|
| | 2 | | Single Family Res | R3 | |

| (10) IS AUTO RUNWAY TO BE CONSTRUCTED OR ALTERED? | YES ☐ NO ☐ | (11) WILL STREET SPACE BE USED DURING CONSTRUCTION? | YES ☐ NO ☐ | (12) ELECTRICAL WORK TO BE PERFORMED? | YES ☐ NO ☑ | (13) PLUMBING WORK TO BE PERFORMED? | YES ☐ NO ☑ |
|---|---|---|---|---|---|---|---|

| (14) GENERAL CONTRACTOR OWNER BUILDER | ADDRESS | ZIP | PHONE | CALIF. LIC. NO. | EXPIRATION DATE |
|---|---|---|---|---|---|

| (15) OWNER - LESSEE (CROSS OUT ONE) GC Block IW. Gen. | ADDRESS PO BOX 523 Byron | ZIP 94514 | BTRC# | PHONE (FOR CONTACT BY DEPT) 925-525-3911 |
|---|---|---|---|---|

(16) WRITE IN DESCRIPTION OF ALL WORK TO BE PERFORMED UNDER THIS APPLICATION (REFERENCE TO PLANS IS NOT SUFFICIENT)

RE ROOF + gutters
And to comply with VIOLATION 201644272

EXHIBIT
GALLAGHER 7-31-25

### ADDITIONAL INFORMATION

| (17) DOES THIS ALTERATION CREATE ADDITIONAL HEIGHT OR STORY TO BUILDING? | YES ☐ NO ☑ | (18) IF (17) IS YES, STATE NEW HEIGHT AT CENTER LINE OF FRONT | (19) DOES THIS ALTERATION CREATE DECK OR HORIZ. EXTENSION TO BUILDING? | YES ☐ NO ☑ | (20) IF (19) IS YES, STATE NEW GROUND FLOOR AREA | 1250 SQ. FT. |
|---|---|---|---|---|---|---|
| (21) WILL SIDEWALK OVER SUB-SIDEWALK SPACE BE REPAIRED OR ALTERED? | YES ☐ NO ☑ | (22) WILL BUILDING EXTEND BEYOND PROPERTY LINE? | YES ☐ NO ☑ | (23) ANY OTHER EXISTING BLDG. ON LOT (IF YES, SHOW ON PLOT PLAN) | YES ☐ NO ☑ | (24) DOES THIS ALTERATION CONSTITUTE A CHANGE OF OCCUPANCY? | YES ☐ NO ☑ |
| (25) ARCHITECT OR ENGINEER (DESIGN ☐ CONSTRUCTION ☐) | | ADDRESS | | CALIF. CERTIFICATE NO. | | |

(26) CONSTRUCTION LENDER (ENTER NAME AND BRANCH DESIGNATION IF ANY.
IF THERE IS NO KNOWN CONSTRUCTION LENDER, ENTER "UNKNOWN".)          ADDRESS

### IMPORTANT NOTICES

No change shall be made in the character of the occupancy or use without first obtaining a Building Permit authorizing such change. See San Francisco Building Code and San Francisco Housing Code.

No portion of building or structure or scaffolding used during construction is to be closer than 6'0" to any wire combining more than 750 volts. See Sec 385, California Penal Code.

Pursuant to San Francisco Building Code, the building permit shall be posted on the job. The owner is responsible for approved plans and application being kept at building site.

Grade lines as shown on drawings accompanying this application are assumed to be correct. If actual grade lines are not the same as shown, revised drawings showing correct grade lines, cuts and fills, and complete details of retaining walls and wall footings must be submitted to this department for approval.

ANY STIPULATION REQUIRED HEREIN OR BY CODE MAY BE APPEALED.

BUILDING NOT TO BE OCCUPIED UNTIL CERTIFICATE OF FINAL COMPLETION IS POSTED ON THE BUILDING OR PERMIT OF OCCUPANCY GRANTED, WHEN REQUIRED.

APPROVAL OF THIS APPLICATION DOES NOT CONSTITUTE AN APPROVAL FOR THE ELECTRICAL WIRING OR PLUMBING INSTALLATIONS. A SEPARATE PERMIT FOR THE WIRING AND PLUMBING MUST BE OBTAINED. SEPARATE PERMITS ARE REQUIRED IF ANSWER IS "YES" TO ANY OF ABOVE QUESTIONS (10) (11) (12) (13) (22) OR (24).

THIS IS NOT A BUILDING PERMIT. NO WORK SHALL BE STARTED UNTIL A BUILDING PERMIT IS ISSUED.

In dwellings, all insulating materials must have a clearance of not less than two inches from all electrical wires or equipment.

CHECK APPROPRIATE BOX
☐ OWNER        ☐ ARCHITECT
☐ LESSEE        ☐ AGENT
☐ CONTRACTOR    ☐ ENGINEER

### APPLICANT'S CERTIFICATION

I HEREBY CERTIFY AND AGREE THAT IF A PERMIT IS ISSUED FOR THE CONSTRUCTION DESCRIBED IN THIS APPLICATION, ALL THE PROVISIONS OF THE PERMIT AND ALL LAWS AND ORDINANCES THERETO WILL BE COMPLIED WITH.

REV 09/13

### NOTICE TO APPLICANT

HOLD HARMLESS CLAUSE. The permittee(s) by acceptance of the permit, agree(s) to indemnify and hold harmless the City and County of San Francisco from and against any and all claims, demands and actions for damages resulting from operations under this permit, regardless of negligence of the City and County of San Francisco, and to assume the defense of the City and County of San Francisco against all such claims, demands or actions.

In conformity with the provisions of Section 3800 of the Labor Code of the State of California, the applicant shall have worker's compensation coverage under (I) or (II) designated below, or shall indicate item (III), (IV), or (V), whichever is applicable. If however item (V) is checked, item (V) must be checked as well. Mark the appropriate method of compliance below.

I hereby affirm under penalty of one of the following declarations:

( ) I.   I have and will maintain a certificate of consent to self-insure for worker's compensation, as provided by Section 3700 of the Labor Code, for the performance of the work for which this permit is issued.

( ) II.  I have and will maintain worker's compensation insurance, as required by Section 3700 of the Labor Code, for the performance of the work for which this permit is issued. My worker's compensation insurance carrier and policy number are:
Carrier _____
Policy Number _____

( ) III. The cost of the work to be done is $100 or less.

( ) IV. I certify that in the performance of the work for which this permit is issued, I shall not employ any person in any manner so as to become subject to the worker's compensation laws of California. I further acknowledge that I understand that in the event that I should become subject to the worker's compensation provisions of the Labor Code of California and fail to comply forthwith with the provisions of Section 3800 of the Labor Code, that the permit herein applied for shall be deemed revoked.

(X) V.  I certify as the owner (or the agent the owner) that in the performance of the work for which this permit is issued, I will employ a contractor who complies with the worker's compensation laws of California and who, prior to the commencement of any work, will file a completed copy of this form with the Central Permit Bureau.

Signature of Applicant or Agent _____  Date _____

OFFICE COPY

## CONDITIONS AND STIPULATIONS

**OFFICIAL COPY**

SAN FRANCISCO

**DEPARTMENT OF BUILDING INSPECTION**

Matthew Ralls, DBI

AUG 1 0 2018

FOR OFFICE USE ONLY

| | |
|---|---|
| ☐ | DATE: _____ |
| | REASON: |
| | BUILDING INSPECTOR, DEPT. OF BLDG. INSP. |
| | NOTIFIED MR. |

**APPROVED:**

| | |
|---|---|
| ☐ | N/A |
| | DATE: _____ |
| | REASON: |
| | DEPARTMENT OF CITY PLANNING |
| | NOTIFIED MR. |

**APPROVED:**

| | |
|---|---|
| ☐ | DATE: _____ |
| | REASON: |
| | BUREAU OF FIRE PREVENTION & PUBLIC SAFETY |
| | NOTIFIED MR. |

**APPROVED:**

| | |
|---|---|
| ☐ | DATE: _____ |
| | REASON: |
| | MECHANICAL ENGINEER, DEPT. OF BLDG. INSPECTION |
| | NOTIFIED MR. |

**APPROVED:**

| | |
|---|---|
| ☐ | DATE: _____ |
| | REASON: |
| | CIVIL ENGINEER, DEPT. OF BLDG. INSPECTION |
| | NOTIFIED MR. |

**APPROVED:**

| | |
|---|---|
| ☐ | DATE: _____ |
| | REASON: |
| | BUREAU OF ENGINEERING |
| | NOTIFIED MR. |

**APPROVED:**

| | |
|---|---|
| ☐ | DATE: _____ |
| | REASON: |
| | DEPARTMENT OF PUBLIC HEALTH |
| | NOTIFIED MR. |

**APPROVED:**

| | |
|---|---|
| ☐ | DATE: _____ |
| | REASON: |
| | REDEVELOPMENT AGENCY |
| | NOTIFIED MR. |

**APPROVED:**

| | |
|---|---|
| ☐ | FOR WORK STATED ONLY   5/10/18 |
| | DATE: _____ |
| | REASON: |
| | HOUSING INSPECTION DIVISION |
| | NOTIFIED MR. |

*HOLD SECTION - NOTE DATES AND NAMES OF ALL PERSONS NOTIFIED DURING PROCESSING*

I agree to comply with all conditions or stipulations of the various bureaus or departments noted on this application, and attached statements of conditions or stipulations, which are hereby made a part of this application.

Number of attachments ☐

_____
OWNER'S AUTHORIZED AGENT

4.2




City and County of San Francisco
Department of Building Inspection

**Mark Farrell, Mayor**
**Tom C. Hui, S.E., C.B.O., Director**

FOR OFFICE USE ONLY

# PROPERTY OWNER'S PACKAGE

## Disclosures & Forms for Owner-Builders Applying for Construction Permits

*IMPORTANT!* NOTICE TO PROPERTY OWNER

Dear Property Owner:

An application for a building permit has been submitted in your name listing yourself as the builder of the property improvements specified at _____ 2 00   NAPLES  SF,   SF_____.

We are providing you with an Owner-Builder Acknowledgment and Information Verification Form to make you aware of your responsibilities and possible risk you may incur by having this permit issued in your name as the Owner-Builder. **We will not issue a building permit until you have read, initialed your understanding of each provision, signed, and returned this form to us at our official address indicated.** An agent of the owner cannot execute this notice unless you, the property owner, obtain the prior approval of the permitting authority.

## OWNER'S ACKNOWLEDGMENT AND VERIFICATION OF INFORMATION
*DIRECTIONS: Read and initial each statement below to signify you understand or verify this information.*

_____1. I understand a frequent practice of unlicensed persons is to have the property owner obtain an "OwnerBuilder" building permit that erroneously implies that the property owner is providing his or her own labor and material personally. I, as an Owner-Builder, may be held liable and subject to serious financial risk for any injuries sustained by an unlicensed person and his or her employees while working on my property. My homeowner's insurance may not provide coverage for those injuries. I am willfully acting as an Owner-Builder and am aware of the limits of my insurance coverage for injuries to workers on my property.

_____2. I understand building permits are not required to be signed by property owners unless they are *responsible* for the construction and are not hiring a licensed Contractor to assume this responsibility.

_____3. I understand as an "Owner-Builder" I am the responsible party of record on the permit. I understand that I may protect myself from potential financial risk by hiring a licensed Contractor and having the permit filed in his or her name instead of my own.

_____4. I understand Contractors are required by law to be licensed and bonded in California and to list their license numbers on permits and contracts.

_____5. I understand if I employ or otherwise engage any persons, other than California licensed Contractors, and the total value of my construction is at least five hundred dollars ($500), including labor and materials, I may be considered an "employer" under state and federal law.

_____6. I understand if I am considered an "employer" under state and federal law, I must register with the state and federal government, withhold payroll taxes, provide workers' compensation disability insurance, and contribute to unemployment compensation for each "employee." I also understand my failure to abide by these laws may subject me to serious financial risk.

_____7. I understand under California Contractors' State License Law, an Owner-Builder who builds single-family residential structures cannot legally build them with the intent to offer them for sale, unless *all* work is performed by licensed subcontractors and the number of structures does not exceed four within any calendar year, or all of the work is performed under contract with a licensed general building Contractor.

**1660 Mission Street – San Francisco CA 94103**
**Office (415) 558-6088 – FAX (415) 558-6401**
**Website: www.sfdbi.org**

4.3

OFFICIAL COPY
SAN FRANCISCO
DBI
DEPARTMENT
BUILDING
FOR OFFICE USE ONLY

_____9. I understand as an Owner-Builder if I sell the property for which this permit is issued, I may be held liable for any financial or personal injuries sustained by any subsequent owner(s) that result from any latent construction defects in the workmanship or materials.

_____ I understand I may obtain more information regarding my obligations as an "employer" from the Internal Revenue Service, the United States Small Business Administration, the California Department of Benefit Payments, and the California Division of Industrial Accidents. I also understand I may contact the California Contractors' State License Board (CSLB) at 1-800-321-CSLB (2752) or www.cslb.ca.gov for more information about licensed contractors.

_____10. I am aware of and consent to an Owner-Builder building permit applied for in my name, and understand that I am the party legally and financially responsible for proposed construction activity at the following address:

_____

_____11. I agree that, as the party legally and financially responsible for this proposed construction activity, I will abide by all applicable laws and requirements that govern Owner-Builders as well as employers.

_____12. I agree to notify the issuer of this form immediately of any additions, deletions, or changes to any of the information I have provided on this form. Licensed contractors are regulated by laws designed to protect the public. If you contract with someone who does not have a license, the Contractors' State License Board may be unable to assist you with any financial loss you may sustain as a result of a complaint. Your only remedy against unlicensed Contractors may be in civil court. It is also important for you to understand that if an unlicensed Contractor or employee of that individual or firm is injured while working on your property, you may be held liable for damages. If you obtain a permit as Owner-Builder and wish to hire Contractors, you will be responsible for verifying whether or not those Contractors are properly licensed and the status of their workers' compensation insurance coverage.

**Before a building permit can be issued, this form must be completed and signed by the property owner and returned to the agency responsible for issuing the permit.** *Note: A copy of the property owner's driver's license, form notarization, or other verification acceptable to the agency is required to be presented when the permit is issued to verify the property owner's signature.*

Signature of property owner _____   Date: 8/10/18

_____

*Note: The following Authorization Form is required to be completed by the property owner only when designating an agent of the property owner to apply for a construction permit for the Owner-Builder.*

## AUTHORIZATION OF AGENT TO ACT ON PROPERTY OWNER'S BEHALF

Excluding the Notice to Property Owner, the execution of which I understand is my personal responsibility, I hereby authorize the following person(s) to act as my agent(s) to apply for, sign, and file the documents necessary to obtain an Owner-Builder Permit for my project.

Scope of Construction Project (or Description of Work): _____

Project Location or Address: _____

Name of Authorized Agent: _____ Tel No. _____

Address of Authorized Agent: _____

I declare under penalty of perjury that I am the property owner for the address listed above and I personally filled out the above information and certify its accuracy. *Note: A copy of the owner's driver's license, form notarization, or other verification acceptable to the agency is required to be presented when the permit is issued to verify the property owner's signature.*

Property Owner's Signature: _____ Date: _____

**1660 Mission Street – San Francisco CA 94103
Office (415) 558-6088 – FAX (415) 558-6401
Website: www.sfdbi.org**

4.4

Exhibit F



# NOTICE OF VIOLATION
### of the San Francisco Municipal Codes Regarding Unsafe, Substandard or Noncomplying Structure or Land or Occupancy

**DEPARTMENT OF BUILDING INSPECTION**    **NOTICE:** 1    **NUMBER:** 201895477
City and County of San Francisco    **DATE:** 03-OCT-18
1660 Mission St. San Francisco, CA 94103

**ADDRESS:** 200 NAPLES ST
**OCCUPANCY/USE:** R-3 (RESIDENTIAL- 1 & 2 UNIT DWELLINGS, TOWNHOUSES **BLOCK:** 6008    **LOT:** 001

☐ If checked, this information is based upons site-observation only. Further research may indicate that legal use is different. If so, a revised Notice of Violation will be issued.

**OWNER/AGENT:** LAU FRANCIS    **PHONE #:** --
**MAILING**    LAU FRANCIS
**ADDRESS**    1023 GILMAN DR
DALY CITY CA
94015

**PERSON CONTACTED @ SITE:** LAU FRANCIS    **PHONE #:** —

## VIOLATION DESCRIPTION:    CODE/SECTION#

☐ **WORK WITHOUT PERMIT**    106.1.1
☑ **ADDITIONAL WORK-PERMIT REQUIRED**    106.4.7
☐ **EXPIRED OR** ☐ **CANCELLED PERMIT PA#:**    106.4.4
☑ **UNSAFE BUILDING**  ☐ **SEE ATTACHMENTS**    102.1

Site investigation revealed that building has been gutted and construction in progress of multiple dormers without proper permits and inspections. Work is beyond scope of PA201808107075, 201808107063 and does not have Planning Dept approval. Debris pile in backyard is leaning on neighbor's building. Code/Section: SFBC 106A.4.7, 102A

## CORRECTIVE ACTION:

☑ **STOP ALL WORK SFBC 104.2.4**    415-558-6042

☑ **FILE BUILDING PERMIT WITHIN 5 DAYS**    ☑ **(WITH PLANS)** A copy of This Notice Must Accompany the Permit Application
☑ **OBTAIN PERMIT WITHIN 10 DAYS AND COMPLETE ALL WORK WITHIN 90 DAYS, INCLUDING FINAL INSPECTION AND SIGN OFF.**
☑ **CORRECT VIOLATIONS WITHIN 90 DAYS.**    ☐ **NO PERMIT REQUIRED**
☐ YOU FAILED TO COMPLY WITH THE NOTICE(S) DATED , THEREFORE THIS DEPT. HAS INITIATED ABATEMENT PROCEEDINGS.

● **FAILURE TO COMPLY WITH THIS NOTICE WILL CAUSE ABATEMENT PROCEEDINGS TO BEGIN. SEE ATTACHMENT FOR ADDITIONAL WARNINGS.**
Obtain permits and inspections for all work for which permits are required including corresponding Plumbing and Electrical permits.
Obtain Planning Dept approval for work. Remove debris from site and secure properly.

**INVESTIGATION FEE OR OTHER FEE WILL APPLY**
☐ 9x FEE (WORK W/O PERMIT AFTER 9/1/60)    ☑ 2x FEE (WORK EXCEEDING SCOPE OF PERMIT)
☐ **OTHER:**    ☐ REINSPECTION FEE $    ☐ NO PENALTY (WORK W/O PERMIT PRIOR TO 9/1/60)
**APPROX. DATE OF WORK W/O PERMIT**    **VALUE OF WORK PERFORMED W/O PERMITS $**

### BY ORDER OF THE DIRECTOR, DEPARTMENT OF BUILDING INSPECTION
**CONTACT INSPECTOR:** Philip Saunders
PHONE # 415-558-6042    DIVISION: BID    DISTRICT : 12
By:(Inspectors's Signature) _____



EXHIBIT
5 HL
GALLAGHER 7-31-25

# NOTICE OF VIOLATION
### of the San Francisco Municipal Codes Regarding Unsafe,
### Substandard or Noncomplying Structure or Land or Occupancy

Pursuant to SFBC 304(e) and 332.3 investigation fees are charged for work begun or performed without permits or for work exceeding the scope of permits. Such fees may be appealed to the Board of Permit Appeals within 15 days of permit issuance, at 875 Stevenson St., 4th floor.  554-6720

**WARNING:** Failure to take immediate action as required to correct the above violations will result in abatement proceedings by the Department of Building Inspection. If an Order of Abatement is recorded against this property, the owner will be billed or the property will be liened for all costs incurred in the code enforcement process from the posting of the first "Notice of Violation" until all costs are paid. SFBC 203(b) & 332.3

**WARNING:** Section 204 of the San Francisco Housing Code provides for immediate fines of $100 for each instance of initial non-compliance, followed by $200 fines per violation for the second instance of non-compliance, up to a maximum of $7,500 per building. This section also provides for issuance of a criminal charge as a misdemeanor for each violation, resulting in fines of not less than $1,000 per day or six months' imprisonment or both.

**WARNING:** Anyone who derives rental income from housing determined by the Department of Building Inspection to be substandard cannot deduct from state personal income tax and bank and corporate income tax interest, depreciation or taxes attributable to such substandard structure. If correction work is not completed or being diligently, expeditiously and continuously prosecuted after six (6) months from the date of this notice, notification will be sent to the Franchise Tax Board as provided in Section 17264(c) of the Revenue and Taxation Code.

**WARNING:** Section 205(a) of the San Francisco Building Code provides for civil fines of up to $500 per day for any person who violates, disobeys, omits, neglects or refuses to comply with or opposes the execution of any provisions of this code. This section also provides for misdemeanor fines, if convicted, of up to $500 and/or imprisonment up to six months for each separate offense for every day such offense occurs.

De acuerdo a las Secciones 304(e) y 332.3 de el Código de Construcción de Edificios de San Francisco, gastos de investigación serán cobrados por trabajo empezado o realizado sin los debidos permisos o por trabajo que exceda el límite estipulado en los permisos. Dichos cobros pueden ser apelados ante la Junta de Apelaciones de Permisos (Board of Permit Appeals) dentro de los primeros quince días de haberse obtenido el permiso. Las apelaciones se hacen en el 875 de la calle Stevenson, cuarto piso, teléfono 554-6720.

**ADVERTENCIA:** Si no cumple con las acciones inmediatas requeridas para corregir las infracciones, el Departamento de Inspección de Edificios tendrá el derecho de iniciar el proceso de mitigación. Si una Orden de Mitigación es registrada contra dicha propiedad, los gastos incurridos durante el proceso de aplicación del código, desde la primera puesta del Aviso de Infracción hasta que todos los gastos estén pagados, se le cobrarán al dueño del edificio o la propiedad sera embargada para recuperar dichos gastos. Referencia a la Sección 203(b) y 332.3 de el Código de Construcción de Edificios.

**ADVERTENCIA:** La Sección 204 de el Código de Vivienda de San Francisco permite que se multe inmediatamente $100 por cada primer caso de inconformidad, seguida por una multa de $200 por cada segunda infracción de inconformidad, aumentando hasta un máximo de $7,500 por cada edificio. Esta Sección también permite obtener cargos criminales como delito menor, resultando en multas de no menos de $1,000 diarios o 6 meses de encarcelamiento o ambas sanciones.

**ADVERTENCIA:** Cualquier persona que reciba renta por una vivienda que haya sido declarada que no satisface las normas requeridas por el Departamento de Inspección de Edificios, no puede deducir del estado intereses personales, de banco o empresa, depreciación o taxes atribuidos sobre dicha estructura. Si el trabajo de reparación no se termina o está diligentemente, rápidamente y continuamente acusado después de seis (6) meses de la fecha de este aviso, se le enviará una notificación a la Junta de Concesión de Impuestos (Franchise Tax Board) de acuerdo a la Sección 1264(c) del Código de Ingresos e Impuestos (Revenue and Taxation Code).

**ADVERTENCIA:** La Sección 205(a) del Código de Edicios de San Francisco impone multas civiles hasta de $500 por cada día a cualquier persona que infrinja, desobedezca, omita, descuide, rehusa cumplir, resiste o se opone a la ejecución de las provisiones de este código. Esta sección también impone multas por delito menor, si es declarado culpable, de hasta $500 o encarcelamiento de hasta 6 meses, o ambas sanciones, por cada una de las ofensas y por cada día que dicha ofensa ocurra.

根據《三藩市建築法規》（第第 3FBC）第 304(e) 項和第 332.3 項條款的規定，對沒有許可建即已開始的工程和或在進行中的工程、或者超越許可範圍的工程，將收取調查費。有事人可以在許可證發出日期 15 天之內，向建築可以向許可上訴委員會提出上訴。該委員會地址在 Stevenson 街 875 號第 4 樓，電話：554-6720。

警告：如不採取立即改正的行動，以修正上述違章行為，將導致建築檢查局對你進行制裁正程序的執行。倘若此房地產被記的強制制正程序令一經在市府檔案，則由該業主將附這費用和上訴正程序令令有關的費用，開始業主地產和評，直至付清各項費用。詳參閱《三藩市建築法規》第 203 (b) 項和第 332.3 項條款。

警告：《三藩市房屋法規》（即 3FBC）第 204(b) 項條款規定：對每一違章的初次違反將罰款 100 元，二次違章例款 200 元，每幢樓中的最高例款可達 7,500 元。此項法規還規定每一違章罰款者可提出刑事裁告，每日最高罰款可達 1,000 元，或/和監禁六個月。

警告：任何人通過出租房屋獲得收入，因該房屋已被建築局鑒定房地產被的規定那準章，不能從加州個人所得稅、銀行稅或工所得稅中扣除、以及與該標準規定那準的建築折舊或費用中扣除攤銷。如果在此層含公的六個月後，改正工程沒有完成，或者仍有繼續、勤進行按稅規收進行，我們將通報（繼保稅收組）（即 Revenue & Taxation Code）第 1264 (c) 項條款。屆如加州稅務委員會（The Franchise Tax Board）。

警告：《三藩市建築法規》第 205(a) 項條款規定：對於任何違反、不服從、疏忽、怠慢、或拒絕聽遵此法的個人、反對實施此法執令者的個人，將付最高 500 元的民事罰款。此法規還規定該法每每犯、如是被定罪，將每天所惡生的、每一單獨的犯法行為，將付予罰款 500 元的刑罰，和/或者監禁六個月。

Exhibit G



## APPLICATION FOR BUILDING PERMIT
### ADDITIONS, ALTERATIONS OR REPAIRS

FORM 3 ☐ OTHER AGENCIES REVIEW REQUIRED

FORM 8 ☑ OVER-THE-COUNTER ISSUANCE

NUMBER OF PLAN SETS

### CITY AND COUNTY OF SAN FRANCISCO
### DEPARTMENT OF BUILDING INSPECTION

APPLICATION IS HEREBY MADE TO THE DEPARTMENT OF BUILDING INSPECTION OF SAN FRANCISCO FOR PERMISSION TO BUILD IN ACCORDANCE WITH THE PLANS AND SPECIFICATIONS SUBMITTED HEREWITH AND ACCORDING TO THE DESCRIPTION AND FOR THE PURPOSE HEREINAFTER SET FORTH.

