UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PATRICK GALLAGHER,

Plaintiff,

v.

CITY AND COUNTY OF SAN FRANCISCO, et al.,

Defendants.

Case No.  23-cv-03579-SI

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 106, 109

Before the Court are cross-motions for summary judgment filed by plaintiff Patrick Gallagher and defendants City and County of San Francisco (the "City"), William Hughen, Kevin Birmingham, Natalia Fossi (formerly Kwaitkowska), Joe Duffy, and Mauricio Hernandez (collectively, the "City Defendants"). Dkt. No. 106 ("City Defs. MSJ"); Dkt. No. 109 ("Gallagher MSJ"). Defendant Bernard Curran joins in the City Defendants' motion and separately opposes Gallagher's Motion. Dkt. No. 126 ("Curran Joinder"); Dkt. No. 129 ("Curran Opp'n").[1] The Court heard oral argument on January 16, 2026. Dkt. No. 130. Having considered the parties' arguments, the relevant legal authority, and the record in this case, the Court GRANTS the City Defendants' Motion and DENIES Gallagher's Motion.

---

[1] Curran's Opposition argues that "any attempts by Plaintiff to move for summary judgment on his [state law claims] against CURRAN must be denied." Curran Opp'n at 16–19. The Court dismissed without prejudice Gallagher's state law claims on grounds that "Gallagher had not exhausted his administrative or judicial remedies" and declined supplemental jurisdiction over "any state law claims not subject to administrative exhaustion[.]" Dkt. No. 37 at 13–14. Although the motion to dismiss was brought by the City Defendants and not Curran, nothing in the Court's Order suggests that the dismissal was only as to the City Defendants. Gallagher did not file an amended complaint that reasserted the state law claims, and his motion for summary judgment did not address such claims. Accordingly, the Court declines to consider Curran's arguments regarding the dismissed state law claims.

United States District Court
Northern District of California

# BACKGROUND

## I.    Factual Background[2]

This litigation concerns the property located at 200 Naples Street, San Francisco, California (the "Property"), and Gallagher's attempt to renovate and sell it.  For approximately 24 years, Gallagher worked in the commercial construction industry as a superintendent and foreman.  Sims Decl., Ex. A ("Gallagher Dep.") at 11:24–15:2.  He holds two welding certificates and is a certified trainer on specialty equipment.  *Id.* at 15:3–16:3.

San Francisco's Department of Building Inspection ("DBI") "is the official agency responsible for administering and enforcing the San Francsico Building Code, including the issuance of building permits, inspection reports and Notices of Violation ('NOVs')."  Greene Decl. ¶ 5.

San Francisco's "Planning Department, among other duties, is charged with maintaining both the General Plan, policies of the Planning Department and Planning and Historic Preservation Commissions, the Planning Code, and other municipal codes."  Fossi Decl. ¶ 4; Hughen Decl. ¶ 3. The DBI "route[s] permit applications to the Planning Department when the permit applications and drawings reflect a scope of work that would warrant review by the Planning Department."  Fossi Decl. ¶ 4; Hughen Decl. ¶ 4.  The DBI and Planning Department are different departments.  Fossi Decl. ¶ 16; Hughen Decl. ¶ 26.

---

[2] For ease of reference, the Court provides only one citation to the record even if the same document was filed multiple times.  Much of the evidence submitted in connection with the parties' briefs is duplicative.  The City Defendants submitted the same declarations and exhibits in support of their motion for summary judgment as their opposition to Gallagher's motion for summary judgment.  Dkt. Nos. 106-2 & 114-1 (Sims Decl.); Dkt. Nos. 106-3 &114-2 (Birmingham Decl.); Dkt. Nos. 106-4 & 114-3 (Duffy Decl.); Dkt. Nos. 106-5 & 5 & 114-4 (Fossi Decl.); Dkt. Nos. 113 & 114-5 (Greene Decl.); Dkt. Nos. 106-7 & 114-6 (Hernandez Decl.); Dkt. Nos. 106-8 & 114-7 (Hughen Decl.); Dkt. Nos. 106-9 & 114-8 (Langan Decl.).  Thus, citations to the Sims, Birmingham, Duffy, Fossi, Greene, Hernandez, Hughen, and Langan Declarations refer to both the declaration submitted with the City Defendants' motion for summary judgment and their opposition to Gallagher's motion for summary judgment.

The Lew Declaration (Dkt. No. 129-1) and the Sims Declaration attach the entirety of Gallagher's July 31, 2025 deposition transcript and exhibits; the criminal complaint filed *USA v. Curran*, Case No. 21-mj-71315-MAG-1; and the operative SAC, which is already part of the record. Lew Decl., Exs. A–O, P; Sims Decl., Exs. A–O, T.

### A.     The Property and Notices of Violations

In September 2017 and January 2018, the Property received two NOVs.  Greene Decl., Exs. A & B.  NOV 201644272, which issued on September 11, 2017, identified the following violations and necessary repairs to be completed within 30 days:

> The roof structure over front door has rotting timber and is pulling away from the house, constituting a hazard.  Obtain a building permit and repair or replace the structure.
> . . .
> The gutters and downspouts are missing at the Naples street side and south side at yard.  Repair or replace as required.
> . . .
> Remove trash at the front yard at left and right side of front door.

Greene Decl., Ex. A at ECF p.13.  A reinspection was scheduled to occur on October 12, 2017.  *Id.* The violations identified in NOV 201644272 were abated on October 23, 2024.  *Id.* at ECF p.11.

On January 4, 2018, a DBI inspector issued NOV 201721241, due to "a building without proper weatherization and no guardrail at rear deck."  *Id.*, Ex. B at ECF p.21.  NOV 201721241 ordered the homeowners to cease all work, file a building permit within 7 days, obtain a permit within 14 days, and complete all work within 30 days.  *Id.*  NOV 201721241 was abated on October 24, 2024.  *Id.*

### B.     Permit Applications and Notices of Violation

On or about May 2018, the Madison Trust purchased the Property for $795,000.  *Id.* at 24:17–25:2.  NOV 201644272 and NOV 201721241 remained outstanding at the time of purchase.[3]  Greene Decl., Ex. A at ECF pp.9–11; *id.*, Ex. B at ECF pp.17–20.

On August 10, 2018, Gallagher filed two Applications for Building Permit Additions,

---

[3] At an unspecified point in time, GCBlockInvestments.com, came to own the Property. Gallagher Dep. at 21:11–13, 22:4–6.  The Madison Trust, which owned GCBlockInvestments.com, "had a single investment strategy, and that was to invest into GCBlockInvestments.com . . . and then GC Block Investments would go purchase the property, improve it, sell it, and then the proceeds would go back to Madison Trust FBO Patrick Gallagher."  *Id.* at 22:13–14; *id.* at ("Q . . . . I'm not trying to put words in your mouth here, but did GCBlockInvestments.com basically renovate residential properties?  A.  Yes.").  Gallagher was the manager of GCBlockInvestments.com.  *Id.* at 23:3–8.  GCBlockInvestments.com ceased to exist in 2021, as "[i]t was no longer needed."  *Id.* at 22:7–11.  GCBlockInvestments.com is not a party to this action.

United States District Court
Northern District of California

Alterations or Repairs ("permit applications" or "PAs") with the San Francisco Department of Building Inspection ("DBI"). Greene Decl., Exs. C & D. PA 201808107075 described the work to be performed as "reroof & gutters and to comply with violation 201644272." Greene Decl., Ex. C at ECF p.24. PA 201808107063 sought to make changes to "kitchen & bath cabinets, paint, drywall, flooring and to comply with violation notice 201721241." *Id.*, Ex. D at ECF p.29.