▼ DO NOT WRITE ABOVE THIS LINE ▼

| DATE FILED | FILING FEE RECEIPT NO. | (1) STREET ADDRESS OF JOB | BLOCK & LOT |
|---|---|---|---|
| 10/25/18 | 18/0962 | 200 NAPLES ST. | 6008 00 |

| PERMIT NO. | ISSUED | (2A) ESTIMATED COST OF JOB | (2B) REVISED COST |
|---|---|---|---|
| 1502025 | JUN 1 1 2019 | 4,000 | $100,000 |

### INFORMATION TO BE FURNISHED BY ALL APPLICANTS

### LEGAL DESCRIPTION OF EXISTING BUILDING

| (4A) TYPE OF CONSTR. | (5A) NO. OF STORIES OR OCCUPANCY | (6A) NO. OF BASEMENTS AND CELLARS | (7A) PRESENT USE: | (8A) OCCUP. CLASS | (9A) NO. OF DWELLING UNITS |
|---|---|---|---|---|---|
| | 2 | 1 | RESIDENTIAL SFD | R3 SING FM | 1 |

### DESCRIPTION OF BUILDING AFTER PROPOSED ALTERATION

| (4) TYPE OF CONSTR. | (5) NO. OF STORIES OR OCCUPANCY | (6) NO. OF BASEMENTS AND CELLARS | (7) PROPOSED USE (LEGAL USE) | (8) OCCUP. CLASS | (9) NO. OF DWELLING UNITS |
|---|---|---|---|---|---|
| | S | 2 | SFD | R3 | 1 |

| (10) IS AUTO RUNWAY TO BE CONSTRUCTED OR ALTERED? | YES ☐ NO ☐ | (11) WILL STREET SPACE BE USED DURING CONSTRUCTION? | YES ☐ NO ☐ | (12) ELECTRICAL WORK TO BE PERFORMED? | YES ☐ NO ☐ | (13) PLUMBING WORK TO BE PERFORMED? | YES ☐ NO ☐ |
|---|---|---|---|---|---|---|---|

| (14) GENERAL CONTRACTOR | ADDRESS | ZIP | PHONE | CALIF. LIC. NO. | EXPIRATION DATE |
|---|---|---|---|---|---|
| OWNER | | | | | |

(15) OWNER - LESSEE (CROSS OUT ONE)   R.L. BLOCK   ADDRESS   POU- PO Box 573 Byron 94514   PHONE (FOR CONTACT BY DEPT.)   925-325-3911

(16) WRITE IN DESCRIPTION OF ALL WORK TO BE PERFORMED UNDER THIS APPLICATION (REFERENCE TO PLANS IS NOT SUFFICIENT)
To Comply With NOV 201815477

- REMODEL 1 BATHROOMS AND 1 ... TO EFFECT SIDE
- STRUCTURAL STRENGTHENING INCLUDE REMODEL & REPLACING THE
- DEMO EXISTING LAUNDRY - @ 2ND FLOOR FRAMING

### ADDITIONAL INFORMATION

| (17) DOES THIS ALTERATION CREATE ADDITIONAL HEIGHT OR STORY TO BUILDING? | YES ☐ NO ☑ | (18) IF (17) IS YES, STATE NEW HEIGHT AT CENTER LINE OF FRONT | | (19) DOES THIS ALTERATION CREATE DECK OR HORIZ. EXTENSION TO BUILDING? | YES ☐ NO ☑ | (20) IF (19) IS YES, STATE NEW GROUND FLOOR AREA | | SQ. FT. |
|---|---|---|---|---|---|---|---|---|

| (21) WILL SIDEWALK OVER SUB-SIDEWALK SPACE BE REPAIRED OR ALTERED? | YES ☐ NO ☐ | (22) WILL BUILDING EXTEND BEYOND PROPERTY LINE? | YES ☐ NO ☑ | (23) ANY OTHER EXISTING BLDG. ON LOT? (IF YES, SHOW ON PLOT PLAN) | YES ☐ NO ☑ | (24) DOES THIS ALTERATION CONSTITUTE A CHANGE OF OCCUPANCY? | YES ☐ NO ☑ |
|---|---|---|---|---|---|---|---|

| (25) ARCHITECT OR ENGINEER (DESIGN ☐ CONSTRUCTION ☐) | ADDRESS | CALIF. CERTIFICATE NO. |
|---|---|---|
| BILL MANFREDI | | |

(26) CONSTRUCTION LENDER (ENTER NAME AND BRANCH DESIGNATION IF ANY. IF THERE IS NO KNOWN CONSTRUCTION LENDER, ENTER "UNKNOWN")   ADDRESS

### IMPORTANT NOTICES

No change shall be made in the character of the occupancy or use without first obtaining a Building Permit authorizing such change. See San Francisco Building Code and San Francisco Housing Code.

No portion of building or structure or scaffolding used during construction is to be closer than 6'0" to any wire containing more than 750 volts. See Sec 385, California Penal Code.

Pursuant to San Francisco Building Code, the building permit shall be posted on the job. The owner is responsible for approved plans and application being kept at building site.

Grade lines as shown on drawings accompanying this application are assumed to be correct. If actual grade lines are not the same as shown, revised drawings showing correct grade lines, cuts and fills, and complete details of retaining walls and wall footings must be submitted to this department for approval.

ANY STIPULATION REQUIRED HEREIN OR BY CODE MAY BE APPEALED.

BUILDING NOT TO BE OCCUPIED UNTIL CERTIFICATE OF FINAL COMPLETION IS POSTED ON THE BUILDING OR PERMIT OF OCCUPANCY GRANTED, WHEN REQUIRED.

APPROVAL OF THIS APPLICATION DOES NOT CONSTITUTE AN APPROVAL FOR THE ELECTRICAL WIRING OR PLUMBING INSTALLATIONS. A SEPARATE PERMIT FOR THE WIRING AND PLUMBING MUST BE OBTAINED. SEPARATE PERMITS ARE REQUIRED IF ANSWER IS "YES" TO ANY OF ABOVE QUESTIONS (10) (11) (12) (13) (22) OR (24).

THIS IS NOT A BUILDING PERMIT. NO WORK SHALL BE STARTED UNTIL A BUILDING PERMIT IS ISSUED.

In dwellings, all insulating materials must have a clearance of not less than two inches from all electrical wires or equipment.

CHECK APPROPRIATE BOX
☑ OWNER     ☐ ARCHITECT
☐ LESSEE     ☐ AGENT
☐ CONTRACTOR     ☐ ENGINEER

### APPLICANT'S CERTIFICATION
I HEREBY CERTIFY AND AGREE THAT IF A PERMIT IS ISSUED FOR THE CONSTRUCTION DESCRIBED IN THIS APPLICATION, ALL THE PROVISIONS OF THE PERMIT AND ALL LAWS AND ORDINANCES THERETO WILL BE COMPLIED WITH.

REV 06/13

### NOTICE TO APPLICANT

HOLD HARMLESS CLAUSE. The permittee(s) by acceptance of the permit, agree(s) to indemnify and hold harmless the City and County of San Francisco from and against any and all claims, demands and actions for damages resulting from operations under this permit, regardless of negligence of the City and County of San Francisco, and assumes the defense of the City and County of San Francisco against all such claims, demands or actions.

In conformity with the provisions of Section 3600 of the Labor Code of the State of California, the applicant shall have worker's compensation coverage under (I) or (II) designated below, or shall indicate item (III), (IV), or (V), whichever is applicable. If however item (V) is checked, item (IV) must be checked as well. Mark the appropriate method of compliance below.

I hereby affirm under penalty of perjury one of the following declarations:

( ) I.   I have and will maintain a certificate of consent to self-insure for worker's compensation, as provided by Section 3700 of the Labor Code, for the performance of the work for which this permit is issued.

( ) II.  I have and will maintain worker's compensation insurance, as required by Section 3700 of the Labor Code, for the performance of the work for which this permit is issued. My worker's compensation insurance carrier and policy number are:

Carrier
Policy Number

( ) III. The cost of the work to be done is $100 or less.

( ) IV.  I certify that in the performance of the work for which this permit is issued, I shall not employ any person in any manner so as to become subject to the worker's compensation laws of California. I further acknowledge that I understand that in the event that I should become subject to the worker's compensation provisions of the Labor Code of California and fail to comply forthwith with the provisions of Section 3800 of the Labor Code, that the permit shall be deemed revoked.

(X) V.   I certify as the owner or the agent for the owner that in the performance of the work for which this permit is issued, I will employ a contractor who complies with the worker's compensation laws of California and who, prior to the commencement of any work, will file a completed copy of this form with the Central Permit Bureau.

Signature of Applicant or Agent                    Date

OFFICE COPY

EXHIBIT
Co HL
GALLAGHER 8-31-25

6.1

OFFICIAL COPY

SAN FRANCISCO
DBI
DEPARTMENT OF
BUILDING INSPECTION

**CONDITIONS AND STIPULATIONS**

FOR OFFICE USE ONLY

| APPROVED: | | |
|---|---|---|
| Stephan Leung, DBI | DATE: OCT 1 8 2019 | |
| MAY 23 2019 | REASON: B.I.D. — | |
| BUILDING INSPECTOR, DEPT. OF BLDG. INSP. | OK TO PROCESS | |
| | OK TO PROCESS TO END 7/16/18 | |
| | NOTIFIED MR. | |

APPROVED: APPROVED DORMERS AND NEW FIBREX COMPOSITE WINDOWS

APR 1 8 2019

DEPARTMENT OF CITY PLANNING Dept. Cathleen Campbell

DATE: _____
REASON: _____

NOTIFIED MR. _____

APPROVED:

BUREAU OF FIRE PREVENTION & PUBLIC SAFETY

DATE: _____
REASON: _____

NOTIFIED MR. _____

APPROVED:

MECHANICAL ENGINEER, DEPT. OF BLDG. INSPECTION

DATE: _____
REASON: _____

NOTIFIED MR. _____

APPROVED:

Stephan Leung, DBI

MAY 23 2019

CIVIL ENGINEER, DEPT. OF BLDG. INSPECTION

DATE: _____
REASON: .

NOTIFIED MR. _____

APPROVED:

BUREAU OF ENGINEERING

DATE: _____
REASON: _____

NOTIFIED MR. _____

APPROVED:

DEPARTMENT OF PUBLIC HEALTH

DATE: _____
REASON: _____

NOTIFIED MR. _____

APPROVED:

REDEVELOPMENT AGENCY

DATE: _____
REASON: _____

NOTIFIED MR. _____

APPROVED:

HIS records indicate _R3 unit_

FOR WORK STATED ONLY    HOUSING INSPECTION DIVISION    10/8/18

DATE: _____
REASON: _____

NOTIFIED MR. _____

HOLD SECTION - NOTE DATES AND NAMES OF ALL PERSONS NOTIFIED DURING PROCESSING

I agree to comply with all conditions or stipulations of the various bureaus or departments noted on this application, and attached statements of conditions or stipulations, which are hereby made a part of this application.

Number of attachments [   ]

OWNER'S AUTHORIZED AGENT




NOT FOR PUBLIC USE

OFFICIAL COPY

**Department of Building Inspection.**
City & County of San Francisco
1660 Mission Street, San Francisco, CA 94103-2414

Page 1

**DEPARTMENT OF BUILDING INSPECTION**

**Receipt for Filing Fees Paid (Plancheck Receipt)**          **Receipt No: 18109626**

FOR OFFICE USE ONLY

| Application Number | Address |
| --- | --- |
| 201810183586 | 200 NAPLES ST |

| Filing Fees based on Estimated Cost: | $ | 4000.00 | |
| --- | --- | --- | --- |
| Fee Code | Description | | Fee Amount |
| DCP-F | DCP Plan Check (F) | | 395.00 |
| BLDGSTD-F | Bldg Stds Admin Spec Revolv Fund | | 1.00 |
| PLAN REV-F | Plan Review (filing) DBI | | 224.34 |
| | | **Total Filing Fees** | **620.34** |

| Payments | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Payment Stage | Type | Paid By | Pay Date | Receipt # | Rec By | Payment Amount |
| FILING | CHECK | G.C. BLOCK INV. LLC 925-325-3911 P.O. BOX 523 BYRON CA 94514 | 10/25/2018 | 18109626 | NGUTIERR | 620.34 |

|  |  |  |  | **Total Payments** |  | **620.34** |
| --- | --- | --- | --- | --- | --- | --- |

Printed on:   10/25/2018

6.3

**Attachment A**



**SAN FRANCISCO UNIFIED SCHOOL DISTRICT**
**CERTIFICATION OF PAYMENT OF SCHOOL FACILITY FEES**
**FORM 100**  (415) 241-6090  (See Other Side for Instructions)

**FOR OFFICE USE ONLY**

**I.  APPLICANT (Completed by Applicant)**         DBI FEE PAYMENT STAMP

Developer/Owner: _Patrick Gallagher_   Phone: _925-325-3911_

Or DBA: _____   Phone: _____

Mailing Address: _PO Box 523 Byron CA_   Zip: _94574_

Contact Name: _Patrick Gallagher_   Phone: _____

Email: _BIGBLOCKPAT@GMAIL.COM_ (Use N/A when no email is available)

**II.  SITE INFORMATION (Completed by Applicant)**

Permit Application No(s): _2018-1018-3586_

Project Site Address or Legal Description: _200 Naples Street_

**III.  AREA/SQUARE FOOTAGE (Completed by Plan Checker)**

Plan Checker's Name (Print): _Stephen Leung_   Tel. No: (415) _558-6495_

Email: _Stephen.Leung_ @sfgov.org

| Residential Construction | Total Area Square Feet | DBI Initials | SFUSD Fee |
|---|---|---|---|
| 1  Total Habitable Space - New Construction, Additions and Conversions (Space in a structure used for living, sleeping, eating or cooking. Bathrooms, toilet compartments, closets, halls, storage or utility space and similar areas are not considered habitable space). | | | $ |
| 2  Exemption from fees - additions & alterations with 500 sq.ft. or less of new habitable space, taking into account any decrease in existing habitable space that results from the construction.  (If the addition exceeds 500 sq. ft., fees are charged on the entire addition.) | 88 ft² | SL | NO SCHOOL FEE |
| 3  New Senior Citizen Housing (Used exclusively for the housing of senior citizens) | | | $ |
| Commercial/Industrial Construction New Construction and Additions | | | |
| 1  Office  (See DBI Information Sheet | | | $ |
| 2  Hotel/Motel  No.G-11 for use descriptions) | | | $ |
| 3  Retail and Services | | | $ |
| 4  Research and Development | | | $ |
| 5  Industrial/Warehouse/Manufacturing | | | $ |
| Total Fees Due (SFUSD Signature/Date) | | $ | |

**IV.  Signed by Developer/Owner or authorized agent at time of Fee Payment.  The undersigned agrees that:**

1.  The above information is correct and true to the best of my knowledge and that I will file an amended certification of payment and pay the additional fee if I request an increase in the square footage after the building permit has been issued or if the initial determination of the square footage is found to be incorrect.

2.  I am the Developer/Owner of the above described project(s) or I am authorized to sign on their behalf.

Name: _____   Organization: _____

Signature: _____   Title: _____   Date: _____

OFFICIAL COPY

SAN FRANCISCO

Attachment A

# SCHOOL FACILITY FEE PAYMENT PROCEDURE

Process at: San Francisco Department of Building Inspection, 1660 Mission Street, S.F. CA 94103

## CERTIFICATION OF PAYMENT OF SCHOOL FACILITY FEES FORM

BUILDING INSPECTION

FOR OFFICE USE ONLY

1. **New Construction, additions, conversions and alteration projects** - This Certification of Payment of School Facility Fee Form 100 is always required, without exceptions.

2. **Statutory Exemptions (Section III(2)- Residential Additions of 500 Square Feet or Less)** – For projects that conform, school fee payment is not required. However, this Form 100 is required to document the exemption status of conforming projects. On the front of Form 100, Plan Checker shall state the Total Area Square Feet, initial, and write NO SCHOOL FEE under the SFUSD Fee column. Developer/Owner/authorized agent shall complete Sections I and II, but does not need to sign Section IV. The form submittal process follows steps outlined in accordance with item 1 or 2 below, whichever is applicable. However, there is no fee payment to be collected.

3. **Other Statutory Exemptions listed on Form 100A** - For projects that conform, school fee payment is not required. However, both this Form 100 and SFUSD Certification of Statutory Exemption-Form 100A are required to document exempt status of conforming projects. The Developer/Owner and Plan Checker shall both complete Form 100. Property owner shall complete and sign Form 100A. Both forms 100 & 100A shall then be submitted to SFUSD for review and approval, following the applicable submittal process of step 1 or 2 below.

## WHEN SCHOOL FACILITY FEE PAYMENT IS REQUIRED

1. **Submitted Plan Review** - Applicant completes Sections I & II of this Form 100 and submits to Central Permit Bureau (CPB) clerk in addition to the submittal documents and plans. Under plan review, Plan Checker completes Part III, staples a copy with the application and places the completed form in the Plan Review Section's (PRS) 2nd floor SFUSD collection box. The forms will be delivered to 1st floor CPB for emailing to SFUSD for fee calculation and approval.

2. **Over-the-Counter Plan Review (OTC)** - Applicant completes Sections I & II and submits to the OTC Plan Checker. During plan review, Plan Checker completes Section III, staples a copy with the application and places another copy in the OTC 5th floor SFUSD collection box. The forms will be delivered to 1st floor CPB for emailing to SFUSD. The applicant retains the submittal documents and completes the review process with the appropriate review stations and agencies. Even if all agency approvals are secured, applicant cannot pay for the permit until the form has been processed and approved by SFUSD.

3. **Approval of SFUSD Form** – SFUSD calculates the fee, approves the form and emails it back to CPB. CPB will then update the Permit Tracking System (PTS) school fee payment status under the Permit Application No. (PA#).

4. **Status Check for School Fee Calculation** - Applicant may call CPB at 415/558-6070 to verify the status of the SFUSD school fee payment approval process. Alternatively, applicant can check the status on the Permit Tracking System (PTS) at www.sfdbi.org. To conduct the web search the Building Permit Application No. will be required for input.

5. **Payment of School Fee for Submitted Plan Review** - School fees will be collected by CPB as part of the building permit payment process. At time of fee payment, applicant signs Form 100, Section IV.

6. **Payment of School Fee for OTC Plan Review** - Applicant can go to 1st floor CPB to get a copy of the SFUSD approved Form 100 after SFUSD has returned the form to CPB (see item 4 above). Applicant takes Form 100 and the approved permit documents, which have been in applicant's possession, to the 5th floor OTC cashier. School fees will be collected as part of the building permit payment process. At time of fee payment, applicant signs Form 100, Section IV.

7. **Disagreements over Area Calculation for Submitted Plan Reviews** - Disagreements and disputes shall be addressed prior to payment of the building permit fees. When plans have already been routed to CPB for permit issuance, request that the permit documents be re-routed from CPB to the Permit Processing Center (PPC) located on the 2nd floor. Contact the Plan Checker for a re-check appointment to review the area calculations. If no resolution is reached, applicant may make an appointment with the Technical Services Division (TSD) on the 1st floor to request a 2nd opinion. All permit documents shall remain in the possession of DBI staff. PRS will internally route plans to TSD for review.

8. **Disagreements over Area Calculation for OTC Reviews** - Disagreements and disputes for OTC projects shall be addressed with the Plan Checker. Applicant may request a 2nd opinion from an OTC supervisor on the 5th floor.

9. **Refund of School Fee** – If a refund is required because the project is cancelled or the project scope and calculated area is reduced, CPB shall e-mail the revised FORM 100 to SFUSD. SFUSD will confirm that payment has been received prior to issuing a refund. Applicant may call San Francisco Unified School District, Real Estate & Permit office at (415) 241-6090 to check the refund status.

10. **Additional School Fee for Commercial/Industrial Projects**– Projects that increase the calculated area after permit issuance will pay additional School Fees for the added area only. Applicant and Plan Checker shall complete a new Form 100. CPB shall e-mail the new FORM 100 and supporting documentation to SFUSD for approval (see #3 above). CPB will collect the additional fee as part of the building permit payment process.

11. **Additional School Fee for Residential Projects:**
    a. **Exceeding 500 Sq. Ft. of habitable area originally** – Projects that increase the calculated habitable area after permit issuance shall pay additional School Fees for the added habitable area only. Applicant and Plan Checker shall complete a new Form 100. CPB shall e-mail the new FORM 100 to SFUSD for approval (see #3 above). CPB will collect the additional fee as part of the building permit payment process
    b. **Not Exceeding 500 Sq. Ft. of habitable area originally (statutory exemption)** - Projects that increase the calculated habitable area after permit issuance shall pay School Fees for the total habitable area (once it exceeds 500 Sq. Ft. & it no longer qualifies for statutory exempt status). In cases when the original plus added calculated habitable area together still does not exceed 500 Sq. Ft. they continue to qualify for statutory exempt status and no fee will be collected. In call cases, a new Form 100 shall be completed by applicant and Plan Checker and processed by SFUSD. CPB will collect the School Fee only when applicable.

OFFICIAL COPY

City and County of San Francisco
DEPARTMENT OF Building Inspection
BUILDING INSPECTION
FOR OFFICE USE ONLY



London N. Breed, Mayor
Tom C. Hui, S.E. C.B.B., Director

PERMIT APPLICATION #: 2018-0183-5-86

# PROPERTY OWNER'S PACKAGE

## Disclosures & Forms for Owner-Builders Applying for Construction Permits

### *IMPORTANT!* NOTICE TO PROPERTY OWNER

An application for a building permit has been submitted in your name listing yourself as the builder of the property improvements specified at [ Voc — L x) L5 — 56 ]

We are providing you with an Owner-Builder Acknowledgment and Information Verification Form to make you aware of your responsibilities and possible risk you may incur by having this permit issued in your name as the Owner-Builder. **We will not issue a building permit until you have read, initialed your understanding of each provision, signed, and returned this form to us at our official address indicated.** An agent of the owner cannot execute this notice unless you, the property owner, obtain the prior approval of the permitting authority.

### OWNER'S ACKNOWLEDGMENT AND VERIFICATION OF INFORMATION

*(DIRECTIONS: Read and initial each statement below to signify you understand or verify this information.)*

1) I understand a frequent practice of unlicensed persons is to have the property owner obtain an "Owner-Builder" building permit that erroneously implies that the property owner is providing his or her own labor and material personally. I, as an Owner-Builder, may be held liable and subject to serious financial risk for any injuries sustained by an unlicensed person and his or her employees while working on my property. My homeowner's insurance may not provide coverage for those injuries. I am willfully acting as an Owner-Builder and am aware of the limits of my insurance coverage for injuries to workers on my property.

2) I understand building permits are not required to be signed by property owners unless they are *responsible* for the construction and are not hiring a licensed Contractor to assume this responsibility.

3) I understand as an "Owner-Builder" I am the responsible party of record on the permit. I understand that I may protect myself from potential financial risk by hiring a licensed Contractor and having the permit filed in his or her name instead of my own.

4) I understand Contractors are required by law to be licensed and bonded in California and to list their license numbers on permits and contracts.

5) I understand if I employ or otherwise engage any persons, other than California licensed Contractors, and the total value of my construction is at least five hundred dollars ($500), including labor and materials, I may be considered an "employer" under state and federal law.

6) I understand if I am considered an "employer" under state and federal law, I must register with the state and federal government, withhold payroll taxes, provide workers' compensation disability insurance, and contribute to unemployment compensation for each "employee." I also understand my failure to abide by these laws may subject me to serious financial risk.

7) I understand under California Contractors' State License Law, an Owner-Builder who builds single-family residential structures cannot legally build them with the intent to offer them for sale, unless *all* work is performed by licensed subcontractors and the number of structures does not exceed four within any calendar year, or all of the work is performed under contract with a licensed general building Contractor.

**1660 Mission Street – San Francisco CA 94103**
**Office (415) 558-6088 – FAX (415) 558-6401**
**Website: www.sfdbi.org**

8. I understand as an Owner-Builder if I sell the property for which this permit is issued, I may be held liable for any financial or personal injuries sustained by any subsequent owner(s) that result from any latent construction defects in the workmanship or materials.

9. I understand I may obtain more information regarding my obligations as an "employer" from the Internal Revenue Service, the United States Small Business Administration, the California Department of Benefit Payments, and the California Division of Industrial Accidents. I also understand I may contact the California Contractors' State License Board (CSLB) at 1-800-321-CSLB (2752) or www.cslb.ca.gov for more information about licensed contractors.

10. I am aware of and consent to an Owner-Builder building permit applied for in my name, and understand that I am the party legally and financially responsible for proposed construction activity at the following address:

r 260 NAPLES ST.

11. I agree that, as the party legally and financially responsible for this proposed construction activity, I will abide by all applicable laws and requirements that govern Owner-Builders as well as employers.

12. I agree to notify the issuer of this form immediately of any additions, deletions, or changes to any of the information I have provided on this form. Licensed contractors are regulated by laws designed to protect the public. If you contract with someone who does not have a license, the Contractors' State License Board may be unable to assist you with any financial loss you may sustain as a result of a complaint. Your only remedy against unlicensed Contractors may be in civil court. It is also important for you to understand that if an unlicensed Contractor or employee of that individual or firm is injured while working on your property, you may be held liable for damages. If you obtain a permit as Owner-Builder and wish to hire Contractors, you will be responsible for verifying whether or not those Contractors are properly licensed and the status of their workers' compensation insurance coverage.

**Before a building permit can be issued, this form must be completed and signed by the property owner and returned to the agency responsible for issuing the permit.** *Note: A copy of the property owner's driver's license, form notarization, or other verification acceptable to the agency is required to be presented when the permit is issued to verify the property owner's signature.*

Property Owner's Signature: _____    Date: 6/11/19

Note: The following Authorization Form is required to be completed by the property owner only when designating an agent of the property owner to apply for a construction permit for the Owner-Builder.

## AUTHORIZATION OF AGENT TO ACT ON PROPERTY OWNER'S BEHALF

Excluding the Notice to Property Owner, the execution of which I understand is my personal responsibility, I hereby authorize the following person(s) to act as my agent(s) to apply for, sign, and file the documents necessary to obtain an Owner-Builder Permit for my project.
Scope of Construction Project (or Description of Work): _____

Project Location or Address: _____

Name of Authorized Agent: _____    Phone: (___)_____

Address of Authorized Agent: _____
I declare under penalty of perjury that I am the property owner for the address listed above and I personally filled out the above information and certify its accuracy. *Note: A copy of the owner's driver's license, form notarization, or other verification acceptable to the agency is required to be presented when the permit is issued to verify the property owner's signature.*

Property Owner's Signature: _____    Date: _____

6.7

# Exhibit H

# NOTICE OF VIOLATION
### of the San Francisco Municipal Codes Regarding Unsafe, Substandard or Noncomplying Structure or Land or Occupancy

**OFFICIAL COPY** — NOT FOR PUBLIC DISTRIBUTION

**DEPARTMENT OF BUILDING INSPECTION**   **NOTICE:** 1   **NUMBER:** 202175602   **DATE:** 17-MAY-21
City and County of San Francisco
49 South Van Ness Ave, Suite 400 San Francisco, CA

**ADDRESS:** 200 NAPLES ST
**OCCUPANCY/USE:** R-3 (RESIDENTIAL- 1 & 2 UNIT DWELLINGS,TOWNHOUSES  **BLOCK:** 6008  **LOT:** 001

☐ If checked, this information is based upons site-observation only. Further research may indicate that legal use is different. If so, a revised Notice of Violation will be issued.