On October 3, 2018, a DBI inspector issued NOV 201895477, which stated the following:

> Site investigation revealed that building has been gutted and construction in progress of multiple dormers without proper permits and inspections. Work is beyond scope of PA201808107075, 201808107063 and does not have Planning Dept approval. Debris pile in backyard is leaning on neighbor's building.

*Id.*, Ex. E at ECF p.38[4]. Gallagher was ordered to stop all work, file a building permit with plans within 5 days, obtain a permit within 10 days and complete all work and correct violations within 90 days. *Id.* Gallagher testified that at the time NOV 201895477 was issued, he "had a roofing permit . . . [b]ut approval for the dormers, no." Gallager Dep. at 111:5–10.

On October 25, 2018, Gallagher filed and obtained PA 201810183586 "to comply with NOV 201895477," "remove 1 dormers [and] add 2 to each side," perform "structural strengthening including removing and replacing the floor framing," and "demo existing laundry @ 2nd floor." Greene Decl., Ex. G at ECF p.44; Gallagher Dep. at 114:5–12.

### C.    Gallagher Hires Santos

At some point after October 3, 2018, when NOV 201895477 was issued, Curran informed Gallagher that he had to hire a structural engineer and recommended that Gallagher hire Santos. Gallagher Dep. at 124:6–125:12. Gallagher already had an architect and disagreed that he needed

---

[4] Several documents list the owner of the Property as individuals other than the Madison Trust. For instance, NOV 201895477 lists the Property's "owner/agent" and "the "person contacted @ site" as "LAU FRANCIS." Greene Decl., Ex. E at ECF p.38. Gallagher testified that he believed Francis Lau to be the previous owner who sold the Property to the Madison Trust. Gallagher Dep. at 108:22–109:13. Gallagher further confirmed that "Francis Lau was not involved with construction at the property at that time." *Id.* at 109:14–17. The Building Inspection History for PA 201810183586 lists the "Owner Name" as "Hu Qi Huan." Greene Decl., Ex. H. The parties do not address these discrepancies; however, they do not dispute that the Madison Trust owned the Property at all relevant times.

4

a structural engineer. *Id.* at 125:17–23. Curran, however, "kept insisting 'You have to hire a structural engineer or your permit's going nowhere, and this [Santos] is the guy you need to call[.]'" and said that "'[h]e'll smooth out all the bumps and, you know, we'll get you going. It will be smooth sailing[.]'" *Id.* at 125:23–25, 126:3–5.

Gallagher testified that "when [he] first talked to Rodrigo [Santos] they needed [$]3,000 up front in cash. . . . And then over the course of the next six months he just kept hitting [Gallagher] up for more and more money." *Id.* at 126:5–6, 9–10. Gallagher "fired him after six or seven months." *Id.* at 126:12–13.

### D.    Certificate of Final Completion

On August 27, 2020, Curran signed a Certificate of Final Completion and Occupancy ("CFC") as to PA 201810183586. Sims Decl., Ex. K (8/27/20 CFC). The August 27, 2020 CFC described the construction as follows: "To comply with NOV 201895477. Structural strengthening to include removing + replacing floor framing. Remove (E) dormer. Add 2 new dormers on each side. Demo (E) laundry @ 2nd floor." *Id.* It also included the following language:

> To the best of our knowledge, the construction described above has been completed and, **effective as of the date the building permit application was filed**, conforms both to the Ordinances of the City and County of San Francisco and to the Laws of the State of California. The above referenced occupancy is classification is approved pursuant to Section 109A of the *San Francisco Building Code*.

*Id.* (emphasis in the original). The DBI's internal tracking system shows that the CFC was entered as "pre-final" inspection. Greene Decl., Ex. H; Dkt. No. 106-9 ("Langan Decl."), Ex. A. Because was listed as a "pre-final" inspection, the DBI did not recognize the CFC as valid. Greene Decl. ¶ 19.

In 2020, Gallagher listed the Property for sale with an asking price of $1.19 million. Gallagher Dep. at 29:2–23, 30:4–8. Gallagher testified that there were no pending NOVs, orders of abatement, DBI enforcement action, or liens when the Property was placed on the market. *Id.* at 30:19–31:7.

According to Gallagher, the City's Covid guidelines required prospective buyers to fill out a questionnaire prior to viewing for-sale properties. *Id.* at 32:12–18. Although more than 30 people

United States District Court
Northern District of California

inquired about the Property, none of them filled out the questionnaire that would allow them to visit it. *Id.* at 31:12–33:5. Gallagher took the Property off the market. *Id.* at 33:20–25.

### E.      Criminal Proceedings Against Curran and Santos

Sometime between May 17 and June 8, 2021, Federal Bureau of Investigation Special Agent Allison Lopez contacted Gallagher to ask whether he had hired Santos & Urrutia. Gallagher Dep. at 128:8–129:11, 130:19–22, 131:4–7. Gallagher confirmed that he had hired Santos & Urrutia, and that he "just got a red tag stuck on [his] door for [an] expired permit" and that he "[could not] figure out what the hell's going on[.]" *Id.* at 129:12–14. When Special Agent Lopez asked Gallagher how he "had ended up hiring Santos," Gallagher explained that "Bernie [Curran] wasn't going to approve the permit that I had outstanding unless I hired Santos, and even though under California Building Code I'm not required to have a structural engineer, I was forced to hire this idiot [Santos] anyways." *Id.* at 133:9–13.

Gallagher testified that Special Agent Lopez "mentioned that Bernie [Curran] had just been indicted and that the red tag was not a coincidence." *Id.* at 129:15–16; *see id.* at 130:2–8 (Gallagher had "a specific memory of [Special Agent Lopez] telling [Gallagher] that it's not a coincidence that the building had been red-tagged[.]"); *id.* at 132:17–19 ("Q. And in what context did she talk to you about Mr. Curran? A. That he'd just been indicted."). In total, Gallagher spoke to Special Agent Lopez three or four times over the next year. *Id.* at 131:10–14, 132:8–10.

On August 20, 2021, Curran and Santos were criminally charged with two counts of honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346. Sims Decl., Ex. T (compl.); *see USA v. Curran et al.*, Case No. 21-cr-00453-SI (N.D. Cal.). The complaint alleged that "SANTOS urged his clients to make charitable contributions to the Golden Gate Rugby Association," a non-profit organization where Curran volunteered and his child played rugby. Sims Decl., Ex. T ¶ 4. "[I]n exchange for the stream of benefits flowing to the charity, CURRAN gave SANTOS' clients favorable official treatment." *Id.*; *see id.* ¶ 8 ("SANTOS facilitated a stream of benefits to CURRAN's favorite charity in exchange for official action . . . .").

**F.      NOV 202175602**

In March or April 2021, the Property went back on the market for $1.2 million.  Gallagher Dep. at 34:23–24–34:5, 35:23–36:2.  Gallagher testified that there were no existing NOVs, orders of abatement, enforcement from the San Francisco Planning Department, liens, or encumbrances at this time.  *Id.* at 34:9–22.  Three offers were made, and Gallagher accepted an offer for $1.2 million. *Id.* at 36:13–37:7.  The offer went into escrow in late April or early May.  *Id.* at 37:20–24, 38:12–14.

Four days prior to the close of escrow, on May 17, 2021, DBI Inspector Thomas Keane issued NOV 202175602, which stated that "[r]esearch in response to a complaint for the [Property] has revealed that P.A. 20180183586 has expired without obtaining all the necessary sign offs to complete the permit."  Sims Decl., Ex. H at ECF p.262; Gallagher Dep. at 38:15–17; *see id.* at 38:5–11 ("Q. And we'll talk about some of the NOV's, but I think when you say "red-tagged," there was a number of notices of violation that were issued by the Department of Building Inspection?  A. At that time?  Q. Correct.  A. No, just the one.").  Keane's supervisor, DBI Chief Building Inspector Mauricio Hernandez, reviewed NOV 202175602 prior to its issuance.  Dkt. No. 106-7 ("Hernandez Decl.") ¶ 4.