**OWNER/AGENT:** MADISON TRUST CO FBO PATRICK  **PHONE #:** --
**MAILING ADDRESS** MADISON TRUST CO FBO PATRIC
GALLAGHER PATRICK
PO BOX 523
BYRON CA          94514

**PERSON CONTACTED @ SITE:** MADISON TRUST CO FBO PATRICK P   **PHONE #:** --

## VIOLATION DESCRIPTION:
CODE/SECTION#

☐ **WORK WITHOUT PERMIT**    103A
☐ **ADDITIONAL WORK-PERMIT REQUIRED**    106A.4.7
☑ **EXPIRED OR** ☐ **CANCELLED PERMIT  PA#:**    106A.4.4; 106A.3.7
☐ **UNSAFE BUILDING**   ☐ **SEE ATTACHMENTS**    102A.1

Research in response to a complaint for the above addres has revealed that P.A. 201810183586 has expired without obtaining all the necessary sign offs to complete the permit.
Code/section SFBC 106A.4.4

Monthly monitoring fee applies.
Code/Section: SFBC 110A, Table 1A-K

## CORRECTIVE ACTION:
☐ **STOP ALL WORK SFBC 104.2.4**

☑ **FILE BUILDING PERMIT WITHIN** 15 **DAYS**    ☐ **(WITH PLANS)** A copy of This Notice Must Accompany the Permit Application
☑ **OBTAIN PERMIT WITHIN** 15 **DAYS AND COMPLETE ALL WORK WITHIN** 90 **DAYS, INCLUDING FINAL INSPECTION SIGNOFF.**
☐ **CORRECT VIOLATIONS WITHIN  DAYS.**    ☐ **NO PERMIT REQUIRED**
☐ YOU FAILED TO COMPLY WITH THE NOTICE(S) DATED  , THEREFORE THIS DEPT. HAS INITIATED ABATEMENT PROCEEDINGS.
● **FAILURE TO COMPLY WITH THIS NOTICE WILL CAUSE ABATEMENT PROCEEDINGS TO BEGIN. SEE ATTACHMENT FOR ADDITIONAL WARNINGS.**
Obtain a building permit to renew P.A. 201810183586. Obtain all necessary sign offs from District inspector to complete permit. At time of inspection building inspector to investigate remainder of complaint-illegal change of use. State on P.A. to comply with NOV 202175602.

**INVESTIGATION FEE OR OTHER FEE WILL APPLY**
☐ 9x FEE (WORK W/O PERMIT AFTER 9/1/60)   ☐ 2x FEE (WORK EXCEEDING SCOPE OF PERMIT)
☐ OTHER:    ☐ REINSPECTION FEE $    ☐ NO PENALTY (WORK W/O PERMIT PRIOR TO 9/1/60)
**APPROX. DATE OF WORK W/O PERMIT**    **VALUE OF WORK PERFORMED W/O PERMITS $**

**BY ORDER OF THE DIRECTOR, DEPARTMENT OF BUILDING INSPECTION**
**CONTACT INSPECTOR:** Thomas D Keane
**PHONE #** 628-652-3447   **DIVISION:** BID   **DISTRICT :**
**By:(Inspectors's Signature)** _____

EXHIBIT 7 HL
GALLAGHER 7-31-25

7.1

# NOTICE OF VIOLATION
### of the San Francisco Municipal Codes Regarding Unsafe,
### Substandard or Noncomplying Structure or Land or Occupancy

**FOR OFFICE USE ONLY**

Pursuant to SFBC 107A.5 and 106A 4.7 investigation fees are charged for work begun or performed without permits or for Work exceeding the scope of permits. Such fees may be appealed to the Board of Permit Appeals within 15 days of permit issuance, at 49 South Van Ness Ave., Suite 1475 (14th Floor), (628) 652-1150.

**WARNING:** Failure to take immediate action as required to correct the above violations will result in abatement proceedings by the Department of Building Inspection. If an Order of Abatement is recorded against this property, the owner will be billed or the property will be liened for all costs incurred in the code enforcement process from the posting of the first "Notice of Violation" until all costs are paid. SFBC 102A.2 & 110A.

**WARNING:** Section 204 of the San Francisco Housing Code provides for immediate fines of $100 for each instance of initial non-compliance, followed by $200 fines per violation for the second instance of non-compliance, up to a maximum of $7,500 per building. This section also provides for issuance of a criminal charge as a misdemeanor for each violation, resulting in fines of not less than $1,000 per day or six months' imprisonment or both.

**WARNING:** Anyone who derives rental income from housing determined by the Department of Building Inspection to be substandard **cannot deduct** from state personal income tax and bank and corporate income tax interest, depreciation or taxes attributable to such substandard structure. If correction work is not completed or being diligently, expeditiously and continuously prosecuted after six (6) months from the date of this notice, notification will be sent to the Franchise Tax Board as provided in Section 17264(6) of the Revenue and Taxation Code.

**WARNING:** Section 103A of the San Francisco Building Code provides for civil fines of up to $500 per day for any person who violates, disobeys, omits, neglects or refuses to comply with or opposes the execution of any provisions of this code. This section also provides for misdemeanor fines, if convicted, of up to $500 and/or imprisonment up to six months for each separate offense for every such offense occurs.

De acuerdo a las Secciones 107A.5 y 106A 4.7 de el Codigo de Construcción. de Edificios de San Francisco, gastos de investigación serán cobrados por trabajo empezado o realizado sin los debidos permisos o por trabajo que exceda el límite estipulado en los permisos. Dichos cobros pueden ser apelados ante la Junta de Apelaciones de Permisos (Board of Permit Appeals) dentro de los primeros quince dias de haberse obtenido el permiso. Las apelaciones se hacen en el 49 South Van Ness Ave., Suite 1475 (14th Floor), telefono (628) 652-1150.

**ADVERTENCIA:** Si no cumple con las acciones inmediatas requeridas para corregir las infracciones, el Departamento de Inspección de Edificios tendra el derecho de iniciar el proceso de mitigación. Si una Orden de Mitigación es registrada contra dicha propiedad, los gastos incurridos durante el proceso de aplicación del código, desde la primera puesta del Aviso de Infracción hasta que todos los gastos estén pagados, se le cobraran al dueño del edificio o la propiedad será embargada para recuperar dichos gastos. Referencia a la Sección 102A.2 y 110A de el Código de Construcción de Edificios.

**ADVERTENCIA:** La Sección 204 de el Código de Vivienda de San Francisco permite que se multa inmediatamente $100 por cada primer caso de inconformidad, seguida por una multa. de $200 por cada segunda infracción de inconformidad, aumentando hasta un máximo de $7,500 por cada edificio. Esta Sección tambien permite obtener cargos criminales como delito menor, resultando en multas de no menos de $1,000 diarios ó 6 meses de encarcelamiento o ambas sanciones.

**ADVERTENCIA:** Cualquier persona que reciba renta por una vivienda que haya sido declarada que no satisface las normas requeridas por el Departamento de Inspección de Edificios, no puede deducir del estado intereses personales, de banco o empresa, depreciación o taxes atribuidos sobre dicha estructura. Si el trabajo de reparación no se termina o esta diligentemente, rapidamente y continuamente acusado despues de seis(c) meses de la fecha de este aviso, se le enviara una notificación a la Junta de Concesion de Impuestos (Franchise Tax Board) de acuerdo a la Sección 1264(c) del Código de ingresos e impuestos (Revenue and Taxation Code).

**ADVERTENCIA:** La Sección 103A de el Código de edificios de San Francisco impone multas civiles hasta de $500 por cada dia a cualquier persona que infrinja, desobedezca, omita, descuide, se niega a cumplir, resiste o se opone a la ejecución de las provisiones de este codigo. Esta sección tambien impone multas per delito menor, si es declarado culpable, de hasta $500 o encarcelamiento hasta 6 meses. o ambas sanciones. por cada una de las ofensas y por cada dia que dicha ofensa occura.

Sang-ayon sa SFBC 107A.5 at 106A.4.7 ang bayad sa pagsusuri ay sisingilin sa mga gusaling naumpisahan na o ginawa na walang permit o sa mga gawaing labis sa sakop ng permit. Ang gayong singil ay maaring iapela sa Board of Permit Appeals sa loob ng 15 na araw mula sa pag-isyu ng permit sa 49 South Van Ness Ave., suite 1475 (14th palapag). (628)652-1150.

**BABALA:** Ang kabiguan na gumawa ng aksiyon tulad ng kinakailangan upang iwasto ang mga nasabing paglabag ay magreresulta sa paglilitis ng abatement ng Kagawaran ng Inspeksyon ng Gusali. Kung meron Order of Abatement ang naitala laban sa isang ari-arian, ang may-ari ay sisingilin o di kaya ang an-arian ay gagamitin na lien sa lahat ng mga gastos na natamo sa proseso ng pagpapatupad mula sa unang "Paunawa sa Paglabag" hanggang sa lahat ng gastos ay mabayaran. SFBC 102A.2 & 110A.

**BABALA:** Ang Seksyon 204 ng Housing Code ng San Francisco ay nagtatakda ng agad-agad na multa na $100 sa bawat halimbawa ng unang hindi pagsunod, at susundan ng multa na $200 sa bawat paglabag sa pangalawang hindi pagsunod, hanggang sa sukdulan na $7,500 sa bawat gusali. Ang seksyon na ito ay itinatakda na magsasampa rin ng kasong kriminal bilang isang misdemeanor sa bawat paglabag at magreresulta sa multa na hindi bababa ng $1,000 sa bawat araw o di kaya sa anim na buwan na pagkabilanggo o parehong ipapataw.

**BABALA:** Sinumang kumikita sa pag-upa ng pabahay na tinukoy ng Kagawaran ng Inspeksyon ng Gusali na substandard, ay hindi maaring ibawas ang ganoong kita sa buwis na estado ng kitang personal, at gayundin sa buwis na kita sa interes sa bangko at korporasyon, at sa depresasyon o mga buwis na maiugnay sa gusaling substandard. Kung ang Gawain sa pagpapawasto ay hindi nakumpleto o hindi masigasig, mabilis at tuloy-tuloy ang pagpawa matapos ang anim (6) na buwan mula sa petsa nitong paunawa, ay magpapadala ng abiso sa Franchise Tax Board na itinakda sa Seksyon 17264(6) ng Revenue and Taxation code.

**BABALA:** Ang Seksyon 103A ng Building Code ng San Francisco ay nagtatakda ng mga multang sibil hanggang sa $500 sa bawat araw sa sinumang lumabag, sumuway, magtanggol, magpabaya o tumangging sumunod o di kaya sumalungat sa pagpatupad ng mga probisyon nitong code. Nagpapataw din itong seksyon ng multang misdemeanor kapag nahatulan, ng hanggang sa $500 at o di kaya anim na buwan na pagkabilanggo sa bawat magkakahiwalay na pagkasala para sa bawat araw na nangyari ang ganoong pagkasala.

根據《三藩市建築物條例》第107.5條款和第106.4.7條款，對未經許可的建築工程或要工程超過許可証範圍的檢查，將會收取檢查費用。對該費用可以作出上訴，可以在許可証發出的15天之內，向「上訴委員會」（Board of Appeals）作出上訴。上訴委員會地址：49 South Van Ness Ave., Suite 1475 (14th Floor)，電話：(628) 652-1150。

警告：如果沒有立即採取行動更正以上的違例情況，可能會引致矯正檢查局展開執法行動。如果執法命令正式紀錄於該物業，業主可能會收取費用，或者該物業會被抵押，用於支付證關局第一條"違例通知"開始，在執法過程中所產生的所有費用，直至所有費用相付清為止。《三藩市建築物條例》第102.2條款和第110條款。

警告：三藩市房屋條例第204條款對最初的違例會立即處以如項100元的罰款，接下來會對第二次的違例處以每項200元的罰款，最高可以對每座建築物處以7,500元的罰款。該條例還可以對每項違例處以刑事檢控，可處以每日最少1,000元的罰款或6個月的監禁，或兩者並罰。

警告：任何從樓宇收益所認定為低於標準的房屋中獲取租金收入的個人，，對於該低於標準的建築結構，將不能用於其個人所得稅和銀行以及企業的所得稅利息、折舊或適用於該房屋的稅項。如果在該違例如期內的6個月之後，更正工程尚未完成，違例不積極努力、快速和緊湊地進行施工，有關通知將會根據《收入及稅項條例》第17264（6）條款寄給加州平稅委員會。

警告：三藩市建築物條例第103條款規定對每天最高可至500元的行政罰款。對任何違反、不遵從、遺漏、疏忽或拒絕遵守或反對執行該條例的任何個人、違反該行政的罰款。一經定罪，可以對每一項單項的違例，違例期間的每一天，處於最高500元和/或處以6個月的監禁。

Exhibit I

# NOTICE OF VIOLATION
### of the San Francisco Municipal Codes Regarding Unsafe, Substandard or Noncomplying Structure or Land or Occupancy

NOT FOR PUBLIC DISTRIBUTION

OFFICIAL COPY

**DEPARTMENT OF BUILDING INSPECTION**     **NOTICE:** 2              **NUMBER:** 202175602
City and County of San Francisco                                      **DATE:** 08-JUN-21
**49 South Van Ness Ave, Suite 400 San Francisco, CA**

**ADDRESS:** 200 NAPLES ST

**OCCUPANCY/USE:** R-3 (RESIDENTIAL- 1 & 2 UNIT DWELLINGS,TOWNHOUSES **BLOCK:** 6008   **LOT:** 001

☐ If checked, this information is based upons site-observation only. Further research may indicate that legal use is different. If so, a revised Notice of Violation will be issued.

**OWNER/AGENT:** MADISON TRUST CO FBO PATRICK           **PHONE #:** --
**MAILING**      MADISON TRUST CO FBO PATRIC
**ADDRESS**      GALLAGHER PATRICK
                 PO BOX 523
                 BYRON CA            94514

**PERSON CONTACTED @ SITE:** MADISON TRUST CO FBO PATRICK P         **PHONE #:** --

## VIOLATION DESCRIPTION:

|  | | CODE/SECTION# |
|---|---|---|
| ☑ **WORK WITHOUT PERMIT** | | 103A |
| ☐ **ADDITIONAL WORK-PERMIT REQUIRED** | | 106A.4.7 |
| ☐ **EXPIRED OR** ☐ **CANCELLED PERMIT  PA#:** | | 106A.4.4; 106A.3.7 |
| ☐ **UNSAFE BUILDING** ☐ **SEE ATTACHMENTS** | | 102A.1 |

This is to amend 1st NOV issued on 5/17/2021. A site visit on 6/3/21 identify the following deviations from approved PA 201810183586 and approved plans.
-Stairs leading to 3rd floor not installed to approved plans. Stairs have been built as a straight run. Plans called out for U-Shape detail.
-Stairs leading from 1st floor to 2nd floor  was not constructed. A mechanical closet for furnace has been added on both floors modifying the existing and propose plans of having a communicating stairs from 1st floor to 2nd floor
-Windows have been replaced throughout
-1st floor area has been converted to an ADU by adding a full kitchen with stove, sink and cabinets. Plans under PA201810183586 shows this area to be compose of a storage with dryer, washer and furnace.-
-Plans for PA201810183586 show an existing ceiling height of 8ft and a propose height of 8ft on 1st floor level. Site conditions observed approx. 7ft in kitchen area (approved as storage area)
-Plans for PA201810183586 show an existing ceiling height of 8ft and a propose height of 8ft on 1st floor level. Site conditions observed approx. 7'3" in approved lower bedroom
Code/Section: SFBC 106.4.7, SFBC 103A

Monthly monitoring fee applies.
Code/Section: SFBC 110A, Table 1A-K

## CORRECTIVE ACTION:

☑ **STOP ALL WORK SFBC 104.2.4**

☑ **FILE BUILDING PERMIT WITHIN** 30 **DAYS**      ☑ **(WITH PLANS)** A copy of This Notice Must Accompany the Permit Application
☑ **OBTAIN PERMIT WITHIN** 60 **DAYS AND COMPLETE ALL WORK WITHIN** 90 **DAYS, INCLUDING FINAL INSPECTION**
**AND** SIGN OFF.
☐ **CORRECT VIOLATIONS WITHIN  DAYS.**        ☐ **NO PERMIT REQUIRED**
☐ YOU FAILED TO COMPLY WITH THE NOTICE(S) DATED  , THEREFORE THIS DEPT. HAS INITIATED ABATEMENT PROCEEDINGS.

● **FAILURE TO COMPLY WITH THIS NOTICE WILL CAUSE ABATEMENT PROCEEDINGS TO BEGIN.**
**SEE ATTACHMENT FOR ADDITIONAL WARNINGS.**

1. Obtain a building permit with plans to legalize all work that deviated from the approved plans under PA201810183586. This will include any interior layout reconfiguration, faced changes, window replacement and separating the 2 and 3rd floor from 1st floor. Plans must show preexisting conditions that predates the approval of PA201810183586. Plans will also require as built conditions and





# NOTICE OF VIOLATION
### of the San Francisco Municipal Codes Regarding Unsafe,
### Substandard or Noncomplying Structure or Land or Occupancy

propose. City planning approval is requires

2. A separate permit will be required for the conversion of the 1st floor to an ADU

File an application for a Building permit required to legalize the unit pursuant to Building Code Section 106A 3.1.3 and Planning Code Section 207.3. Separate Electrical and Plumbing permits are required.

**INVESTIGATION FEE OR OTHER FEE WILL APPLY**

☐ 9x FEE (WORK W/O PERMIT AFTER  9/1/60)  ☑ 2x FEE (WORK EXCEEDING SCOPE OF PERMIT)

☐ OTHER:      ☐ REINSPECTION FEE $      ☐ NO PENALTY
(WORK W/O PERMIT PRIOR TO 9/1/60)

**APPROX. DATE OF WORK W/O PERMIT**      **VALUE OF WORK PERFORMED W/O PERMITS $15000**

### BY ORDER OF THE DIRECTOR, DEPARTMENT OF BUILDING INSPECTION

CONTACT INSPECTOR:  Mauricio E Hernandez

PHONE #  628-652-3440      DIVISION:  BID      DISTRICT :

By:(Inspectors's Signature) _____

8.2

Exhibit J

NOT FOR PUBLIC

OFFICIAL COPY

SAN FRANCISCO
DBI
DEPARTMENT OF
BUILDING INSPECTION

FOR OFFICE USE ONLY

APPROVED
Dept. of Building Insp.
San Francisco -
JUL 1 9 2021
PATRICK O'RIORDAN
INTERIM DIRECTOR

2021 75602  BFD  NOV-D
2021 75 41    CES  NOV-NP
202178577 c ES NOV-P
2021 78568 PFD
202178566 EID    201644272 HFS

BLDG.
FORM 3/8
APPLICATION NUMBER
2021 07 02 2920
OSHA APPROVAL REQ'D
APPROVAL NUMBER

## APPLICATION FOR BUILDING PERMIT
## ADDITIONS, ALTERATIONS OR REPAIRS

**CITY AND COUNTY OF SAN FRANCISCO**
**DEPARTMENT OF BUILDING INSPECTION**

APPLICATION IS HEREBY MADE TO THE DEPARTMENT OF
BUILDING INSPECTION OF SAN FRANCISCO FOR
PERMISSION TO BUILD IN ACCORDANCE WITH THE PLANS
AND SPECIFICATIONS SUBMITTED HEREWITH AND
ACCORDING TO THE DESCRIPTION AND FOR THE PURPOSE
HEREINAFTER SET FORTH.

FORM 3 ☐ OTHER AGENCIES REVIEW REQUIRED

FORM 8 ☒ OVER-THE-COUNTER ISSUANCE

NUMBER OF PLAN SETS

▼ DO NOT WRITE ABOVE THIS LINE ▼

| DATE FILED 7/2/2021 | FILING FEE RECEIPT NO. | (1) STREET ADDRESS OF JOB  200  NAPLES  ST | BLOCK & LOT  6008 | 001 |

| PERMIT NO. 15 /1994 | ISSUED  JUL 1 9 2021 | (2A) ESTIMATED COST OF JOB  1,000 | (2B) REVISED COST  $15,000 | DATE  7/69/2021 |

### INFORMATION TO BE FURNISHED BY ALL APPLICANTS

### LEGAL DESCRIPTION OF EXISTING BUILDING

| (4A) TYPE OF CONSTR.  WOOD 5B | (5A) NO. OF STORIES OF OCCUPANCY  2 | (6A) NO. OF BASEMENTS AND CELLARS | (7A) PRESENT USE  Single Family | (8A) OCCUP. CLASS  R3 | (9A) NO. OF DWELLING UNITS  1 |

### DESCRIPTION OF BUILDING AFTER PROPOSED ALTERATION

| (4) TYPE OF CONSTR.  5B | (5) NO. OF STORIES OF OCCUPANCY  2 | (6) NO. OF BASEMENTS AND CELLARS | (7) PROPOSED USE (LEGAL USE)  Single Family | (8) OCCUP. CLASS  R3 | (9) NO. OF DWELLING UNITS |

| (10) IS AUTO RUNWAY TO BE CONSTRUCTED OR ALTERED?  YES ☐ NO ☐ | (11) WILL STREET SPACE BE USED DURING CONSTRUCTION?  YES ☐ NO ☐ | (12) ELECTRICAL WORK TO BE PERFORMED?  YES ☐ NO ☐ | (13) PLUMBING WORK TO BE PERFORMED?  YES ☐ NO ☐ |

| (14) GENERAL CONTRACTOR  OWNER BUILDER | ADDRESS | ZIP | PHONE | CALIF. LIC. NO. | EXPIRATION DATE |

| (15) OWNER - LESSEE (CROSS ONE)  PATRICK GALLAGHER | ADDRESS  200 Naples | ZIP  94112 | BTRC# | PHONE (FOR CONTACT BY DEPT.)  925-325-3971 |

(16) WRITE IN DESCRIPTION OF ALL WORK TO BE PERFORMED UNDER THIS APPLICATION (REFERENCE TO PLANS IS NOT ACCEPTABLE)

To partially comply with NOV 202175602  Drawing Revision
Document All Changes 9A 2018101835 86
Cesation New Windows Revise Stair (EXISTING) (5)
Document Change to Stairway Clarify Voluntary
Show Existing Mech. Closet Seismic Retrofit
9A 2018-1018-0-2586

### ADDITIONAL INFORMATION

| (17) DOES THIS ALTERATION CREATE ADDITIONAL HEIGHT OR STORY TO BUILDING?  YES ☐ NO ☐ | (18) IF (17) IS YES, STATE NEW HEIGHT AT CENTER LINE OF FRONT | (19) DOES THIS ALTERATION CREATE DECK OR HORIZ. EXTENSION TO BUILDING?  YES ☐ NO ☐ | (20) IF (19) IS YES, STATE NEW GROUND FLOOR AREA  SQ. FT. |

| (21) WILL SIDEWALK OVER SUB-SIDEWALK SPACE BE REPAIRED OR ALTERED?  YES ☐ NO ☐ | (22) WILL BUILDING EXTEND BEYOND PROPERTY LINE?  YES ☐ NO ☐ | (23) ANY OTHER EXISTING BLDG. ON LOT? (IF YES, SHOW ON PLOT PLAN)  YES ☐ NO ☐ | (24) DOES THIS ALTERATION CONSTITUTE A CHANGE OF OCCUPANCY?  YES ☐ NO ☐ |

| (25) ARCHITECT OR ENGINEER (DESIGN ☐ CONSTRUCTION ☐) | ADDRESS | CALIF. CERTIFICATE NO. |

| (26) CONSTRUCTION LENDER (ENTER NAME AND BRANCH DESIGNATION IF ANY. IF THERE IS NO KNOWN CONSTRUCTION LENDER, ENTER "UNKNOWN") | ADDRESS |

### IMPORTANT NOTICES

No change shall be made in the character of the occupancy or use without first obtaining a Building Permit authorizing such change. See San Francisco Building Code and San Francisco Housing Code.

No portion of building or structure or scaffolding used during construction is to be closer than 6'0" to any wire containing more than 750 volts. See Sec 385, California Penal Code.

Pursuant to San Francisco Building Code, the building permit shall be posted on the job. The owner is responsible for approved plans and application being kept at building site.

Grade lines as shown on drawings accompanying this application are assumed to be correct. If actual grade lines are not the same as shown, revised drawings showing correct grade lines, cuts and fills, and complete details of retaining wall and toll footings must be submitted to this department for approval.

ANY STIPULATION REQUIRED HEREIN OR BY CODE MAY BE APPEALED.

BUILDING NOT TO BE OCCUPIED UNTIL CERTIFICATE OF FINAL COMPLETION IS POSTED ON THE BUILDING OR PERMIT OF OCCUPANCY GRANTED, WHEN REQUIRED.

APPROVAL OF THIS APPLICATION DOES NOT CONSTITUTE AN APPROVAL FOR THE ELECTRICAL WIRING OR PLUMBING INSTALLATIONS. A SEPARATE PERMIT FOR THE WIRING AND PLUMBING MUST BE OBTAINED. SEPARATE PERMITS ARE REQUIRED IF ANSWER IS "YES" TO ANY OF ABOVE QUESTIONS (10) (11) (12) (13) (22) OR (24).

THIS IS NOT A BUILDING PERMIT. NO WORK SHALL BE STARTED UNTIL A BUILDING PERMIT IS ISSUED.

In dwellings, all insulating materials must have a clearance of not less than two inches from all electrical wires or equipment.

CHECK APPROPRIATE BOX
☒ OWNER    ☐ ARCHITECT
☐ LESSEE    ☐ AGENT
☐ CONTRACTOR    ☐ ENGINEER

### APPLICANT'S CERTIFICATION

I HEREBY CERTIFY AND AGREE THAT IF A PERMIT IS ISSUED FOR THE CONSTRUCTION DESCRIBED IN THIS APPLICATION, ALL THE PROVISIONS OF THE PERMIT AND ALL LAWS AND ORDINANCES THERETO WILL BE COMPLIED WITH.

REV 06/13

### NOTICE TO APPLICANT

HOLD HARMLESS CLAUSE. The permittee(s) by acceptance of the permit, agree(s) to indemnify and hold harmless the City and County of San Francisco from and against any and all claims, demands and actions for damages resulting from operations under this permit, regardless of negligence of the City and County of San Francisco, and assume the defense of the City and County of San Francisco against all such claims, demands and actions.

In conformity with the provisions of Section 3800 of the Labor Code of the State of California, the worker's compensation coverage under (i) or (ii) designated below, or shall indicate item (iii), (IV), or (V), whichever is applicable. If however item (V) is checked, item (IV) must be checked as well. Mark the appropriate method of compliance below.

I hereby affirm under penalty of perjury one of the following declarations:

( )  I.  I have and will maintain a certificate of consent to self-insure for worker's compensation, as provided by Section 3700 of the Labor Code, for the performance of the work for which this permit is issued.

( )  II.  I have and will maintain worker's compensation insurance, as required by Section 3700 of the Labor Code, for the performance of the work for which this permit is issued.  My worker's compensation insurance carrier and policy number are:
Carrier
Policy Number

( )  III.  The cost of the work to be done is $100 or less.