Gallagher believed that, although NOV 202175602 concerned "an expired permit, and I had a certificate of completion in hand, so I just figured it was an error.  They just got the wrong house." Gallagher Dep. at 38:23–39:1.

Gallagher, Hernandez, and either Keane or Birmingham[5] conducted a site visit on June 3, 2021.  Gallagher Dep. at 121:24–122:21; Dkt. No. 106-7 ("Hernandez Decl.") ¶ 8.  Gallagher testified that, during this visit, Hernandez stated, "We know who you've been talking to[.]" Gallagher Dep. at 122:22–123:1.  Gallagher further testified that Hernadez and Birmingham

---

[5] There is conflicting evidence regarding the identity of the second DBI inspector.  Gallagher testified that he, Hernandez, and Kevin Birmingham were present at the site visit.  Gallagher Dep. at 122:4–10.  According to Hernandez, DBI Inspector Keane attended, but not Birmingham.  Dkt. No. 106-7 ("Hernandez Decl.") ¶ 8 ("I scheduled a meeting with Plaintiff at the Property on June 3, 2021.  DBI Inspector Thomas Keane accompanied me to the meeting.  No other City employees were present.").

explained that the August 27, 2020 CFC was never filed and therefore, "as far as the building department was concerned, it didn't exist." *Id.* at 123:5–124:1.

On June 8, 2021, Hernandez amended NOV 202175602. Sims Decl., Ex. I at ECF p.265; Greene Decl., Ex. L; Hernandez Decl. ¶ 9. Based on the "site visit on 6/3/21[,]" NOV 202175602 "identif[ied] deviations from approved PA 201810183586" relating to the stairs leading to the third floor, the addition of a mechanical closet for a furnace on the first and second floors, new windows, a conversion of the first floor to an ADU, and ceilings in the kitchen and lower bedroom that were lower than the 8 feet proposed in the permit. Sims Decl., Ex. I at ECF p.265.

Although the potential buyers were initially willing to work with Gallagher until the issues regarding the NOVs were resolved, the sale of the Property ultimately fell apart. Gallagher Dep. at 40:8–17. Thereafter, the Property went into escrow two more times. *Id.* at 41:6–9.

### G.    PA 202107023726

On July 2, 2021, Gallagher filed PA 202107023726 to "partially comply with NOV 202175602." Sims Decl., Ex. J at ECF p.268; Gallagher Dep. at 143:17–144:10. The description of work further stated "Document all changes to 201810183586. Legalize new windows previously shown existing (5). Document change to stairwell . . . Show existing mechanical closet and seismic retrofit." Sims Decl., Ex. J at ECF p.268; Gallagher Dep. at 144:3–6. The DBI approved PA 202107023726 on July 19, 2021. Sims Decl., Ex. J at ECF p.268; Gallagher Dep. at 145:14–18.

### H.    PA 202108096049

PA 202108096049 sought "TO COMPLY WITH NOV #202175602: This proposal is for a new ADU in a single family residence, within the existing envelope. Restoration of existing curb cut per scope of work on plans." Dkt. No. 109-2 at ECF p.35 (capitalization in the original); *see* Fossi Decl. ¶ 6 ("The application stated that it was 'to comply with NOV 202175602: Addition of an ADU and the restoration of existing curb cut (per scope of work on the plans).'"); Hughen Decl. ¶ 7 (same); *id.*, Ex. A (plans submitted in support of PA 202108096049 identifying scope of work as "NEW ADU AND (N) CURB CUT FOR (E) DRIVEWAY ACCESS") (capitalization in the

original).

Principal Planner Natalia Fossi and Planner II William Hughen were part of the Planning Department's Flex Team, "a catch all team focused on smaller projects, with a focus on unit legalization and Accessory Dwelling Units ('ADU's') within the City." Fossi Decl. ¶ 2; Hughen Decl. ¶ 1. At an unspecified date, Fossi received PA 202108096049 and, on August 26, 2021, assigned it to Hughen for review.[6] Fossi Decl. ¶¶ 2, 7; Hughen Decl. ¶ 6.

On September 7, 2021, Hughen provided Gallagher with comments on the proposed plans. Hughen Decl. ¶ 9; *see id.*, Ex. A. Among other things, Hughen determined that the proposed curb cut and proposal to have parking in the rear yard violated Planning Code section 134, which requires the rear yard to be an open space. Hughen Decl. ¶ 8; *id.*, Ex. A at ECF p.8 ("Automobile parking is not permitted in the required rear yard area or within required open space areas unless the applicant files and obtains a variance."; *id.* ("Curb cut policy: project must meet Planning's Curb Cut policies, summarized in ZA Bulletin 2 . . . Additional review of the proposed curb will be completed and additional comments may be issued regarding the curb cut."). Hughen could not approve a curb cut at the permit approval process, but informed Gallagher that he could "[f]ile a variance for the automobile parking within the required rear yard area" or "[m]ove the automobile parking and curb cut out of the required rear yard area." Fossi Decl., Ex. A at ECF p.9; Hughen Decl. ¶ 8; *see* San Francisco, Cal. Planning Code § 134 (2021) (setting forth requirements for rear yards); San Francisco, Cal. Planning Code § 136(c)(30) (2021) (parking is not permitted in required yards) . Hughen found no issues with the proposed ADU. Hughen Decl. ¶ 8.

On October 30, 2021, Gallagher emailed the Zoning Administrator, stating that "planning has told me that the zoning commissioner has determined that now Avalon is the front of my property. [T]herefor[e] [I] have to apply for a variance. Can you confirm that for me?" Fossi Decl.,

---

[6] It is unclear when Gallagher filed PA 202108096049, as the application was not submitted with the parties' briefs. Rather than cite to the application itself, the City cites only to the Fossi and Hughen Declarations. City Defs. MSJ at 15. Although both declarations purport to quote from PA 202108096049 and while the Hughen Declaration attaches the plans in support of PA 202108096049 (Hughen Decl., Ex. A), neither attaches the actual application. Gallagher attaches a January 10, 2023 email from Cheng Chan from the DBI stating that appears to quote the application. Dkt. No. 109-2 at ECF p.35.

United States District Court
Northern District of California

Ex. A at ECF p.8. According to Gallagher, "it would seem very strange seeing that every house on [N]aples faces [N]aples including mine, but [A]valon is now the front. And if that is indeed the case, [I] need that determination for the variance application." *Id.* On November 1, 2021, Fossi responded to Gallagher on behalf of the Zoning Administrator. Fossi Decl. ¶ 9; *id.*, Ex. A at ECF p.7. Fossi attached an email that Hughen had sent to Gallagher on October 19, 2021, explaining that "the Zoning Administrator considers Avalon Avenue to be the front of the property. This is because treatment of Avalon Avenue as the front of the property results in an existing building and property that is significantly more code-compliant compared to if Naples Street was treated as the front of the property." Fossi Decl., Ex. A at ECF p.9. Fossi also informed Gallagher that "[a] formal written determination can be requested from the Zoning Administrator through a Letter of Determination. if needed." *Id.* at ECF p.7.

On November 9, 2021, Gallagher filed a variance request. Sims Decl., Ex. P.[7] On July 27, 2022, the San Francisco Planning Department denied the request on three grounds: (1)"[t]here are no exceptional or extraordinary circumstances applying [to] the subject property," (2) "there are no exceptional or extraordinary circumstances that result in any unnecessary hardship or practical difficulty related the subject property," and (3) "[t]he subject property is not required to provide offstreet parking in the RH-1 District." *Id.* at ECF p.327.