(✗)  IV.  I certify that in the performance of the work for which this permit is issued, I shall not employ any person in any manner so as to become subject to the worker's compensation laws of California. I further acknowledge that I understand that in the event that I should become subject to the worker's compensation provisions of the Labor Code of California and fail to comply forthwith with the provisions of Section 3800 of the Labor Code, that the permit herein applied for shall be deemed revoked.

(✗)  V.  I certify as the owner (or the agent for the owner) that in the performance of the work for which this permit is issued, I will employ a contractor who complies with the worker's compensation laws of California and who, prior to the commencement of any work, will file a completed copy of this form with the Central Permit Bureau.

Signature of Applicant or Agent          Date

OFFICE COPY

EXHIBIT
9  HL
GALLAGHER 7-31-25
GALLAGHER 000-031-00688

9.1

OFFICIAL COPY

## CONDITIONS AND STIPULATIONS

**REFERRED APPROVED:**

_David Jones, DBI_

JUL 19 2021

BUILDING INSPECTOR, DEPT. OF BLDG. INSP.

FOR OFFICE USE ONLY

DATE: 7/2/21
REASON:
OK to process
COM
NOTIFIED MR.

**APPROVED:** legalization of windows (previously approved) and interim stairwell configuration.

_Alt west 7/6/21_
Approved Planning Dept. Alex Westhoff

DEPARTMENT OF CITY PLANNING

DATE: 7/6/21
REASON:
OK to issue
BOB CHRISTINA
PLD
NOTIFIED MR.

**APPROVED:**

BUREAU OF FIRE PREVENTION & PUBLIC SAFETY

DATE: 7/2/21
REASON:
R. EID
OK to Process
Must address NOV's & Complaints
NOTIFIED MR

**APPROVED:**

MECHANICAL ENGINEER, DEPT. OF BLDG. INSPECTION

DATE: _____
REASON:

NOTIFIED MR.

**APPROVED:**

N/A DWB 7/19/2021

CIVIL ENGINEER, DEPT. OF BLDG. INSPECTION

DATE: _____
REASON:

NOTIFIED MR.

**APPROVED:**

BUREAU OF ENGINEERING

DATE: _____
REASON:

NOTIFIED MR.

**APPROVED:**

DEPARTMENT OF PUBLIC HEALTH

DATE: _____
REASON:

NOTIFIED MR.

**APPROVED:**

_Inspector M. Chung, CES_

JUL 02 2021

REDEVELOPMENT AGENCY

DATE: 07/02/2021
REASON:
OK to process
MC
NOTIFIED MR. CES

**APPROVED:**

FOR WORK STATED ONLY

HOUSING INSPECTION DIVISION

DATE: _____
REASON:

NOTIFIED MR.

_SECTION - NOTE DATES AND NAMES OF ALL PERSONS NOTIFIED DURING PROCESSING_

I agree to comply with all conditions or stipulations of the various bureaus or departments noted on this application, and attached statements of conditions or stipulations, which are hereby made a part of this application.

Number of attachments [ ]

_____
OWNER'S AUTHORIZED AGENT

9.2



OFFICIAL COPY

City and County of San Francisco
Department of Building Inspection

**London N. Breed, Mayor**
**Patrick O'Riordan, Interim Director**

DEPARTMENT OF
BUILDING INSPECTION

FOR OFFICE USE ONLY

# PROPERTY OWNER'S PACKAGE

## Disclosures & Forms for Owner-Builders Applying for Construction Permits

### *IMPORTANT!* NOTICE TO PROPERTY OWNER

Dear Property Owner:

An application for a building permit has been submitted in your name listing yourself as the builder of the property improvements specified at _____.

We are providing you with an Owner-Builder Acknowledgment and Information Verification Form to make you aware of your responsibilities and possible risk you may incur by having this permit issued in your name as the Owner-Builder. **We will not issue a building permit until you have read, initialed your understanding of each provision, signed, and returned this form to us at our official address indicated.** An agent of the owner cannot execute this notice unless you, the property owner, obtain the prior approval of the permitting authority.

### OWNER'S ACKNOWLEDGMENT AND VERIFICATION OF INFORMATION

*DIRECTIONS: Read and initial each statement below to signify you understand or verify this information.*

___ 1. I understand a frequent practice of unlicensed persons is to have the property owner obtain an "Owner-Builder" building permit that erroneously implies that the property owner is providing his or her own labor and material personally. I, as an Owner-Builder, may be held liable and subject to serious financial risk for any injuries sustained by an unlicensed person and his or her employees while working on my property. My homeowner's insurance may not provide coverage for those injuries. I am willfully acting as an Owner-Builder and am aware of the limits of my insurance coverage for injuries to workers on my property.

___ 2. I understand building permits are not required to be signed by property owners unless they are responsible for the construction and are not hiring a licensed Contractor to assume this responsibility.

___ 3. I understand as an "Owner-Builder" I am the responsible party of record on the permit. I understand that I may protect myself from potential financial risk by hiring a licensed Contractor and having the permit filed in his or her name instead of my own.

___ 4. I understand Contractors are required by law to be licensed and bonded in California and to list their license numbers on permits and contracts.

___ 5. I understand if I employ or otherwise engage any persons, other than California licensed Contractors, and the total value of my construction is at least five hundred dollars ($500), including labor and materials, I may be considered an "employer" under state and federal law.

___ 6. I understand if I am considered an "employer" under state and federal law, I must register with the state and federal government, withhold payroll taxes, provide workers' compensation disability insurance, and contribute to unemployment compensation for each "employee." I also understand my failure to abide by these laws may subject me to serious financial risk.

___ 7. I understand under California Contractors' State License Law, an Owner-Builder who builds single-family residential structures cannot legally build them with the intent to offer them for sale, unless *all* work is performed by licensed subcontractors and the number of structures does not exceed four within any calendar year, or all of the work is performed under contract with a licensed general building Contractor.

9.3

OFFICIAL COPY

SAN FRANCISCO

DEPARTMENT
BUILDING INSPECTION
FOR OFFICE USE ONLY

as an Owner-Builder if I sell the property for which this permit is issued, I may be held liable for any financial or personal injuries sustained by any subsequent owner(s) that result from any latent construction defects in the workmanship or materials.

9. I understand I may obtain more information regarding my obligations as an "employer" from the Internal Revenue Service, the United States Small Business Administration, the California Department of Benefit Payments, and the California Division of Industrial Accidents. I also understand I may contact the California Contractors' State License Board (CSLB) at 1-800-321-CSLB (2752) or www.cslb.ca.gov for more information about licensed contractors.

10. I am aware of and consent to an Owner-Builder building permit applied for in my name, and understand that I am the party legally and financially responsible for proposed construction activity at the following address:

_____

11. I agree that, as the party legally and financially responsible for this proposed construction activity, I will abide by all applicable laws and requirements that govern Owner-Builders as well as employers.

12. I agree to notify the issuer of this form immediately of any additions, deletions, or changes to any of the information I have provided on this form. Licensed contractors are regulated by laws designed to protect the public. If you contract with someone who does not have a license, the Contractors' State License Board may be unable to assist you with any financial loss you may sustain as a result of a complaint. Your only remedy against unlicensed Contractors may be in civil court. It is also important for you to understand that if an unlicensed Contractor or employee of that individual or firm is injured while working on your property, you may be held liable for damages. If you obtain a permit as Owner-Builder and wish to hire Contractors, you will be responsible for verifying whether or not those Contractors are properly licensed and the status of their workers' compensation insurance coverage.

**Before a building permit can be issued, this form must be completed and signed by the property owner and returned to the agency responsible for issuing the permit.** *Note: A copy of the property owner's driver's license, form notarization, or other verification acceptable to the agency is required to be presented when the permit is issued to verify the property owner's signature.*

Signature of property owner _____    Date: 7/9/27

_____

*Note: The following Authorization Form is required to be completed by the property owner only when designating an agent of the property owner to apply for a construction permit for the Owner-Builder.*

### AUTHORIZATION OF AGENT TO ACT ON PROPERTY OWNER'S BEHALF

Excluding the Notice to Property Owner, the execution of which I understand is my personal responsibility, I hereby authorize the following person(s) to act as my agent(s) to apply for, sign, and file the documents necessary to obtain an Owner-Builder Permit for my project. *VOLUNTARY SEISMIC RETROFIT*
Scope of Construction Project (or Description of Work): RESPONSE TO NOV + WPOJ + STAIR
Project Location or Address: 2220 NAPLES ST.
Name of Authorized Agent: MEGHAN O'HALLORAN    Tel No. 917 414 1169
Address of Authorized Agent: 1300 Golden Gate Ave #100

I declare under penalty of perjury that I am the property owner for the address listed above and I personally filled out the above information and certify its accuracy. *Note: A copy of the owner's driver's license, form notarization, or other verification acceptable to the agency is required to be presented when the permit is issued to verify the property owner's signature.*

Property Owner's Signature: _____    Date: 7/9/21

**49 South Van Ness Avenue – San Francisco CA 94103**
**Office (628) 652-3200 – FAX (628) 652-3239 – www.sfdbi.org**

9.4

# Exhibit K

**EXHIBIT**

10    *HL*

PENGAD 800-631-6989

*GALLAGHER 7-31-25*

City and County of San Francisco

## Department of Building Inspection

## CERTIFICATE OF FINAL COMPLETION AND OCCUPANCY

LOCATION: **200 Naples St.** _____ **6008/001** _____

    (number)     (street)                           (block and lot)

Permit Application No.: **201810183586** Type of Construction: **V-B** Stories: **2** Dwelling Units: **1**

Occupancy Classification: **R - 3** No. of Guestrooms: **Ø** with cooking facilities: **Ø**

Basements: **Ø**

Description of Construction: **To comply with Nov 20189547.7. Structural Strengthening to include removing + replacing floor framing. Repair 1 (E) dormer. Add a new dormers on each side. Remo (E) laundry e 2nd floor.**

To the best of our knowledge, the construction described above has been completed and, effective as of the date the building permit application was filed, conforms both to the Ordinances of the City and County of San Francisco and to the Laws of the State of California. The above referenced occupancy classification is approved pursuant to Section 109A of th *San Francisco Building Code.*

Any change in the use or occupancy of these premises—or any change to the building or premises—could cause the property to be in violation of the *Municipal Codes* of the City and County of Sn Francisco and, thereby, would invalidate this *Certificate of Final Completion and Occupancy.* A copy of this *Certificate* shall be maintained on the premises and shall be available at all times. Another copy of this *Certificate* should be kept with your important property documents.

Before making any changes to the structure in the future, please contact the Department of Building Inspection, which will provide advice regarding any change that you wish to make and will assist you in making the change in accordance with the *Municipal Codes* of the City and County of San Francisco.

This certificate issued on: _____ **8/27/2020** _____

by: _____

                         (Signature)         *for District Insp.*

                               **Building Inspector**

**Patrick O'Riordan, Interim Director**

                            **Printed Name**

Copies: White (original to microfilm), Blue (to property owner); Yellow (to Building Inspector); Pink (to Housing Inspector)

9003-M-36

10.1

# Exhibit L



August 20, 2020

City and County of San Francisco
Department of Building Inspection
1660 Mission Street, Third Floor
San Francisco, CA 94103

RE:     200 Naples Street Remodel
Permit Number: 201810183586

BASE Design Project No. 19084

In accordance with Sections 1704 and 1705 of the 2016 San Francisco Building Code, we have provided Special Inspections for the following items:

1.  4 – Reinforcing Steel
2.  18A – Bolts Installed in Existing Concrete

Based upon inspections performed, it is my professional judgement that, to the best of my knowledge, the observed work was performed in accordance with the approved plans and applicable workmanship provisions of the San Francisco Building Code.

Additionally, pull testing was provided at the holdown anchor rods epoxied into the existing concrete by JB Goodie Structural Engineers.  The letter indicating the results of the pull tests they performed is attached to this letter. This letter addressed Special Inspection item 18C.


Very truly yours,

**BASE Design**



Kathryn Briggs, SE 5732
Principal



582 Market Street, Suite 1402 | San Francisco, CA 94104 | **T** 415-466-2997 | www.BASEdesigninc.com

11.1

**J B GOOD**

STRUCTURAL ENGINE
908 Yolo R
Manteca, CA 95
*Phone:  (209) 683-9*

# TEST REPORT

| Job Description | Hold down testing on lines 1, 3 and 4 | Date | 8/15/2020 |
|---|---|---|---|
| Location | 200 Naples St., San Francisco, CA 94112 | Job Number | 1313 |

## TEST NOTES

Testing conducted as per S8,1 detail 9

HDU2s tested to 4700 lbs ………. Pass
HDU5s tested to 8300 lbs ………. Pass
HDU8s tested to 10100 lbs ……... Pass
HDU11s tested to 14900 lbs ……. Pass

*NOTE:*
Where HDU2s were indicated on S2,0/1, HDU5s were used.  We tested to 4700 lbs per S8,1/9



11.2

# Exhibit M

6/4/25, 10:39 PM                                   Gmail - 200 Naples Orders of Abatement

# M Gmail

Pat mg <bigblockpat@gmail.com>

## 200 Naples Orders of Abatement
15 messages

**Greene, Matthew (DBI)** <matthew.greene@sfgov.org>                    Thu, Jun 8, 2023 at 4:38 PM
To: bigblockpat <bigblockpat@gmail.com>
Cc: "KAPLA, ROBB (CAT)" <Robb.Kapla@sfcityatty.org>, "Buckley, Jeff (BOS)" <jeff.buckley@sfgov.org>, "MacKenzie,
Kathy" <KMacKenzie@ortc.com>, "charles.quan@corcoranicon.com" <charles.quan@corcoranicon.com>

Mr. Gallagher,

In an effort to answer all your questions, I would like to present all the information you will need to move forward and
complete your project at 200 Naples and have all recorded  Orders against the property lifted.

First, please see attached the email I sent of you on March 9, 2023.  At that time, I laid out the exact steps required to
complete permit application # 202108096049 and receive a valid  Certificate of Final Completion (CFC).  If all those steps
have been completed, we can schedule your Final Inspection.

Second, there are three Orders of Abatements recorded by the Department of Building Inspection against the property:

      a.   Order of Abatement # 110003-A  (for complaint # 201895477). Recorded on February 3, 2019.

      b.   Order of Abatement # 110438-A  (for complaint # 201721241). Recorded on July 3, 2019.

      c.   Order of Abatement # 201644272-A   (for complaint # 201644272). Recorded on February 3, 2019.

These Order will be lifted when all work is complete, the valid CFC is issued and all outstanding bills have been paid.

   **1.  Order of Abatement # 110438-A** (for complaint # 201721241) has an outstanding bill of
**$2860.60** (bill attached).

       Make check out to: CCSF-DBI

       Mail to: Code Enforcement Section

       Department of Building Inspection

          49 South Van Ness Ave 4th Floor

       San Francisco, Ca 94103



EXHIBIT

*12 ML*

*GALLAGHER 7-31-25*

   **2.  Order of Abatement # 201644272-A** (for complaint # 201644272) has an outstanding bill of
**$3403.00**. (bill attached)

12.1

Make check out to: CCSF-DBI

Mail to: Housing Inspection Services

    Department of Building Inspection

    49 South Van Ness Ave 4th Floor

    San Francisco, Ca 94103

3.   There are no further assessments due for **Order of Abatement # 110003-A**

As I have said earlier, when the valid CFC for completion of work is issued <u>and</u> these bills are paid, the Department of Building Inspection will lift these recorded Orders.

I hope I was able to answer any questions you may have about reaching resolution to your concerns.

Thank you,

*Matt Greene*

*Acting Deputy DIrector*

*Inspection Services*

*Department of Building Inspection*

*49 South Van Ness Avenue, 4th Floor*

*San Francisco, CA 94103*

---------- Forwarded message ---------
From: "Greene, Matthew (DBI)" <matthew.greene@sfgov.org>
To: bigblockpat <bigblockpat@gmail.com>
Cc: "Buckley, Jeff (BOS)" <jeff.buckley@sfgov.org>, "Duffy, Joseph (DBI)" <joseph.duffy@sfgov.org>, "Howard, Brett (DBI)" <brett.howard@sfgov.org>, "Burke, Kenneth (DBI)" <kenneth.burke@sfgov.org>, "Wong, Kelly (CPC)" <kelly.wong@sfgov.org>, "Czajkowski, Matt (DPW)" <matt.czajkowski@sfdpw.org>, "Pereira, Neville (DBI)" <neville.pereira@sfgov.org>
Bcc:
Date: Fri, 10 Mar 2023 00:15:13 +0000
Subject: RE: 200 Naples Street San Francisco Electrical Corrections for the ADU Unit

Mr. Gallagher

Per your request, please see the below for the specific requirements to receive final sign off for building permit application # 202108096049 (for a new ADU at 200 Naples).

12.2

1.  Sheet # 3 of the approved plans for permit application # 202108096049 call for the ceiling height for the ADU bedroom to 8 feet.



During the site visit on March 2, 2023. The ceiling height was measured to 7 foot 3 inches. San Francisco Building Code Section states that habitable space shall "have a ceiling height of not less than 7 feet 6 inches above the finished floor". The current conditions do not match the approved plans and do not meet the minimum requirements of the San Francisco Building Code. If it is impractical to increase the ceiling height of this bedroom, you may request a local equivalency through Administrative Bulleting AB-005. The purpose of this Administrative Bulletin is to detail the procedures to be used for the application and case-by-case review of requests for approval of equivalencies, when work is proposed which does not strictly comply with the provisions of the latest edition of the San Francisco Building Code. I have attached the form to request such an equivalency, and I have discussed your situation with the Deputy Director of Permit Services. I encourage you to take advantage of this possibility.


2.  Also on sheet # 3 f the approved plans for permit application # 202108096049 are the requirements for the bedroom's Emergency Escape and Rescue Opening (aka the bedroom window). There must be a 5 foot clear opening and the interior sill height cannot be higher than 44" above the finish floor:

12.3

During site visit on March 2, 2023, the sill height was measured to be 48" and not meeting the minimum requirements of the code. This sill height will need to be corrected.

3.   Obtain final sign off for electrical permit # EW 20230208798.

4.   Have the Department of Public Works- Bureau of Street Use and Mapping complete there required inspection of the Public Way. I would remind you that the Planning Department's approval for PA no. 202108096049 is to remove the existing curb cut. The Variance to request off-street parking and allow for this curb cut was denied. (Variance decision is attached)

5.   Have the Department of Public Works -Bureau of Urban Forestry inspect and approve the planting of the 4 required street trees and the required 42 square feet of landscaping.

I think this is a very clear concise list of requirements and hope that this explains your path forward to complete this project.

*Matt Greene*

*Chief Building Inspector*

*Building Inspection Division*

*Department of Building Inspection*

*49 South Van Ness Avenue, 4th Floor*

*San Francisco, CA 94103*

*(628) 652-3637*

12.4

Exhibit N

Patrick Gallagher
470 Coletas Way
Byron, CA 94514

Plaintiff, In Pro Per

ELECTRONICALLY
**F I L E D**
*Superior Court of California,
County of San Francisco*

**03/16/2023**
**Clerk of the Court**
BY: JEFFREY FLORES
Deputy Clerk

### SUPERIOR COURT OF THE STATE OF CALIFORNIA
### FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| PATRICK GALLAGHER, | CASE NO.:      **CGC-23-605173** |
| Plaintiff, | |
| vs. | **UNLIMITED JURISDICTION VERIFIED COMPLAINT** |
| CITY AND COUNTY OF SAN FRANCISCO, BERNARD CURRAN, RODRIGO SANTOS, WILLIAM HUGHEN, KEVIN BIRMINGHAM, NATALIA KWAITKOWSKA, AND JOE DUFFY, | 1. *INJUNCTIVE RELIEF* <br> 2. *DECLARATORY RELIEF* <br> 3. *SLANDER OF TITLE* <br> 4. *INVERSE CONDEMNATION* |
| Defendants. | |



EXHIBIT
13 ML
GALLAGHER 7-31-25

13.1

COMES NOW Plaintiff, PATRICK GALLAGHER complaining of a policy that was known, encouraged, formulated and tolerated by the CITY OF SAN FRANCISCO, whereby individuals such as the Plaintiff who are engaged in the process of purchasing and refurbishing houses in the City of Francisco, are subjected to a process whereby they are not able to receive permits to complete work and/or not give approval for work that has been completed and/or threatened with and issued frivolous code enforcement violations, unless they pay bribes to city officials, such as those named as individuals in this lawsuit.

## I.     THE PARTIES

1.     Plaintiff PATRICK GALLAGHER is an individual and is now, and at all times relevant to this action was, a resident of the County of SAN FRANCISCO, State of CALIFORNIA.

2.     Defendant COUNTY OF SAN FRANCISCO (hereinafter "SAN FRAN") is a political subdivision of the State of California.

3.     Defendant BERNARD CURRAN (hereinafter "MR. CURRAN") is now, and at all times relevant to this action was, a resident of the County of SAN FRANCISCO, State of CALIFORNIA and was employed by the CITY OF SAN FRANCISCO as a Building Inspector. At all times, he was acting individually and/or within the course and scope of his employment under color of state law.

4.     Defendant WILLIAM HUGHEN (hereinafter "MR. HUGHEN") is now, and at all times relevant to this action was, a resident of the County of SAN FRANCISCO, State of CALIFORNIA and was employed by the CITY OF SAN FRANCISCO as a Senior Planner. At

13.2

13.3

all times, he was acting individually and/or within the course and scope of his employment under color of state law.

5.    Defendant RODRIGO SANTOS, (hereinafter "MR. SANTOS") is now, and at all times relevant to this action was, a resident of the County of SAN FRANCISCO, State of CALIFORNIA and was employed by the CITY OF SAN FRANCISCO as a Building Inspector. At all times, he was acting individually and/or within the course and scope of his employment under color of state law.

6.    Defendant KEVIN BIMINGHAM (hereinafter "MR. BIMINGHAM") is now, and at all times relevant to this action was, a resident of the County of SAN FRANCISCO, State of CALIFORNIA and was employed by the CITY OF SAN FRANCISCO as a Building Inspector. At all times, he was acting individually and/or within the course and scope of his employment under color of state law.

7.    Defendant NATALIA KWAITKOWSKA ("MS. KWAITKOWSKA") is now, and at all times relevant to this action was, a resident of the County of SAN FRANCISCO, State of CALIFORNIA and was employed by the CITY OF SAN FRANCISCO as a Principal Planner. At all times, he was acting individually and/or within the course and scope of his employment under color of state law.

VERIFIED COMPLAINT

13.4

8.     Defendant JOE DUFFY ("MR. DUFFY") is now, and at all times relevant to this action was, a resident of the County of SAN FRANCISCO, State of CALIFORNIA and was employed by the CITY OF SAN FRANCISCO as the Chief Building Inspector.  At all times, he was acting individually and/or within the course and scope of his employment under color of state law.

9.     Whenever in this Complaint an act or omission of a corporation or business entity is alleged or political subdivision, said allegation shall be deemed to mean and include an allegation that the corporation or business entity acted or omitted to act through its authorized officers, directors, agents, servants, and/or employees, acting within the course and scope of their duties, that the act or omission was authorized by corporate managerial officers or directors, and that the act or omission was ratified by the officers and directors of the corporation.

## II.     JURISDICTION & VENUE

10.     The Superior Court of the State of California in and for the County of San Francisco has jurisdiction over this action and venue is proper in this Court pursuant to California Code of Civil Procedure § 395.5 in that the conduct took place in San Francisco County, the work on the home was to be performed in San Francisco County and the property at the center of this dispute is also located in San Francisco County, State of California.

11.     The amount in controversy is more than $25,000.

4
VERIFIED COMPLAINT

13.5

### III.    GENERAL ALLEGATIONS

12.    The For the past 12 years, the Plaintiff has been involved in the business of purchasing and refurbishing homes and it was this type of business, that he was involved in when in 2018, he purchased a home located at 200 Naples Street, San Francisco, CA 94112 (the "home" or the "property").

13. The home was built in 1907 and was in need of a large amount of repairs.

14. Once the Plaintiff started the process of making repairs, MR. CURRAN, MR. HUGHEN routinely refused to grant him permits to continue repairs and routinely threatened him with code enforcement actions unless he hired MR. SANTOS to be the "structural engineer".

15. In reality MR. SANTOS had once worked with the SAN FRAN and had recently retired and was operating a business that specializes in "structural engineering".

16. The Plaintiff was shocked when MR. SANTOS and MR. CURRAN were arrested by the U.S. Federal Government on charges of bribery, which MR. CURRAN plead guilty to.

17. While the charges do not involve the property involved in this matter, they demonstrate a pattern of how unless gratuities were accepted, building permits were not issued.

18. The project of refurbishing the home should not have taken over 10 weeks, but has now been drawn out to become a four year project and the Plaintiff has lost over $1.7 million dollars in lost sales, taxes and unnecessary repairs.

19. Currently, the Plaintiff is losing over $7,000 per month, in lost rental income.

20. The Plaintiff was forced to replace windows, repave the driveway and other unnecessary repairs, due to the actions of the Defendants.

13.6

21. Plaintiff received a Certificate of Final Completion and Occupancy (the "Certificate"), from the Defendant, CITY OF SAN FRANCISCO, on or about August 27, 2020 and it was signed by Defendant, BERNARD CURRAN, however after his arrest the Certificate was mysteriously removed from public records and the taxes for the property were raised.

22. In committing the wrongful acts alleged herein, Defendants, inclusive, and each of them, have pursued, or joined in the pursuit of a common course of conduct, and have acted in concert via agreement with, and conspired with, one another in furtherance of the improper acts, plans, schemes, and transactions that are the subject of this Complaint.

23. In addition, each of the Defendants, inclusive, and each of them, rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, and was aware of his, her or its overall contribution to, and furtherance of the wrongdoing.

24. Consequently, the actions of Defendants, inclusive, and each of them, and each of them, were done not in the best interest of the Plaintiff.

25. As a result, based upon information and belief, Plaintiff , thereon alleges that each Defendant, inclusive, and each of them, are liable for the events and damages as alleged herein by their knowingly consenting to or approving the unlawful acts.

26. As such, Defendants, inclusive, and each of them, should be held accountable for each other's wrongful misconduct as set forth herein. An inequitable result will follow if such Defendants are not treated as aiders, abettors and co-conspirators of the facts as

13.7

alleged herein.

## IV.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION - INJUNCTIVE RELIEF

_____

#### (As against Defendants)

27.    Plaintiff PATRICK GALLAGHER is an individual and refers to and incorporates paragraphs 1 through 22 above, as though set forth in full herein, and alleges this First Cause of Action for Injunctive Relief.

28.    Defendants have acted and continue to act in excess of statutory jurisdiction and contrary to the law in this matter. Defendants have threatened to reinstitute and take further actions against the Plaintiff's property and furthermore, Defendants have refused to issue permits for Plaintiff's property.