Gallagher appealed the denial, and the Board of Appeals held a hearing on August 17, 2022. Sims Decl., Exs. R & S. On August 30, 2022, the Board of Appeals denied the appeal and upheld the Zoning Administrator's variance decision. Sims Decl., Ex. S. Fossi was not involved in Gallagher's variance request or the scheduling of the hearing on Gallagher's appeal. Fossi Decl. ¶¶ 11, 14. Hughen did not work any further on PA 202108096049 after Gallagher's variance request and appeal were denied, as he left the Planning Department in October 2022. Hughen Decl. ¶¶ 1, 15; Fossi Decl. ¶ 15.

On November 7, 2022, Gallagher submitted revised plans, which Fossi approved the same

---

[7] The applicant's affidavit attached to the variance application is not signed or dated. Sims Decl., Ex. P at ECF p.324. The parties do not argue that this rendered the application invalid or was the reason for its denial.

day.  Fossi Decl. ¶ 15.

## I.    Attempts to Sell the Property

In 2022, the Property went into escrow with a purchase price of $1.2 million.  *Id.* at 41:10–24; *see id.* at 43:19–23 (Q.  But it would be fair to say, though, that . . . the potential purchase price was, essentially, the same between the first escrow period and the second escrow period?  A. Yes.").  That sale fell through due to another pending NOV regarding the Property's windows and Gallagher's inability to obtain another certificate of completion.  *Id.* at 41:25–42:13.

The Property went into escrow for a third time in July 2023.  *Id.* at 44:3–7, 45:16–19.  The purchase price was again $1.2 million.  *Id.* at 47:23–48:1; *see id.* at 48:2–6 ("Q. Okay.  So for the three potential escrow periods or -- for the three escrow periods that you entered into pertaining to the property, all of the purchase prices were relatively the same?  A. Yes.").  According to Gallagher, that sale was not finalized because the City "had went ahead and slapped these abatements on the house . . . from 2018, 2017 and 2016."  *Id.* at 47:11–12, 17; *see id.* at 47:14–15 (Abatements "hadn't been there before, and they're all from before I even owned the place.").  Gallagher eventually sold the Property for $1 million in 2025.  *Id.* at 51:11–20.

## II.    Procedural History

On March 16, 2023, Gallagher initiated this action in the Superior Court of California, County of San Francisco.  Dkt. No. 1-1 (Compl.).  Gallagher's initial Complaint asserted state law claims for injunctive and declaratory relief, slander of title, and inverse condemnation.  *Id.* On June 19, 2023, Gallagher filed his First Amended Complaint ("FAC"), which again asserted declaratory relief, slander of title, and inverse condemnation claims; added claims for intentional interference with prospective economic relations, violation of civil rights pursuant to 42 U.S.C. § 1983, intentional infliction of emotional distress, and negligence; and omitted the injunctive relief claim.  Dkt. No. 1-2 (FAC).  The City removed the action to this Court on July 19, 2023.  Dkt. No. 1.

On November 23, 2023, Gallagher filed a Second Amended Complaint ("SAC"), which asserted the same claims as the FAC.  Dkt. No. 28 (SAC).  The Court granted the City's motion to

dismiss the state law claims without prejudice on grounds that Gallagher failed to exhaust his administrative remedies and denied the City's motion to dismiss the § 1983 claim. Dkt. No. 37. Gallagher did not reassert the state law claims in a third amended complaint; thus, only the § 1983 claim remains pending.

The SAC alleges that defendants retaliated against Gallagher and deprived him of his First Amendment right to freedom of speech by "issuing and refusing to release frivolous code enforcement liens, issuing and refusing to release notices of violation, issuing and refusing to release abatement orders, revoking permits, revoking a certificate of completion, and making disparaging statements related to the subject property." SAC ¶ 94.

The City Defendants answered the SAC on February 23, 2024. Dkt. No. 41. In March 2024, the parties requested an early settlement conference. Dkt. No. 42. After extensive settlement discussions with Magistrate Judge Joseph C. Spero, the parties settled the injunctive relief claims but were unable to resolve Gallagher's claims for monetary damages. Dkt. No. 51 at 2; Dkt. No. 65 at 5. On July 29, 2025, the Clerk entered default against Bernard Curran. Dkt. No. 90. Gallagher moved for default judgment (Dkt. No. 96), and Curran moved to set aside the entry of default (Dkt. No. 99). The Court denied Gallagher's motion and granted Curran's motion. Dkt. No. 112. Curran answered the SAC on December 22, 2025. Dkt. No. 125.

On August 26, 2025, the Court dismissed Santos, as Gallagher had been unable to serve him. Dkt. No. 94.

**LEGAL STANDARD**

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's

case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting then Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c).

## REQUESTS FOR JUDICIAL NOTICE

Gallagher and the City Defendants seek judicial notice of several documents. Federal Rule of Evidence 201(b) permits a court to notice an adjudicative fact if it is "not subject to reasonable dispute." A fact is "not subject to reasonable dispute" if it is "generally known," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)–(2). However, a court cannot take judicial notice of disputed facts contained in such public records. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).

### I.    City Defendants' Requests for Judicial Notice

The City Defendants seek judicial notice of five documents:

- Gallagher's Request for Variance Hearing (Sims Decl., Ex. P);

13

- The San Francisco Planning Department's July 27, 2022 Variance Decision (*id.*, Ex. Q);

- Gallagher's Appeal of Variance Decision (*id.*, Ex. R);

- The San Francisco Board of Appeal's Denial of Gallagher's Appeal of Variance Decision (*id.*, Ex. S); and

- The date the criminal complaint was filed in *USA v. Curran*, Case No. 21-mj-71315-MAG-1 (Sims Decl., Ex. T);

Dkt. Nos. 107, 115. With respect to Gallagher's Request for Variance Hearing and Appeal of Variance Decision (Sims Decl., Exs. P, R), the City Defendants seek judicial notice only of the fact that Gallagher requested a variance and appealed the denial thereof, as well as the date of the request and appeal. Dkt. Nos. 107 & 115 at 2–3.

As the aforementioned documents are judicially noticeable, the Court GRANTS the City Defendants' request. *See United States v. 14.02 Acres of Land More or Less in Fresno Cnty.*, 547 F.3d 943, 955 (9th Cir. 2008) ("Judicial notice is appropriate for records and reports of administrative bodies.") (citation modified); *Regino v. Staley*, 133 F.4th 951, 968 n.9 (9th Cir. 2025) (taking judicial notice of court filings) (citing Fed. R. Evid. 201(b); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006); additional citation omitted).

## II.     Gallagher's Request for Judicial Notice

Gallagher seeks judicial notice of four documents:

- The first amended complaint filed in *Richards v. City and County of San Francisco*, No. 20-cv-1242-JCS (N.D. Cal.);

- The federal grand jury indictment in *USA v. Curran*, 21-cr-00453-SI-1;

- The waiver of indictment in *USA v. Curran*, 21-cr-00453-SI-1; and

- The judgment against Santos in *USA v. Santos*, 21-cr-00453-SI-2.

The Court GRANTS Gallagher's request, as each of these documents are court filings which are a matter of public record and readily verifiable, but only of the fact that the documents exist and not the truth of the facts therein. *See United States v. Raygoza-Garcia*, 902 F.3d 994, 1001 (9th Cir.

2018) ("A court may take judicial notice of undisputed matters of public record, which may include court records available through PACER" but may not judicially notice the truth of the facts recited in them).