29.    Defendants will cause Plaintiff to suffer irreparable injury because it will continue to prohibit him from exercising their lawful rights to the property as a property owner without exposing him to further civil penalties.

30.    Plaintiff is now losing and will continue to lose, and/or benefit from, the profits lawfully exercising his rights including but not limited to renting and/or selling the property.

31.    Plaintiff does not have a plain, speedy, and adequate remedy in the ordinary course of law.

32.    Currently, Plaintiff has found a potential buyer for the property, and the property is in escrow for $_____ but cannot clear the title due to frivolous Code Enforcement Liens.

33.    Further, regardless of the potential sale, the Plaintiff is losing rental value at

13.8

approximately $7,000 per month.

34.    Plaintiff  is the true owner of the property located at 200 Naples Street, San Francisco, CA 94112 and is entitled to take possession of the property.

## SECOND CAUSE OF ACTION – DECLARATORY RELIEF

### *(As against Defendants )*

35.    Plaintiff PATRICK GALLAGHER is an individual and refers to and incorporates paragraphs 1 through 22 above, as though set forth in full herein, and alleges this Second Cause of Action for Declaratory Relief.

36.    The Plaintiff owns the home located at 200 Naples Street, San Francisco, CA 94112.

37.    The Defendants' refusal to release frivolous Code Enforcement Liens, has placed an untenable cloud on the title to the property, in that the real property remains vacant, and cannot be sold.

38.    An actually controversy has arisen and now exists between the parties hereto in connection with the matters alleged herein.

39.    No adequate remedy other than that herein prayed for exists by which the rights of the parties may be determined.

40.    A judicial determination resolving this actual controversy is necessary and appropriate at this time.

VERIFIED COMPLAINT

13.9

**THIRD CAUSE OF ACTION - SLANDER OF TITLE**

*(As against all Defendants)*

41. Plaintiff PATRICK GALLAGHER is an individual and refers to and incorporates paragraphs 1 through 22 above, as though set forth in full herein, and alleges this Third Cause of Action for Declaratory Relief.

42. The Plaintiff owns the home located at 200 Naples Street, San Francisco, CA 94112.

43. The Defendants' refusal to release frivolous Code Enforcement Liens, has placed an untenable cloud on the title to the property, in that the real property remains vacant, and cannot be sold.

44. By doing the acts described above, Defendants slandered Plaintiff's title to the property located at 200 Naples Street, San Francisco, CA 94112.

**FOURTH CAUSE OF ACTION - INVERSE CONDEMNATION**

*(As against all Defendants)*

45. Plaintiff PATRICK GALLAGHER is an individual and refers to and incorporates paragraphs 1 through 22 above, as though set forth in full herein, and alleges this Fourth Cause of Action for Inverse Condemnation.

46. Article I, Section 19 of the California Constitution, prohibits the taking, including the temporary or permanent deprivation of private property, for a public use without just compensation, where such deprivation amounts to the abridgment or destruction, by reason of the actions fo te government body, of the lawful rights of an individual to the possession, use or enjoyment of his land. It has also been held that an undue restriction on the use of property is as much a taking for constitutional purposes as is an

13.10

appropriation or destruction.

47. The intentional actions of the Defendants have unlawfully damages Plaintiff's property interests and for that reason constitute violations of the constitutional ban on taking without just compensation.   Furthermore, no public use has been served by the Defendant's conduct.

48. Defendants by their intentional actions have sacrificed the economic interests of the Plaintiff in order to benefit the Defendants herein.

49. Plaintiff should not be forced to bear these burdens for the benefit of the Defendants.

50. Plaintiff alleges that these intentional actions of the Defendants constitute a direct, substantial and peculiar burden on Plaintiff's property interests and a taking of Plaintiff's property without payment of just compensation in violation of the California Constitution.

51. Plaintiff further alleges that Defendants' intentional actions against Plaintiff failed to advance a legitimate state interest and deprived Plaintiff of the viable use and value of his property interest and caused the damages alleged herein.

52. As a direct and proximate result of the Defendants' actions, Plaintiff has suffered damages, including, but no limited to, a diminution in the value of the property, loss of rental income, inability to take advantage of beneficial refinancing and lower interest rates, tax penalities, the inability to sell the property, insurance of expenses for attorneys, experts, court costs, loss of time, resources and income and severe physical and emotional distress.

10
VERIFIED COMPLAINT

13.11

**WHEREFORE**, Plaintiff, :

1)     For general damages according to law and proof, but at least $2.4 million;

2)     For special damages according to law and proof;

3)     For treble damages pursuant to Civil Code § 3345;

4)     For punitive damages;

5)     Attorney's fees and costs; and

6)     For such other and further relief as the court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiff _____ hereby demands a jury trial.

Dated:     March 8 2023

Plaintiff, in Pro Per

11

VERIFIED COMPLAINT

13.12

**VERIFICATION**

I have read the foregoing **VERIFIED COMPLAINT** know its contents.

☒      I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true.

☐      I am ___ an officer, ___ a partner ___, an agent ___, of _____, a party to this action, and am authorized to make this Verification for and on its behalf, and I make this Verification for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true.

☐      I am one of the attorneys for _____, a party to this action. Such party is absent from the County of aforesaid where such attorneys have their offices, and I make this Verification for and on behalf, and I make this Verification for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

I declare under penalty of perjury, that the foregoing is true and correct.

Executed this _8th_ day of ~~December~~ MARCH, 2023 at San Francisco, California.

_(signature)_

12

VERIFIED COMPLAINT

13.13

# Exhibit O

1   **CALLAHAN & BLAINE, APLC**
    Javier H. van Oordt (Bar No. 184879)
2   Jonathan W. Hornberger (Bar No. 311144)
    3 Hutton Centre Drive, Ninth Floor
3   Santa Ana, California 92707
    Telephone: (714) 241-4444
4   Facsimile: (714) 241-4445
    Email: jvo@callahan-law.com
5           jhornberger@callahan-law.com

6   Attorneys for Plaintiff PATRICK GALLAGHER

7

8                    UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10

11  PATRICK GALLAGHER,                  | Case No: 23-cv-03579-SI

12                  Plaintiff,          | Judge: Hon. Susan Illston

13        vs.                          | **SECOND AMENDED COMPLAINT FOR:**

14  CITY AND COUNTY OF SAN             | 1. **SLANDER OF TITLE**
    FRANCISCO, BERNARD CURRAN,         |
15  RODRIGO SANTOS, WILLIAM            | 2. **INVERSE CONDEMNATION**
    HUGHEN, KEVIN BIRMINGHAM,          |
16  NATALIA KWAITKOWSKA, AND JOE       | 3. **INTENTIONAL INTERFERENCE**
    DUFFY,                             |    **WITH PROSPECTIVE**
17                                      |    **ECONOMIC RELATIONS**

18                  Defendants.         | 4. **VIOLATION OF CIVIL RIGHTS,**
                                        |    **42 U.S.C. § 1983**
19                                      |
                                        | 5. **INTENTIONAL INFLICTION OF**
20                                      |    **EMOTIONAL DISTRESS**

21                                      | 6. **NEGLIGENCE**

22                                      | 7. **DECLARATORY RELIEF**

23                                      | **DEMAND FOR JURY TRIAL**

24

25        Plaintiff PATRICK GALLAGHER, as an individual and as trustee for the Madison Trust

26  FBO Patrick Gallagher, hereby alleges as follows:

27

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

**INTRODUCTION**

1.      In 2018, Plaintiff PATRICK GALLAGHER ("Plaintiff"), a veteran in the construction industry for over forty-five (45) years, purchased a single family home in San Francisco with the intention of renovating and selling the property.

2.      During the initial renovation process, Plaintiff was the victim of a pay-to-play fraud by employees of Defendant CITY AND COUNTY OF SAN FRANCISCO ("CITY").  The pay-to-play fraud was known, encouraged, formulated, and tolerated by the CITY and targeted individuals, such as Plaintiff, who were renovating homes for re-sell.  As part of the fraud, the CITY would not issue Plaintiff permits necessary to complete work, would not approve work that had been completed in compliance with all CITY ordinances, and threatened frivolous code enforcement violations unless Plaintiff agreed to use the services of certain consultants or engineers recommended to Plaintiff by the CITY.

3.      After uncovering the truth behind these deceptive practices and refusing to participate, Plaintiff spoke with the Federal Bureau of Investigation concerning this illegal and fraudulent scheme. The FBI had already been conducting an investigation into several CITY officials including Defendant BERNARD CURRAN ("CURRAN"), former Building Inspector for San Francisco's Department of Building Inspection ("SFDBI"), who specifically perpetrated this scheme against Plaintiff. CURRAN was eventually arrested and charged with accepting gratuities as rewards for approving building permits.

4.      Due to Plaintiff's participation in the FBI's investigation and refusal to participate in the pay-to-play fraud, Plaintiff was subjected to brazen retaliation by SFDBI employees and other CITY officials. Such retaliation included, without limitation, issuing and refusing to release frivolous code enforcement liens, issuing and refusing to release notices of violation, issuing and refusing to release abatement orders, revoking permits, and revoking a certificate of completion. The subject property has been in escrow on three (3) separate occasions, all of which have fallen through due to the CITY's retaliation and unjustified taking.

5.      The CITY has a pattern, custom, and/or practice of retaliatory conduct against those who speak out against wrongful and illegal actions. Namely, much like the facts in this case, a

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CITY Planning Commissioner, who also owned an investment property in San Francisco, recently filed suit alleging that he was retaliated against by SFDBI employees after making complaints and speaking out against its pay-to-play scheme and corrupt practices. The Commissioner alleged that after he called on the City Attorney to conduct an investigation, SFDBI employees riddled the Commissioner's property with erroneous complaints, unnecessary inspections, unwarranted notices of violation, and revoked nine (9) permits, all related to completed work that had already been approved, permitted, and inspected by SFDBI. The retaliation caused the value of the Commissioner's property to depreciate and caused other significant damages. The Commissioner named Defendant MAURICIO HERNANDEZ ("HERNANDEZ"), a SFDBI Building Inspector, as a defendant in his case, alleging that he was one of the employees who retaliated against him. The Commissioner settled his case against the CITY for $1.8 Million dollars.

6.    As of the filing of this Complaint, the subject property has been in escrow on three (3) occasions and has not sold as a result of the CITY's retaliation and unjustified taking.

7.    Plaintiff has suffered and continues to suffer severe damages including, without limitation, lost profits, lost income, lost interest, expenditures for unnecessary repairs, increased taxes, severe emotional distress, and irreparable harm to reputation.

8.    This Complaint addresses the CITY's unlawful and wrongful conduct against Plaintiff and seeks to shed light on its practices that undermine the public trust in government and present a threat to public safety.

**PARTIES**

9.    At all relevant times, Plaintiff PATRICK GALLAGHER ("Plaintiff") is and was a resident of the County of San Francisco, State of California. Plaintiff brings this action individually and as trustee for the Madison Trust FBO Patrick Gallagher.

10.   Plaintiff is informed, believes, and based thereon alleges that at all relevant times, Defendant CITY AND COUNTY OF SAN FRANCISCO ("CITY") is and was a public entity duly organized and existing under and by virtue of the laws of the State of California.  The San Francisco Department of Building Inspection ("SFDBI") is the CITY's agency responsible for issuing permits and overseeing the enforcement of state and local building codes and regulations.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1    Employees of the SFDBI are local officials of the CITY.

2         11.    Plaintiff is informed, believes, and based thereon alleges that at all relevant times,

3    Defendant BERNARD CURRAN ("CURRAN") is and was a resident of the County of San

4    Francisco, State of California and was employed by the CITY as a Building Inspector with the

5    SFDBI. At all times, he was acting individually and/or within the course and scope of his

6    employment with the CITY.

7         12.    Plaintiff is informed, believes, and based thereon alleges that at all relevant times,

8    Defendant RODRIGO SANTOS ("SANTOS") is and was a resident of the County of San

9    Francisco, State of California and was a former employee of the CITY.

10        13.    Plaintiff is informed, believes, and based thereon alleges that at all relevant times,

11   Defendant JOE DUFFY ("DUFFY") is and was a resident of the County of San Francisco, State of

12   California and was employed by the CITY as the Deputy Director of SFDBI. At all times, he was

13   acting individually and/or within the course and scope of his employment with the CITY.

14        14.    Plaintiff is informed, believes, and based thereon alleges that at all relevant times,

15   Defendant KEVIN BIRMINGHAM ("BIRMINGHAM") is and was a resident of the County of

16   San Francisco, State of California and was employed by the CITY as a Building Inspector with the

17   SFDBI. At all times, he was acting individually and/or within the course and scope of his

18   employment with the CITY.

19        15.    Plaintiff is informed, believes, and based thereon alleges that at all relevant times,

20   Defendant MAURICIO HERNANDEZ ("HERNANDEZ") is and was a resident of the County of

21   San Francisco, State of California and was employed by the CITY as a Building Inspector with the

22   SFDBI. At all times, he was acting individually and/or within the course and scope of his

23   employment with the CITY.

24        16.    Plaintiff is informed, believes, and based thereon alleges that at all relevant times,

25   Defendant WILLIAM HUGHEN ("HUGHEN") is and was a resident of the County of San

26   Francisco, State of California and was employed by the CITY as a Senior Planner with San

27   Francisco Planning. At all times, he was acting individually and/or within the course and scope of

28   his employment with the CITY.

17.     Plaintiff is informed, believes, and based thereon alleges that at all relevant times, Defendant NATALIA KWAITKOWSKA ("KWAITKOWSKA") is and was a resident of the County of San Francisco, State of California and was employed by the CITY as a Principal Planner with San Francisco Planning. At all times, he was acting individually and/or within the course and scope of his employment with the CITY.

18.     Plaintiff is ignorant of the true names and capacities of defendants sued in this Complaint as DOES 1 through 100, inclusive, and therefore Plaintiff sues these defendants by these fictitious names.  Plaintiff is informed, believes, and thereon alleges that each of the defendants designated herein as a DOE negligently, carelessly, and tortiously is responsible in some manner for the events and happenings herein referred to and proximately caused injury and damages to Plaintiff as herein alleged.  Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.

19.     Plaintiff is informed, believes, and based thereon alleges that, at all times herein mentioned, Defendants CITY, DUFFY, CURRAN, SANTOS, BIRMINGHAM, HERNANDEZ, HUGHEN, KWAITKOWSKA, and DOES 1 through 100, inclusive, and each of them, were the agents, servants, representatives, employees, and employers of each remaining defendant, and in doing the things alleged in this Complaint, were acting within the course, scope, and purpose of said agency and employment and in said capacity.

20.     Defendants CITY, DUFFY, CURRAN, SANTOS, BIRMINGHAM, HERNANDEZ, HUGHEN, KWAITKOWSKA, and DOES 1 through 100, inclusive, at times hereinafter shall be collectively referred to as "Defendants".

## JURISDICTION AND VENUE

21.     Plaintiff filed his original Complaint in the Superior Court, State of California in and for the County of San Francisco. Plaintiff maintained that the Superior Court had jurisdiction over this action and the venue was proper pursuant to *California Code of Civil Procedure* § 395.5 in that the conduct took place in the County of San Francisco, the work on the home was to be performed in the County of San Francisco, the property at the center of this dispute is located in the County of San Francisco, and the amount in controversy is more than $25,000.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

22.     CITY removed this action to its current venue, the United States District Court, Northern District of California on July 19, 2023, pursuant to 28 U.S.C. §§ 1441 and 1446.

## SATISFACTION OF GOVERNMENT CLAIMS ACT REQUIREMENTS

23.     Plaintiff has complied with all applicable government claims act requirements.

24.     Plaintiff timely presented a claim for damages to CITY on or about September 8, 2022, within six (6) months of the incidents giving rise to this litigation. On or about October 6, 2022, CITY served a written rejection of Plaintiff's claim.

25.     Thus, this action has been filed within the allowable time limit.

## PUBLIC ENTITY LIABILITY

26.     Defendants and DOES 1 through 100, inclusive, are liable to Plaintiff pursuant to, without limitation, *Government Code* § 815.2(a).

## FACTUAL ALLEGATIONS

27.     Plaintiff alleges the following upon reasonable information and belief and without limitation:

28.     For the past twelve (12) years, Plaintiff, a veteran of the construction industry for over forty-five (45) years, has been involved in the business of purchasing and renovating homes. It was this type of business that he was involved in when he purchased a single family home through his trust, the Madison Trust FBO Patrick Gallagher, in or around the summer of 2018, located at 200 Naples Street, San Francisco, California 94112 ("subject property" or "property").

29.     The subject property was originally built in 1907 and is the only sub-dividable or expandable lot in the neighborhood with the best views. The property was in need of a large amount of repairs.

30.     Once Plaintiff started the renovation process, SFDBI inspectors, including Philip Saunders, routinely showed up to the subject property threatening Plaintiff and his workers with code enforcement violations for standard work that was being performed. The unwarranted threats and harassment from SFDBI got significantly worse, such that two (2) of Plaintiff's employees were forced to quit.

Second Amended Complaint - Case No.: 23-cv-03579-SI

31.     To begin substantive work on the property, Plaintiff needed to obtain an all-encompassing permit from the CITY. CURRAN, an SFDBI Building Inspector at the time, told Plaintiff that in order to obtain the permit and begin the full renovation process, Plaintiff needed to hire a structural engineer for the project. Plaintiff was confused and disagreed with CURRAN, stating that a structural engineer for a two-story single family home was completely unnecessary. Nevertheless, CURRAN insisted that Plaintiff hire a structural engineer or the permit would not be granted. What's more, Curran insisted that Plaintiff hire SANTOS, a former SFDBI employee who was now operating a business that specialized in structural engineering. To ensure the permit would be issued and to move the already delayed project along, Plaintiff complied with CURRAN's mandate and hired SANTOS.

32.     Work that was supposed to take approximately two (2) weeks turned into ten (10) months. SANTOS continually delayed the project and kept demanding more money from Plaintiff for specious and unnecessary work. By the time SANTOS had completed his drawings for the project, they were completely wrong and called for more work than was necessary for a home that size. Plaintiff at this point had paid SANTOS approximately $13,000 in fees and wasted a significant amount of time and resources for work that was essentially useless. Consequently, Plaintiff fired SANTOS and hired a different firm that was unaffiliated with SFDBI. The new firm completed the work in approximately two (2) weeks for a fraction of the cost.

33.     After the significant delay, Plaintiff was issued the all-encompassing permit in or around June of 2019 and began the main renovation process.

34.     In or around August of 2020, the project was complete and CURRAN issued Plaintiff a signed certificate of completion.

35.     In or around May of 2021, Plaintiff entered into an agreement to sell the subject property and it went into escrow.

36.     At or around this time, the Federal Bureau of Investigation was conducting an investigation into CURRAN and SANTOS related to, among other things, an illegal "pay to play" scheme. CURRAN was forced to resign from SFDBI due to the investigation.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

Second Amended Complaint - Case No.: 23-cv-03579-SI

37.     At or around this time, Plaintiff was contacted by the Federal Bureau of Investigation, discussing his dealings with CURRAN and SANTOS concerning the apparent scheme that was perpetrated against him.

38.     At or around this time, the CITY, namely DUFFY, BIRMINGHAM, HERNANDEZ, HUGHEN, and KWAITKOWSKA, close associates with both CURRAN and SANTOS, became aware and/or were under the belief that Plaintiff had discussions with the FBI concerning CURRAN and SANTOS.

39.     Approximately four (4) days prior to escrow closing on the subject property, SFDBI issued Plaintiff a notice of violation for an expired permit and an illegal downstairs unit. The taxes on the property were also raised. SFDBI falsely claimed that the certificate of completion that CURRAN signed never got filed correctly and was now void. SFDBI also falsely claimed that a realtor had reported the illegal downstairs unit after discovering it at an open house, despite the fact that Plaintiff never held an open house and did not intend for the space to be used as an additional dwelling unit. SFDBI told Plaintiff that the entire property would need to be re-inspected and approved. Escrow did not close and the sale of the subject property fell through. The CITY's retaliation against Plaintiff and its unjustified taking of the subject property had begun.

40.     The CITY has a pattern, custom, and/or practice of retaliatory conduct against those who speak out against wrongful and illegal actions. Namely, much like the facts in this case, a CITY Planning Commissioner, who also owned an investment property in San Francisco, recently filed suit alleging that he was retaliated against by SFDBI employees after making complaints and speaking out against its pay-to-play scheme and corrupt practices. Specifically, the Commissioner raised numerous concerns to CITY officials and called for investigations into SFDBI's corrupt practice of approving and issuing unqualified permits and work for certain development projects in exchange for kickbacks. One of these projects involved two convicted felons who were believed to have close relationships with SFDBI employees. The Commissioner alleged that SFDBI employees were approving grossly misrepresented permit applications, allowing work to be done on projects far beyond the scope permitted, failing to conduct sufficient inspections, and failing to stop serial permitting, among others. Less than a month after the Commissioner called for an

Second Amended Complaint - Case No.: 23-cv-03579-SI

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1    investigation to be conducted by the City Attorney, SFDBI employees, including HERNANDEZ,

2    an SFDBI Building Inspector, began targeting the Commissioner's investment property. SFDBI

3    riddled the property with erroneous complaints, unnecessary inspections, unwarranted notices of

4    violations, and revoked nine (9) permits, all related to completed work that had already been

5    approved, permitted, and inspected by SFDBI. Notably, the Commissioner alleged that

6    HERNANDEZ made statements to other officials that they were going to come down hard on the

7    Commissioner's property. HERNANDEZ was named as individual defendant in the

8    Commissioner's case. The Commissioner settled his case against the CITY for $1.8 Million

9    dollars.

10          41.     Much like the Commissioner's case, HERNANDEZ and BIRMINGHAM, another

11   SFDBI Building Inspector, began the retaliation campaign against Plaintiff. HERNANDEZ and

12   BIRMINGHAM re-inspected the property and issued another notice of violation, falsely claiming

13   that the windows located on the second floor were illegal. The windows in question had been in

14   existence since the house was built and had already been approved twice. They demanded that

15   Plaintiff submit an application to legalize the windows. They also told Plaintiff that he needed to

16   submit an application for an additional dwelling unit and revise the plans for the property to more

17   accurately reflect the stairs as built. During the inspection, HERNANDEZ sneered at Plaintiff,

18   telling him "we know who you've been talking to".

19          42.     Plaintiff had no choice but to comply with SFDBI's demands related to these

20   unfound violations and submitted his applications and revised plans accordingly.

21          43.     Without cause, BIRMINGHAM subsequently rejected Plaintiff's application

22   related to the windows on the second floor, demanding Plaintiff to now close off the windows

23   completely. Plaintiff strongly objected. Closing off the windows would cost a significant amount

24   of money and further delay Plaintiff's ability to sell the property. Again, these windows had been

25   approved twice before and Plaintiff had already received a certificate of completion for the entire

26   property.

27          44.     Upset, frustrated, and losing more money, Plaintiff contacted the CITY's Board of

28   Supervisors for help. The Board facilitated a meeting between Plaintiff and SFDBI.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 9 -

45.     At the meeting, Plaintiff aired his grievances. Plaintiff presented evidence showing that the subject property had already received a certificate of completion and that the recent demands by SFDBI were unreasonable and excessive. Plaintiff was frustrated and wanted to know why SFDBI made him jump through more hoops after he had already secured a valid certificate of completion. DUFFY, SFDBI's Deputy Director, dismissed Plaintiff's concerns and ignored the validity of his claims, refusing to approve his plans or his applications. DUFFY demanded that the windows on the second floor be closed off completely. What's more, DUFFY, then expressed to Plaintiff during this meeting that he had no doubt that Plaintiff had spoken to the FBI concerning his dealings with CURRAN and SANTOS. Plaintiff was shocked and dismayed. The CITY's retaliation against Plaintiff was unequivocal at this point and DUFFY was not only ratifying and approving the unlawful conduct, he was spearheading it.

46.     DUFFY, as SFDBI's Deputy Director, was in charge of and had complete oversight of SFDBI and all of its employees. He was a final policymaker acting under the color of his authority and had the power to approve, deny, and/or overturn any decisions made by SFDBI employees concerning their "regulation" of the subject property to ensure conformance with CITY policies. All of the wrongful conduct complained of herein including, without limitation, issuing and refusing to release frivolous code enforcement liens, issuing and refusing to release notices of violation, issuing and refusing to release abatement orders, revoking permits, and revoking a valid certificate of completion, was at the behest and/or endorsement of DUFFY.

47.     DUFFY's job duties and responsibilities as Deputy Director included, without limitation:

a.     Planning, directing, and evaluating the work of SFDBI employees, including all Building Inspectors, who provide information regarding inspection services to the public, review plans and permits, and perform inspections in connection with the construction and modification of buildings or other structures, and of buildings under investigation for code violations in order to ensure that department policies and procedures are adhered to and the applicable codes, ordinances, and laws are properly enforced;

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

b.      Interpreting and explaining codes, related laws and ordinances which govern building construction in the City such as the building code, housing code, mechanical code, state building standards, appeal procedures, abatement process and permit processing to staff and others including architects, engineers, contractors, and the general public to ensure that the information concerning the department is disseminated accurately;

c.      Representing SFDBI at meetings, hearings, and in court by preparing evidence and/or appearing before such bodies as the Board of Supervisors, Building Inspection Commission, judicial committees, Access Appeals Commission, Board of Permit Appeals, Abatement Appeals Board, and Board of Examiners in order to testify or present information regarding code violation cases;

d.      Directing the preparation and maintenance of records and reports on abatement appeals board cases, statistical analyses, inspection activities, work orders, contracts, specifications, plans, cost estimates, emergency orders, and operational activities by assigning, reviewing, and revising when necessary, to ensure that such work is correct, complete, and in conformance with departmental policies and procedures;

e.      Reviewing complaints regarding inspection services, plan reviews, code interpretations, and/or code violations from property owners, general public, other City departments, and various civic groups by researching pertinent codes, ordinances, laws and conducting investigations, taking appropriate actions, and informing complainant of findings in order to clarify and resolve problems;

f.      Establishing inspection and operational procedures by reviewing existing policies and procedures and when necessary, revising or creating new procedures in order to effectively maximize staff and resources and/or conform to current laws, regulations, ordinances and codes regulating the construction and modification of buildings and other structures;

g.      Reviewing current codes, administrative bulletins and code rulings in order to inform staff of revisions and/or additions, and to provide management with input regarding the feasibility of such revisions or additions on current work processes and, if necessary, prepares recommendations for revisions or additions.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

48.     Again, having no choice but to comply with SFDBI's demands, Plaintiff closed off the windows on the second floor completely, requiring, among other things, demolition, scaffolding, installation of new material, and painting. The additional work cost Plaintiff approximately $30,000.

49.     In or around October of 2021, approval of Plaintiff's application for an additional dwelling unit was transferred to HUGHEN, Senior Planner with the CITY's Planning department. HUGHEN, and then KWAITKOWSKA, Principal Planner with the CITY's Planning department, egregiously delayed the approval of the application for months on end, forcing Plaintiff to jump over more arbitrary hurdles. A process that should have taken a few weeks, took over seven (7) months before Plaintiff's initial application for the additional unit was approved in or around May of 2022.