**DISCUSSION**

**I.    Section 1983 Claim: First Amendment Retaliation**

Gallagher contends the City Defendants engaged in retaliatory conduct by "revok[ing] nine valid permits, [i]ssu[ing] meritless violations, [h]arass[ing] real estate agents and potential buyers, [and] [c]aus[ing] multiple escrows to collapse." Gallagher MSJ at 10. The City Defendants argue that Gallagher cannot show that the City Defendants took any adverse action that would chill Gallagher from engaging in protected conduct. City Defs. MSJ at 20–22.

**A.    Elements**

Section 1983 creates a right of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . ." 42 U.S.C. § 1983. "As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (citation modified).

To prevail on a First Amendment retaliation under § 1983, the plaintiff must prove "that (1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1053 (9th Cir. 2019) (citation modified). This requires the plaintiff to "establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Nieves*, 587 U.S. at 398 (citation omitted). In other words, "the motive . . . must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not

15

have been taken absent the retaliatory motive." *Id.* at 398–99.

### B.    Substantial or Motivating Factor

For the reasons explained below, there is no evidence that Duffy, Hernandez, Birmingham, Fossi, Hughen, or Curran knew that Gallagher spoke to the FBI, let alone retaliated against him for doing so.

#### 1.    Duffy

The City Defendants argue that there is no evidence that Duffy retaliated against Gallagher by changing the CFC or directing others to retaliate against Gallagher. City Defs. MSJ at 20. Gallagher contends that he "has shown that SFDBI records were falsified" and that "Joe Duffy is one of only two people who can change SFDBI records." Gallagher Opp'n at 4; *see* Gallagher Opp'n Decl. ¶ 5 ("SFDBI records were falsified. Joe Duffy is only one of two people who can alter those records, but assessor's records still show the permit as completed on August 27, 2020."); Gallagher MSJ Decl., Ex. D at ECF p.12 ("Joe [D]uffy went into building dept records and changed my permit status from completed to expired. This is something he can do with building dept records . . . This clearly shows that building dept records were falsified in retaliation for Bernie getting indicted in 2021[.]").[8]

The DBI utilizes data entry systems that track when a DBI employee enters or edits a permit application, permit, or complaint, as well as when a DBI employee makes changes to the entry of another employee. Greene Decl. ¶ 9 ("Once DBI receives a permit application or a complaint it creates a data entry system for every permit application and complaint . . . . [I]f another DBI employee changes, edits or alters the data entry of another DBI employee, that change is reflected in the database."); *id.* ¶ 11 ("DBI permit details report indicates when a change has been made in the system and by whom."); *id.* ¶ 15 ("DBI internal tracking system indicates when a change has been made in the system and by whom.").

---

[8] Gallagher's Declarations in support of his Motion for Summary Judgment and his Opposition to the City Defendants' Motion for Summary Judgment immediately follow the signature lines of his briefs. Dkt. No. 109-1 at 11–12 ("Gallagher MSJ Decl."); Dkt. No. 117 at 6–7 ("Gallagher Opp'n Decl.").

According to the DBI's internal permit details report for PA 201810183586, the permit expired on "06/18/2020." Greene Decl., Ex. H. There is an August 27, 2020 entry that shows that "Curran, Bernard" changed the permit's status to "PRE-FINAL" with the comment "OK to OK to final pending installation of grippable handrail." *Id.* On May 17, 2021, "Keane, Thomas" changed the status of the permit to "EXPIRE" and added a comment that "[p]ermit expired without obtaining all necessary sign offs to complete permit. tdk." *Id.* Duffy's name does not appear in the history. *See id.*

The DBI's internal complaint tracking system for NOV 201895477—the NOV covered by the August 27, 2020 CFC—does not show any entries on August 27, 2020. Greene Decl., Ex. E. The City Defendants argue this means that "the CFC Curran provided Plaintiff was never recognized by DBI as a valid CFC." City Defs. Mot. at 12; *see* Greene Decl. ¶ 19 ("The purported Certificate of Completion and Occupancy was never registered into the internal DBI system.").[9]

The City Defendants also submit records from the DBI's Permit Tracking System, which stores "all records of permit applications, permit plan reviews, and permit issuances." Langan Decl. ¶ 2. A search of the Permit Tracking System for PA 201810183586 shows that Curran conducted an inspection on August 27, 2020, and that entries for that inspection were entered and updated on the same date. Langan Decl., Ex. A; *see id.* ¶ 7 ("The 'ACTION' column tells us when a particular record was inserted (INS) or updated (UPD)."). Duffy's name does not appear in the search, nor are there any entries showing any updates to Curran's inspection after August 27, 2020. *See* Langan Decl., Ex. A.

If Duffy had altered the August 27, 2020 CFC or changed the permit status from "valid" to "expired," such changes would have been recorded by the DBI's internal tracking systems. Greene Decl. ¶ 15. Because Duffy's name does not appear in the records, a reasonable juror could find that

---

[9] Greene declares that "[n]otably, as is shown in Exhibit E, the only entry for the Certificate of Final Completion on August 27, 2020 in DBI's internal complaint tracking system is for a 'pre-final' inspection." Greene Decl. ¶ 19. It is unclear whether Greene intended to refer to Exhibit E or Exhibit H. Exhibit E is a Complaint Data Sheet for NOV 201895477. It does not list any entries dated August 27, 2020, and the only reference to a CFC is dated October 24, 2024. On the other hand, Exhibit H, the DBI's internal permit details report for PA 201810183586, contains an entry dated August 27, 2020 that updates the permit's status to "PRE-FINAL."

17

no DBI employee, including Duffy, improperly altered records for PA 201810183586, including by changing the CFC from "final" to "pre-final."

Gallagher fails to rebut the City Defendants' evidence, and his assertion that unspecified "SFDBI records were falsified" also lacks evidentiary support.  For instance, Gallagher argues that "assessor's records still show the permit as completed on August 27, 2020."  Gallagher Opp'n at 4; Gallagher Opp'n Decl. ¶ 5.  But the documents upon which he relies show only that the work had been completed, not that a valid CFC was issued or that Duffy altered or falsified records.  *See, e.g.*, Gallagher Opp'n Decl., Ex. B at ECF p.12 (October 14, 2021 assessment of costs stating, "Our records show that all work has been completed to abate the code enforcement case referenced above."); *id.* at ECF p.14 ("Assessor used the 9/3/2020 listing date as the completion date of construction.").

Gallagher's deposition testimony confirms that his theory that Duffy changed the permit status from "complete" to "expired" is based on speculation, not evidence.  Gallagher testified that his belief that "Mr. Duffy falsified the records is due to his position within DBI"—that is, "he is high up in the [DBI] hierarchy"—and that he lacks "direct evidence that Mr. Duffy was the one that committed the fraud" and such evidence instead "would be more circumstantial."  Gallagher Dep. at 156:12–23.

"A plaintiff may establish motive using direct or circumstantial evidence."  *Arizona Students' Ass'n v. Arizona Bd. of Regents*, 824 F.3d 858, 870 (9th Cir. 2016) (citing *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 979 (9th Cir. 2002); additional citation omitted).  Circumstantial evidence of motive requires the plaintiff to show "(1) proximity in time between the protected action and the allegedly retaliatory response, from which a jury logically could infer retaliation speech; (2) evidence that the official expressed opposition to the speech; [or] (3) evidence that the official's explanations for the action were false and pretextual."  *Colonies Partners LP v. Cnty. of San Bernardino*, No. EDCV 18-420 JGB (SHKX), 2020 WL 5102160, at *24 (C.D. Cal. July 28, 2020), *aff'd sub nom. Erwin v. Ramos*, No. 20-55903, 2022 WL 541188 (9th Cir. Feb. 23, 2022) (citing *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003)).