50.     During the pendency of Plaintiff's application for the additional dwelling unit, HUGHEN placed yet another baseless roadblock in front of Plaintiff. HUGHEN, citing to an erroneous ordinance and law, claimed that the driveway on the subject property was out of code and could not be used for off street parking anymore. Again, the driveway had been in existence since the property was built and had already been approved.  This would place a significant limitation on the property and greatly affect its overall value. On-site parking for a single family home in San Francisco is essential. Plaintiff, after contacting the CITY attorney's office, provided HUGHEN with the applicable laws and ordinances showing that the driveway was code complaint. HUGHEN dismissed Plaintiff's pleas and demanded that he now apply for a variance. Plaintiff was truly at a loss.

51.     Again, having no choice, Plaintiff complied with the CITY's demands. His applications for the additional dwelling unit and the driveway were subsequently approved in or around May of 2022 and he received the necessary permits.

52.     At or around this time, Plaintiff entered into another agreement to sell the subject property and it again entered escrow. Although Plaintiff had not received a new certificate of completion, he needed to sell the property and was willing to do so at a discount. Selling the property without a certificate of completion significantly affected its value.

Second Amended Complaint - Case No.: 23-cv-03579-SI

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

53.     In or around July of 2022, while the subject property was still in escrow, Plaintiff was informed by SFDBI that his permit for the additional dwelling unit and the driveway were being revoked. SFDBI falsely claimed that the CITY's Planning department had mistakenly provided him these permits and that he actually needed approval from SFDBI as it was within their purview. They demanded Plaintiff submit new applications, new revised plans, and go through the entire process again. Plaintiff was shocked, confused, and defeated. The CITY's wrongful conduct was relentless. Unfortunately, the sale of the subject property fell through for a second time.

54.     Approximately six (6) months later, after another long, arbitrary, and arduous process, Plaintiff was finally issued new permits by SFDBI in or around January of 2023 for the additional dwelling unit and the driveway. Plaintiff hoped that the CITY's retribution had concluded and he would now be able to obtain a final certificate of completion and sell the property accordingly. Although Plaintiff had obtained new permits, he still needed to go through additional inspections in order to receive the final certificate of completion.

55.     Unfortunately, the CITY's retaliation against Plaintiff and its unjustified taking of his property continued and continues as of the filing of this Complaint. Although Plaintiff possesses valid permits, inspections have led to new, unfound, and vindictive violations concerning, among other things, the legality of the windows located on the first floor of the property. Windows that have been in existence since the property was built and approved many times before.

56.     In or around February of 2023, Plaintiff was again forced to forgo additional revenue and enter into another agreement to sell the property without a certificate of completion. This is the third time the property has been in escrow. Due to the numerous abatements and notices of violation that remain on the property, the sale fell through in or around August of 2023.

57.     The CITY has intentionally and vindictively drawn out the renovation process for the property for the past five (5) years. Plaintiff has lost a significant amount of money in lost profits, lost income, lost interest, expenditures for unnecessary repairs, and increased taxes. Plaintiff has also suffered severe emotional distress and irreparable harm to reputation.

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

58.     The CITY's conduct was intentional, punitive, and non-discretionary, causing Plaintiff to sustain and to continue to sustain severe economic, non-economic, and pecuniary damages and all other damages available by law.

## FIRST CAUSE OF ACTION

## SLANDER OF TITLE

### (By Plaintiff against all Defendants and DOES 1 through 100, inclusive)

59.     Plaintiff re-alleges as though fully set forth at length and incorporates herein by reference all of the allegations and statements contained within this Complaint.

60.     At all relevant times, Plaintiff, through his trust, the Madison Trust FBO Patrick Gallagher, owned the subject property.

61.     Defendants disparaged the quality of the subject property including, without limitation, issuing and refusing to release frivolous code enforcement liens, issuing and refusing to release notices of violation, issuing and refusing to release abatement orders, revoking permits, and revoking a certificate of completion.

62.     Defendants' statements were made to members of the public, including real estate agents or brokers and prospective purchasers of the subject property.

63.     Defendants' statements were without privilege and/or justification as they were false and done with the intention of suggesting that the subject property was unfit to be sold.

64.     Defendants knew that their statements were false and/or acted with reckless disregard of the truth or falsity of the statements.

65.     Defendants knew or should have recognized that someone else might act or forbear action in reliance on their statements.

66.     Defendants made their statements with the intent or reasonable belief that the statements would cause financial loss to Plaintiff.

67.     Defendants' statements have placed an untenable cloud on the title to the subject property, in that the property remains vacant and cannot be sold.

68.     As a direct and proximate result of Defendants' actions, Plaintiff has suffered direct and immediate financial loss including, without limitation, decrease in market value of the subject

- 14 -

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

1   property, lost profits, lost income, lost interest, expenditures for unnecessary repairs, and increased

2   taxes. Plaintiff has also lost time and suffered inconvenience.

3       69.    As a direct and proximate result of Defendants' actions, Plaintiff has been required

4   to retain counsel to bring an action to clear title to the subject property. Plaintiff is entitled to

5   recover all attorney fees and costs incurred in bringing the action.

6   <div align="center">**SECOND CAUSE OF ACTION**</div>

7   <div align="center">**INVERSE CONDEMNATION**</div>

8   <div align="center">**(By Plaintiff against CITY and DOES 1 through 100, inclusive)**</div>

9       70.    Plaintiff re-alleges as though fully set forth at length and incorporate herein by

10  reference all of the allegations and statements contained within this Complaint.

11      71.    Article I, Section 19 of the California Constitution, prohibits the taking, including

12  the temporary or permanent deprivation of private property, for a public use without just

13  compensation, where such deprivation amounts to the abridgment or destruction, by reason of the

14  actions for the government body, of the lawful rights of an individual to the possession, use, or

15  enjoyment of his land. It has also been held that an undue restriction on the use of property is as

16  much a taking for constitutional purposes as is an appropriation or destruction.

17      72.    At all relevant times, Plaintiff, through his trust, the Madison Trust FBO Patrick

18  Gallagher, owned the subject property.

19      73.    Defendants have unlawfully taken and/or damaged the subject property without

20  providing Plaintiff just compensation. Defendants have abridged and/or destructed Plaintiff's

21  rights to the possession, use, and/or enjoyment of his land. Such conduct includes, without

22  limitation, issuing and refusing to release frivolous code enforcement liens, issuing and refusing to

23  release notices of violation, issuing and refusing to release abatement orders, revoking permits,

24  and revoking a certificate of completion.

25      74.    Defendants by their intentional conduct have sacrificed the economic interests of

26  Plaintiff in order to benefit their own interests. Plaintiff should not be forced to bear these burdens

27  for the benefit of the Defendants.

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

75.     Plaintiff alleges that these intentional actions of the Defendants constitute a direct, substantial and peculiar burden on Plaintiff's property interests and a taking of his property without payment of just compensation in violation of the California Constitution.

76.     Plaintiff further alleges that Defendants' intentional actions against Plaintiff failed to advance a legitimate state interest and deprived Plaintiff of the viable use and value of his property interest and caused the damages alleged herein.

77.     As a direct and proximate result of Defendants' actions, Plaintiff has suffered direct and immediate financial loss including, without limitation, decrease in market value of the subject property, lost profits, lost income, lost interest, expenditures for unnecessary repairs, and increased taxes.

78.     As a direct and proximate result of Defendants' actions, Plaintiff has been required to retain counsel to bring an action. Plaintiff is entitled to recover all attorney fees and costs incurred in bringing the action.

## THIRD CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

### (By Plaintiff against all Defendants and DOES 1 through 100, inclusive)

79.     Plaintiff re-alleges as though fully set forth at length and incorporate herein by reference all of the allegations and statements contained within this Complaint.

80.     At all relevant times, Plaintiff, through his trust, the Madison Trust FBO Patrick Gallagher, owned the subject property.

81.     Plaintiff established an economic relationship with various real estate agents or brokers, purchasers, and prospective purchasers related to the property that would have resulted in an economic benefit to Plaintiff by leading to the sale of the subject property.

82.     Defendants knew of the relationship.

83.     Defendants engaged in conduct intended to falsely signal to the real estate agents or brokers, purchasers, and prospective purchasers that there were issues with the subject property so as to affect their decision to proceed with a purchase of the property, encouraging them instead to avoid any consideration or purchase of the property. The subject property has gone into escrow on

- 16 -

1  multiple occasions and has failed to sell due to Defendants' actions in disrupting the relationship.

2      84.      By engaging in this conduct, Defendants intended to disrupt the economic

3  relationship between Plaintiff and the real estate agents or brokers, purchasers, and prospective

4  purchasers.

5      85.      The relationship was disrupted.

6      86.      As a direct and proximate result of Defendants' actions, Plaintiff has suffered

7  financial loss including, without limitation, decrease in market value of the subject property, lost

8  profits, lost income, lost interest, expenditures for unnecessary repairs, and increased taxes.

9  Plaintiff has also suffered severe emotional distress and irreparable harm to reputation.

10      87.      As a direct and proximate result of Defendants' actions, Plaintiff has been required

11  to retain counsel to bring an action. Plaintiff is entitled to recover all attorney fees and costs

12  incurred in bringing the action.

13      88.      Defendants' actions were a substantial factor in causing the harm suffered by

14  Plaintiff.

15                      **FOURTH CAUSE OF ACTION**

16              **VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983**

17          **(By Plaintiff against all Defendants and DOES 1 through 100, inclusive)**

18      89.      Plaintiff re-alleges as though fully set forth at length and incorporate herein by

19  reference all of the allegations and statements contained within this Complaint.

20      90.      Every person who, under color of any statute, ordinance, regulation, custom, or

21  usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected,

22  any citizen of the United States or other person within the jurisdiction thereof to the deprivation of

23  any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the

24  party injured in an action at law, suit in equity, or other proper proceeding for redress.

25      91.      Plaintiff had discussions with the FBI concerning their criminal investigation into

26  the corruptive practices of CURRAN, SANTOS, and the Defendants.

27

28

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

- 17 -

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE (714) 241-4444
WWW.CALLAHAN-LAW.COM

92.     Plaintiff refused to participate in the ongoing scheme that was being perpetrated against him by CURRAN, SANTOS, and the Defendants, including, without limitation, firing Santos as the structural engineer on his renovation project for the subject property.

93.     Defendants were aware and/or were under the belief that Plaintiff had discussions with the FBI and were aware and/or were under the belief that he refused to participate in the ongoing scheme.

94.     Defendants acted under color of local ordinance and law by using their authority to retaliate against Plaintiff and deprive him of his right to freedom of speech guaranteed by the First and Fourteenth Amendment of the United States Constitution. Defendants' unlawful actions included, without limitation, issuing and refusing to release frivolous code enforcement liens, issuing and refusing to release notices of violation, issuing and refusing to release abatement orders, revoking permits, revoking a certificate of completion, and making disparaging statements related to the subject property.

95.     Defendants intentionally targeted the subject property because of Plaintiff's property interests and rights therein.

96.     Defendants' actions were in direct response to and meant to cause the deprivation of Plaintiff's exercise of his right of freedom of speech.

97.     Defendants' actions were in response to Plaintiff's statements concerning matters of public concern.

98.     Plaintiff was harmed as a result of Defendants' actions.

99.     As a direct and proximate result of Defendants' actions, Plaintiff has suffered financial loss including, without limitation, decrease in market value of the subject property, lost profits, lost income, lost interest, expenditures for unnecessary repairs, and increased taxes. Plaintiff has also suffered severe emotional distress and irreparable harm to reputation.

100.    As a direct and proximate result of Defendants' actions, Plaintiff has been required to retain counsel to bring an action. Plaintiff is entitled to recover all attorney fees and costs incurred in bringing the action.

- 18 -

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

# FIFTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (By Plaintiff against all Defendants and DOES 1 through 100, inclusive)

101.    Plaintiff re-alleges as though fully set forth at length and incorporate herein by reference all of the allegations and statements contained within this Complaint.

102.    Defendants acted outrageously in committing the acts alleged herein. Defendants abused their positions of authority to retaliate against and harass Plaintiff.

103.    Defendants intended to cause, or acted with reckless disregard that they would cause, Plaintiff severe emotional distress.

104.    Plaintiff has suffered emotional distress including, without limitation, shock, anxiety, stress, depression, humiliation, irreparable and physical manifestations of such distress as a result of Defendants' actions.

105.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered severe injuries and sustained economic, non-economic, and pecuniary damages and all other damages available by law.

106.    As a direct and proximate result of Defendants' actions, Plaintiff has been required to retain counsel to bring an action. Plaintiff is entitled to recover all attorney fees and costs incurred in bringing the action.

107.    Defendants' actions were a substantial factor in causing the harm suffered by Plaintiff.

## SIXTH CAUSE OF ACTION

## NEGLIGENCE

### (By Plaintiff against all Defendants and DOES 1 through 100, inclusive)

108.    Plaintiff re-alleges as though fully set forth at length and incorporate herein by reference all of the allegations and statements contained within this Complaint.

109.    Defendants were negligent in committing the acts or omissions alleged herein.

110.    Defendants owed a duty of care to Plaintiff to act in a reasonable, professional, honest, and timely manner.

- 19 -

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

111.   Defendants breached the duty of care owed to Plaintiff.

112.   As a direct and proximate result of Defendants' actions or inactions, Plaintiff has suffered severe injuries and sustained economic, non-economic, and pecuniary damages and all other damages available by law.

113.   As a direct and proximate result of Defendants' actions, Plaintiff has been required to retain counsel to bring an action. Plaintiff is entitled to recover all attorney fees and costs incurred in bringing the action.

114.   Defendants' actions were a substantial factor in causing the harm suffered by Plaintiff.

### SEVENTH CAUSE OF ACTION

### DECLARATORY RELIEF

#### (By Plaintiff against all Defendants and DOES 1 through 100, inclusive)

115.   Plaintiff re-alleges as though fully set forth at length and incorporate herein by reference all of the allegations and statements contained within this Complaint.

116.   At all relevant times, Plaintiff, through his trust, the Madison Trust FBO Patrick Gallagher, owned the subject property.

117.   Defendants' refusal to, without limitation, release frivolous code enforcement liens, release notices of violation, release abatement orders, issue permits, and issue a certificate of completion has placed an untenable cloud on the title to the subject property, in that the property remains vacant and cannot be sold.

118.   An actual controversy has arisen and now exists between Defendants and Plaintiff in connection with the matters alleged herein.

119.   No adequate remedy other than that herein prayed for exists by which the rights of the parties may be determined. A judicial determination resolving this actual controversy is necessary and appropriate at this time.

### PRAYER

WHEREFORE, Plaintiff prays for relief as follows:

1.   For general damages (also known as non-economic damages), according to proof;

- 20 -

2.  For special damages (also known as economic damages), according to proof;

3.  For compensatory damages, according to proof;

4.  For treble damages pursuant to Civil Code § 3345;

5.  For an order enjoining Defendants from violating Plaintiff's constitutional rights;

6.  For injunctive relief;

7.  For punitive damages, according to proof;

8.  For prejudgment interest and pretrial interest, according to proof;

9.  For attorneys' fees and costs, according to proof;

10. For damages for Plaintiff's other losses, according to proof;

11. For all statutorily allowed damages; and

12. For such other and further relief as the Court deems proper.

Dated: November 9, 2023

**CALLAHAN & BLAINE, APLC**

By: */s/ Jonathan W. Hornberger*
Javier H. van Oordt
Jonathan W. Hornberger
Attorneys for Plaintiff Patrick Gallagher

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on each and all of the causes of action set forth in this Complaint.

Dated:  November 9, 2023                    **CALLAHAN & BLAINE, APLC**

By:    */s/ Jonathan W. Hornberger*
Javier H. van Oordt
Jonathan W. Hornberger
Attorneys for Plaintiff Patrick Gallagher

CALLAHAN & BLAINE
A PROFESSIONAL LAW CORPORATION
3 HUTTON CENTRE DRIVE, NINTH FLOOR
SANTA ANA, CALIFORNIA 92707
TELEPHONE: (714) 241-4444
WWW.CALLAHAN-LAW.COM

Second Amended Complaint - Case No.: 23-cv-03579-JCS

Exhibit P

**San Francisco Planning**

49 South Van Ness Avenue, Suite 1400
San Francisco, CA 94103
www.sfplanning.org

# VARIANCE FROM THE PLANNING CODE

## INFORMATIONAL AND SUPPLEMENTAL APPLICATION PACKET

**ATTENTION: A Project Application must be completed and/or attached prior to submitting this Supplemental Application. See the Project Application for instructions.**

Pursuant to Planning Code Section 305, the Zoning Administrator shall hear and make determinations regarding applications for variances from the strict application of quantitative standards in the Planning Code. The first pages consist of instructions which should be read carefully before the application form is completed.

For questions or more information, you can call the Planning counter at 628.652.7300 or email pic@sfgov.org where planners are able to assist you.

**Español:** Si desea ayuda sobre cómo llenar esta solicitud en español, por favor llame al 628.652.7550. Tenga en cuenta que el Departamento de Planificación requerirá al menos un día hábil para responder.

**中文：** 如果您希望獲得使用中文填寫這份申請表的幫助，請致電628.652.7550。請注意，規劃部門需要至少一個工作日來回應。

**Filipino:** Kung gusto mo ng tulong sa pagkumpleto ng application na ito sa Filipino, paki tawagan ang 628.652.7550. Paki tandaan na mangangailangan ang Planning Department ng hindi kukulangin sa isang araw na pantrabaho para makasagot.

## WHAT IS A VARIANCE?

The Planning Code regulates the use of property, including the size, design, and siting of buildings that may be constructed on a piece of property. The Planning Code has standards for buildings that govern such features as rear yards, front setbacks, usable open space, height, and parking. A variance is a request for an exception to a Planning Code standard. The Zoning Administrator is the City official that interprets and maintains the Planning Code.

## WHEN IS A VARIANCE NECESSARY?

There may be special circumstances that make it difficult for a project to meet all of the Planning Code requirements. In those instances, a project sponsor may request that the Zoning Administrator grant a Variance from the Code provisions. Under the City Charter (Section 4.105), the Zoning Administrator has the power to grant only those variances that are consistent with the general purpose and the intent of the Planning Code. The power to grant a variance shall be applied only when the plain and literal interpretation and enforcement of the Code would "result in practical difficulties, unnecessary hardships, or where the results would be inconsistent with the general purpose of the [Code]."

Planning Code Section 305(c) outlines the five criteria that must be met in order for the Zoning Administrator to grant a variance. The Section 305(c) criteria are as follows:

1. That there are exceptional or extraordinary circumstances applying to the property involved or to the intended use of the property that do not apply generally to other property or uses in the same class of district;

2. That owing to such exceptional or extraordinary circumstances the literal enforcement of specified provisions of this Code would result in practical difficulty or unnecessary hardship not created by or attributable to the applicant or the owner of the property;

3. That such variance is necessary for the preservation and enjoyment of a substantial property right of the subject property, possessed by other property in the same class of district;

4. That the granting of such variance will not be materially detrimental to the public welfare or materially injurious to the property or improvements in the vicinity; and

5. That the granting of such variance will be in harmony with the general purpose and intent of this Code and will not adversely affect the General Plan.

## HOW DOES THE PROCESS WORK?

Upon submittal of a complete application to the Planning Department, the Zoning Administrator will schedule a public hearing to consider whether to grant the Variance. Variance hearings typically occur on the last Wednesday of each month. Upon issuing the formal written decision either granting or denying the Variance in whole or in part, the Zoning Administrator shall forthwith transmit a copy the Variance decision letter to the applicant. The action of the Zoning Administrator shall be final and shall become effective 10 days after the date of his written decision except upon the filing of a valid appeal to the Board of Permit Appeals as provided in Section 308.2 of the Planning Code.

## FEES

Please refer to the Planning Department Fee Schedule available at **www.sfplanning.org.** For questions related to the Fee Schedule, contact the Planning counter at the Permit Center by calling 628.652.7300 or by emailing pic@sfgov.org.

Fees will be determined based on the estimated construction costs. Should the cost of staff time exceed the initial fee paid, an additional fee for time and materials may be billed upon completion of the hearing process or permit approval. Additional fees may also be collected for preparation and recordation of any documents with the San Francisco Assessor-Recorder's office and for monitoring compliance with any conditions of approval.

## WHAT APPLICANTS SHOULD KNOW ABOUT THE PUBLIC HEARING PROCESS

A.    The Zoning Administrator encourages applicants to meet with all community groups and parties interested in their application early in the entitlement process. In many cases, this is required as part of the Pre-application process. Department staff is available to assist in determining how to contact interested groups. Neighborhood organization lists are available on the Department's website. Notice of the hearing will be sent to groups in or near the neighborhood of the project. The applicant may be contacted by the Planning Department staff with requests for additional information or clarification. An applicant's cooperation will facilitate the timely review of the application.

B.    The Zoning Administrator requests that applicants familiarize themselves with the procedure for public hearings, which are excerpted from the Planning Commission's Rules and Regulations below.

**Hearings.** A public hearing may be held on any matter before the Zoning Administrator at either a Regular (every 4th Wednesday of the month) or a Special Meeting. The procedure for such public hearings shall be as follows:

1.  A description of the issue by Zoning Administrator along with the Planning Department's recommendation.

2.  A presentation of the proposal by the project sponsor for a period not to exceed 5 minutes.

3.  A presentation of opposition to the proposal, by organized opposition, for a period not to exceed 3 minutes.

4.  Public testimony from proponents of the proposal. An individual may speak for a period not to exceed 3 minutes.

5.  Public testimony from opponents of the proposal would be taken under conditions parallel to those imposed on proposal proponents, not to exceed 3 minutes.

6.  The project sponsor or applicant will be given a period, not to exceed 3 minutes, within which to clarify any questions raised in previous testimony.

7.  Discussion by the Zoning Administrator on the matter.

8.  The Zoning Administrator may impose time limits on appearances by members of the public and may otherwise exercise his or her discretion on procedures for the conduct of public hearings.

C.    **Opportunities for Appeals by Other Bodies:** Zoning Administrator actions on Variances are final unless appealed to the Board of Appeals within 10 days of the Zoning Administrator's written decision.



# VARIANCE FROM THE PLANNING CODE

SUPPLEMENTAL APPLICATION

## Property Information

Project Address: 200 naples st                    Block/Lot(s): 6008/001

The Project is seeking a variance from Planning Code Section(s):   *SEC   150*

## Variance Findings

Pursuant to Planning Code Section 305(c), before approving a variance application, the Zoning Administrator needs to find that the facts presented are such to establish the findings stated below. In the space below and on separate paper, if necessary, please present facts sufficient to establish each finding.

1.  That there are exceptional or extraordinary circumstances applying to the property involved or to the intended use of the property that do not apply generally to other property or uses in the same class of district;

yes. im told that parking is not allowed in the rear of the property. however the house faces naples as does the existing driveway. this lot number 1 in the neighborhood. residents of 200 naples have been parkinthere since 1907. at one point the curb was cut for the existing drivewat but got filled in during ada work on the upper corner sidewalk. its the only place for off street parking on this property

2.  That owing to such exceptional or extraordinary circumstances the literal enforcement of specified provisions of this Code would result in practical difficulty or unnecessary hardship not created by or attributable to the applicant or the owner of the property;

without the variance, im told i wont have offstreet parking. however this property underwent a seismic retrofit and thus now complies with s.f. ordinance 95-17 which provides for off street parking anywhere accesable to the lot. page 7 and 8 of 95-17    *ALSO ORDINANCE  112-08*

3.  That such variance is necessary for the preservation and enjoyment of a substantial property right of the subject property, possessed by other property in the same class of district;

apparently, without this variance, ill have the only property without off street parking. ab094 dictates that as long as property complies with 95-17....off street parking is allowed

4. That the granting of such variance will not be materially detrimental to the public welfare or materially injurious to the property or improvements in the vicinity;

**it wont affect anyone else in the neighborhood**

5. That the granting of such variance will be in harmony with the general purpose and intent of this Code and will not adversely affect the General Plan.

**it wont have an adverse effect on anyone**

# APPLICANT'S AFFIDAVIT

Under penalty of perjury the following declarations are made:

a)  The undersigned is the owner or authorized agent of the owner of this property.

b)  The information presented is true and correct to the best of my knowledge.

c)  Other information or applications may be required.

d)  I hereby authorize City and County of San Francisco Planning staff to conduct a site visit of this property as part of the City's review of this application, making all portions of the interior and exterior accessible through completion of construction and in response to the monitoring of any condition of approval.

e)  I attest that personally identifiable information (PII) - i.e. social security numbers, driver's license numbers, bank accounts - have not been provided as part of this application.  Furthermore, where supplemental information is required by this application, PII has been redacted prior to submittal to the Planning Department.  I understand that any information provided to the Planning Department becomes part of the public record and can be made available to the public for review and/or posted to Department websites.

_____          _____

Signature                                          Name (Printed)


_____

Date


_____          _____          _____

Relationship to Project                    Phone                             Email
(i.e. Owner, Architect, etc.)

For Department Use Only
Application received by Planning Department:

By: _____          Date: _____

Exhibit Q



49 South Van Ness Avenue, Suite 1400
San Francisco, CA 94103

628.652.7600
www.sfplanning.org

# VARIANCE DECISION

**Date:**            July 27, 2022
**Case No.:**        2021-011391VAR
**Project Address:** 200 NAPLES ST
**Block/Lots:**      6008 / 001
**Zoning:**          RH-1 (RESIDENTIAL- HOUSE, ONE FAMILY)
**Height/Bulk:**     40-X Height and Bulk District
**Applicant:**       Patrick Gallagher
                     PO Box 1784
                     Discovery Bay, CA 94505
**Owner:**           MADISON TRUST CO FBO PATRICK P GALLAGHER
                     P.O Box 523
                     Byron, CA 94514
**Staff Contact:**   Jeffrey Speirs – 628-652-7357
                     Jeffrey.Speirs@sfgov.org

## Description of Variance – Rear Yard Variance Sought:

The proposal is to establish two off-street parking spaces in the rear yard, accessed from Naples Street.

**Planning Code Section 134** requires the subject property to maintain a rear yard of approximately 30 feet, which is 30% of lot depth. Planning Code Section 136(c)(30) clarifies that parking is not permitted in required yards. The two off-street parking spaces would be located within the required rear yard. Therefore, a variance is required.

## Procedural Background:

1. The Project is exempt from the California Environmental Quality Act ("CEQA") as a Class 1 categorical exemption.

2. The Zoning Administrator held a public hearing on **Variance Application No. 2021-011391VAR** on **May 25, 2022.**

3. Planning Code Section 311 notification is not required for the associated building permit.

## Decision:

**DENIED,** in general conformity with the plans on file with this application, shown as EXHIBIT A, to establish two off-street parking spaces in the rear yard of the two-story, single-family building that would obstruct into the lot's required rear yard.