Gallagher offers no such evidence.  Gallagher's contention that Duffy changed, or directed

18

others to change, the permit's status from "complete" to "expired" simply by virtue of Duffy's position at DBI is, without more, conjecture that is insufficient on a motion for summary judgment. Moreover, nothing in the record indicates that Duffy expressed opposition to Gallagher's interviews with the FBI, or that any explanation for changing the permit's status was pretextual.

Any proximity in time between the alleged alteration and Gallagher's FBI interviews, without more, is also insufficient to allow a reasonable inference of retaliation. Gallagher testified that he first spoke to the FBI sometime between May 17 and June 8, 2021. Gallagher Dep. at 131:4–7; *see id.* at 130:19–22. The DBI's internal permit details report shows that, on May 17, 2021, Thomas Keane updated the status of the permit from "PRE-FINAL" to "EXPIRE." Greene Decl., Ex. H. To the extent the interview occurred after May 17, 2021, the alteration could not have been retaliatory. If the interview took place on May 17, 2021, Gallagher offers no evidence that Keane changed the permit's status after the interview or even knew the interview happened. Temporal proximity is therefore insufficient to constitute circumstantial evidence of retaliation. *See Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003) (holding that, in a § 1983 action alleging First Amendment retaliation, "[w]hether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances. In some cases, the totality of the facts may form such a clear picture that a district court would be justified in granting summary judgment, either for or against a plaintiff, on the issue of retaliatory motive; but the length of time, considered without regard to its factual setting, is not enough by itself to justify a grant of summary judgment."); *Kelly v. Boeing Co.*, 848 F. App'x 692, 694 (9th Cir. 2021) ("Even if Kelly established a minimal prima facie case based on temporal proximity, temporal proximity alone is insufficient evidence of pretext in light of the substantial evidence that Boeing received reports that Kelly attempted to tamper with the urine sample.") (citing *Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997)).

On this record, there is no evidence to allow a reasonable jury to find that Duffy altered, or directed other to alter, the DBI records of PA 201810183586, let alone that any such change was retaliatory. The Court thus GRANTS summary judgment in favor of Duffy.

### 2.    Hernandez and Birmingham

Gallagher argues that "[m]ultiple inspectors signed off [on the Property] prior to May of 2021" and, although "[t]here were no violations on the [P]roperty[,]" Hernandez and Birmingham "wrote up erroneous violations" to retaliate against Gallagher for speaking to the FBI about Curran. Gallagher MSJ at 4; Gallagher Opp'n at 4.   The City Defendants contend that Hernandez and Birmingham did not retaliate against Gallagher by issuing and amending NOV 202175602, as the violations identified therein were justified.  City Defs. MSJ at 21–22.

Gallagher offers no evidentiary support for his arguments.  Gallagher fails to offer any evidence rebutting Hernandez's and Birmingham's declarations stating they were unaware that Gallagher had spoken to the FBI until this litigation, long after issuing NOV 202175602. Hernandez Decl. ¶ 18 ("Through this lawsuit, I learned that Plaintiff allegedly . . . spoke with the FBI in connection to their investigation into Bernie Curran.  I was unaware that Plaintiff had been contacted by the FBI prior to arriving at the Property on June 8, 2021.  While I may have received emails from Plaintiff claiming to have spoken with the FBI, I was unaware that he had done so until after the filing of this lawsuit."); Birmingham Decl. ¶ 22 ("I did not know that Plaintiff spoke with the FBI prior to June 8, 2021, when amended NOV 202175602 was issued. Some time after amended NOV 202175602 was issued, I learned Plaintiff claimed he had spoken with the FBI about Bernie Curran and Rodrigo Santos. Plaintiff was the only source of this information.").  He also does not identify the "[m]ultiple inspectors" who signed off on the Property and cites no evidence showing any such approvals.

In addition, Gallagher makes no attempt to rebut Hernandez's and Birmingham's explanations that the violations identified in NOV 202175602 did not just deviate from the approved plans, but also "implicated serious life-safety issues" and violated the California Building Code provisions that "pertain[] to a health and safety issue aimed to prevent death and serious injury." Hernandez Decl. ¶¶ 8–10; Birmingham Decl. ¶¶ 12–14.

Notably, Gallagher's sworn deposition testimony contradicts his argument that the violations identified in NOV 202175602 were "erroneous."   Gallagher conceded that NOV 202175602 correctly identified deviations from the approved plans for PA 201810183586.  As Birmingham

United States District Court
Northern District of California

explains, "[i]t is important for general contractors and property owners to follow the plans that are submitted to DBI" so that "DBI can ensure that any construction related activities conducted in the neighborhoods of San Francisco is done in a safe and workmanlike manner." Birmingham Decl. ¶ 9.

For instance, amended NOV 202175602 states that "[s]tairs leading to 3rd floor not installed to approved plans. Stairs have been built as a straight run. Plans called out for U-shaped detail." Sims Decl., Ex. I at ECF p.265; *see* Birmingham Decl., Ex. A (approved plans for PA 201810183586) at ECF p.8. Gallagher agreed that the stairs were "built as a straight run up" and that "[t]hey differed from the plans." Gallagher Dep. at 137:4–138:8. Although he testified that he "tried several different configurations on the stairs" due to "problems with head heights and risers and tread length," the final configuration "was different than what had been approved." *Id.* at 138:2–8.

NOV 202175602 also found that the "[s]tairs leading from 1st floor to 2nd floor was not constructed. A mechanical closet for furnace has been added on both floors modifying the existing and propose[d] plans of having a communicating stairs from 1st floor to 2nd floor." Sims Decl., Ex. I at ECF p.265; *see* Birmingham Decl., Ex. A at 8. Gallagher testified that there were no stairs leading from the first floor to the second floor and that a mechanical closet for a furnace "wasn't on the plans[.]" Gallagher Dep. at 138:13–17, 139:3–7.

Gallagher further conceded that he had replaced all the windows at the Property, the first floor had "a full kitchen with stove, sink, and cabinets," and the ceilings in the kitchen and lower bedroom were shorter than the 8 feet identified in the approved plans. Sims Decl., Ex. I at ECF p.265; Birmingham Decl., Ex. A at 9; Gallagher Dep. at 139:12–143:9.

"[W]here there is 'very strong evidence of probable cause and very weak evidence of a retaliatory motive[,]' a case cannot survive summary judgment." *Henneberry v. City of Newark*, No. 13-CV-05238-MEJ, 2017 WL 1493006, at *11 (N.D. Cal. Apr. 26, 2017) (quoting *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 901 (9th Cir. 2008)) (second brackets in the original). Such is the case here. The City Defendants present evidence in the form of deposition testimony and declarations from Gallagher, Hernandez, and Birmingham that the violations in NOV 202175602

accurately identified code violations. Gallagher does not offer any evidence to the contrary, nor does he identify evidence showing that Hernandez and Birmingham were aware of Gallagher's FBI interview.

Nor is Hernandez's comment that "We know who you've been talking to" sufficient to show retaliation. This singular comment, without more, cannot save Gallagher's First Amendment retaliation claim. *See, e.g.*, *Monroe v. McDaniel*, 386 F. App'x 714, 715 (9th Cir. 2010) ("The district court properly granted summary judgment in favor of defendants . . . on the theory that they retaliated against plaintiffs for their union activity" where "the record contain[ed] evidence of only a single anti-union statement by [defendant]. Such an isolated statement is insufficient to support a [First Amendment] retaliation claim as a matter of law.").

For these reasons, nothing in the record would allow a reasonable fact finder to conclude that Hernandez and Birmingham issued NOV 202175602 to retaliate against Gallagher. Summary judgment is therefore GRANTED as to Hernandez and Birmingham.