## Findings:

Section 305(c) of the Planning Code states that in order to grant a variance, the Zoning Administrator must determine that the facts of the case are sufficient to establish the following five findings:

**FINDING 1.**

That there are exceptional or extraordinary circumstances applying to the property involved or to the intended use of the property that do not apply generally to other properties or uses in the same class of district.

Requirement Not Met.

A.   There are no exceptional or extraordinary circumstances applying the subject property. The existing corner lot is typical in every way, with a rectangular shape, a width of 25 feet, an area of nearly 2,500 square feet, and no slope. The lot is already developed with an existing 2-story, single-family building. While the property does not contain an off-street parking space, none are required by the Planning Code.

**FINDING 2.**

That owing to such exceptional and extraordinary circumstances the literal enforcement of specified provisions of this Code would result in a practical difficulty or unnecessary hardship not created by or attributed to the applicant or the owner of the property.

Requirement Not Met.

A.   As stated above, there are no exceptional or extraordinary circumstances that result in any unnecessary hardship or practical difficulty related the subject property. The variances are triggered by the property owners proposed actions to add private off-street parking that is not required by the Planning Code.

**FINDING 3.**

That such variance is necessary for preservation and enjoyment of a substantial property right of the subject property, possessed by other property in the same class of district.

Requirement Not Met.

A.   Most properties provide usable open space at grade within the required rear yard, and off-street parking screened from view in the buildable area of the lot. The subject property is not required to provide off-street parking in the RH-1 District. Given these facts, the subject variance is not necessary for the preservation and enjoyment of a substantial property right possessed by other property in the same class of district.

**FINDING 4.**

That the granting of such variance will not be materially detrimental to the public welfare or materially injurious to the property or improvements in the vicinity.



Variance Decision                                                    CASE NO. 2021-011391VAR
July 27, 2022                                                               200 NAPLES ST

**Requirement Not Met**.

A.  Off-street parking is not required for the subject lot. Granting the variance would privatize the curb space
    for a single lot by removing a public parking space from the street, which would impact the availability of
    public parking in the area.

**FINDING 5.**

The granting of such variance will be in harmony with the general purpose and intent of this Code and will not
adversely affect the General Plan.

**Requirement Not Met**.

A.  This development is not consistent with the generally stated intent and purpose of the Planning Code to
    promote orderly and beneficial development. Planning Code Section 101.1 establishes eight priority-
    planning policies and requires review of variance applications for consistency with said policies. The
    project does not meet all relevant policies.

    1.  Existing neighborhood retail uses will not be adversely affected by the proposed project.

    2.  The proposed project will not be in keeping with the existing housing and neighborhood character
        because it is not typical to park vehicles in a lot's rear yard.

    3.  The proposed project will have no effect on the City's supply of affordable housing.

    4.  The proposed project will adversely affect neighborhood parking by removing on-street parking
        space to provide private parking in the rear yard.

    5.  The project will have no effect on the City's industrial and service sectors.

    6.  The proposed project will have no effect on the City's preparedness to protect against injury and loss
        of life in an earthquake.

    7.  The project will have no effect on the City's landmarks or historic buildings.

    8.  The project would not affect any existing or planned public parks or open spaces.

The effective date of this decision shall be either the date of this decision letter if not appealed, or the date of the
Notice of Decision and Order if appealed to the Board of Appeals.

Once any portion of the granted variance is used, all specifications and conditions of the variance authorization
become immediately operative.

**Protest of Fee or Exaction:** You may protest any fee or exaction subject to Government Code Section 66000 that
is imposed as a condition of approval by following the procedures set forth in Government Code Section 66020.
The protest must satisfy the requirements of Government Code Section 66020(a) and must be filed within 90
days of the date of the first approval or conditional approval of the development referencing the challenged fee



or exaction. For purposes of Government Code Section 66020, the date of imposition of the fee shall be the date of the earliest discretionary approval by the City of the subject development.

If the City has not previously given Notice of an earlier discretionary approval of the project, the Planning Commission's adoption of this Motion, Resolution, Discretionary Review Action or the Zoning Administrator's Variance Decision Letter constitutes the approval or conditional approval of the development and the City hereby gives **NOTICE** that the 90-day protest period under Government Code Section 66020 has begun. If the City has already given Notice that the 90-day approval period has begun for the subject development, then this document does not re-commence the 90-day approval period.

APPEAL: Any aggrieved person may appeal this variance decision to the Board of Appeals within ten (10) days after the date of the issuance of this Variance Decision. For further information, please contact the Board of Appeals in person at 49 South Van Ness Ave, Suite 1475 (14th Floor), call 628-652-1150, or visit www.sfgov.org/bdappeal.

Very truly yours,

Corey A. Teague, AICP
*Zoning Administrator*

> This is not a permit to commence any work or change occupancy. Permits from appropriate departments must be secured before work is started or occupancy is changed.



# Exhibit R

## BOARD OF APPEALS, CITY & COUNTY OF SAN FRANCISCO

Appeal of                                                                                  Appeal No. **22-053**
PATRICK GALLAGHER,
_____  )
                          Appellant(s)     )
                                                                          )
vs.                                                                       )
                                                                          )
ZONING ADMINISTRATOR,                            )
NA                                        Respondent

## NOTICE OF APPEAL

**NOTICE IS HEREBY GIVEN THAT** on July 27, 2022, the above named appellant(s) filed an appeal with the Board of Appeals of the City and County of San Francisco from the decision or order of the above named department(s), commission, or officer.

The substance or effect of the decision or order appealed from is the ISSUANCE on July 27, 2022, of a Variance (the proposal is to establish two off-street parking spaces in the rear yard, accessed from Naples Street. The proposal does not meet any of the five findings required by Planning Code Section 305(c) to grant a variance) at 200 Naples Street.

## APPLICATION NO. Case No. 2021-011391VAR

## FOR HEARING ON August 17, 2022

| Address of Appellant(s): | Address of Other Parties: |
|---|---|
| Patrick Gallagher, Appellant(s)<br>PO Box 1784<br>Discovery Bay, CA 94505 | N/A |

# Exhibit S

## BOARD OF APPEALS, CITY & COUNTY OF SAN FRANCISCO

| | |
|---|---|
| Appeal of<br>PATRICK GALLAGHER, | Appeal No. **22-053** |
| _____ )<br>Appellant(s)  )<br>)<br>vs.  )<br>)<br>ZONING ADMINISTRATOR,  )<br>_____<br>Respondent | |

### NOTICE OF APPEAL

**NOTICE IS HEREBY GIVEN THAT** on July 27, 2022, the above named appellant(s) filed an appeal with the Board of Appeals of the City and County of San Francisco from the decision or order of the above named department(s), commission, or officer.

The substance or effect of the decision or order appealed from is the ISSUANCE on July 27, 2022, of a Variance Decision to Patrick Gallagher (DENIAL of a Rear Yard Variance; the proposal is to establish two off-street parking spaces in the rear yard that would be accessed from Naples Street; the proposal does not meet any of the five findings required by Planning Code Section 305(c) to grant a variance) at 200 Naples Street.

### CASE NO. 2021-011391VAR

### FOR HEARING ON August 17, 2022

| Address of Appellant(s): | Address of Other Parties: |
|---|---|
| Patrick Gallagher, Appellant(s)<br>PO Box 1784<br>Discovery Bay, CA 94505 | N/A |

### NOTICE OF DECISION & ORDER

The hearing on the aforementioned matter came before the Board of Appeals of the City & County of San Francisco on August 17, 2022.

**PURSUANT TO** § 4.106 of the Charter of the City & County of San Francisco and Article 1, §14 of the Business & Tax Regulations Code of the said City & County, and the action above stated, the Board of Appeals hereby **DENIES THE APPEAL AND ORDERS** that the ISSUANCE of the Variance Decision (Denial of a Rear Yard Variance) by the Zoning Administrator is UPHELD on the basis that the five findings required by Planning Code Section 305(c) were not met.

| | |
|---|---|
| BOARD OF APPEALS<br>CITY & COUNTY OF SAN FRANCISCO | Last Day to Request Rehearing: August 29, 2022<br>Rehearing Request: None.<br>Rehearing: None.<br>Notice Released: August 30, 2022 |
| _____<br>Rick Swig, President | _____<br>Julie Rosenberg, Executive Director |

If this decision is subject to review under Code of Civil Procedure § 1094.5, then the time within which judicial review must be sought is governed by California Code of Civil Procedure, §1094.6.

# Exhibit T

AO 91 (Rev. 11/11)   Criminal Complaint

FILED

Aug 20 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

# UNITED STATES DISTRICT COURT

for the

Northern District of California

|  |  |
|---|---|
| United States of America | ) |
| v. | ) |
| BERNARD CURRAN and RODRIGO SANTOS | ) Case No.  3-21-mj-71315 MAG |
|  | ) |
|  | ) |
|  | ) |
|  | ) |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____February 13, 2019_____ in the county of _____San Francisco_____ in the
_____Northern_____ District of _____California_____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 1343 and 1346 | Honest Services Wire Fraud |
|  | Maximum Penalties: 20 years in prison; a fine equal to the greater of $250,000 or twice the gross gain or loss; 3 years of supervised release; $100 special assessment per count; restitution; forfeiture; possible deportation for non-citizens. |

This criminal complaint is based on these facts:

Please see the attached affidavit of FBI Special Agent Allison Lopez.

☑ Continued on the attached sheet.

S/
_____
*Complainant's signature*

Approved as to form _____/s/_____
AUSA  Casey Boome

Special Agent Allison Lopez, FBI
_____
*Printed name and title*

Sworn to before me by telephone.

Date:  8/20/2021

_____
*Judge's signature*

City and state:  San Francisco, CA

Joseph C. Spero, Chief U.S. Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Allison Lopez, Special Agent with the Federal Bureau of Investigation, being duly sworn, state:

## INTRODUCTION

1. This affidavit is presented in support of a criminal complaint and application for summonses and arrest warrants for Bernard CURRAN ("CURRAN") and Rodrigo SANTOS ("SANTOS") for their honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346.

2. CURRAN was a Senior Building Inspector at the Department of Building Inspection (DBI) in San Francisco, California, where CURRAN worked since 2005. On May 20, 2021, CURRAN was placed on paid administrative leave pending the findings of an investigation by the San Francisco City Attorney's Office into unreported income and gifts. After being placed on leave, CURRAN resigned from his position at DBI.

3. SANTOS is a prominent structural engineer in San Francisco, California. SANTOS was the principal and co-founder of SANTOS & Urrutia Structural Engineers, Inc. ("S&U"), a structural engineering company based in the Mission neighborhood. Over the last two decades, SANTOS has received several political appointments related to his engineering work. For example, Mayor Willie Brown appointed SANTOS to the San Francisco Building Inspection Commission (BIC) in 2000. In 2004, Mayor Gavin Newson appointed SANTOS as BIC President. In 2012, Mayor Ed Lee appointed SANTOS to the City College Board of Trustees in San Francisco. SANTOS' day-to-day work consists of providing engineering services to clients and working with project owners and other

contractors through his structural engineering company. This includes work obtaining building permits from local municipalities, including San Francisco.

4. I submit that there is probable cause to find that CURRAN and SANTOS committed honest services wire fraud. As set forth in greater detail below, SANTOS knew that CURRAN supported and participated in activities at the San Francisco Golden Gate Rugby Association, a non-profit organization where CURRAN volunteers and where one of CURRAN's children plays rugby. SANTOS leveraged CURRAN's affinity for the organization to influence CURRAN's official duties as a DBI inspector. Specifically, SANTOS urged his clients to make charitable contributions to the Golden Gate Rugby Association, and in exchange for the stream of benefits flowing to the charity, CURRAN gave SANTOS' clients favorable official treatment. In at least two instances, CURRAN gave final inspection approval on permits for SANTOS' clients without the work necessary to comply with the permit ever being completed. Most of the projects for which CURRAN gave approval for SANTOS' donor-clients were outside of the district to which CURRAN was assigned with DBI, and as such, the inspections should have been the responsibility of another Senior Building Inspector or their subordinates.

**AFFIANT BACKGROUND**

5. I am a Special Agent with the Federal Bureau of Investigation and have been since January 2016. I received approximately 20 weeks of training at the FBI Academy in Quantico, Virginia. During that time, I received training in various areas including evidence collection, interviewing, legal procedure and process, source management, investigative technology, firearms and tactical training, and defensive tactics. I am currently assigned to the Public Corruption squad of the FBI's San Francisco Field Division. I am

2

responsible for investigating, among other things, violations concerning bank and wire fraud, bribery, obstruction of justice, and extortion. Prior to my work in Public Corruption, I was assigned to the Violent Crimes Against Children squad. I have a master's degree in Forensic Psychology, and I am a certified Crisis Negotiator.

6. I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. The contents of this affidavit are based upon the following: my own investigation; information obtained from other law enforcement agencies; my review of documents and computer records related to this investigation; oral and written communications with others who have personal knowledge of the events and circumstances described herein; review of public information, including information available on the Internet; review of records received via legal process; and my experience and background as a special agent of the FBI. Statements made by witnesses and other individuals referenced in this affidavit have been paraphrased. Since this affidavit is being submitted for the limited purpose of securing an arrest warrant and order, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that violations of United States laws occurred.

## APPLICABLE LAW

7. Title 18, United States Code, Sections 1343 and 1346, prohibit honest services wire fraud. The elements of the offense are as follows:

3

1.  The defendant knowingly devised or participated in a scheme to defraud the public of its right to the honest services of a public official through bribery or kickbacks in breach of the official's fiduciary duty;

2.  The defendant did so knowingly and with an intent to defraud, that is, the intent to deceive or cheat the public of honest services;

3.  The scheme or artifice to defraud involved a deception, misrepresentation, false statement, false pretense, or concealment that was material; and

4.  The defendant used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme.

8.  While I submit that the evidence set forth below demonstrates that SANTOS facilitated a stream of benefits to CURRAN's favorite charity in exchange for official action, honest services wire fraud does not require the bribe or kickback be completed, or that official action was actually taken, because the criminal act is the creation of a "scheme" to defraud. *See Pasquantino v. United States*, 544 U.S. 349, 371(2005) ("the wire fraud statute punishes the scheme, not its success") (citations quotations omitted); *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400 (9th Cir. 1986) (for mail and wire fraud, it is not necessary to show that the scheme was successful or that the intended victim suffered a loss or that the defendants secured a gain); *see also United States v. Kimbrew*, 944 F.3d 810, 815 (9th Cir. 2019) (ability for bribery of a public official, in violation of 18 U.S.C. § 201(b)(2)(A), "does not depend on an outcome; the offense is complete at the moment of agreement, and that agreement need not even be accompanied by the bribe recipient's genuine intentions to follow through"). In addition, "anyone who

knowingly and intentionally participates in the execution of [a] fraudulent scheme comes within the prohibition of the mail and wire fraud statutes regardless of whether the defendant devised the scheme." *United States v. Holden*, 908 F.3d 395, 400 (9th Cir. 2018) (citation omitted), *cert. denied*, 139 S. Ct. 1645 (2019).

## THE SAN FRANCISCO DEPARTMENT OF BUILDING INSPECTION

9. The San Francisco Department of Building Inspection ("DBI") is the regulatory agency responsible for overseeing the enforcement of building, electrical, plumbing, disability access, and housing codes for commercial and residential buildings in the City and County of San Francisco. DBI's enforcement of building codes is complex, and as such, most property owners seeking to build or renovate in San Francisco rely on professionals to navigate the system on their behalf—usually a contractor, engineer, and/or permit expediter.

10. The first hurdle that a property owner must clear to shepherd a project from inception to completion is to obtain a permit from DBI. The permitting process is designed to ensure that the proposed construction or renovation project will comply with all applicable codes and ordinances. To obtain a permit, the property owner ("sponsor") or the sponsor's representative (contractor, engineer, or expediter) must apply for a permit by completing a permit application and submitting other necessary paperwork to DBI. If the project is sufficiently broad in scope, the sponsor must submit plans along with the permit application. Depending on the "scope of work" described in the application, the plans/permit may require review by one or more specialized departments, including the SF Housing Authority, Fire Safety, Plumbing, or Electrical. If DBI determines that the application and plans comply with all applicable codes, DBI will formally issue a building

permit authorizing the project to commence according to the approved scope of work and plans. The project sponsor is not authorized to make any material changes to the property until DBI issues a building permit and the sponsor pays any fees associated with the permit (usually calculated as a percentage of the total project costs).

11. Another critical regulatory hurdle is a physical inspection of the work by a DBI building inspector. The purpose of the inspection is to verify that the job has been completed according to the scope of work and plans authorized by the permit. Normally, a DBI inspector with responsibility over the district where the property is located will conduct the inspection.[1] According to DBI procedures, line inspectors conduct most inspections while the senior building inspectors supervise line inspectors and weigh in on unusual issues, usually at the request of a line inspector. A given project may require multiple inspections, depending on the scope of work. For instance, a bathroom addition may require an interim inspection to confirm that all pipes and plumbing components have been properly installed before the contractor covers the pipes with drywall (called an "ok to cover" inspection).

12. According to a DBI Official ("DBI Official-1"), during a typical final inspection, a DBI inspector should go to the subject property with the project sponsor or the sponsor's representative, who should provide the inspector with the approved permit and plans. The inspector should examine the permit and plans to determine whether the sponsor completed the work properly. If the work has been completed according to the approved plans, the inspector should "final" the permit and, if applicable, issue a certificate of final

---

[1] Each line DBI building inspector is assigned to one of 18 geographic districts in the City. Each inspector has primary responsibility for conducting building inspections in his/her district. Senior building inspectors are assigned to supervise multiple districts and the line supervisors assigned to those districts.

6

completion and occupancy ("CFC"), which gives the sponsor the legal authority to begin using the property for its approved purpose (*e.g.*, residential, office, retail, or other use). If the project has not been completed according to the permit and plans, the inspector should note the discrepancies and instruct the sponsor to remedy the issue before "finaling" the permit and issuing a CFC.

13. DBI maintains a public-facing online database, the "Permit Tracking System" or "PTS", which contains approval and inspection information for each permit issued in San Francisco. According to DBI procedure, building inspectors must log property inspections in PTS, including the date, purpose, inspector's name, and findings.

## FACTS SUPPORTING PROBABLE CAUSE

*SANTOS solicited donations from his clients intending to use them to influence CURRAN.*

14. As set forth in the paragraphs below, text messages found on SANTOS' cell phone (which was searched and seized pursuant to a federal search warrant) show that SANTOS solicited individuals for donations to the San Francisco Golden Gate Rugby Association while attributing the charity to CURRAN.[2] As demonstrated by the messages below, SANTOS most often requested a donation from his clients immediately after discussing an official action by CURRAN (*e.g.* issuing final inspection approval, coming to the client's property for a final inspection, or issuing a CFC). As will be discussed in greater detail below, on several occasions SANTOS informed his client's that checks written to the rugby association were intended to help influence CURRAN, but SANTOS deposited

---

[2] On numerous occasions, when directing his clients to write checks to the organization, SANTOS incorrectly stated the name of the organization. However, the charity still deposited these checks and many others like them, despite the "pay to the order" line of the check often having a variation on the name of the charity (*e.g.* "Golden Gate Youth Rugby Association" or "Golden Gate Rugby Foundation"), rather than the correct name.

those checks into his own person checking account instead of passing them along to CURRAN.

**900 Block of Guerrero Street**

15. On June 8, 2017, SANTOS and "Client-1"[3] exchanged the following text messages about permitting issues related to Client-1's renovation project:

> Client-1 (to SANTOS): Some mortgage brokers are concerned that their lenders won't close if there is only a TCO[4]. Can we get a CO by July 1?
>
> SANTOS (to Client-1): Yes. Write a check payable to San Francisco Golden Gate Rugby association for $1,500.00 (Bernie Curran's club). Curran will issue the CFC.
>
> Client-1 (to SANTOS): Okay. Should I drop it by tomorrow?
>
> SANTOS (to Client-1): Yes please.

16. Between June and October 2017, SANTOS and Client-1 continued to exchange text messages relating to the project on the 900 block of Guerrero Street. SANTOS told Client-1 on numerous occasions that any problems with the project would be fixed soon and that CURRAN would issue the CFC shortly. A review of DBI's on-line permit and complaint tracking system for the project on the 900 block of Guerrero Street, San Francisco, California showed CURRAN as the final approver on October 13, 2017, for two building permits related to property.

---

[3] Throughout this affidavit, "Client" refers to property owners or their agents working with SANTOS on the projects discussed herein.
[4] DBI defines "TCO" on its website as "Temporary Certificate of Occupancy," which is normally issued to property owners who request permission to occupy their property before all work allowed under a building permit has been finished, and for which a CFC is required.

17. A review of a JP Morgan Chase account belonging to the Golden Gate Rugby Association was conducted and a check for $1,500.00 written by Client-1's company dated June 9, 2017 was deposited into the account.

**1000 Block of Alabama Street**

18. On January 29, 2018, SANTOS and Client-2, the contractor for the project, exchanged the following text messages about the remodel and structural upgrade project in which they discussed CURRAN conducting a final inspection at the property.

> SANTOS (to Client-2):  Bernie Curran will meet me at the site in twenty minutes. Please allow access.
>
> Client-2 (to SANTOS):  I'll be there in 5
>
> SANTOS (to Client-2):  Two checks One payable to Santos and Urrutia for $3k One payable to Golden Gate Youth Rugby Association for $1k
>
> Client-2 (to SANTOS):  I'll pass it on
>
> SANTOS (to Client-2):  Thanks.  We are done!
>
> Client-2 (to SANTOS):  Thank you for all the help!

19. On January 29, 2018, SANTOS and Client-3, the property owner for the Alabama Street project, exchanged the following text messages in which SANTOS informed Client-3 that CURRAN had just finaled the permit for Client-3's project:

> SANTOS (to Client-3):  The eagle has landed!  Two checks One to Santos and Urrutia for $3k and one for Golden Gate youth rugby association for $1k
>
> Client-3 (to SANTOS):  Hallelujah and thanks so much.  Will come by your office tomorrow morning.

9

20. A review of DBI's on-line permit and complaint tracking system for the property located on the 1000 block of Alabama Street, San Francisco, California showed CURRAN as the final approver on January 29, 2018 for a permit related to the property.

21. A review of DBI's website showed that the property on the 1000 block of Alabama Street was in DBI's Building Inspection Division district eight. Per a DBI organizational chart effective October 23, 2017, a DBI Senior Building Inspector other than CURRAN was the senior building inspector with authority over district eight.

22. A check from Client-3 dated February 1, 2018 for $1,000 was deposited into a JP Morgan Chase account belonging to the Golden Gate Rugby Association.

**700 Block of Wisconsin Street**

23. On April 24, 2018, SANTOS and Client-4 exchanged the following text messages regarding permitting for Client-4's project:

> Client-4 (to SANTOS): Please don't forget the job card
>
> SANTOS (to Client-4): I have it with me. Write a check for $500 payable to Golden Gate youth Rugby association.
>
> Client-4 (to SANTOS): All ready did
>
> SANTOS (to Client-4): Thank you.

24. On May 4, 2018, SANTOS and CURRAN exchanged the following text messages:

> SANTOS (to CURRAN): Dear Senior: Any assistance of the CFC for [the address on the 700 block of] Wisconsin will be greatly appreciated. [Client-4's] permit expires tomorrow.
>
> CURRAN (to SANTOS): I will write it this afternoon when I get back at three

25. On May 4, 2018, SANTOS and Client-4 exchanged the following text messages:

10

SANTOS (to Client-4):  CFC will be ready this afternoon.  Write a check payable to Golden Gate Rugby Association for $300.

Client-4 (to SANTOS):  No problem When can I see it online?

SANTOS (to Client-4):  I will pick up the CFC this afternoon after 3:30 pm. Drop off the check at my office before 2 pm.

Client-4 (to SANTOS):  That's fine.  I will come back for the CFC after 3:30. I don't want to wait until Monday.

26. A review of DBI's on-line permit and complaint tracking system showed permit related to the property on the 700 Block of Wisconsin Street received pre-final approval from CURRAN on May 4, 2018 and a final inspection approval and issuance of CFC from CURRAN on August 3, 2018.

27. A review of DBI's website showed the property on the 700 block of Wisconsin Street was in DBI's Building Inspection Division district eight.  Per a DBI organizational chart effective February 20, 2018, a Senior Building Inspector other than CURRAN had authority over district eight.

28. A review of the Golden Gate Rugby Association's JP Morgan Account was conducted and a check for $300.00 written by Client-4 dated May 4, 2018, was present in the account. The memo line of the check read, "thank you".

**3900 Block of 24th Street**

29. SANTOS and Client-5, who works in construction in San Francisco, worked on several projects together, including one located on the 3900 block of 24th Street, San Francisco, California.  On January 20, 2019, SANTOS and Client-5 exchanged the following text messages in reference to the project on the 3900 block of 24th Street:

11

SANTOS (to Client-5):  Drop off a check payable to the Golden Gate Rugby Association for $500.  Bernie's favorite nonprofit.

Client-5 (to SANTOS):  Will do

SANTOS (to Client-5):  Drop off the Bernie check first thing this morning please.

Client-5 (to SANTOS):  Will be in around 7

SANTOS (to Client-5):  Sounds good.  Will be bringing Bernie Curran to the site on Friday.

30. Client-6 was the owner of the property on the 3900 block of 24th Street.  On January 20, 2019, SANTOS sent the following message to Client-6:

SANTOS (to Client-6):  Drop off a check payable to Golden Gate Rugby Association for $500.  This will smooth the inspection with the Senior DBI Inspector.

31. Client-6 later told the FBI, that he consulted his attorney about SANTOS' request for a donation to the Golden Gate Rugby Association to "smooth the inspection with the Senior DBI Inspector" and was advised by his attorney it was a line he did not want to cross. Client-6 did not make out the check to Golden Gate Rugby Association as requested by SANTOS.  Client-6 told SANTOS to leave him out of anything related to the Rugby Association and to do the plans the right way.  Client-6 reported to the FBI that he did not feel there were any negative consequences for his decision with respect to the project.

32. A review of DBI's on-line permit and complaint tracking system showed multiple permits for Client-6's property located on the 3900 block of 24th Street, San Francisco, California. None of these permits had been completed and therefore none have required final inspection approval at this stage.

*CURRAN was aware of the donations and understood their purpose in the scheme to defraud.*

33. On numerous occasions, SANTOS sent text messages to CURRAN stating that SANTOS' clients had written checks or made donations to the Golden Gate Rugby Association in connection with specific projects. In several instances, SANTOS informed CURRAN about donations made by his clients while also asking CURRAN to take some official action for the benefit of the client.

**900 Block of South Van Ness**

34. Client-7 is member of the trust that owns the property located on the 900 block of South Van Ness Ave. On April 16, 2018, SANTOS and CURRAN exchanged the following text messages about the property in which SANTOS asked CURRAN to conduct an inspection immediately before notifying CURRAN about the client's donation:

> SANTOS (to CURRAN): Can we schedule a final for [the 900 block of] South Van Ness? Client has given me his SF GG Rugby contribution.