### 3.    Fossi and Hughen

The City Defendants argue that Fossi and Hughen had grounds to require Gallagher to seek a variance to restore the curb cut and turn the rear yard into a parking area, and that neither Fossi nor Hughen had any role in evaluating Gallagher's appeals. City Defs. MSJ at 22. Gallagher contends that "Hughen never sought to legalize the ADU." Gallagher Opp'n at 4. Moreover, Gallagher was not seeking to add a new driveway but rather was restoring the original one. *Id.*

Nothing in the record suggests Fossi or Hughen sought to retaliate against Gallagher by making him seek a request for variance, and then denying that request. Gallagher offers no evidence to contradict Fossi's and Hughen's declarations that neither worked with DBI with respect to reviewing plans on behalf of Planning; worked with Duffy, Curran, or Santos; had been aware that Gallagher had spoken to the FBI until Gallagher informed them of such; and that Gallagher's conversations with the FBI had no influence on their review of his proposed plans. Fossi Decl. ¶¶ 16–19; Hughen Decl. ¶¶ 16–19. Absent any such evidence, Gallagher cannot show that the denial of his curb cut and rear yard parking area were done in retaliation for speaking to the FBI.

22

Second, the record shows that the Planning Department had grounds to deny Gallagher's request for variance, as Gallagher's proposed plans did not comply with the San Francisco Planning Code and he failed to articulate a reason to deviate from the Code. *See Henneberry*, 2017 WL 1493006, at \*11. There is also no evidence that Hughen attempted to block the ADU; to the contrary, Hughen declares that he "did not find any issue with the proposed ADU." Hughen Decl. ¶ 8.

Although Gallagher contends that "Hughen claimed the [P]roperty did not fall under Ordinance 9517 but under 'Day Law'" and that "Robb Kappa at the City Attorney's office confirmed there was no such law" (Gallagher Opp'n at 4), he offers no evidence that Kappa confirmed any such thing. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . ."); *Safari Club Int'l v. Haaland*, 31 F.4th 1157, 1176–77 (9th Cir. 2022) ("[B]are assertions unsupported by evidence in the record . . . cannot survive summary judgment.") (citing Fed. R. Civ. P. 56(c)(1)(A)–(B)). Furthermore, Ordinance No. 95-17 concerns ADUs, which was not the subject of the variance or the appeals thereof. *See* San Francisco, Cal., Ordinance No. 95-17 ("Ordinance amending the Planning Code to bring the requirements and procedures for authorizing the construction of Accessory Dwelling Units (ADUs) in single-family homes into conformity with the new mandates of state law . . ."). It also appears that Gallagher misunderstood Hughen's representation. In an October 26, 2021 email, Hughen explained that "Planning operates under 'law of the day,' which means the laws in place at the time of review apply to a given project." Gallagher Decl., Ex. C at ECF p.25. Hughen further explained that "Ordinance 95-17 is no longer active. Projects therefore can not be approved with this ordinance at this time. This has been confirmed by my superior." *Id.*

Accordingly, there is no triable issue of material fact that Fossi or Hughen retaliated against Gallagher. Summary judgment in favor of Fossi and Hughen is therefore GRANTED.

### 4.    Curran

Gallagher's motion with respect to Curran is light on specifics. Gallagher contends that

United States District Court
Northern District of California

Curran required Gallagher to obtain a permit to begin renovations and to hire Santos. Gallagher MSJ at 5 (citing SAC ¶ 31). Curran argues that summary judgment should be denied because Gallagher fails to identify any admissible evidence of retaliation by Curran and cannot rely solely on the SAC's allegations. Curran Opp'n at 7.

As a general matter, a party cannot cite allegations in a complaint to defeat summary judgment. *See Washington Env't Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013) ("While '[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice,' in responding to a summary judgment motion, 'the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true.'") (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)) (alterations in the original). However, courts have more leeway to consider certain pleadings where, as here, a party is a *pro se* litigant. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) ("[B]ecause Jones is pro se, we must consider as evidence in his opposition to summary judgment all of Jones's contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where Jones attested under penalty of perjury that the contents of the motions or pleadings are true and correct."); *see Abalos v. Parham*, No. 22-16250, 2024 WL 5200169, at *2 (9th Cir. Dec. 23, 2024) (citing *Jones*, 393 F.3d at 922–23).

Even with this additional latitude, Gallagher cannot prevail on his claims against Curran. The SAC is unverified, and the statements in the Gallagher Declaration are based on speculation, not personal knowledge or facts. Gallagher also does not offer any evidence that Curran retaliated against Gallagher for speaking with the FBI. There is no evidence that Curran was involved with the Property after August 27, 2020, the date of Curran's last inspection and the date on which he signed the CFC. *See* Dkt. No. 129-2 ("Curran Decl.") ¶ 15 ("[M]y involvement with the Subject Property ended after my inspection of the [P]roperty on August 27, 2020."); Sims Decl., Ex. K (8/27/20 CFC). Gallagher did not speak with the FBI until May or June 2021. Gallagher Dep. at 130:19–22. As the alleged protected speech occurred after Curran's involvement ended, there is no triable issue of material fact as to whether Curran retaliated against Gallagher.

24

The Court therefore DENIES Gallagher's motion for summary judgment as to Curran.[10]

### C.    Qualified Immunity

Because there is no evidence that Duffy, Hernandez, Birmingham, Fossi, Hughen, or Curran violated Gallagher's First Amendment rights, the Court does not reach the question of whether these defendants are entitled to qualified immunity.

## II.    *Monell* Liability

Gallagher asserts two theories of *Monell* liability. First, Gallagher alleges that "[t]he CITY has a pattern, custom, and/or practice of retaliatory conduct against those who speak out against wrongful and illegal actions." SAC ¶ 5. Second, Gallagher contends that Duffy "was a final policymaker acting under the color of his authority and had the power to approve, deny, and/or overturn any decisions made by SFDBI employees concerning their 'regulation' of the subject property to ensure conformance with CITY policies." *Id.* ¶ 46.

"A municipality . . . may be liable under [42 U.S.C. § 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60, 131 (2011) (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978)). However, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694; *see id.* at 691 ("[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory."). "[M]unicipalities may be liable under § 1983 for constitutional injuries pursuant to (1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019) (citing *Monell*, 436 U.S. at 693–95). "A plaintiff must . . . show '*deliberate* action attributable to the municipality [that] directly caused a deprivation of federal rights.'" *Williams v. City of Sparks*, 112 F.4th 635, 646 (9th Cir. 2024) (quoting *Horton by Horton*,

---

[10] Curran does not affirmatively move for summary judgment.

915 F.3d at 603) (ellipses and emphasis in the original; additional citation omitted).

### A.  Policy, Custom, and Practice[11]

The City Defendants argue the City is entitled to summary judgment on Gallagher's policy and custom theory because the City has no written policy of retaliation against whistleblowers, there is no admissible evidence of a "permissible and widespread" practice of retaliation, and there is no evidence that the alleged policy or custom caused the retaliation. City Defs. Suppl. Br. at 5–7. Gallagher argues he is entitled to summary judgment because the "DBI's documented history of retaliatory enforcement and the federal criminal proceedings of its senior leadership . . . proves a 'persistent and widespread' custom of administration weaponization. Gallagher Suppl. Br. at 2.

A municipality is liable under "§ 1983 when it maintains a policy or custom that causes the deprivation of a plaintiff's federally protected rights." *Hyun Ju Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020) (citing *Monell*, 436 U.S. at 694). To prevail on policy or custom theory, a plaintiff must "demonstrate that an 'official policy, custom, or pattern' on the part of [the municipality] was 'the actionable cause of the claimed injury.'" *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (quoting *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022, 1026 (9th Cir. 2008)). Alternatively, "a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)).

There is no evidence that would allow a reasonable jury to find that the City maintained a policy, practice, or custom of whistleblower retaliation. Gallagher fails to identify any official policy of retaliation or failure to implement a policy of preventing retaliation. *See Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001) ("A policy or custom may be found either in an affirmative

United States District Court
Northern District of California

---

[11] As the parties did not argue whether the Court should grant summary judgment on Gallagher's policy or custom theory of liability, the Court ordered supplemental briefing on the issue. Dkt. No. 132; *see* Dkt. No. 133 (City Defs. Suppl. Br.); Dkt. No. 134 (Gallagher Suppl. Br.).

proclamation of policy or in the failure of an official to take any remedial steps after the violations.") (citation modified); *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014) ("A policy of action is one in which the government body itself violates someone's constitutional rights, or instructs its employees to do so; a policy of inaction is based on a government body's failure to implement procedural safeguards to prevent constitutional violations.") (citation modified).

There is also no evidence that the City had a custom or practice of retaliatory conduct. Gallagher cites the criminal prosecutions against Curran and Santos to show that DBI had a custom and practice of retaliatory tactics and *Richards v. City and County of San Francisco*, No. 20-cv-01242-JCS (N.D. Cal.).[12]   Gallagher Suppl. Br. at 2–3.   This is insufficient to establish a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996), *holding modified by Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001) (citation modified).  First, the criminal prosecutions of Curran and Santos show only that two individuals engaged in illegal activity, not that the City had a custom of retaliating against individuals who spoke to investigators in connection with those prosecutions.  Second, Gallagher cannot rely on *Richards* alone to establish a custom or practice. *Id.* ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy.").  Without more, there is no evidence from which a reasonable jury could find that the City had a custom or practice of retaliation.

Because there is no triable issue of fact as to whether the City had a policy, custom, or practice of whistleblower retaliation that resulted in Gallagher's alleged injury, the Court GRANTS

---

[12] The City Defendants argue that Gallagher failed to produce evidence in support of his custom and practice claim, including evidence regarding *Richards*, which Gallagher cited in his SAC.  City Defs. Suppl. Br. at 4; *see* SAC ¶ 5 ("[M]uch like the facts in this case, a CITY Planning Commissioner, who also owned an investment property in San Francisco, recently filed suit alleging that he was retaliated against by SFDBI employees after making complaints and speaking out against its pay-to-play scheme and corrupt practices.").  The City Defendants are correct that Gallagher cannot rely on documents not produced in discovery.  *See* Fed. R. Civ. P. 37(c) ("If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").  In this case, however, it is immaterial as the *Richards* complaint does not in fact support Gallagher's arguments.

summary judgment in favor of the City on this theory.

### B.      Final Policymaker

The City Defendants argue summary judgment is warranted because Duffy was not a policymaker with final decisionmaker authority; rather, pursuant to the San Francisco Charter and San Francisco Building Code other individuals—namely, the Director of DBI and the Building Inspection Commission—have such authority.  City Defs. MSJ at 17–18.  Gallagher contends that "Curran made policy when he forced Plaintiff to hire Santos" and that "Fossi, Hughen, Birmingham, and Duffy also made policy."  Gallagher Opp'n at 5.

"Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) (footnote omitted). "'Authority to make municipal policy may be granted directly by a legislative enactment' or 'delegated by an official who possesses such authority[.]'" *Barone v. City of Springfield, Oregon*, 902 F.3d 1091, 1107 (9th Cir. 2018) (quoting *Pembaur*, 475 U.S. at 483.  But "[t]he fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."  *Pembaur*, 475 U.S. at 481–82 (citation omitted).  Rather, "[t]he official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable."  *Id.* at 482–83.  "Whether an official is a policymaker for *Monell* purposes is a question governed by state law."  *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1066 (9th Cir. 2013) (citing *City of St. Louis*, 485 U.S. at 124); *see Nguyen v. City of San Jose*, No. 21-CV-00092-EJD, 2022 WL 912891, at *11 (N.D. Cal. Mar. 29, 2022) ("To determine who has final policymaking authority, the Court looks to the City's charter and the ordinances enacted pursuant to it."); *Chung v. Cnty. of Santa Clara*, 614 F. Supp. 3d 709, 724 (N.D. Cal. 2022) ("[T]he court must analyze state law to discern the official's actual function with respect to that particular area or issue . . . . In doing so, courts look to state laws, county charters and codes, and city charters.") (citation modified).

During the events giving rise to this action, Duffy served as the acting Deputy Director at

United States District Court
Northern District of California

28

DBI and became the permanent Deputy Director in November or December 2021.  Duffy Decl. ¶¶ 3–4.  As acting Deputy Director, Duffy "was responsible for overseeing and supervising all of DBI's inspection divisions, including building, electrical, plumbing, code enforcement, housing inspection and inspection support services, managing staff and ensuring compliance with building codes and regulations."  *Id.* ¶ 4.  His responsibilities as the permanent Deputy Director were largely the same.  *See id.* ¶ 3 ("As Deputy Director of DBI, I was responsible for overseeing all the operations of DBI's inspection divisions, including building, electrical, plumbing, code enforcement, housing inspection and inspection support services.").  Duffy also served as Chief Building Inspector until he became the permanent Deputy Director.  *Id.* ¶ 5.

In San Francisco, the Building Inspection Commission ("BIC") "ha[s] responsibility for oversight of the Department of Building Inspection."  San Francisco Charter § 4.121.  This includes overseeing amendments to the Building Code.  *Id.*; San Francisco, Cal., Building Code §§ 104A.2.11–104A.2.11.2.  In addition, the BIC "may reverse, affirm, or modify determinations made by the Department of Building Inspection on all permits required for a final certificate of completion."  San Francisco Charter § 4.121.  There is no evidence that Duffy was part of the BIC or otherwise took part in fulfilling the BIC's responsibilities.  To the contrary, as the DBI's Deputy Director, Duffy was bound to follow laws and regulations promulgated by the BIC, and his decisions regarding NOVs was subject to the BIC's review.  Duffy therefore was not a final policymaker.  *See Gonzales v. Lake Havasu City*, 836 F. App'x 554, 556–57 (9th Cir. 2020) ("Where an official's decision is 'constrained by policies not of that official's making' and where the official's decision is 'subject to review by the municipality's authorized policymakers' the official is not a *final* policymaker for purposes of *Monell* liability.") (quoting *City of St. Louis*, 485 U.S. at 127 (emphasis in the original)). [13]

___

[13] The City Defendants object to paragraphs 2, 5, 6, 7, and 8 of the Gallagher Opposition Declaration, as well as Exhibit C thereto.  City Def. Reply at 9–11.  Curran objects to "emails proffered by Plaintiff as hearsay and lacking foundation" without identifying the specific exhibits those emails are found.  Curran Opp'n at 7 n.2.  As the Court does not rely on these paragraphs and exhibits, the objections are DENIED AS MOOT.
Gallagher objects to statements in paragraph 18 of the Lew Declaration that the "FBI [was] 'not interested' in 200 Naples" and to "[a]ny statements implying the FBI 'cleared' 200 Naples." Dkt. No. 131 at ECF pp.7–8.  The Lew Declaration contains no such statements.  *See* Lew Decl.

**CONCLUSION**

For the foregoing reasons, the Court DENIES Gallagher's Motion for Summary Judgment and GRANTS the City Defendants' Motion for Summary judgment.

**IT IS SO ORDERED**.

Dated:  March 31, 2026

_____
SUSAN ILLSTON
United States District Judge

¶ 18 ("Attached as Exhibit O is a true and correct copy of Plaintiff's Second Amended Complaint, ECF. No. 28, filed on November 9, 2023 ('SAC').").  Accordingly, the Court DENIES AS MOOT Gallagher's objections.