> CURRAN (to SANTOS): Let me check it this morning

> SANTOS (to CURRAN): Thank you Senior. I am five minutes away from the site.

35. A review of DBI's on-line permit and complaint tracking system showed a permit related to the property on the 900 block of South Van Ness Avenue received a final inspection approval and issuance of CFC from CURRAN on April 20, 2018.

36. The property located on the 900 block of South Van Ness Avenue was located in DBI's Building Inspection Division's district eight. Per a DBI organizational chart effective February 20, 2018, an individual other than CURRAN was the Senior Building Inspector in district eight.

**700 Block of Wisconsin Street**

37.  On May 4, 2018, SANTOS and CURRAN exchanged the following text messages in
which CURRAN agreed to do an inspection at the project located on the 700 block of
Wisconsin Street (discussed above at ¶¶ 23-28) and SANTOS informed CURRAN about
the client's donation:

>  SANTOS (to CURRAN):  Dear Senior: Any assistance of the CFC for [the
>  address on the 700 block of] Wisconsin will be greatly appreciated.  [Client-4's]
>  permit expires tomorrow.
>
>  CURRAN (to SANTOS):  I will write it this afternoon when I get back at three
>
>  SANTOS (to CURRAN):  Thank you Senior.  She [Client-4] will make an
>  additional contribution to the good cause.
>
>  CURRAN (to SANTOS):  That's not necessary she has done more than enough

**2000 Block of Bryant Street**

38. On December 6, 2018, SANTOS and Client-8 exchanged the following text messages
shortly after CURRAN, Client-8, and SANTOS had met at the property to discuss a code
violation and the work and permit required to remedy the violation.[5]

>  SANTOS (to Client-8):  Please have [Client-8's employer] write a check for $500
>  payable to the 'San Francisco Golden Gate Rugby Association'.
>
>  Client-8 (to SANTOS):  It'll likely be from me.  Is that cool?
>
>  SANTOS (to Client-8):  Sure

39. On December 7, 2018, SANTOS and Client-8 exchanged the following text messages:

---

[5] This property on the 2000 block of Bryant Street was adjacent to a building being constructed by Client-8's
employer and his company.  Client-8 was an employee of this company her responsibilities included interfacing with
the neighbors.

Client-8 (to SANTOS):  I see he [CURRAN] closed out the permit but how do we close out the complaint

SANTOS (to Client-8):  Bernie will be abating the complaint.

Client-8 (to SANTOS):  Can I just mail in check or should I give directly to him?

SANTOS (to Client-8):  Give it to me and I will deliver it to Bernie.

Client-8 (to SANTOS):  K cool

40. On December 13, 2018, SANTOS exchanged the following text messages with CURRAN:

CURRAN (to SANTOS):  Hey Rodrigo do you have a contact phone number for [Client-8] I want to call and thank her for her donation

SANTOS (to CURRAN):  I will forward her phone number to you shortly.

CURRAN (to SANTOS):  Yeah make sure she's OK with it.

CURRAN (to SANTOS):  Whatever that attachment was you sent did not come through

SANTOS (to CURRAN):  She is absolutely okay with it.

CURRAN (to SANTOS):  Great, thank you.

CURRAN (to SANTOS):  Don't forget to send me Client-8's number if it was in an attachment you sent earlier it did not come through.

SANTOS (to CURRAN): [SANTOS provides CURRAN with Client-8's name and telephone number]

41. An image of a check written to "SFGG Rugby Foundation" by Client-8 was found on CURRAN's personal cell phone during a search of the device pursuant to a search warrant issued in the Northern District of California.  Information stored in CURRAN's phone

15

shows that CURRAN's phone captured the picture, indicating that CURRAN was in possession of the check from Client-8.[6]



42. A review of DBI's on-line permit and complaint tracking system for the property located on the 2000 block of Bryant Street showed that a Notice of Violation (NOV) related to the property was abated (*i.e.*, resolved) on December 6, 2018, with the following comment, "[2000 block of Bryant permit] has been issued and completed to comply with this complaint. b.curran." This permit related to the property on the 2000 block of Bryant Street showed in DBI's on-line system as final inspection/approved by CURRAN with a date of December 6, 2018.

---

[6] During an interview with Client-8, she told me that the check she wrote was from an account that had issued her checks that had printing error on them and therefore, the check, had it been deposited, would have bounced. Client-8 contacted SANTOS and asked him to tell CURRAN not to deposit the check for this reason. In January 2019, Client-8 wrote a second check to the Golden Gate Rugby Association, but this check was never cashed.

43. The property located on the 2000 of Bryant Street is located in DBI Building Inspection Division district eight.  Per a DBI organizational chart effective December 18, 2018, an individual other than CURRAN was the Senior Building Inspector for district eight.

44. Consistent with SANTOS' instruction to Client-8 (*i.e.* "Give [the check] to me and I will deliver it to Bernie."), it was SANTOS' regular practice to direct clients to write checks to the Golden Gate Rugby Association and deliver the checks to him.  SANTOS would then deliver the checks to CURRAN, ensuring that CURRAN would know that SANTOS had arranged the donation.  For instance, SANTOS often directed clients to drop off a check payable to the Golden Gate Rugby Association along with a check payable to S&U.  This was the case on April 26, 2018, when SANTOS sent the following text message to Client-7:

> SANTOS (to Client-7): Please drop off a check for $500 payable to SF Golden Gate Rugby Association and a check payabke [sic] to Santos and Urrutia for $2K for 1475 Church Street.

45. SANTOS' January 29, 2018, exchange with his Client-3 provides another example:

> SANTOS (to Client-3):  The eagle has landed!  Two checks One to Santos and Urrutia for $3k and one for Golden Gate youth rugby association for $1k
>
> Client-3 (to SANTOS):  Hallelujah and thanks so much.  Will come by your office tomorrow morning.

*CURRAN provided corrupt benefits to SANTOS' clients in exchange for the stream of donations*

46. I submit that the evidence shows that CURRAN was aware of the donations to the Golden Gate Rugby Association that SANTOS solicited from his clients and took official actions based on those donations.  On several occasions, CURRAN gave final inspection approval

17

for SANTOS' clients on projects where work had not been completed in accordance with the permit or plans.

**1300 Block of Utah Street**

47. Between September 25 and September 27, 2017, SANTOS exchanged the following text message with Client-9, an individual working on behalf of the owners of the property located on the 1300 block of Utah Street in San Francisco, California. In the following conversation, the issue discussed is the need to resolve several building code violations contained in several Notices of Violation ("NOV") at the property by obtaining new permits for the work required to abate the violations.

> Client-9 (to SANTOS): System still shows violations
>
> SANTOS (to Client-9): Going to DBI this morning to talk to Bernie Curran. I will report back.
>
> SANTOS (to Client-9): I mus [sic] sent you an email from Curran. No violation on [an address on a perpendicular street address provided by SANTOS]. What is the Utah address?
>
> Client-9 (to SANTOS): [Client-9 provides SANTOS with the Utah Street address and informs SANTOS that the violation was from 2015]
>
> SANTOS (to Client-9): I will forward the address to Curran. He will abate it.
>
> SANTOS (to Client-9): Please drop off a check payable to Golden Gate Youth Hockey Association for $1k. Bernie's nonprofit,
>
> Client-9 (to SANTOS): With pleasure
>
> SANTOS (to Client-9): Golden Gate Youth Rugby Association.
>
> SANTOS (to Client-9): Please drop off the Bernie check this morning.

18

Client-9 (to SANTOS):  thank you for suggesting.

48. Client-9 sent a screenshot of a donation confirmation to SANTOS on September 27, 2017, indicating that Client-9 had directed a charitable gift fund to send a $1,500 donation to the "Golden Gate Youth Rugby Foundation."  Client-9's text message to SANTOS accompanying the screenshot stated, "made the donation and it is being sent today".  This donation, sent as a bank transfer from the charitable gift fund, was never deposited by the Golden Gate Rugby Association.  The donation was returned to the fund as it was not deposited within a certain period of time per the fund administrator's policy.

49. On December 7, 2017, CURRAN gave final inspection approval on a permit related to the property on the 1300 block of Utah Street.  The scope of work for this permit, according to DBI's permit tracking site, was to abate the 2015 NOV by removing partition walls installed without a permit and reverting the property to its last approved floor layout from 2003.  Since the 2003 floor layout did not include the two partition walls, the removal both walls was required to complete the work authorized by the permit.

50. The FBI obtained images of the interior of the property located on the 1300 block of Utah Street taken in September 2017 during an insurance appraisal.  The images show the two aforementioned walls that the owners were required to remove to resolve the violations. In August 2020, FBI Special Agents were given access to the property on the 1300 block of Utah Street.  During this visit, Special Agents took photographs of the interior of the building and compared them to the photos taken in 2017 by the insurance company.  The partition walls, which should have been removed under the permit referenced in the previous paragraph, were still intact.

51. DBI Official-1 stated that inspectors are required to physically visit the site of a project to give final inspection approval. The inspector would need to review the permit and the plans associated with the permit. The plans for the project on the 1300 block of Utah Street clearly showed that two partition walls needed to be removed. He also stated that since the partition walls had not been removed, there could be no legitimate reason that the permit should have been given final approval by CURRAN. DBI Official-1 also noted that DBI did not issue the permit for the work required to resolve the violations until December 7, 2017, the same day that CURRAN claimed that he inspected the property and finaled the permit. Since property owners are not authorized to begin work until a permit is issued, it would have been nearly impossible for all work to be completed the same day that the permit was issued.

52. The property located on the 1300 block of Utah Street is located in DBI Building Inspection Division district eight. Per a DBI organizational chart effective April 17, 2017, an individual other than CURRAN was the Senior Building Inspector for district eight.

**1400 Block of Church Street**

53. This property provides another example of CURRAN ignoring non-compliance with a permit by SANTOS' client. SANTOS and Client-7 had obtained a permit authorizing the construction of an accessory dwelling unit (ADU). The permit required the installation of a sprinkler system for fire safety under a separate permit number. SANTOS and his client, however, never obtained the sprinkler permit. Text messages between SANTOS and CURRAN show that CURRAN knew about the requirement and ignored it. Client-7 made a $500 donation to the Golden Gate Rugby Association on January 31, 2019.

20

54. Between February 8 and February 11, 2019, SANTOS and CURRAN had a conversation about the inspection of the property located on the 1400 block of Church Street:

> CURRAN (to SANTOS):  Hey Rodrigo where is the sprinkler permit that is supposed to be done in conjunction with the ADU I don't see it online.
>
> SANTOS (to CURRAN):  Should I have CPB correct the issue?
>
> CURRAN (to SANTOS):  Yes
>
> SANTOS (to CURRAN):  I will take care of your request ASAP
>
> CURRAN (to SANTOS):  I have also entered in inspection for Church Street with a pre-final stating that sprinklers have to be verified

55. A review of the DBI's on-line permit and complaint tracking system for property located on the 1400 block of Church Street, showed no permit relating to sprinklers was ever applied for or issued.

56. A review of DBI's on-line permit and complaint tracking system for property located on the 1400 block of Church Street showed that a permit related to the property received a final inspection approval from CURRAN on May 9, 2018.  CURRAN put a note into the DBI system when he entered his final inspection indicating that a future permit would be applied for to deal with the sprinklers for the building.  According to DBI Official-1, CURRAN did not have the authority to approve that permit without a permit for sprinklers having been applied for, issued, and completed.  A complaint regarding this issue was opened at DBI on July 30, 2021.  An inspection was completed by employees of the fire department who confirmed that the ADU did not have sprinklers or any fire safety systems.

21

57. The property located on the 1400 block of Church Street is located in DBI Building Inspection Division district 16.  Per a DBI organizational chart effective February 20, 2018, an individual other than CURRAN was the Senior Building Inspector in district 16.

58. A check for $500.00 written by Client-7 dated January 31, 2019, was deposited into the JP Morgan Chase bank account belonging to Golden Gate Rugby Association on February 13, 2019.

**900 Block of South Van Ness Avenue**

59. On February 27 and February 28, 2018, SANTOS and CURRAN exchanged the following text messages in which SANTOS and CURRAN took extraordinary steps to ensure that CURRAN, and not the inspector assigned to the district where the property is located, conducted the necessary inspections:

> SANTOS (to CURRAN): [900 block of] South Van Ness soft story inspection has been scheduled with [District Inspector-1] between 9 and 12 am
>
> CURRAN (to SANTOS):  What day
>
> SANTOS (to CURRAN):  TOMORROW morning
>
> SANTOS (to CURRAN):  Let me know the time (this morning) for [the 900 block of] South Van Ness with [District Inspector-1]
>
> CURRAN (to SANTOS):  I have reassigned it to [District Inspector-2] but there is no inspection history out there
>
> SANTOS (to CURRAN):  I will meet [District Inspector-2] at [the 900 block of] South Van Ness.  Thank you Senior
>
> CURRAN (to SANTOS): [District Inspector-3] is coming and I have instructed him on how to proceed.

22

60. DBI records show that a final inspection was scheduled for February 28, 2018 at the South Van Ness property.  The documents indicate in the instructions/comment section that "This inspection has been reassigned from [District Inspector-1]" and reassigned to District Inspector-3.  I received a copy of District Inspector-1's schedule for February 28, 2018.  DBI Official-1 reviewed the schedule and explained that District Inspector-1 was not busy on this date and would have had time in his day to complete this inspection. District Inspector-1 was the district inspector for this property and therefore, was the person who should have handled the inspection, unless he indicated that he was unable to do so.  DBI Official-1 indicated that a Senior Building Inspector taking an inspection away from the district inspector and reassigning to someone else for no apparent reason it is unusual and discouraged.[7]

61. On February 28, 2018, in the DBI permit tracking system, District Inspector-3 wrote that the inspection status was "no entry/no progress."  According to DBI Official-1, "no entry/no progress" should be used as the status when the inspector is unable to access the project site.  This should not have been the case here, because an inspection had been scheduled for that day and SANTOS was listed as the contact person.  In several text messages, SANTOS told CURRAN that his office was only five minutes from the property located on the 900 block of South Van Ness Avenue, and he was aware that an inspection was meant to take place on that date because he had discussed the inspection

_____

[7] It had been discussed at a January 11, 2018 DBI staff meeting that "Building Inspectors are regularly asked by Seniors to assist in coverage of Districts.  This is due to District Building Inspector not being available or busy. Please understand that these assignments and reassignments are the responsibility of a Supervisor.  The Building Inspector may not conduct inspections outside of their assigned District without first informing a Supervisor." CURRAN frequently frustrated district inspectors by performing inspections on properties in their districts without informing them.  On at least one occasion, CURRAN failed to tell the district inspector that he had done an inspection on a property and the district inspector arrived for a scheduled inspection, only to find CURRAN had already completed it.

with CURRAN that morning.  I believe that when CURRAN stated to SANTOS "[District Inspector-3] is coming and I have instructed him on how to proceed," CURRAN was informing SANTOS that he had reassigned the inspection to an inspector who would follow CURRAN's instructions to enter a status of "no entry/no progress."  This would ensure that CURRAN could do the inspection himself at a later date.

62. On March 13, 2018, SANTOS cancelled another inspection on the property that was assigned to District Inspector-1.  On March 14, 2018, SANTOS sent the following text messages to CURRAN:

> SANTOS (to CURRAN):  I cancelled the inspection for [the 900 block of] South Van Ness.  We will create an inspection report and narrative for your use.  Thank you Senior.
>
> SANTOS (to CURRAN):  I dropped off the inspection report for [the 900 block of] South Van Ness.  Please let us know if you will require additional documentation.  Thank you Senior

63. On March 21, 2018, an individual believed to be an S&U employee scheduled two inspections at the property, one for "reinforcing steel", and one for "ok to cover".  "Reinforcing steel" refers to the pouring of a foundation over the top of steel that has been installed.  "Ok to cover" refers to hanging drywall that will cover plumbing, electrical, or other building work that has been completed inside the walls of the project.  The employee listed his contact phone number as one registered to S&U.  On March 22, 2018, SANTOS and CURRAN exchanged the following text messages:

24

> SANTOS (to CURRAN):  Dear Senior: Any time today will work for [the 900 block of] South Van Ness inspection.  Our office is s five minutes away from the site.
>
> CURRAN (to SANTOS):  I already put an inspection in the computer yesterday.

64. A review of the DBI on-line permit and complaint tracking system showed that on March 21, 2018, CURRAN gave approval for reinforcing steel.  The fact that CURRAN stated that he had "put an inspection in the computer" indicated that CURRAN did not actually visit the property or inspect the work that had been done, but rather entered an inspection in the DBI Permit tracking system without any legitimate inspection.

65. On April 2, 2018, SANTOS and CURRAN exchanged the following text messages:

> SANTOS (to CURRAN):  Dear Senior Building Inspector Bernie Curran: When can we schedule a final inspection for [the property on the 900 block of] South Van Ness?  Our office is five minutes away from the site.  Any day and time will work.
>
> CURRAN (to SANTOS):  We need to put in the rough OK to cover appointment
>
> SANTOS (to CURRAN):  Thank you Senior.

66. These text messages indicate that SANTOS was trying to schedule a final inspection, which would require that all work at the project site was complete.  However, CURRAN pointed out that the inspection that would authorize the owner to cover the walls with drywall had yet to be completed.

67. On April 16, 2018, SANTOS requested an inspection with CURRAN for the "okay to cover" the walls, and also told CURRAN that "Client [Client-7] has given me his SF GG Rugby contribution."  CURRAN approved the "okay to cover" on the same date.  Four

days later, on April 20, 2018, SANTOS requested that CURRAN meet him at the site for a

final inspection.  CURRAN gave final inspection approval and issued the CFC on April

20, 2018.

**Out-of-District Inspections**

68. According to DBI Official-1, CURRAN often did inspections outside of his district, which

caused problems with the inspectors who were assigned to those districts and who did not

want CURRAN doing inspections in their territory.  It became contentious enough that in

April 2014, a supervising employee at DBI created an assignment flow chart that dictated

how inspections should be reassigned if the district inspector was unavailable and then if

subsequent inspectors were also unavailable:

    1.  District Inspector

    2.  Floating Inspector

    3.  Inspector with availability on their schedule

    4.  Spread Inspection to Inspectors where schedule is not completely full

    5.  Adjacent District Building Inspector

    6.  Building Inspector from other Districts

    7.  Senior Building Inspector

69. There were 14 properties where SANTOS' clients either made donations or wrote checks

that were never cashed.  Of these 14 properties, 12 were outside of CURRAN's assigned

districts.  Based on my review of text messages between CURRAN and SANTOS, it

appears that CURRAN typically disregarded DBI guidance by unilaterally assigning

inspections for SANTOS' clients to himself.

**Check Tracking**

70. A review of SANTOS' phone pursuant to a federal search warrant revealed that he solicited checks for the Golden Gate Rugby Association or some variation on that name, from 19 different clients.  There are also three additional clients with whom SANTOS discussed both their building projects and Bernie CURRAN but did not make a direct solicitation for rugby association checks.  Nevertheless, a review of bank records shows that checks from these individuals were deposited into the Golden Gate Rugby Association Bank account around the time that their projects received approvals from CURRAN as documented in the DBI permit tracking system.

71. SANTOS' solicitations resulted in 12 clients writing checks to the rugby association, with one client writing two checks.  Solicitations from SANTOS resulted in donations to the rugby club totaling $9,600 from May 2017 through April 2019.

72. CURRAN was involved in abating an NOV, abating a complaint, giving demolition permission, or giving final inspection approval for all 12 of the donor-clients.

73. In addition to the checks that were deposited into the Golden Gate Rugby Association's bank account, SANTOS solicited several Golden Gate Rugby Association donations from his clients that SANTOS stole by depositing them into his personal bank account without the permission of his client or the Association.  For instance, SANTOS solicited checks made out to Golden Gate Rugby Association from Client-1 in connection with Client-1's project on the 900 block of Guerrero Street (discussed above in paragraph 15-17) on September 28, 2017, and October 16, 2017, calling the association "Bernie's nonprofit organization".  According to records from a Bank of America account belonging to SANTOS and his wife, two checks from Client-1's company written pay to the order of

27

Golden Gate Youth Rugby Association were deposited into the account (check 1671 dated October 17, 2017, for $1,000 and check 1031 dated February 13, 2018, for $500.00).

74. On July 1, 2021, Rodrigo SANTOS was charged in Indictment No. CR 21-268-SI, which alleges 10 counts of Bank Fraud, one count of Obstruction of Justice, and two counts of Aggravated Identity Theft. That indictment alleges a scheme in which SANTOS stole more than $775,000 from his clients between November 2012 and March 2019 by requesting checks payable to City agencies (mostly DBI and the Department of Public Works) and other construction-related companies and individuals. SANTOS then deposited the checks into his personal bank account without authorization from the client or the payee on the check. Between July 2, 2017 and February 13, 2018, SANTOS deposited 10 checks totaling $9,000 that his clients had written to the Golden Gate Rugby Association in connection with projects that CURRAN inspected. This $9,000 in checks to the Golden Gate Rugby Association is included in the approximately $775,000 total alleged in Indictment CR 21-268-SI.

**Material Concealment of the Scheme to Defraud**

75. CURRAN and SANTOS attempted to conceal their scheme using DBI's online inspection system. For instance, on November 9, 2018, CURRAN sent SANTOS a text message regarding SANTOS' request that CURRAN conduct a final inspection at a property on the 3000 block of 23rd Street. CURRAN stated, "Rodrigo can you do me a favor and put 23rd St. on the schedule then I can move it to myself and it won't look funny". I believe that CURRAN was asking SANTOS to schedule an inspection through DBI's online inspection platform. This was a departure from CURRAN and SANTOS' regular practice whereby SANTOS would ask CURRAN to inspect a property (usually outside of

CURRAN's assigned district) and CURRAN would schedule the inspection himself. According to the message above, CURRAN believed that their scheme was beginning to "look funny" since project sponsors are normally required to request and schedule inspection using DBI's online system. Notably, the 3000 block of 23rd Street was outside of CURRAN's district in November of 2018. The property owner, Client-10, donated $1,500 to the Golden Gate Rugby Association in January ($1,000) and October ($500) of 2018.

76. Also, regarding concealment of the scheme to defraud, on March 3, 2020, the FBI seized SANTOS' cell phone and conducted a search of the device pursuant to a search warrant issued in the Northern District of California. The search included a review of text messages found on the device. During this review, 444 text messages between SANTOS and CURRAN were identified. On April 9, 2020, the FBI seized CURRAN's cell phone and conducted a search of the device pursuant to a search warrant issued in the Northern District of California. The search included a review of text messages found on the device, which was the same device that CURRAN used during the aforementioned text messages with SANTOS. CURRAN identified this device as his personal cell phone. The phone contained no text messages between CURRAN and SANTOS. However, there were text messages with other parties during the same time period as the CURRAN/SANTOS texts identified on SANTOS' phone. The absence of known text messages with SANTOS on CURRAN's phone indicates that CURRAN deleted his texts with SANTOS before the FBI seized his phone.

77. DBI Official-1 told the FBI that CURRAN conducting inspections for properties where people connected to the project had made donations to an organization linked to

29

CURRAN would constitute a conflict of interest.  DBI Official-1 indicated that, had DBI known about the donations from SANTOS' clients, CURRAN would not have been allowed to inspect these properties because of the possibility that the donations could influence his inspections.  In addition, had DBI Official-1 learned about the scheme described in this affidavit before CURRAN left his position at DBI, disciplinary action would have been taken against CURRAN.

**Interstate Wire**

78. On April 16, 2021, I interviewed two subject matter experts employed by JP Morgan Chase Bank, identified here as Employee-1 and Employee-2.  Employee-1 is a subject matter expert regarding how ATM and teller transactions are processed. Employee-2 is a subject matter expert regarding how electronic deposits are processed.  Both experts confirmed that Chase utilizes data processing centers outside the state of California to process all checks deposited at ATMs, in bank branches through bank tellers, and for electronic deposits made from an account holder's electronic device.  Therefore, when the Golden Gate Rugby Association deposited checks into its JP Morgan Chase bank account, JP Morgan Chase bank sent an electronic image of the deposited check via a wire communication to its data processing servers in either Michigan, Delaware, or New Jersey.  The data processing center determines if the check should be approved or declined within 5 to 10 seconds.  If the check is approved, the transaction is considered complete by the bank.  These wire communications facilitate the check clearing process by ensuring that the appropriate accounts are debited and credited.

30

79. As alleged in the complaint, a check for $500.00 written by SANTOS' client Client-7 dated January 31, 2019 was deposited into the JP Morgan Chase bank account belonging to Golden Gate Rugby Association on February 13, 2019.

## CONCLUSION

80.  Based on the foregoing facts and my training and experience, I respectfully submit there is probable cause to believe that CURRAN and SANTOS committed honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346.  I therefore respectfully request the issuance of the attached criminal complaint, as well as summonses and arrest warrants for CURRAN and SANTOS.


S/
_____
ALLISON LOPEZ
Special Agent
FEDERAL BUREAU OF INVESTIGATION



Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4(d) and 4.1 on this 20TH day of August 2021.


_____
HONORABLE JOSEPH C. SPERO
Chief United States Magistrate Judge

31

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☒ COMPLAINT ☐ INFORMATION ☐ INDICTMENT

☐ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

### OFFENSE CHARGED

18 U.S.C. §§ 1343 and 1346 - Honest Services Wire Fraud

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY: Maximum Penalties: 20 years in prison; a fine equal to the greater of $250,000 or twice the gross gain or loss; 3 years of supervised release; $100 special assessment per count; restitution; forfeiture; possible deportation for non-citizens.

### DEFENDANT - U.S

► Rodrigo Santos

DISTRICT COURT NUMBER

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

FBI Special Agent Allison Lopez

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40.  Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:

☐ U.S. ATTORNEY ☐ DEFENSE

} SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

} MAGISTRATE CASE NO.

Name and Office of Person Furnishing Information on this form ___ Stephanie M. Hinds

☒ U.S. Attorney ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned) ___ Casey Boome

### DEFENDANT

#### IS *NOT* IN CUSTODY

1) ☐ Has not been arrested, pending outcome this proceeding.
If not detained give date any prior summons was served on above charges ►

2) ☐ Is a Fugitive

3) ☒ Is on Bail or Release from (show District)

NDCA (CR 21-268-SI)

#### IS IN CUSTODY

4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges

} ☐ Federal ☐ State

If answer to (6) is "Yes", show name of institution

Has detainer been filed? ☐ Yes ☐ No } If "Yes" give date filed

DATE OF ARREST ► ___ Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY ► ___ Month/Day/Year

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☒ SUMMONS ☐ NO PROCESS* ☒ WARRANT    Bail Amount: ___

If Summons, complete following:
☐ Arraignment ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

Date/Time: ___    Before Judge: ___

Comments: